**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AMBAC FINANCIAL GROUP, INC. SECURITIES LITIGATION | ) ) ) ) ) |

Lead Case No. 08-CV-411 (NRB)

ECF Case

**MEMORANDUM IN SUPPORT OF AMBAC AND INDIVIDUAL DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Peter C. Hein (PH-5279)
Warren R. Stern (WS-2957)
Joshua A. Naftalis (JN-8054)
C. Lee Wilson (CW-7925)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Defendants Ambac Financial Group, Inc., Robert J. Genader, Sean T. Leonard, John W. Uhlein, III, David W. Wallis, Michael A. Callen, Phillip B. Lassiter, Jill M. Considine, W. Grant Gregory, Thomas C. Theobald, Laura S. Unger, Henry Wallace, Philip N. Duff.*

Dated:  October 21, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... iv

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF THE CASE...................................................................................................3

    A.    Plaintiffs' claims. ............................................................................................3

    B.    Ambac provided financial guarantees on investment-grade tranches of MBS and super senior tranches of CDOs. .........................................................4

    C.    Ambac disclosed information on its guarantees of RMBS and CDOs. ...........6

    D.    Ambac disclosed the risks presented by its operations and guarantees of RMBS and CDOs. ......................................................................................7

    E.    Ambac disclosed negative developments resulting from mortgage and credit market downturns. .................................................................................8

ARGUMENT ...........................................................................................................................11

POINT I:    PLAINTIFFS' EXCHANGE ACT CLAIMS SHOULD BE DISMISSED (COUNTS I, II) ...............................................................11

    A.    The PSLRA and Rule 9(b) require plaintiffs to plead their claims with particularity. ........................................................................................11

    B.    The Complaint does not plead with particularity any material misstatement or omission of fact. .....................................................................12

          1.    The "fact" that mortgage originators had lowered their underwriting standards and that the housing  and mortgage markets were deteriorating did not render Ambac's statements regarding its guarantees of investment-grade tranches of RMBS and CDOs false when made. ...............................................................................12

          2.    The "fact" that Ambac changed its underwriting standards did not render any of Ambac's statements regarding the quality of its underwriting standards false when made. ..............................................13

          3.    Plaintiffs' "expert" analysis does not show that Ambac's CDO valuations and determinations of writedowns and losses were false when made. ...........................................................................15

          4.    Plaintiffs' alleged "facts" and "expert analysis" do not show that Ambac violated GAAP in any other respect. ..........................................19

**Page**

C.  The Complaint fails to plead scienter with the requisite particularity. ...........................21

    1.  The Complaint fails to allege with particularity that any defendant was aware of any "facts" that made his statements false or misleading. ...................................................................................21

    2.  The Complaint fails to allege any legally cognizable motive for defendants to carry out the alleged fraud. .................................26

    3.  The Complaint's reliance on vague statements from confidential witnesses not shown to have first-hand knowledge of the relevant facts further undermines an inference of scienter. ...................................................27

    4.  The more compelling inference is that Ambac, along with many other financial institutions, suffered from unexpected market downturns and updated its financial disclosures accordingly as developments unfolded. ...................................................28

D.  The Complaint does not sufficiently plead loss causation. ..............................................30

    1.  Plaintiffs have not identified any *corrective* disclosure...........................................30

    2.  Plaintiffs impermissibly fail to ascribe any proportion of their losses to alleged revelations of prior misstatements...........................................31

POINT II:  PLAINTIFFS' SECURITIES ACT CLAIMS SHOULD BE DISMISSED (COUNTS III-VII) ................................................................31

A.  The Securities Act claims arise out of the same alleged misstatements plaintiffs identified in their Exchange Act claims and thus "sound in fraud" and are governed by the heightened pleading requirements of Rule 9(b).  Likewise, under *Twombly*, the claims should be dismissed. .........................32

B.  The claims arising out of the February 2007 DISCS Offering should be dismissed (Counts III, IV, VII). .......................................................33

    1.  The Complaint fails to sufficiently allege any material misstatement or omission of fact, particularly in light of the explicit risk disclosures in the DISCS offering documents and other information in the marketplace. ...................................................33

    2.  In any event, the DISCS claims are barred by the one-year statute of limitations. ...................................................35

C.  The claims arising out of the March 2008 Offerings should be dismissed (Counts V, VI, VII). ...................................................38

    1.  The Complaint fails to sufficiently allege any material misstatement or omission of fact, particularly in light of the explicit risk disclosures in the offering documents and other information in the marketplace by March 2008...................................................38

**Page**

      2.    Plaintiffs lack standing under Sections 11 and 12(a)(2) with respect to the March 2008 equity units offering. ...................................................40

D.    All of the Securities Act claims must be dismissed because plaintiffs' allegations make it clear that plaintiffs' losses are not due to the revelation of alleged misstatements, but are instead due to other factors....................................................................................................................40

CONCLUSION.............................................................................................................................40

# TABLE OF AUTHORITIES

**Case**                                                                                                                **Page**

*60223 Trust* v. *Goldman Sachs*, 540 F. Supp. 2d 449 (S.D.N.Y. 2007)...........................................31

*In re Aegon N.V. Sec. Litig.*, 2004 U.S. Dist. LEXIS 1146 (S.D.N.Y. 2004)..................................28

*In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832 (N.D. Tex. 2005)...........................40

*In re Allied Capital Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 6962 (S.D.N.Y. 2003) .............16, 25

*In re American Express Co. Sec. Litig.*, 2008 WL 4501928 (S.D.N.Y. 2008) .............23, 24, 26, 27

*ATSI Comm'cns Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ......................................1 n.1

*In re AXIS Capital Holdings Ltd.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006)......................................32

*Bell Atlantic* v. *Twombly*, 127 S. Ct. 1955 (2007) ..................................................33, 34, 38, 39 n.23

*Benak* v. *Alliance Capital Mgmt. L.P.*, 435 F.3d 396 (3d Cir. 2006) ........................................35, 37

*Bond Opportunity Fund* v. *Unilab Corp.*, 2003 U.S. Dist. LEXIS 7838 (S.D.N.Y. 2003) .............16

*CALPERS* v. *Chubb*, 394 F.3d 126 (3rd Cir. 2004)........................................................................23

*In re Ceridian Corp. Sec. Litig.*, 2008 WL 4163782 (8th Cir. 2008) .............................................21

*Ciresi* v. *Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991) ..................................................................40

*In re CIT Group, Inc.*, 349 F. Supp. 2d 685 (S.D.N.Y. 2005) ..................................................15, 16

*City of Brockton Ret. Sys.* v. *Shaw Group Inc.*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008) .................21

*Davidoff* v. *Farina*, 2005 WL 2030501 (S.D.N.Y. 2005).............................................................25

*Delta Holdings, Inc.* v. *Nat'l Distillers & Chemical Corp.*, 945 F.2d 1226 (2d Cir. 1991) ...........15

*Denny* v. *Barber*, 576 F.2d 465 (2d Cir. 1978)........................................................................1, 28

*Dietrich* v. *Bauer*, 76 F. Supp. 2d 312 (S.D.N.Y. 1999) ..............................................................35

*In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993)................................34, 38, 39

*Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336 (2005).............................................................11, 30

*Elam* v. *Neidorff*, 2008 WL 4587310 (8th Cir. Oct. 16, 2008).....................................................25

*Fadem* v. *Ford Motor Co.*, 352 F. Supp. 2d 501 (S.D.N.Y. 2005).................................................27

**Page**

*In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2006) .................................................. 14

*First National Bank* v. *Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) ...................................... 31

*First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) ............................. 1 n.1

*Fisher* v. *Ross*, 1996 U.S. Dist. LEXIS 15091 (S.D.N.Y. 1996) ................................................... 13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004) ............. 19, 40

*Garber* v. *Legg Mason*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) ...................... 33, 34, 38, 39, 39 n.23

*In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003) ....................... 35, 40

*Halperin* v. *eBanker USA.Com*, 295 F.3d 352 (2d Cir. 2002) ............................................ 34, 38-39

*Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) ............................................ 13, 27

*Hinerfeld* v. *United Auto Group*, 1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. 1998) ) ..................... 15

*In re IMAX Sec. Litig.*, 2008 WL 4307981 (S.D.N.Y. Sept. 16, 2008) ...................... 25, 25 n.20, 26

*In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106 (C.D. Cal. 2003) ............................. 36

*Jackson Nat'l Life Ins. Co.* v. *Merrill Lynch & Co., Inc.*, 32 F.3d 697 (2d Cir. 1994) ............. 35, 37

*Johnson* v. *NYFIX, Inc.*, 399 F. Supp. 2d 105 (D. Conn. 2005) ................................................ 25, 32

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ....................... 14, 32, 33

*In re JP Morgan Chase Sec. Litig.*, 2007 U.S. Dist. LEXIS 22948 (S.D.N.Y. 2007) ......... 14, 25, 30

*Kalnit* v. *Eichler*, 264 F.3d 131 (2d Cir. 2001) ........................................................................... 26

*Kramer* v. *Time Warner*, 937 F.2d 767 (2d Cir. 1991) .............................................................. 1 n.1

*Lasker* v. *N.Y. State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) .............................................. 14

*Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161 (2nd Cir. 2005) ......................................... 11, 30, 31

*Menowitz* v. *Brown*, 991 F.2d 36 (2d Cir. 1993) ....................................................................... 35

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416
    (S.D.N.Y. 2003) ..................................................................................... 1 n.1, 36, 40 n.26

*In re Merrill Lynch & Co. Research Reports*, 272 F. Supp. 2d 243 (S.D.N.Y 2003) ................... 40

*Merrill Lynch & Co. Research Reports*, 2008 U.S. Dist. LEXIS 37993 (S.D.N.Y. 2008) ............. 31

**Page**

*Miller* v. *Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007)........................................................32

*Mizzaro* v. *Home Depot, Inc.*, 2008 WL 4498940 (11th Cir. 2008)................................................21

*In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000) ........................................34

*In re Novastar Fin. Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) ..........................................................................................................................................28

*Oran* v. *Stafford*, 226 F.3d 275 (3d Cir. 2000) ...............................................................................19

*Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008)..............33

*In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527 (S.D.N.Y. 2007)......................................... 30-31

*Rombach* v. *Chang*, 355 F.3d 164 (2d Cir. 2004).....................................14, 29, 30, 31 n.21, 32, 33

*Salomon Analyst Level 3*, 373 F. Supp. 2d 248 (S.D.N.Y. 2005).....................................................15

*In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579 (S.D.N.Y. 2006) ..........40

*Shah* v. *Meeker*, 453 F.3d 244 (2d Cir. 2006)................................................................................35

*Shields* v. *Citytrust Bancorp*, 25 F.3d 1124 (2d Cir. 1994) ..................................................1, 26, 28

*In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535 (N.D. Cal. 2007) ...........................27

*In re Sotheby's Holdings Sec. Litig.*, 2000 WL 1234601 (S.D.N.Y. 2000)......................................26

*Teachers' Ret. Sys.* v. *Hunter*, 477 F.3d 162 (4th Cir. 2007) ..........................................................30

*Teamsters Local 445* v. *Dynex Capital*, 531 F.3d 190 (2d Cir. 2008)......................1, 21, 22, 25, 28

*Tellabs Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007).........................1 n.1, 11, 21, 26

*In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254 (D.N.J. Aug. 26, 2005) .....................................30

*Thor Power Tool Co. v. Comm'r.*, 439 U.S. 522 (1979) .................................................................15

*Tripp* v. *IndyMac Fin. Inc.*, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007)....................................29

*Yahoo Inc.* v. *Brodsky*, 2008 WL 4531815 (N.D. Cal. 2008)..........................................................30

<u>Statutes</u>

15 U.S.C. § 77m............................................................................................................................35

**Page**

15 U.S.C. § 78u-4(b)(1) ................................................................................11

15 U.S.C. § 78u-4(b)(2) ...........................................................................11, 21

15 U.S.C. § 78u-5(c)(1) ................................................................................14

15 U.S.C. § 77z-2 .........................................................................................34

FAS 133 ..........................................................................................18, 18 n.17

Fed. R. Civ. P. 9(b) ............................................................... 11, 23, 32-33, 38

## PRELIMINARY STATEMENT

Plaintiffs seek recovery of damages allegedly resulting from declines in the price of Ambac securities that followed Ambac's announcements of financial results on October 24, 2007, January 16, 2008, and April 23, 2008.  Compl. ¶¶ 310-23.  Those announcements reported that Ambac, a major bond insurer, had increased loss reserves and had downgraded or taken mark-to-market writedowns on its guarantees of CDOs.  *Id.* ¶¶ 310, 315, 320.  Ambac suffered these adversities as a result of what the plaintiffs call "[t]he current crisis in the U.S. residential mortgage market. . . ."  *Id.* ¶ 55.  This "crisis" — which stems from *inter alia* an extraordinary drop in U.S. housing prices and widespread defaults by mortgagors (*see, e.g.*, Ex. 2 at 2)[1] — has engulfed bond insurers and many other financial institutions around the world, led to the collapse of several major financial institutions, led to global stock market crashes of a magnitude not seen since the Great Depression, and led to massive government rescue efforts on an international scale.

The fact that financial guarantors (including Ambac), whose businesses are based upon taking on credit risk in exchange for premium payments, would face losses and writedowns in the wake of this extraordinary market-wide downturn hardly suggests "fraud."  Rather, this is a quintessential example of a "fraud-by-hindsight" complaint that Courts in this Circuit have repeatedly rejected.  The seminal Second Circuit decisions in *Denny* v. *Barber*, 576 F.2d 465 (2d Cir. 1978), and *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994),  dismissed complaints of this type filed following (respectively) the recession in the mid-1970s and the savings and loan crisis in the late 1980s.  And most recently, the Second Circuit, in *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008), directed the dismissal of a suit

---

[1] On a motion to dismiss, "courts must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc.* v. *Makor Issues & Rights Ltd.*, 127 S. Ct. 2499, 2509 (2007); *see also ATSI Commc'ns Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (court may consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").  The court may also take judicial notice of market phenomena. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (judicial notice of "the internet bubble and its subsequent crash"); *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994) (real estate market downturn); *Kramer* v. *Time Warner*, 937 F.2d 767, 773 (2d Cir. 1991) (junk bond market collapse).  Pertinent excerpts of such documents are attached as exhibits to the accompanying Declaration of C. Lee Wilson, dated October 21, 2008 (cited herein as "Ex. __").

against an issuer of asset-backed bonds that suffered as defaults rose in the 2000-2001 recession.

Even though Ambac's losses resulted from a calamity affecting the entire financial sector, plaintiffs seek to maintain securities claims by asserting that Ambac made numerous "false and misleading" statements, starting with its announcement of third quarter results on October 25, 2006. Compl. ¶ 147. Despite the length of the Complaint, plaintiffs do not meet the legal standards for pleading a violation of the federal securities laws. Among the deficiencies:

- **Failure to allege material misrepresentations of fact**: Ambac did not guarantee mortgages. Ambac guaranteed investment-grade tranches of MBS and senior tranches of CDOs that would only face losses after subordinate tranches had suffered. Plaintiffs' allegations of lowered underwriting standards and negative mortgage market trends do not demonstrate that Ambac's statements about its underwriting of the tranches it guaranteed or its valuations, and any resultant determinations of losses and writedowns, were false when made. Moreover, Ambac disclosed its valuation methods, and its auditors were aware of them. Plaintiffs' index-based valuation model has fundamental flaws and does not show that Ambac's method violated GAAP. These failures are fatal to all claims.

- **Failure to allege scienter with particularity**: The Complaint fails to allege any information communicated to senior executives that creates a strong inference that any defendant made a public statement with an intent to deceive, and fails to allege that any defendant had a plausible motive to deceive the public. The more compelling inference in the wake of the market-wide downturn is that Ambac, like its competitors and numerous other financial institutions, failed to predict the unprecedented impact of adverse market trends. These failures are fatal to plaintiffs' Exchange Act claims.

- **No loss causation**: The Complaint fails to allege that plaintiffs' losses were caused by a corrective disclosure of improperly concealed information as opposed to Ambac's timely disclosures of the impact of the credit and mortgage market downturns on Ambac's financial condition. These failures are fatal to all claims.

On top of this, certain of the Securities Act claims are time-barred because they were filed

more than one year after plaintiffs were on inquiry notice of what they claim to have been the "true" facts, and are brought on behalf of persons who did not purchase in the particular offering. For these reasons — and others described below — plaintiffs' claims must be dismissed.

## STATEMENT OF THE CASE

**A.    Plaintiffs' claims.**

The Complaint was filed on behalf of (1) all purchasers of Ambac securities from October 25, 2006 through April 23, 2008 ("the Exchange Act Class"); (2) all purchasers of Ambac's 2007 Directly-Issued Subordinated Capital Securities ("DISCS") pursuant to a post-effective registration statement amendment and prospectus supplement dated February 6 and 7, 2007, respectively; (3) all purchasers of Ambac's equity units pursuant to a post-effective registration statement amendment and prospectus supplement dated January 16 and March 6, 2008 respectively; and (4) all purchasers of common stock pursuant to the March 6, 2008 amendment and prospectus supplement.  Compl. ¶¶ 511, 355-356, 358-359, 362.

Ambac sold financial guarantee insurance in three markets:  U.S. public finance, international, and U.S. structured finance (which included residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs")).  Plaintiffs allege that between 2002 and 2006, Ambac guaranteed growing amounts of mortgage-backed securities — more than doubling its net income in the process — while failing to disclose the risks of this business in light of certain "facts" known to defendants.  Compl. ¶¶ 6, 8.

The "facts" that plaintiffs allege defendants knew (Compl. ¶ 146) — and that, by their omission, allegedly rendered numerous statements made by defendants during the class period false and misleading — can be distilled into three categories:

- That mortgage originators lowered their standards and that by late 2006 the mortgage and housing markets were declining.  Compl. ¶¶ 55-59, 76-77, 106-110, 146.

- That Ambac had lowered its own underwriting standards for guarantees of mortgage-backed instruments.  Compl. ¶¶ 72-96, 146.

- That the mortgage collateral underlying those mortgage-backed instruments that Ambac guaranteed suffered the same level of delinquencies as the mortgage collateral underlying two allegedly relevant market indices (the ABX and TABX indices) and that, therefore, under GAAP's mark-to-market rules, Ambac should have valued its guarantees of CDOs based on price changes in those indices. *E.g.*, Compl. ¶¶ 111-140, 146.

Plaintiffs claim that Ambac, Robert Genader (Ambac's Chairman and CEO for much of the class period), Sean Leonard (Ambac's CFO), John Uhlein (Ambac's head of structured finance during the class period) and David Wallis (Ambac's head of portfolio and risk management) violated (as applicable) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 (Counts I and II). Plaintiffs further allege that Genader and Leonard, as well as certain of Ambac's current and former directors and Ambac's underwriters and its auditor, KPMG, violated (as applicable) Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 in connection with public offerings of Ambac securities in February 2007 and March 2008 (Counts III-VII).

**B.    Ambac provided financial guarantees on investment-grade tranches of MBS and super senior tranches of CDOs.**

Ambac's business was insuring against the risk of default on various financial instruments, for which it received premium payments from insured parties. Compl. ¶ 30. Ambac assumed the risk of default by the issuer of these instruments, not liquidity risk or the risk of price declines on the underlying instruments. Ex. 29, 2007 Form 10-K, at 53-54. Its goal was to guarantee only those obligations "which in the opinion" of Ambac's underwriting officers "are of investment grade quality with a remote risk of loss." Compl. ¶ 30 (quoting Ambac's 2006 Form 10-K); Ex. 30 at 9-10. The 10-K goes on to caution: "However, losses may occur" — a cautionary disclosure omitted from the Complaint. Ex. 30 at 10.

Ambac and other bond insurers expanded their business to guarantee structured finance obligations, including RMBS and CDOs. Compl. ¶ 70. A residential mortgage-backed security (or RMBS) typically consists of a pool of individual mortgages that serves as the collateral for the RMBS. Compl. ¶ 45. Initially, to pay for the mortgages in its collateral pool, the arranger of the

4

RMBS sells bonds to investors. The income from the underlying pool of mortgages is used to pay off the bonds. *Id.* Bonds insured by Ambac benefit from a "tranched" capital structure, and include one or more tranches of debt and/or equity which are subordinated to the Ambac-insured tranche. Each tranche bears a different risk profile and credit rating based on the priority in which each tranche is paid in the case of defaults on the underlying loans. Senior tranches are paid first and are typically highly rated, *e.g.*, A to AAA. Mezzanine tranches are paid after any senior tranches and are rated lower, but still investment grade, *e.g.*, BBB. In the event of defaults, lower tranches and the equity layer are paid last and are rated below investment grade. Compl. ¶¶ 45-47.

A collateralized debt obligation (or CDO) is similar to a RMBS in that the bonds issued are divided into tranches, with the senior tranches facing less risk than the more subordinated tranches. Compl. ¶¶ 48-51. While the collateral underlying a RMBS is a pool of mortgages, the collateral underlying a CDO can be RMBS tranches, other asset-backed security tranches or even tranches from other CDOs. Compl. ¶ 48. As plaintiffs recognize, the seniority of the collateral underlying a CDO is important — high-grade CDOs are comprised of the A, AA and AAA tranches of the underlying collateral while mezzanine CDOs are comprised of BBB or BBB- tranches of the underlying collateral. Compl. ¶ 51. However, even if the assets in the CDO's collateral pool are rated BBB or BBB-, the senior tranches can receive A, AA or AAA ratings through the use of subordination. Ex. 3 at 114, 117-18.

**Ambac did not guarantee mortgages. Nor did Ambac guarantee entire RMBS or CDOs.** Instead, Ambac guaranteed only investment-grade tranches of RMBS and senior tranches of CDOs. *Cf.* Compl. ¶¶ 45-47; *see* Ex. 54 at 4; Ex. 51 at 4. Defaults and delinquencies on the underlying mortgages would first cause losses for the subordinated tranches Ambac had not guaranteed. Compl. ¶ 47. Only once those tranches were rendered worthless would the senior tranches suffer loss. *Id.*

The super-senior CDO tranches that Ambac guaranteed not only had AAA-ratings, but in

many cases were senior to other tranches also rated AAA.  Oehrig Decl. 7d at 6;[2] Ex. 40, 2Q 2006

Form 10-Q, at 31-32.  Some of the CDOs Ambac guaranteed had as much as 48%-50% subordina-

tion (Oehrig Decl. 7d at 6), meaning that as much as half of the underlying collateral could default

before Ambac faced losses on its guarantee.  Moreover, subordination (also known as first loss) is

only one of the deal protections available to mitigate the risk Ambac took on when it guaranteed

RMBS and CDOs.  Overcollateralization and excess spread could further mitigate the chance that

a senior tranche will suffer any losses even if a some underlying mortgages face defaults or delin-

quencies.  *See* "Anatomy of a Typical RMBS," Compl. ¶ 45 at p. 20.[3]

### C.    Ambac disclosed information on its guarantees of RMBS and CDOs.

Ambac publicly disclosed information on its structured finance exposures, including its

guarantees of RMBS and CDOs.[4]  Ambac disclosed that pooled debt obligations (including

CDOs) had grown from 6% of Ambac's new structured finance business in 2004 to 33% in 2006.

Ex. 30, 2006 Form 10-K, at 46; *see also* Ex. 31, 2005 Form 10-K, at 45.  Ambac also disclosed its

total exposure (i.e., "Net Par Amount Outstanding") to various types of collateral — at year-end

2005 this included $49 billion in guarantees of MBS and $22 billion of pooled debt obligations

(CDOs) (Ex. 31 at 14).  By year-end 2006, the numbers were $46 billion for guarantees of MBS

and $40 billion for CDOs (Ex. 30 at 14).  Ambac long disclosed that the underlying collateral for

some of its guarantees included subprime mortgages (*e.g.*, Ex. 54, 4Q 2005 Earnings Call, at 4).

---

[2] Various paragraphs of the Complaint refer to information made available on Ambac's website.  *See, e.g.*, ¶ 116 (re-
ferring to "Open Source Model" containing details on all of Ambac's RMBS and CDO exposures — data posted on
Ambac's website, *see* Oehrig Exhibits); ¶ 66 (referring to Oehrig Ex. 10b, "CDO Overview"), ¶ 221 (referring to re-
sponse to Morgan Stanley report, which was made available via Ambac's website, *see* Ex. 43, Form 8-K (Nov. 6,
2007)).  Also, plaintiffs cite quarterly earnings calls (*e.g.*, 3Q 2007 Earnings Call, Compl. ¶ 286) that refer to the
availability of detailed information regarding Ambac's RMBS, CDO and subprime exposures available on Ambac's
website.  *See, e.g.*, Ex. 47, at 3.  Documents posted on Ambac's public website between January 2006 and the end of
the class period relating to Ambac's RMBS, CDO and subprime exposures are annexed as exhibits to the Declaration
of Susan Oehrig dated October 21, 2008 (cited herein as "Oehrig Ex. ___").

[3] *See generally*, *The Handbook of Mortgage Backed Securities*, Ex. 3 at 113-22.

[4] *See, e.g.*, Ex. 34, Ambac's 2002 Form 10-K, at 5-6, 8-9, 11-12; Ex. 33, Ambac's 2003 Form 10-K, at 5-6, 8-10, 11-
12, 17; Ex. 32, Ambac's 2004 Form 10-K, at 5-6, 8-9, 11-2, 15-16; Ex. 31, Ambac's 2005 Form 10-K, at 6-8, 11-12,
14, 18, 42-46, 49, 52; Ex. 30, Ambac's 2006 Form 10-K, at 6-7, 11-13, 14, 18, 44-46, 48-51; Ex. 29, Ambac's 2007
Form 10-K, at 8-9, 13-16, 21, 36, 39, 48-54.

And in early 2007 Ambac disclosed that it was seeing "robust" production of CDOs "where the underlying collateral is mortgage-type collateral" (Ex. 49, 1Q 2007 Earnings Call, at 5).[5]

Ambac also disclosed detailed information on its public website, including the name, vintage, rating, and amount of all RMBS exposures, as well as additional information on pooled debt obligation (including CDO) exposures (*e.g.*, Oehrig Exs. 5a, 5b). In a document titled "Exposure to Subprime RMBS Bonds" posted to its website in January of 2007 (and then updated quarterly), Ambac disclosed that 31.4% of its CDO exposure was to CDOs with greater than 50% RMBS. *E.g.*, Oehrig Ex. 5c.

## D.  Ambac disclosed the risks presented by its operations and guarantees of RMBS and CDOs.

Both prior to and throughout the class period, Ambac extensively detailed the risks inherent in its operations. In March 2006, Ambac's 2005 Form 10-K, for example, disclosed that:

- Ambac's "triple A financial strength ratings" are subject to periodic review and may be downgraded as a result of "changes in the views of the ratings agencies, adverse developments in our financial condition or results of operation due to underwriting or investment losses." Any such downgrade "would have a material adverse effect" on Ambac's "competitive position" and "future business opportunities." Ex. 31 at 28.

- Ambac was "subject to credit risk through [its] businesses" and that those risks "could cause increased losses and loss reserves and mark-to-market losses with respect to credit derivatives in [its] financial guarantee business." *Id.* at 29.

- "[c]hanges in general economic conditions can impact [Ambac's] business. Recessions; increases in corporate, municipal and/or consumer bankruptcies; changes in interest rate levels . . . could adversely affect the performance" of Ambac's guarantees. *Id.* at 29.

- Ambac's "risk management policies and practices may not anticipate unforeseen risks and/or the magnitude of potential for loss as the result of foreseen risks" and that its underwriting practices "are based in part on models reflecting historical factors, *e.g.*, default rates and severity of loss experience [and that] [t]hese policies and practices may not insulate [Ambac] from risks that are unforeseen and which have unanticipated loss severity." *Id.* at 30-31.

- Ambac's "net income and earnings could become more volatile due to the application of fair value accounting . . . to the portion of our credit enhancement business which is executed in credit derivative form [like CDOs]." *Id.* at 31.

---

[5] As the downturns developed, Ambac also disclosed in its SEC filings its direct RMBS exposure by vintage (*e.g.*, Ex. 37, 2Q 2007 Form 10-Q, at 30-31), the types of loans underlying its RMBS exposure (*e.g.*, Ex. 36, 3Q 2007 Form 10-Q, at 33; Ex. 29, 2007 Form 10-K, at 56), and its RMBS exposure in CDOs (*e.g.*, Ex. 37, 2Q 2007 Form 10-Q, at 31-32). Moreover, all of this information (and more) was publicly available on Ambac's website during the class period. *See* Oehrig Decl.

- Ambac's business is cyclical and that while "[a] strong economic environment . . . is beneficial to our financial guarantee portfolio . . . [that] such conditions, if in place for an extended period of time, will reduce credit spreads and result in lower pricing.  Conversely, in a deteriorating credit environment, credit spreads widen and pricing for our product improves," but that "if the weakening environment is prolonged, the stresses on our portfolio could result in claims payments in excess of normal or historical expectations."  *Id.* at 36.[6]

Furthermore, while Ambac typically guaranteed investment-grade tranches of RMBS and super-senior tranches of CDOs of MBS, it nonetheless repeatedly disclosed to the market the risks attendant to its guarantees of these instruments — including the risks that have materialized with the recent severe market downturns.  Ambac, for example, warned:

- that "severity estimates could materially change in the mortgage-backed and home equity securitization sector.  Severity estimates in this sector are impacted by residential real estate values.  Increases in mortgage interest rates, increased unemployment or personal bankruptcies could have an adverse impact on residential real estate values and mortgage-backed and home-equity loss severity estimates."  Ex. 41, 1Q 2006 Form 10-Q, at 25.

- that Ambac guaranteed "collateralized debt obligations ('CDOs') and mortgage-backed and home equity securitizations," for which there was a "reasonabl[e] possib[ility] that a material change in loss severity estimates could occur over time."  Ex. 40, 2Q 2006 Form 10-Q, at 27.

- that "[based on] experience to date . . . mortgage-backed and home equity ultimate severities have been less than or equal to our current severity assumption.  However, our past experience has been observed during a period of rising real estate values for much for the United States."  Ex. 30, 2006 Form 10-K, at 40.

## E.    Ambac disclosed negative developments resulting from mortgage and credit market downturns.

Although by early 2007 there had been some adverse developments in the mortgage markets, many observers believed that the problems were unlikely to have broad impact.  For example, in April 2007, the International Monetary Fund ("IMF") observed that "deterioration in the credit quality of subprime mortgages" was "not likely to pose a serious systemic threat" to investment-grade tranches and that "[s]tress tests conducted by investment banks show that, even under scenarios of nationwide house price declines that are historically unprecedented, most investors

---

[6] Similar risk disclosures were made in Ambac's 2006 Form 10-K.  *See, e.g.*, Ex. 30 at 28-31, 37.  As the market downturns worsened, Ambac updated its risk disclosures to take market developments into account.  Plaintiffs themselves note one such update, though they inaccurately describe it as an admission that Ambac's previous risk disclosures were inaccurate, rather than as an example of Ambac updating its statements in light of market developments.  Compl. ¶ 171 (citing Form 8-K, Ex. 45, that updates Ambac's risk disclosures concerning risks related to Ambac's RMBS and CDO exposures).

with exposure to subprime mortgages through securitized structures will not face losses."[7]

These initial problems did have a modest adverse impact on Ambac's valuations of some of its guarantees — which Ambac timely disclosed.  In Ambac's Form 10-Q for the first quarter of 2007, it disclosed a $5.1 million mark-to-market loss on its credit derivatives, "driven by wider spreads on certain credit derivative transactions.  Most of the transactions that experienced spread widening had sub prime mortgage exposure in the collateral pool."  Ex. 38, at 32.  And on July 25, 2007, Ambac reported a 27% earnings decrease from 2Q 2006, "primarily due to unrealized mark-to-market losses amounting to ($56.9) million . . . related to credit derivative exposures" resulting from "unfavorable market pricing of collateralized debt obligations with significant amounts of sub-prime residential mortgage collateral."  Ex. 44.

Fifteen days later — as Alan Greenspan noted — "[o]n August 9, 2007 and the days immediately following, financial markets in much of the world seized up.  Virtually overnight the seemingly insatiable desire for financial risk came to an abrupt halt as the price of risk unexpectedly surged."[8]  Even so, the full extent and impact of the problems remained unknown.  As Floyd Norris, a prominent economics journalist, noted, "there is a limit to finger-pointing.  Most of the critics — myself included — did not anticipate the severity of the credit collapse, and we should not act as if the executives and regulators who failed to prevent it were blind or stupid."  Ex. 6.  Indeed, as recently as July 2008, Eric Dinallo, Superintendent of the New York State Insurance Department, suggested problems for insurance companies (including financial guarantors) could, to some extent, be the result of "false rumours."  Ex. 7.

From the third quarter of 2007 on, Ambac reported increasingly greater losses, including mark-to-market losses and loss reserves on mortgage-related guarantees.  *See* Compl. ¶¶ 206 (3Q 2007), 245 (4Q 2007), 320 (1Q 2008).  A comparison of Ambac's announcements with declines in

---

[7] IMF Global Financial Stability Report (April 2007), Ex. 4 at 6-8 ("[One] stress test illustrate[s] . . . that tranches rated A and higher would not face losses unless house prices fell 4 percent per year for five years. . . .  Even the relatively risky BBB tranches only begin to face losses once housing prices fall by 4 percent per year.").

[8] Alan Greenspan, *The Roots of the Mortgage Crisis*, Wall St. J., Dec. 12, 2007, Ex. 5 at A19; *see also* Ex. 8.

the Case-Shiller home price indices (data plaintiffs themselves reference, Compl. ¶ 106) illustrates Ambac's timely response to the evolving downturn.  The Case-Shiller index shows home prices declining moderately in the first three quarters of 2007 but declining more rapidly in late 2007 and early 2008.  *See* Ex. A (attached hereto).[9]  Ambac's announcements of writedowns and losses followed a similar pattern over that time period.  *Id.*

     Ambac, of course, was not alone in announcing losses and writedowns during this period.  Its competitors MBIA, FGIC and Security Capital Assurance ("SCA") all announced major losses in the third and fourth quarter 2007 and first quarter 2008.  Exs. 61, 64, 67.  And while Ambac has had its credit rating downgraded to Aa3 by Moody's, Moody's has downgraded the credit ratings of all these competitors even further.  Exs. 63 (MBIA to A2), 68 (FGIC to B1), 66 (SCA to B2), 69 (CIFG (another competitor) to Ba2).  MBIA's stock price fell from $71.80 in May 2007 to as low as $3.62 in 2008 while SCA's fell from $34.58 in May 2007 to as low as $.21.  Exs. 62, 65.

     And the turmoil in the credit and mortgage markets also resulted in widespread writedowns and losses across the financial industry.  Lehman Brothers and Washington Mutual have declared bankruptcy.  Exs. 20, 21.  Fannie Mae, Freddie Mac and AIG have all been "rescued" by the government.  Exs. 22, 23.  Bear Stearns, Merrill Lynch and Wachovia were purchased in 2008 for a fraction of what they had been worth a year earlier.  Exs. 24, 25, 26.  Indeed, the crisis has resulted in unprecedented government intervention.  On October 3, 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 authorizing the Treasury Department to spend up to $700 billion to purchase distressed assets, particularly mortgage-backed securities.  Pub. L. 110-343.  More recently, government officials reportedly mandated that the heads of nine major banks, ranging from J.P. Morgan Chase to Goldman Sachs, accept infusions of government capital.  Ex. 19.  Alan Greenspan has observed that "[t]he current financial crisis in the United States is likely to be judged in retrospect as the most wrenching since the end of the second world war."  Ex. 8.  And

---

[9] The chart plaintiffs use to depict the same Case-Shiller data could be misread to suggest that the decline in home prices began earlier than it did; in fact, housing prices only begin to decline when the curves on plaintiffs' chart fall below 0%.  Prior to that time, house prices were still increasing, albeit the rate of increase had slowed.

the problems are not confined to the United States.  The head of the IMF recently stated that the downturns "have pushed the global financial system to the brink of systemic meltdown" (Ex. 10) and countries worldwide have rushed to shore up faltering financial systems (Ex. 9).

## ARGUMENT

**POINT I:    PLAINTIFFS' EXCHANGE ACT CLAIMS SHOULD BE DISMISSED (COUNTS I, II)**

To state a claim under Rule 10b-5, plaintiffs must plead with particularity:  (1) a material misstatement or omission, (2) made with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiffs relied, (5) economic loss and (6) loss causation, i.e., a causal connection between the misrepresentation and the loss.  *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005).  Here,  plaintiffs fail to adequately plead any material misstatements, scienter and loss causation, and thus their Complaint must be dismissed for multiple, alternative reasons.

**A.    The PSLRA and Rule 9(b) require plaintiffs to plead their claims with particularity.**

"As a check against abusive [securities] litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA)."  *Tellabs Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007).  Under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Moreover, to plead a securities fraud claim, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," that is, scienter.  15 U.S.C. § 78u-4(b)(2); *see also Tellabs*, 127 S. Ct. at 2504 (describing the PSLRA's "[e]xacting pleading requirements" that "require[] plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter").  Likewise, courts "assiduously" apply Rule 9(b)'s heightened pleading requirements to securities fraud actions, requiring plaintiffs to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005).

11

**B.      The Complaint does not plead with particularity any material misstatement or omission of fact.**

Plaintiffs assert, in essence, that three allegedly undisclosed "facts" render all of the many pleaded statements false:  (1) that mortgage originators had lowered their standards for underwriting mortgages and the housing and mortgage markets were deteriorating (Compl. ¶¶ 55-59, 76-77, 106-110, 146); (2) that Ambac had changed its underwriting standards to allow it to guarantee riskier mortgage-related exposures (*id*. ¶¶ 72-96, 146); and (3) that the mortgage collateral underlying Ambac's guarantees of RMBS and CDOs of MBS was deteriorating "in near lockstep" with the mortgage collateral underlying the ABX and TABX indices (and thus, Ambac's valuations were misstated and not in compliance with GAAP) (Compl. ¶¶ 111-140, 146).  Even if these facts are taken as true, however, plaintiffs have failed to plead with particularity actionable material misrepresentations.

**1.      The "fact" that mortgage originators had lowered their underwriting standards and that the housing  and mortgage markets were deteriorating did not render Ambac's statements regarding its guarantees of investment-grade tranches of RMBS and CDOs false when made.**

Plaintiffs allege that the "facts" that mortgage originators had been lowering standards and engaging in riskier forms of lending, and that by late 2006 the housing and mortgage markets were in decline, dramatically increased Ambac's risk of incurring losses and rendered Ambac's public statements materially misleading due to the failure to disclose the alleged impact of these trends on Ambac's financial condition.  Compl. ¶¶ 55-59, 76-77, 106-110, 128-133, 146.

However, the condition of the housing and mortgage markets was a matter of public knowledge and Ambac had warned as of the first quarter of 2006 — well before the class period — that "severity estimates could materially change in the mortgage-backed and home equity securitization sector."[10]  Ex. 41 at 25; *see also* Compl. ¶¶ 176 (quoting Genader's statement in 2006 annual report that "[t]here is little doubt that the U.S. mortgage market is under stress."); 188.

---

[10] Ambac reiterated this risk in its 2006 Form 10-K, filed in March of 2007, Ex. 30 at 40.  In its 2007 Form 10-K, following the market downturns, Ambac disclosed that the risk it had warned of had materialized and severity estimates for MBS had changed and could continue to change.  Ex. 29 at 50-52.

Thus, no investor in Ambac securities could have been misled on that score. *See Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) (dismissing claim that relied on allegation that management knew but concealed already public information).

Moreover, Ambac's expression of confidence in its business was not undermined by these developments. Ambac was not in the business of guaranteeing mortgages, but instead typically guaranteed investment-grade tranches of MBS and super-senior tranches of CDOs of MBS, with a variety of deal protections ranging from subordination/first loss to overcollateralization and excess spread. Compl. ¶¶ 45, 51. Thus, increased delinquency rates in the mortgage collateral ultimately underlying Ambac's exposures did not necessarily indicate that Ambac would face any losses on the senior tranches that Ambac guaranteed — up to a certain level, defaults would be absorbed by the subordinated tranches. *Id*. ¶ 47. Plaintiffs allege no specific facts that show that mortgage delinquency rates for the mortgages underlying the specific MBS and CDOs that Ambac guaranteed were of such magnitude, at particular points in time, that Ambac was required to have taken write-downs and losses beyond what it disclosed in its public filings (which showed write-downs and losses increasing quarter-by-quarter from the first quarter of 2007, *see supra* pp. 9-10).[11] Defendants' earlier statements are "made misleading [if at all] only with the benefit of hindsight." *Fisher* v. *Ross*, 1996 U.S. Dist. LEXIS 15091, at *11 (S.D.N.Y. 1996).

> ### 2.  The "fact" that Ambac changed its underwriting standards did not render any of Ambac's statements regarding the quality of its underwriting standards false when made.

Plaintiffs allege that Ambac secretly altered its underwriting policies to allow Ambac to accept riskier guarantees. Compl. ¶¶ 76-92. Plaintiffs allege that the "fact" of these alleged changes rendered Ambac's statements — such as "we remain steadfast in judiciously allocating our capital," "[we are] very selective in [the mortgage] sector" and "we're also very cautious about mezzanine-type securities" (*id*. ¶¶ 147-48) and "we do not expect to pay any claims" (*id*. ¶ 211) —

---

[11] Further, plaintiffs only address underwriting standards and delinquency rates for second-lien (HELOC and CES) mortgages and Ambac's related guarantees. Compl. ¶¶ 80-86, 129-133. Plaintiffs make no specific allegations about Ambac's guarantees of RMBS with first-lien mortgages (*e.g.*, prime, subprime, alt-A) as collateral or related defaults.

false or misleading.

The statements plaintiffs challenge are not actionable. They are "generalizations regarding integrity, fiscal discipline and risk management" that courts have recognized are inactionable "puffery" because investors do not rely on such broad, general statements. *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005) (citing *Lasker* v. *N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996)); *see also In re JP Morgan Chase Sec. Litig.*, 2007 U.S. Dist. LEXIS 22948 at *20, *35-36 (S.D.N.Y. 2007) (statement that processes are in place to "ensure credit risk instruments are accurately assessed, properly approved and continuously monitored" was not actionable). Likewise, Ambac's expressions of "corporate optimism" regarding the future performance of its guarantees "do not give rise to securities violations" — "companies must be permitted to operate with a hopeful outlook." *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Indeed, the PSLRA creates a "safe harbor" for forward-looking statements that applies to many of the statements of which plaintiffs complain because they are identified as forward-looking statements (*e.g.*, "we do not expect," Compl. ¶ 211) and are accompanied by meaningful cautionary language (*e.g.*, Ex. 70, 10/24/07 Form 8-K, at 7; Ex. 47, 10/24/07 3Q Earnings Call, at 1 (incorporating 8-K's cautionary statements)) or plaintiffs have not pled with particularity that they were made with actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1).

Furthermore, plaintiffs fail to allege with particularity facts showing that any alleged alteration changed Ambac's underwriting standards to such a degree as to render them imprudent. For example, plaintiffs allege that Ambac lowered its overcollateralization requirements for its guarantees of RMBS backed by home equity lines of credit loans ("HELOC RMBS"). Compl. ¶¶ 80-85. But plaintiffs do not allege this change resulted in Ambac guaranteeing instruments that were not of investment grade quality or in any specific respect materially increased the risks of Ambac's business. That Ambac's allegedly altered underwriting standards turned out to be insufficient to prevent losses in the face of unprecedented, extreme market downturns does not imply that Ambac's assertions that its standards were "cautious" were false when made. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008) (that company's risk management

14

program failed to root out alleged insider trading did not render statements regarding risk management false when made).

### 3.    Plaintiffs' "expert" analysis does not show that Ambac's CDO valuations and determinations of writedowns and losses were false when made.

Plaintiffs' claim that Ambac violated GAAP by failing to properly mark its CDO guarantees to market is predicated on (unidentified) "expert's" analysis that shows that the delinquency rates on the mortgage collateral underlying Ambac's CDOs were similar to the delinquency rates for the mortgage collateral underlying two asset-backed securities indices — the ABX[12] and TABX[13] indices.  *E.g.*, Compl. ¶¶ 113, 122, 125-133, 279, 286-92.  Plaintiffs allege that since the collateral underlying Ambac's CDOs performed similarly to the collateral underlying the TABX indices, Ambac was required by GAAP to mark its guarantees of CDOs to the TABX index, but did not.  *Id.*  ¶¶ 111, 134-139.  These allegations are not sufficient to meet the PSLRA's high standard for pleading misstatements.

GAAP, "far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions . . . tolerate[s] a range of 'reasonable' treatments, leaving the choice among the alternatives to management."  *Thor Power Tool Co.* v. *Comm'r.*, 439 U.S. 522, 544 (1979).  And the courts have recognized that valuation and setting of reserves are matters of judgment and opinion.  *See, e.g., Delta Holdings, Inc.* v. *Nat'l Distillers & Chemical Corp.*, 945 F.2d 1226, 1229-31 (2d Cir. 1991); *In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2005); *Hinerfeld* v. *United Auto Group*, 1998 WL 397852, at *7 (S.D.N.Y. 1998).  Model-driven valuation in particular may be characterized as a matter of opinion, not fact.  *See In re Salomon Analyst*

---

[12] The ABX index consists of a pool of 20 RMBS deals issued in a particular half year that consist solely of subprime mortgages as collateral.  The general index is subdivided into five separate subindices, each corresponding to a pool consisting only of single tranches of the 20 underlying RMBS.  For example, the ABX.HE.BBB- 06-01 subindex consists of the BBB- tranches of each of the underlying RMBS, which were issued in the second half of 2005 (the half of the year prior the first half "01" of 2006 "06").  Laurie S. Goodman et al., *Subprime Mortgage Credit Derivatives* (2008), Ex. 11 at 145-46.

[13] The TABX index essentially takes the BBB and BBB- subindices of the ABX index and provides a variety of levels of subordination in an attempt to mimic the structure of a CDO.  For example, the TABX.HE.BBB- 07-1 06-2 40-100 subindex consists of the BBB- tranches of the 40 RMBS underlying the ABX 07-1 and ABX 06-2 indices with a 40% level of subordination.  Laura S. Goodman et al., *Subprime Mortgage Credit Derivatives* (2008), Ex. 11 at 156-60.

*Level 3 Litig.*, 373. F. Supp. 2d 248, 251 (S.D.N.Y. 2005).

Plaintiffs may plead that a statement of opinion is false, but only by alleging "'with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false." *Bond Opportunity Fund* v. *Unilab Corp.*, 2003 U.S. Dist. LEXIS 7838, at *15 (S.D.N.Y. 2003); *In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y.) (plaintiff must allege that defendant either "did not . . . believe" the judgment expressed or "had no reasonable factual basis for [its] belief"). Here, plaintiffs do not allege with particularity both objective and subjective falsity (i.e., that defendants did not believe that Ambac's valuation model was appropriate and complied with GAAP). "[G]iven the difficulty of valuing illiquid securities, and the multitude of factors that may appropriately be taken into account," simply "alleging disagreement" with Ambac's valuations "does not equate to alleging fraud" or even provide a basis to infer that Ambac's valuations were "in fact incorrect or inflated." *In re Allied Capital Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 6962, at *13 (S.D.N.Y. 2003).

Plaintiffs fail to plead with sufficient particularity how or why Ambac's valuations were either objectively or subjectively false. **First**, the ABX and TABX indices are not appropriate pricing tools. Markit, the company that created those indices, has stated that those indices were "*not* designed to be uncritically extrapolated to the broader ABS market, and it was certainly not designed as a valuation tool for individual securities." Ex. 12 at 48. *See also* Ex. 13, "Don't Mark to Markit," *Economist*, Mar. 6, 2008 (ABX indices have been "prone to distortion (mostly downward) by heavy speculation" and were too illiquid to "take the weight of short-selling heaped on them"). As one treatise on mortgage credit derivatives notes, "there is no way to use TABX pricing as the benchmark for CDO pricing." Ex. 11 at 160. *See also* Compl. ¶ 195 and Ex. 48 at 11 (Ambac explains in 2Q 2007 Earnings Call that the ABX and TABX indices are used primarily by investors to hedge against the risk of MBS-related losses by shorting the indices, which in turn artificially drives the index prices down). Notably, plaintiffs do not allege that any bond insurer used those indices for valuation (if others had used plaintiffs' model, major writedowns on CDOs would have been taken by other insurers in the first and second quarter of 2007 — not just begin-

ning in the third quarter, as in fact occurred (*E.g.*, Exs. 61, 64).

**Second**, for Ambac, the indices would be particularly inappropriate pricing tools because there are significant differences between the TABX index and Ambac's CDO guarantees. Plaintiffs' "expert" analysis depends on the allegation that the mortgages ultimately underlying the TABX index and Ambac's CDOs had similar delinquency rates (Compl. ¶¶ 122, 125-127), but this alleged similarity is irrelevant because the collateral immediately underlying the CDOs Ambac guaranteed is *not* individual mortgages, but tranches of RMBS. As the Complaint acknowledges, the ratings of the underlying RMBS collateral differentiates "high-grade CDOs" from "mezzanine" CDOs. *Id.* ¶ 51. High-grade CDOs have as collateral principally the A, AA and AAA tranches of RMBS while mezzanine CDOs have as collateral the BBB tranches of RMBS. *Id.* The five Ambac CDOs plaintiffs use for their "expert" analysis are *high-grade* CDOs, *i.e.*, CDOs with largely A, AA and AAA tranches of RMBS as their collateral.[14] By contrast, the TABX consists of the "*BBB- tranches* of the ABX indices." *Id.* ¶ 111 n.5. Thus, even if the mortgage loans ultimately underlying the TABX and Ambac's CDOs were *identical*, comparing high-grade CDOs that Ambac guaranteed to the TABX, which is constructed out of the mezzanine tranches of RMBS, would be comparing apples and oranges. By failing to address this fundamental difference, plaintiffs have not met the requirement to plead facts with particularity demonstrating how their allegations support a conclusion that Ambac made material misstatements.

In addition: **(i)** The RMBS collateral underlying the ABX and TABX indices is required to be made up of 100% subprime mortgages. Ex. 11 at 145; *cf.* Compl. ¶ 120, 111 n.4. The Ambac-guaranteed CDOs, however, contain not only RMBS backed by subprime mortgages, but also RMBS backed by Alt-A, prime and second lien mortgages — as well as non-RMBS collateral. *See, e.g.*, Ex. 28 at 18 (showing that over 50% of RMBS in the McKinley Funding III, Ltd. CDO,

---

[14] Ambac's CDO of ABS Data Supplement, Ex. 28 at 3, 9, 17, 18, 23. For each, the "Original Rating Distribution" column demonstrates that the underlying collateral was almost entirely A, AA or AAA for each of the CDOs selected, making them high-grade CDOs. *See also, e.g.*, Ex. 37, 2Q 2007 Form 10-Q, at 32.

one of the five plaintiffs selected (Compl. ¶ 118), was Alt-A RMBS.[15] **(ii)** The subprime RMBS collateral underlying the ABX and TABX indices was issued in particular time periods. For example, the TABX 07-1 06-2 index plaintiffs use consists entirely of subprime RMBS issued in the first and second halves of 2006 (2006 vintage). Ex. 11 at 145; Compl. ¶ 120, 111 n.4. The Ambac-guaranteed CDOs, however, consist of RMBS issued in any year, as well as non-RMBS collateral. *See, e.g.*, Ex. 28 at 3 (showing that over 50% of RMBS in the Belle Haven ABS CDO 2006-1, one of the five plaintiffs selected, was issued in 2005 or prior).[16]

**Third**, Ambac repeatedly disclosed how it valued its CDO guarantees. Ambac disclosed that there were typically no market quotes available for the guarantees themselves, making it necessary to use a valuation model. *See, e.g.*, Compl. ¶¶ 160, 186, 202. As inputs for its model, Ambac used "transaction specific" information, such as "market-driven inputs, including contractual terms, credit spreads and ratings on underlying reference obligations, yield curves and tax-exempt interest ratios." Ex. 30, 2006 Form 10-K, at 87. Each guaranteed CDO was unique — *i.e.*, the composition of the collateral varied, the deal protections (subordination, overcollateralization, excess spread) varied, and the contractual terms (*e.g.*, triggering conditions) varied. *See* Oehrig Ex. 7d at 2-8 (depicting the wide variety of mortgage collateral, collateral vintages, and subordination levels in Ambac's CDOs of MBS). Further, Ambac made clear to investors that it was "not pricing off an index." Ex. 48, 2Q 2007 Earnings call, at 11 (cited in Compl. ¶ 193).

Plaintiffs do not allege particularized facts demonstrating that Ambac's method was either objectively or subjectively false (plaintiffs must show both) and did not comply with FAS 133's requirement that Ambac's derivative exposures (such as its guarantees of CDOs written as credit default swaps) be measured at "fair value." Compl. ¶ 134.[17] To the contrary, plaintiffs acknowl-

---

[15] *See also, e.g.*, Ex. 37 2Q 2007 Form 10-Q, at 31-32.

[16] For similar reasons, plaintiffs' allegations that Ambac fraudulently stated that it does not "underwrite the market" are flawed (*e.g.*, Compl. ¶ 198(e)). Even assuming plaintiffs were correct that the mortgages ultimately underlying the instruments Ambac guaranteed were performing the same as the "market," this comparison does not take into account that Ambac did not guarantee mortgages, but rather guaranteed securities with a variety of credit protections.

[17] In ¶ 134, after reciting FAS 133's "fair value" requirement, plaintiffs include a quote that purports to define "[f]air value for accounting purposes." Plaintiffs omit, however, that this quote is from FAS 157, not FAS 133. FAS 133

(footnote continued)

edge that Ambac's independent auditors, KPMG, audited and issued unqualified opinions for Ambac's financial statements (Compl. ¶ 490; *see also* Ex. 31, 2005 10-K, at 74-75; Ex. 30, 2006 10-K, at 73-74, Ex. 29, 2007 10-K, at 96). KPMG was fully aware of Ambac's valuation method, which was described in the notes to Ambac's financials (*e.g.*, Exs. 29 at 110, 30 at 87-88), and there is no allegation that Ambac has been required to restate any of its previous financials.

**Fourth**, the fact that Moody's and S&P gave the five CDO exposures that plaintiffs selected for their "expert" analysis AAA ratings (independent of Ambac's guarantees) well into 2008 (Ex. 14) underscores the absence of particularized allegations showing Ambac's valuations to be either objectively or subjectively false (much less both).

**Fifth**, plaintiffs themselves highlight a recent transaction that further illustrates plaintiffs failure to plead with particularity that Ambac committed fraud by failing to adequately writedown its CDO guarantees as developments required. Plaintiffs note that on August 1, 2008, Ambac and Citigroup agreed to cancel Ambac's guarantee of a $1.4 billion CDO tranche (owned by Citigoup) in return for Ambac paying Citigroup $850 million. Compl. ¶ 289. Prior to that date, however, Ambac had recorded a $1.0 billion writedown on that CDO. Ex. 42, Form 8-K (Aug.1, 2008). Thus, Ambac actually recognized a gain of $150 million from the cancellation. *Id.* [18]

### 4. Plaintiffs' alleged "facts" and "expert analysis" do not show that Ambac violated GAAP in any other respect.

Plaintiffs allege that Ambac violated Regulation SK, Item 303 by failing to disclose "known trends" affecting its guarantees. Compl. ¶ 267. But there is no private right of action under Item 303, *see Oran* v. *Stafford*, 226 F.3d 275, 287 (3d Cir. 2000), and a violation of Item 303 does not amount to a violation of Section 10(b), *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308

---

(footnote continued)

only requires that derivative instruments be recognized "at fair value." It does not mandate any particular method for determining "fair value."

[18] Ambac and the individual defendants also adopt the points and authorities set forth in the underwriter defendants' (Point I) and defendant KPMG's (Point II) briefs (*see infra* note 24) in support of their arguments that the complaint has failed to plead misstatements of fact.

F. Supp. 2d 249, 263 (S.D.N.Y. 2004).  In any event, plaintiffs do not plead any facts showing that declines in the mortgage industry or changes in underwriting standards adversely impacted the senior tranches of mortgage-backed instruments that Ambac guaranteed beyond what Ambac, in fact, disclosed in its quarterly reports in 2007 and 2008 as developments unfolded.

Plaintiffs also allege that Ambac violated SFAS 5 by not disclosing that there was a "reasonable possibility" that contingent losses on Ambac's RMBS exposures could occur due to the mortgage market downturns.  Compl. ¶ 300.  But plaintiffs have failed to allege particularized facts showing that, as of the date of particular financial statements, Ambac's guarantees of investment-grade tranches of RMBS faced reasonable possibilities of loss due to adverse trends in the mortgage markets that were not already accounted for by the loss reserves that Ambac in fact took on its RMBS exposures beginning in the second quarter of 2007 in accordance with SFAS 60 and SFAS 5.  *E.g.*, Compl. ¶¶ 190, 210, 246.

In addition, in compliance with SFAS 5, Ambac has long disclosed exposures for which material changes in loss severity are possible, one of which is RMBS.  For example, in Ambac's 2006 Form 10-K, Ambac disclosed that it was "reasonably possible" that various factors, including "[i]ncreases in mortgage rates, unemployment and/or personal bankruptcies," if they occurred at a sufficient magnitude, could materially increase the severity of losses for Ambac's guarantees of RMBS, (Ex. 30 at 40) and Ambac provided a chart showing the loss reserve increases that would occur "from reasonably possible increases . . . assum[ing] [a] one full letter downgrade" for its RMBS.  *Id.*

As the market downturns progressed, Ambac's disclosures became more detailed.  While plaintiffs allege that Ambac failed to disclose reasonably possible contingent losses prior to April 23, 2008 (Compl. ¶ 300), Ambac in fact disclosed loss reserves taken for its RMBS exposures from second quarter 2007 on (for those losses which were both probable and estimable) and, as warranted, disclosed reasonably possible additional losses.  *E.g.*, Ex. 29, 2007 Form 10-K, at 51 (disclosing with regard to its MBS guarantees that a "reasonably possible scenario would culminate in present value claims payments of approximately $750 million . . .").

Finally, as noted, Ambac's independent auditors were aware of the contents of the notes to Ambac's financial statements and, as plaintiffs acknowledge, issued unqualified opinions on those statements.  *E.g.*, Compl. ¶ 490.[19]

## C.    The Complaint fails to plead scienter with the requisite particularity.

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2); *Tellabs*, 127 S. Ct. at 2504.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 2510.  The court must weigh all "plausible nonculpable explanations for the defendants' conduct," *id.*, and if after weighing all nonculpable explanations, the inference of scienter is merely "plausible" or "reasonable," the complaint will not survive a motion to dismiss.  *City of Brockton Ret. Sys.* v. *Shaw Group Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008).  Furthermore, a complaint must allege facts supporting a strong inference of scienter "'for each defendant with respect to each violation.'"  *Mizzaro* v. *Home Depot, Inc.*, 2008 WL 4498940, at *4 (11th Cir. 2008).

Plaintiffs allege (based on vague statements from five confidential witnesses and purported descriptions by one of them of two internal memos) that defendants knew but did not disclose the "facts" discussed above, i.e. lowered mortgage originator underwriting standards, lowered Ambac underwriting standards, and market declines.  Compl. ¶ 146.  Plaintiffs also allege defendants were motivated to commit fraud in order to increase short-term earnings and increase their compensation.  *Id.* ¶¶ 68, 74, 78.  For the following reasons, this is not sufficient to plead scienter.

### 1.    The Complaint fails to allege with particularity that any defendant was aware of any "facts" that made his statements false or misleading.

The Second Circuit held in *Dynex* that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  531 F.3d at 196; *see also In re Ceridian Corp. Sec. Litig.*, 2008 WL 4163782, at *3 (8th

---

[19] Plaintiffs also cite to SOP 94-6 (Compl. ¶¶ 301-307), but that specifically does *not* apply to "financial instruments." SOP 94-6 at ¶ 23.

Cir. 2008) (dismissing complaint when plaintiffs failed to make "specific allegations in the complaint linking one of the individual defendants to the violation[s]").  In *Dynex*, plaintiff claimed that defendants concealed that the loans constituting the collateral of Dynex's portfiolio (a financial services company that invested in bonds secured by mortgages) were improperly underwritten.  Plaintiff supported its inference of scienter with allegations that defendants had access to "collection data" that detailed a high percentage of delinquencies and impairments in the loans.  *Id.*  The Second Circuit ordered dismissal of the complaint on the ground that plaintiff failed to plead scienter.  The Court held that "[plaintiff's] broad reference to raw data lacks . . . an allegation that these data had been collected into reports that demonstrated that loan origination practices were undermining the collateral's performance" and given to senior management.  *Id.*

Here, as in *Dynex*, the Complaint lacks particularized factual allegations of contemporaneous information showing that any Exchange Act defendant (or anyone else in senior management) knew alleged "facts" that rendered Ambac's statements false or misleading.  *Dynex*, 531 F.3d at 197.  Each "fact" is addressed in turn:

**First**, plaintiffs conclusorily allege that Exchange Act defendants "witnessed firsthand" mortgage originators' weakened underwriting standards as well as declines in the mortgage market.  Compl. ¶¶ 76-77.  Plaintiffs, however, fail to allege who at Ambac witnessed this or point to any internal reports stating that declines in the mortgage market or underwriting standards were so extreme as to impair Ambac's guarantees of senior tranches of RMBS and CDOs (beyond amounts Ambac in fact wrote down and reserved for from quarter to quarter as events unfolded).  Under *Dynex*, these allegations cannot support an inference of scienter.  531 F.3d at 196-97.

**Second**, plaintiffs allege that Ambac itself lowered its underwriting standards while stating to the public that it remained "cautious" in its guarantees.  Compl. ¶¶ 78-96.  Plaintiffs fail to allege with particularity that any of the Exchange Act defendants knew that any of the alleged changes in underwriting models materially lowered Ambac's underwriting standards (if in fact they did).  Plaintiffs, for example, generally allege that Ambac changed its overcollateralization requirements for RMBS backed by HELOC, but fail to identify any specific contemporaneous in-

formation presented to senior management that stated that the changes materially altered Ambac's underwriting standards. This is particularly important because overcollateralization is but one type of credit protection Ambac may have included in its MBS guarantees. Even had plaintiffs alleged that management knew the changes in the overcollateralization standards were material standing alone, management could have reasonably concluded that other deal protections preserved Ambac's cautious underwriting standards.

Plaintiffs do refer to two internal Ambac documents, but their allegations about the contents of both is based on vague testimony from a confidential witness (alleged to have been an underwriter in Ambac's RMBS group). The first is a June 2006 memo from a member of the RMBS group to the Credit Risk Committee (which included Genader, Uhlein and Wallis — but not Leonard) that allegedly proposed (and the Committee allegedly approved) changing Ambac's underwriting standards for HELOC RMBS to allow Ambac to rely on the historical default rates of the originator instead of examining individual loans in the RMBS. Compl. ¶¶ 84-86. But there is no particularized factual allegation that anyone would have deemed such a change material. The second is an October 2006 memo from a member of the RMBS group to John Uhlein (which the confidential witness allegedly saw "on a computer screen around the time it was sent"), that allegedly included the statement: "Why are we willing to insure stuff in the secondary market that we would not touch with a ten foot pole in the primary market?" Compl. ¶ 89. As a preliminary matter, "[p]laintiffs' barebones sketch of this internal memo utterly fails to" provide the detail required to meet the PSLRA and Rule 9(b) pleading requirements. *CALPERS* v. *Chubb*, 394 F.3d 126, 147 (3d Cir. 2004) (rejecting "barebones sketch" of an internal memo when plaintiffs did not state, among other things, "what data its conclusions were based on."). Moreover, the confidential witness fails to address any response from Uhlein, the context of the memo or whether the heightened level of subordination on Ambac's guarantees of CDOs was the reason for the allegedly different underwriting standards.

Similar allegations were recently rejected in *In re American Express Co. Sec. Litig.*, 2008 WL 4501928 (S.D.N.Y. 2008). In *American Express*, plaintiffs alleged that the defendants caused

the company to invest in "high-risk, high yield debt securities such as below-investment grade bonds and collateralized debt obligations" while publicly representing those investments as conservative, concealing their magnitude, failing to disclose a lack of risk management and failing to disclose that the company's accounting for the instruments violated GAAP. The court dismiss on the ground that plaintiffs had failed to plead scienter:

> None of the confidential sources specifically states that any Individual Defendant had information or access to information indicating that . . . [Amex's] risk control policies were inadequate . . . . Allegations that . . . senior management were warned of the risks . . . show only that Individual Defendants may have been made aware of the risks associated with the High Yield Debt, not that Amex was not properly valuing the debt or monitoring the risk.

*In re American Express Co. Sec. Litig.*, 2008 WL 4501928, at *7 (S.D.N.Y. 2008). Here, plaintiffs do not even allege with particularity that senior management were warned any increased risk. But even if they had, Ambac was in the business of guaranteeing risk. Plaintiffs have not alleged particularized facts demonstrating that even if the Exchange Act defendants had been presented with all of these alleged changes, that this would lead defendants to conclude that Ambac's "risk control policies were inadequate."

**Third**, plaintiffs allege that Ambac either actively monitored underlying portfolios as it said it did, in which case it knew of increased delinquencies, or in fact Ambac did not carry out surveillance. Compl. ¶ 102-103, 105. However, plaintiffs fail to allege with particularity that senior management were aware of any dereliction in surveillance. Plaintiffs point to Ambac's 2006 10-K ("credits that are either in default or have developed problems that eventually may lead to a claim or loss are . . . reported to management," *id.* ¶ 98, Ex. 30 at 12), but plaintiffs do not particularize any credits "in default" or that "developed problems" that were not "reported to management."

And, even accepting that active surveillance was carried out and that it did bring the alleged delinquency and default rates to senior management's attention, Compl. ¶ 102, 105, plaintiffs have not alleged with particularity that any of the Exchange Act defendants knew that this information rendered any of Ambac's statements false. Ambac did not guarantee individual mortgages, which were the instruments facing rising delinquency and default rates. Instead, Ambac

guaranteed investment-grade tranches of RMBS and super senior tranches of CDOs protected by a variety of credit protections including subordination. Even had defendants known of rising *mortgage* delinquency and default rates, plaintiffs fail to allege with any particularity that the Exchange Act defendants were aware that these changes materially affected the investment-grade tranches that Ambac had guaranteed. *See Elam* v. *Neidorff*, 2008 WL 4587310, at *3-4 (8th Cir. 2008) (rejecting argument that defendants who "tout[ed]" their monitoring of costs must therefore have known that costs were increasing months prior to defendants' disclosure of those costs); *Dynex*, 531 F.3d at 196 ("[B]road reference to raw data [that] lacks even an allegation that these data had been collected into reports" cannot "raise an inference of scienter.").

    **Finally**, plaintiffs have not alleged with particularity that the Exchange Act defendants were aware of any of the alleged GAAP violations. GAAP violations must be coupled with evidence of "'corresponding fraudulent intent'" in order to support an inference of scienter. *Davidoff* v. *Farina*, 2005 WL 2030501, at *17 (S.D.N.Y. 2005), The fact that Ambac's financial statements were audited precludes any inference of fraudulent intent with regard to GAAP violations. *In re JP Morgan Chase*, 2007 U.S. Dist. LEXIS 22948, at *39-40. While plaintiffs allege that Ambac should have used plaintiffs' TABX-based model to value its CDO guarantees (Compl. ¶¶ 111-133), plaintiffs have not shown that this was the only reasonable model. Plaintiffs certainly have not identified a "specific source from which defendants received knowledge of flaws in [the company's]" and valuation methods. *Johnson* v. *NYFIX, Inc.*, 399 F. Supp. 2d 105, 115 (D. Conn. 2005). Indeed, "given the difficulty of valuing illiquid securities, and the multitude of factors that may appropriately be taken into account, alleging disagreement with some . . . valuations does not equate to alleging fraud." *Allied Capital*, 2003 U.S. Dist. LEXIS 6962, at *13. As this Court recently noted, plaintiffs face a high bar to allege scienter when "the applicable accounting rules [are] highly complex and . . . involve subjective judgments." *In re IMAX Sec. Litig.*, 2008 WL 4307981, at *8 (S.D.N.Y. 2008).[20]

---

[20] While plaintiffs were able to overcome the high bar in *IMAX*, in that case, the company had restated its earnings and it was accepted that there had been a violation of GAAP — here there has been no restatement and plaintiffs make

(footnote continued)

25

### 2. The Complaint fails to allege any legally cognizable motive for defendants to carry out the alleged fraud.

Motive "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," while opportunity "entail[s] the means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130. Under *Tellabs,* courts must consider competing theories of motive to determine whether the allegations give rise to a strong inference of scienter. *See* 127 S. Ct. at 2511. Here, there was no rational motive to commit the alleged fraud — and every reason to avoid it.

Plaintiffs attempt to establish motive by alleging that Genader announced an "aggressive" goal of achieving "$1 billion a year in net income in the near future" in order to inflate his income and improve his own compensation. Compl. ¶¶ 67-68, 74, 78. But courts have repeatedly held that allegations that "[d]efendants were motivated to commit fraud by a desire to meet aggressive income targets and . . . were specifically motivated by their incentive compensation" are "not entitled to any weight." *American Express*, 2008 WL 4501928, at *6 (citing *Kalnit* v. *Eichler*, 264 F.3d 131, 140 (2d Cir. 2001); *In re Sotheby's Holdings Sec. Litig.*, 2000 WL 1234601, at *7 (S.D.N.Y. 2000)). Indeed as this Court has recently recognized, "[i]ncentives such as these may be imputed to most, if not all, corporate executives, and upholding their sufficiency would vitiate the purpose of the heightened pleading standards applicable to allegations of securities fraud." *IMAX*, 2008 WL 4307981, at *5.

In fact, plaintiffs' allegations contradict any inference of motive. Plaintiffs' theory that the Exchange Act defendants knowingly caused Ambac to lower its underwriting standards and take on riskier obligations in order to increase short-term profits and bonuses (Compl. ¶¶ 67-68) makes

---

(footnote continued)

no such showing. Moreover, in *IMAX*, plaintiffs specifically alleged that defendants knew and understood the relevant accounting rule that had been violated, specifically identified contemporaneous documents to which defendants had access showing that those rules were being violated, alleged with particularity that defendants pushed for aggressive accounting of revenue, and made other factually particularized allegations of defendants' knowledge. *Id.* The company-specific, factually detailed allegations this Court required to find scienter in *IMAX* only emphasizes how the complaint in this case is lacking.

no economic sense: "This is a recipe for economic disaster, which in fact came to pass, and is in-consistent with hopes for or expectations of increased bonuses." *Fadem*, 352 F. Supp. 2d at 525. Furthermore, the fact that Ambac and its insurance units were subject to regulation by the Wiscon-sin insurance commissioner, scrutinized by multiple independent ratings agencies, such as Moody's and S&P (Ex. 30 at 19-20), and audited by KPMG (Ex. 30 at 73-74), all undermine any conclusory allegations that the defendants had opportunity to commit fraud.

### 3. The Complaint's reliance on vague statements from confidential witnesses not shown to have first-hand knowledge of the relevant facts further undermines an inference of scienter.

The Complaint relies heavily on confidential witnesses to support its inference of scienter. Some courts have held that post-*Tellabs* "allegations from 'confidential witnesses' must be dis-counted" because it is "hard to see how information from anonymous sources could be deemed compelling or how we could take account of plausible opposing inferences. Perhaps these confi-dential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Higginbotham*, 495 F.3d at 757. In any event, confidential sources "must be 'described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *American Express*, 2008 WL 4501928, at *7.

Plaintiffs, however, provide only brief descriptions of their confidential witnesses that amount to little more than a job title and dates of employment. *See, e.g.*, Compl. ¶¶ 67, 75, 77, 90. "Plaintiffs have . . . failed to allege any facts showing that the confidential sources . . . had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period." *American Express*, 2008 WL 4501928, at *8. Moreover, the confidential witnesses left Ambac in 2005, mid-2006, February 2007 and July 2007. Compl. ¶¶ 67, 75, 77, 90. Thus, none can provide any information as to defendants' knowledge or intent during the market downturns that began in August 2007. *See In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535, at *18 (N.D. Cal. 2007). At the very least, the allegations based on state-ments from the confidential witness must be heavily discounted.

> **4.    The more compelling inference is that Ambac, along with many other financial institutions, suffered from unexpected market downturns and updated its financial disclosures accordingly as developments unfolded.**

Even had the Complaint sufficiently pled particularized facts supporting a cogent inference of scienter, in light of the unexpectedly severe and long-lasting credit and mortgage market downturns, the far more compelling inference is that the Exchange Act defendants — like many government officials, economists and executives — failed to predict the scope and severity of the market downturns that began to unfold in 3Q 2007, but responded appropriately by updating investors periodically on the then current effects of the downturns on Ambac's business.

Courts have long been skeptical of claims that losses suffered in the wake of market-wide downturns were due to fraud.  Instead, courts recognize that such claims are often premised on "fraud by hindsight" allegations that attempt to fault defendants for not being more clairvoyant in predicting market developments.  Courts in this Circuit have repeatedly rejected such claims, particularly when, as in *Dynex* (and many other cases), plaintiffs "fail [] to allege the existence of information that demonstrate that the statements made to investors were misleading, *e.g.*, information showing that the primary cause of the . . . poor performance was *not* the general weakness in the . . . market" (531 F.3d at 197):

- *Denny* v. *Barber*, 576 F.2d 465, 469-470 (2d Cir. 1978) (dismissing allegations that Chase Bank, the defendant, engaged in "speculative and risky" loans and "risky and speculative" investments because Chase could not be held liable for failing to predict "that foreign governments and enterprises might encounter difficulties, particularly in consequence of the dramatic increase in petroleum prices; that REITS . . . would run into serious trouble . . .; and that New York City would come to the verge of bankruptcy");

- *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994) (rejecting "fraud by hindsight" claim that bank executives knew that loan portfolio was "precarious" and yet understated reserves in the face of the collapsing real estate market and noting that executives "are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage");

- *In re Aegon N.V. Sec. Litig.*, 2004 U.S. Dist. LEXIS 11466, at *5-7, *21-23 (S.D.N.Y. 2004) (rejecting claim that Aegon fraudulently understated its bond default reserve in the midst of precipitous declines in the equity and credit markets in 2000).

In fact, courts around the country have dismissed securities fraud cases arising out of the recent market downturns.  In *In re Novastar Fin. Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 44166

(W.D. Mo. June 4, 2008), plaintiffs alleged that management concealed poor internal controls, weak underwriting standards, and inadequate loan loss reserves. *Id.* at *9-10. The court, however, held that plaintiffs' allegations were "more consistent with a company and executives confronting a deterioration in the business and finding itself unable to prevent it than they are with a company and executives recklessly deceiving the investing community." *Id.* at *15. Similarly, in *Tripp* v. *IndyMac Fin. Inc.*, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007), the court found no strong inference of scienter when the defendant (a mortgage originator and investor in mortgage securities) admitted "mistakes," increased loan loss reserves, and drastically increased secondary market reserves. Instead, the court noted that "an even stronger inference is that Defendants were simply unable to shield themselves as effectively as they anticipated from the drastic change in the housing and mortgage markets and, once that inability became evident, IndyMac's financials were changed accordingly." *Id.* at *4. The same reasoning applies to Ambac.

Further, matters of which this Court can take notice support this non-culpable inference:

First, as the market downturn began, Ambac pre-released its earnings weeks prior to its quarterly filing deadline. For example, on October 10, 2007, Ambac announced a month in advance of its filing deadline that it estimated it would be taking a $743 million mark-to-market loss on its CDO exposures, increase loss reserves, and report a loss. Compl. ¶ 206. *See Rombach*, 355 F.3d at 176 ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file . . . financial statements").

Second, throughout the class period, Ambac has posted additional information regarding its exposures to Ambac's website and updated that information at least quarterly. *See* Oehrig Decl. This has included details regarding Ambac's RMBS exposures (*e.g.*, Oehrig Ex. 1a) as well as Ambac's CDOs and other pooled debt obligation exposures (*e.g.*, Oehrig Ex. 1b). In the fourth quarter of 2006, because investors expressed interest in Ambac's subprime exposure (*e.g.*, Compl. ¶ 148), Ambac added additional information regarding its exposure to subprime, both in RMBS and CDOs. *E.g.*, Oehrig Ex. 5c. Two quarters later, Ambac began to post even more information regarding its exposures to CDOs that contain MBS. *E.g.*, Oehrig Ex. 7d. Such voluntary trans-

parency further supports a non-culpable inference. *Rombach*, 355 F.3d at 176.

 Third, Ambac has not been required to restate its financials, indicating at the very least that "reasonable accountants could differ" on Ambac's valuations and reserves for CDOs and RMBS, which defeats a claim of scienter. *JP Morgan Chase*, 2007 U.S. Dist. LEXIS 22948, at *39-40.

## D. The Complaint does not sufficiently plead loss causation.

 To state a claim under Rule 10b-5, plaintiffs must allege facts showing "a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342. Loss causation is generally pled by pointing to a "corrective disclosure" — i.e., a disclosure that reveals that prior statements were false when made and that is followed by a decline in stock price. *Lentell*, 396 F.3d at 175. Because a decline in stock price can reflect a number of factors other than the alleged misrepresentations, *Dura*, 544 U.S. at 343, plaintiffs must plead loss causation "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists." *Teachers' Ret. Sys.* v. *Hunter*, 477 F.3d 162, 186 (4th Cir. 2007).

### 1. Plaintiffs have not identified any *corrective* disclosure.

 Plaintiffs identify three Ambac earnings statements (3Q 2007, 4Q 2007 and 1Q 2008) that they allege precipitated stock price drops. Compl. ¶¶ 310-323. But plaintiffs do *not* show that the earnings releases "addressed the specific fact[s] allegedly concealed." *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007). None of the releases corrects any previous Ambac disclosure or identifies any previous misstatements — each simply announces Ambac's quarterly earnings, writedowns, and losses, updating investors on the continuing effect of the market downturns on Ambac. Compl. ¶¶ 310, 315, 320. "*Dura* itself makes clear that loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud." *In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005). Indeed, the "[d]isclosure of financial losses generally — even if those financial losses are a result of the specific concealed fact — is not sufficient" to establish loss causation. *Rhodia*, 531 F. Supp. 2d at 545; *Yahoo Inc.* v. *Brodsky*, 2008 WL 4531815 at *12 (N.D. Cal. 2008). Identifying a corrective disclosure is "critical because Section 10(b) is not meant to provide investors

with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Rhodia*, 531 F. Supp. 2d at 544.

###### 2. Plaintiffs impermissibly fail to ascribe any proportion of their losses to alleged revelations of prior misstatements.

Even had plaintiffs alleged a corrective disclosure, they still have not sufficiently pled loss causation. "[W]hen the plaintiff's loss coincides with a market-wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases." *First National Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (affirming dismissal of a claim brought in the wake of a real estate market downturn). In such cases, to survive a motion to dismiss, plaintiffs must "apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." *Lentell*, 396 F.3d at 177.

As the credit and mortgage markets declined beginning in the third quarter of 2007, Ambac's shares regularly lost value. When a company faces a loss of value due to a downturn, it is unsurprising that its earnings releases disclose losses due to the effects of the downturn and it is unsurprising that such disclosures result in stock price drops. *See 60223 Trust* v. *Goldman Sachs*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) (dismissing complaint that failed to "even refer to the phenomenon of the gradual loss of the stock's value, much less attempt to explain it as related to loss causation"). Plaintiffs' Complaint must be dismissed for failing to account for this "'crater[ing]' of the . . . market that occurred during the" class period. *See Merrill Lynch & Co. Research Reports*, 2008 U.S. Dist. LEXIS 37993, at *40.[21]

## POINT II:    PLAINTIFFS' SECURITIES ACT CLAIMS SHOULD BE DISMISSED (COUNTS III-VII)

Plaintiffs' Securities Act claims arise out of three Ambac securities offerings. In February 2007, before the severe downturns in the markets, Ambac completed an offering of Directly-Issued Subordinated Capital Securities ("the DISCS Offering"). Compl. ¶¶ 355-357. Over a year

---

[21] Plaintiffs also allege that Genader and Leonard violated Section 20(a) of the Exchange Act because of their status as "controlling persons" at Ambac. Compl. ¶¶ 343-350. Plaintiffs, however, have not alleged a primary violation of Section 10(b) and therefore have failed to establish control person liability. *See Rombach*, 355 F.3d at 177-78.

later in March 2008 — after the markets had substantially declined and this litigation began — Ambac completed offerings of equity units ("the Equity Units Offering") and common stock ("the Common Stock Offering").  *Id.* ¶¶ 358-365.  Plaintiffs allege that prior Ambac filings incorporated by reference into each of these offerings contained materially false and misleading statements in violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933.

**A.    The Securities Act claims arise out of the same alleged misstatements plaintiffs identified in their Exchange Act claims and thus "sound in fraud" and are governed by the heightened pleading requirements of Rule 9(b).  Likewise, under *Twombly*, the claims should be dismissed.**

Section 11 and 12(a)(2) claims that "sound in fraud" are governed by the heightened pleading requirements of Rule 9(b) and plaintiffs must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."  *Rombach*, 355 F.3d at 172.  Claims "sound in fraud" if they contain the "wording and imputations . . . classically associated with fraud."  *Id.*  As in *Rombach*, plaintiffs here allege that the registration statements were "inaccurate *and* misleading," and that they contained "*untrue* statements of material facts." *Id.*; *e.g.*, Compl. ¶¶ 400, 405, 408, 410.

Plaintiffs state that their Securities Act claims are "in effect a separate complaint," Compl. ¶ 351, but then proceed to identify the same statements they identified in their Exchange Act claims and argue that those statements are false for the same reasons plaintiffs had previously argued they were fraudulent.  *Compare, e.g.*, Compl. ¶¶ 147, 190, 245 with ¶¶ 399, 424, 439 (same statements); ¶ 418 with ¶ 146 (same rationale).  Plaintiffs "cannot evade Rule 9(b)'s strictures" by simply splitting their Complaint into two parts and "disclaiming any reliance on a theory of fraud or recklessness."  *In re JPMorgan Chase*, 363 F. Supp. 2d at 635; *Miller* v. *Lazard, Ltd.*, 473 F. Supp. 2d 571, 585-86 (S.D.N.Y. 2007).  Because plaintiffs "do not allege that the Registration Statement or Prospectus contains any additional 'untrue statement [or omission] of a material fact' independent of [the] fraud allegations," *In re AXIS Capital Holdings Ltd.*, 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) (applying Rule 9(b)), and because the same alleged "facts" support both plaintiffs' Exchange Act fraud claims and their Securities Act claims, *see NYFIX, Inc.*, 399 F.

Supp. 2d at 122 (applying 9(b)), plaintiffs claims sound in fraud and are subject to Rule 9(b). This is particularly true when, as here, plaintiffs make "no effort . . . to show any other basis for the claims levied at the" registration statements other than fraud. *Rombach*, 355 F.3d at 172. Thus, like plaintiffs' Exchange Act claims, plaintiffs' Securities Act claims must be dismissed for failing to plead any actionable misstatement with particularity.

In any event, plaintiffs' vague and conclusory Securities Act claims must be dismissed under *Twombly* as well. *Twombly* requires "[f]actual allegations [that] raise a right to relief above the speculative level . . . . [L]abels and conclusions and a formulaic recitation of the elements of a cause of action" are insufficient. *Bell Atlantic* v. *Twombly*, 127 S. Ct. 1955, 1965 (2007). Under *Twombly*, courts reject "craftily drafted . . . 20/20 hindsight" claims that "imply that what only became clear due to subsequent events was somehow known . . . far earlier in time." *Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669-70 (S.D.N.Y. 2008). Allegations, like those here, that are "too conclusory" and "offer no possibility at all of assessing materiality" are insufficient. *Garber* v. *Legg Mason*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008).

**B.    The claims arising out of the February 2007 DISCS Offering should be dismissed (Counts III, IV, VII).**

**1.    The Complaint fails to sufficiently allege any material misstatement or omission of fact, particularly in light of the explicit risk disclosures in the DISCS offering documents and other information in the marketplace.**

Plaintiffs again identify the three "facts" and allege that they render the statements in the DISCS prospectus false and misleading: (1) mortgage originators had lowered their standards, (2) Ambac had lowered its underwriting standards for RMBS and CDOs of RMBS, and (3) mortgage collateral showed negative trends. Compl. ¶¶ 400, 405, 408. Plaintiffs impermissibly simply list these three "facts" after each set of alleged misstatements and make no attempt whatsoever to demonstrate that "the defendant possessed the omitted information at the time the registration statement became effective and that defendant had a duty to disclose that information." *See In re JP Morgan Chase*, 363 F. Supp. 2d at 635.

Nor do plaintiffs explain *why* any of the alleged facts rendered any misstatement "mate-

rial." *Garber*, 537 F. Supp. 2d at 613.  Indeed, plaintiffs simply allege that Ambac and mortgage originators "lowered" their standards, not that any changes were material.  *E.g.*, ¶ 400.  Plaintiffs likewise only allege "negative" trends, not that such trends were material in light of the subordination-protected tranches of RMBS and CDOs that Ambac guaranteed.  *Id.*

Moreover, plaintiffs do not provide any explanation as to how the alleged facts render any of the identified statements false or misleading.  For example, plaintiffs allege that the October 25, 2006 Form 8-K stated:  "We are currently witnessing a solid level of deal inquires and opportunities. . . .  We remain steadfast in judiciously allocating our capital to transactions that enable us to continue to deliver superior returns."  Compl. ¶ 399.  Plaintiffs' allegations do not contradict these statements.  In any event, the statements plaintiffs identify are puffery on which no reasonable investor would rely.  *See In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 466 (S.D.N.Y. 2000).  Likewise, plaintiffs assert that Ambac's stated earnings in its January 31, 2007 Form 8-K were false and misleading because of the same three alleged "facts" (*id.* ¶¶ 406-408), yet again, plaintiffs make no attempt to explain why this is the case.  Such pleading is "too conclusory" to support a claim under *Twombly*.  *Garber*, 537 F. Supp. 2d at 613.

Plaintiffs' failure to allege any facts demonstrating the materiality of the alleged misstatements is particularly important in light of the extensive risk disclosures present in the prospectus pursuant to which the DISCS were issued that "bespeak caution."  "[W]hen cautionary language is present, we analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled."  *See Halperin*, 295 F.3d at 357, 360.  Optimistic predictions are immaterial when accompanied by specific cautionary statements.  *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993).  Likewise, the PSLRA provides a statutory safe harbor that also covers Ambac's alleged misstatements.  15 U.S.C. § 77z-2.

Here, the DISCS prospectus clearly "bespeaks caution."  It discloses that:

- Ambac is subject to credit risk due to its guarantees that could result in increased loss reserves and mark-to-market writedowns. Ex. 60 at S-9.

- Ambac faces the risk that changes in general economic conditions including recessions and changes in investor perception of credit risk could adversely affect its business. *Id.*

34

- Ambac faces the risk that accounting rules that require it to mark certain of its guarantees to market could result in stated losses.  *Id.* at S-10.

- Ambac faces the risk that its AAA ratings may be downgraded, which would have a material adverse effect on Ambac's prospects for future business.  *Id.* at S-8.

Moreover, documents incorporated by reference into the prospectus have further risk disclosures. The 3Q 2006 Form 10-Q (cited by plaintiffs at ¶¶ 401-402), for example, states that loss severity estimates for CDOs and MBS may face material changes in the case of "[i]ncreases in mortgage rates, unemployment and/or personal bankruptcies [that would] adversely impact residential real estate values and the severity of loss for our transactions."  Ex. 39 at 27.  Indeed, it is just this risk that plaintiffs allege Ambac failed to disclose.  Thus, the alleged omissions are immaterial under the "bespeaks caution" doctrine, non-actionable under the PSLRA safe harbor, and the DISCS claims must be dismissed.

### 2.    In any event, the DISCS claims are barred by the one-year statute of limitations.

In the alternative, plaintiffs' claims are time-barred.  Sections 11 and 12 of the Securities Act require plaintiffs to bring claims within one year from the date on which the plaintiff is put on actual or inquiry notice of an untrue or misleading statement or omission.  15 U.S.C. § 77m.  A plaintiff is on inquiry notice of a Securities Act claim when "the circumstances are such as to suggest to a person of ordinary intelligence the probability" of an alleged misrepresentation of omission.  *Jackson Nat'l Life Ins. Co.* v. *Merrill Lynch & Co., Inc.*, 32 F.3d 697, 701 (2d Cir. 1994). "Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself."  *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 201 (S.D.N.Y. 2003).  A plaintiff may be put on inquiry notice by information in analyst reports, *id.*, news articles, *Shah* v. *Meeker*, 435 F.3d 244, 249 (2d Cir. 2006), government filings, *Menowitz* v. *Brown*, 991 F.2d 36, 42 (2d Cir. 1993), and financial, legal, or other data, *Dietrich* v. *Bauer*, 76 F. Supp. 2d 312, 343-44 (S.D.N.Y. 1999).  Once a plaintiff is on inquiry notice, courts impute constructive notice of "all facts that could have been learned through diligent investigation."  *Benak* v. *Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 (3d Cir. 2006).

Plaintiffs filed their Amended Complaint on August 22, 2008, including for the first time

their Securities Act claims related to the February 2007 DISCS offering. Named plaintiff Painting Industry previously filed a complaint on July 25, 2008 alleging the DISCS-related Securities Act claims. Ex. 27. Even if July 25, 2008 is accepted as the filing date for these claims, they are still time-barred because plaintiffs were on inquiry notice prior to July 25, 2007.

Plaintiffs point generally to three "facts" that Ambac improperly failed to disclose — lowered mortgage originator standards, lowered Ambac underwriting standards and negative trends in mortgage collateral. Compl. ¶¶ 400, 405, 408. Because the alleged omissions are very general, similarly general information available to the market should be sufficient to provide notice. *See In re Merrill Lynch & Co. Research Reports*, 289 F. Supp. 2d at 416; *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1114, 1116 (C.D. Cal. 2003). Prior to July 25, 2007, "storm warnings" in the market put plaintiffs on "inquiry notice" of such information.

The Complaint itself makes it clear that prior to July 25, 2007, it was well-known that mortgage originators had lowered their standards and that mortgage collateral was showing negative trends — and thus plaintiffs were on inquiry notice. Plaintiffs refer to a report by Moody's from the **third quarter of 2006** that stated "that there had not merely been a one-time shift in the quality of loans, but that there appeared to be a trend of weakening loan quality." Compl. ¶ 108. **In March of 2007**, at a conference cited by plaintiffs (Compl. ¶ 173), John Uhlein fielded numerous questions from investors about Ambac's mortgage-related exposures in light of the well-known turmoil in that market. Ex. 57 at 4-6. Plaintiffs also cite John Uhlein's statements at a **June 12, 2007** KBW Mortgage Finance Conference where he explicitly references the "turmoil" in the mortgage markets. *Id.* ¶ 188. Indeed, in the same presentation, Uhlein specifically states that the 2006 vintage of mortgages is not performing well and discusses the fact that many mortgagees are finding it necessary to look into refinancing their loans. Ex. 56, at 5, 7. And on **July 23, 2007**, Countrywide — once the country's largest mortgage originator — disclosed significant losses in its mortgage portfolio. Compl. ¶ 95 (stating that "investors became more sensitive to RMBS and CDO risks" following Countrywide's July 23, 2007 disclosure of losses).

The Complaint also shows that by early 2007 plaintiffs were on inquiry notice of any al-

leged lowering of Ambac's underwriting standards.  Plaintiffs allege that "[b]y early 2007, both the media and research analysts were reporting on the weakening housing market, and began to link the decline in housing prices, rise in interest rates and increase in defaults to a weakening of the securitized RMBS and CDO markets,"  which resulted in investors becoming "concerned that significant declines" in the ABX and TABX indices "indicated deterioration in the values of RMBS and CDOs backed by RMBS collateral."  Compl. ¶ 111.  Assuming that plaintiffs are correct, these reports, combined with Ambac's explicit disclosures that it had guaranteed RMBS and CDOs, would have "suggest[ed] to a person of ordinary intelligence the probability" that Ambac might face losses on the RMBS and CDOs it chose to guarantee.  *See Jackson Nat'l Life Ins. Co.*, 32 F.3d at 701.  Indeed, since at least May 2007, critics of Ambac had been asserting exactly that. *See* Ex. 15 (May 2007 MarketWatch article citing report by Bill Ackman[22] that argued that Ambac was extensively exposed to subprime and that, once subprime losses hit, Ambac's guarantees would be worthless); Ex. 16 (May 2007 Ackman presentation, "Who's Holding the Bag?").

Once on inquiry notice, plaintiffs are imputed to know "all facts that could have been learned through diligent investigation." *Benak,* 435 F.3d at 401.  Since January 2006 (and before), Ambac has disclosed all the details of its RMBS portfolio on its website. *E.g.*, Oehrig Exs. 1a, 2a, 3a.  This gave plaintiffs complete information regarding Ambac's RMBS exposures and thus, with reasonable diligence, plaintiffs could have known (if true, as plaintiffs allege) that Ambac had lowered its underwriting standards.  Likewise, Ambac had extensively disclosed that it was increasingly guaranteeing CDOs backed by MBS — Ambac's 2006 Form 10-K, for example, stated that guarantees of CDOs increased from 6% of Ambac's new structured finance guarantees in 2004 to 33% in 2006.  Ex. 30.  Thus, plaintiffs were on inquiry notice that Ambac was exposed to the risks of MBS and CDOs before July 25, 2007.

---

[22] Bill Ackman is a well-known short-seller who heavily publicized his allegations that both Ambac and its major competitor MBIA were overpriced.  Ex. 18.  His public presentation contains graphic assertions that defendants do not accept, and dispute were true as of May 2007 — nonetheless, the presentation does describe all of the trends plaintiffs contend were allegedly not disclosed and the presentation was widely available and discussed in the market, Exs. 15, 17, at the very least putting plaintiffs on inquiry notice of alleged omissions.

**C.    The claims arising out of the March 2008 Offerings should be dismissed (Counts V, VI, VII).**

The March 2008 Offerings occurred after these securities class actions were filed (the first case was filed January 16, 2008), and the March 2008 Offering documents (as well as other Ambac public filings) expressly disclosed these very suits.  Ex. 59 at S-42.  Yet plaintiffs now seek to expand their Complaint to include these offerings as well.

**1.    The Complaint fails to sufficiently allege any material misstatement or omission of fact, particularly in light of the explicit risk disclosures in the offering documents and other information in the marketplace by March 2008.**

Plaintiffs' March 2008 Offerings claims sound in fraud, are subject to Rule 9(b), involve the same statements alleged to be false for the same reasons identified in plaintiffs' Exchange Act claims, and thus must be dismissed for the same reasons identified above in Point I.B.

Furthermore, under *Twombly*, plaintiffs' conclusory pleading is insufficient.  Plaintiffs simply list a variety of Ambac's statements and then list "facts" that allegedly render the preceding statements false.  And plaintiffs fail to make any allegations regarding why any of the facts they allege rendered any misstatement "material."  *Garber*, 537 F. Supp. 2d at 613.

Such conclusory pleading is particularly insufficient here, where the March 2008 Offerings' prospectuses contained graphic risk disclosures.  As noted above, "[w]hen cautionary language is present, we analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled."  *See Halperin*, 295 F.3d at 357, 360 (affirming dismissal of complaint where offering memoranda "not only bespeak caution, they shout it from the rooftops").  Optimistic predictions are immaterial when accompanied by specific cautionary statements.  *Trump Casino*, 7 F.3d at 371-72; 15 U.S.C. § 77z-2.  Here, the March 2008 offerings prospectuses clearly "bespeak caution" with respect to all of plaintiffs' alleged misstatements, disclosing:

- "Continued increases in RMBS defaults as a result of fraud, foreclosures, increases in interest rates . . ." and that the loans underlying the RMBS were "experiencing near-record volumes of delinquencies and losses, due to factors such as weak mortgage industry underwriting standards [and] declining home value."  Ex. 58, 2008 Common Stock Offering Prospectus,  at S-30; Ex. 59, 2008 Equity Units Offering Prospectus, at S-50.

- Ambac's "underwriting and risk management policies and practices in the past have not anticipated unforeseen risks and/or the magnitude of potential for loss as the result of foreseen risks. . . . [and Ambac relies on] complex financial models [and] [f]laws in these financial models and/or faulty assumptions used by these financial models could lead to increased losses and loss reserving." *Id.* at S-15; S-38.

- Ambac's "net income and earnings have become more volatile due to the application of fair value accounting." *Id.*

- Ambac warned specifically of the risks related to its exposures to RMBS and CDOs of RMBS and that "further deterioration in performance in the subprime mortgage sector is generally expected" and could have an impact on Ambac's "potential claims payments and ultimate losses." *Id.* at S-12-13; S-35.

- Ambac faces the risk of downgrades by S&P and Moody's which would materially adversely affect Ambac's business and prospects. *Id.* at S-7; S-29-30.

The prospectus even included the risk of liability arising out of these very lawsuits. *Id.* at S-19-20; S-42. These specific risk disclosures rendered the alleged misstatements in the documents incorporated by reference — originally made weeks and months prior to the March offerings — immaterial under the "bespeaks caution" doctrine and non-actionable under the PSLRA safe harbor.

In addition, the Complaint itself is replete with allegations showing that the "total mix" of available information in the market at the time of the March 2008 offerings rendered any of Ambac's statements immaterial. *See Garber*, 537 F. Supp. 2d at 613.

- The Offerings followed Ambac's 4Q 2007 disclosure of significant writedowns and loss reserves on its CDO and RMBS exposures due to the market downturns. Compl. ¶¶ 443.

- In January 2008, a third-party had posted an "open-source model" that showed all of Ambac's RMBS and CDO exposures that made it possible for investors to "determine whether Ambac's statements about its mortgage collateral were true." *Id*. ¶¶ 115-116.

- Ambac had filed a Form 8-K in January 2008 that stated that Ambac was "subject to credit risk related to [RMBS] and CDOs of ABS" and detailed that risk. *Id*. ¶ 171.

Every alleged omission was thus known to the market by March 2008 and thus plaintiffs cannot show that any of the alleged misstatements were material at the time of the March 2008 offering.[23]

---

[23] For the same reasons identified in Points I.B.3-4, plaintiffs fail to sufficiently allege any GAAP violations. Compl. ¶¶ 449-466. Indeed, plaintiffs' Securities Act GAAP allegations are so conclusory as to be meaningless. They consist solely of plaintiffs listing various accounting provisions and then stating, with no factual support, that "Ambac failed to comply with SFAS 133 and 107 because it failed to properly value its CDS as required by SFAS 133" or that "Ambac's financial statements failed to properly account for and report loss reserves under GAAP." Compl. ¶¶ 461, 466. Such *ipse dixit* allegations are insufficient to raise plaintiffs' right to relief above the speculative level as required by *Twombly*. *See Garber*, 537 F. Supp. 2d at 613.

2.    **Plaintiffs lack standing under Sections 11 and 12(a)(2) with respect to the March 2008 equity units offering.**

None of the lead plaintiffs nor the additional named plaintiff (Painting Industry) is alleged to have ever purchased any equity units. Accordingly, no named plaintiff has standing to assert any Section 11 or Section 12(a)(2) claims related to the March 2008 equity units offering and those claims must be dismissed. *See In re Global Crossing*, 313 F. Supp. 2d at 206-07 (dismissing Section 11 claims); *In re Flag Telecom*, 308 F. Supp. 2d at 257 (dismissing section 12(a)(2) claims); *Ciresi* v. *Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991).[24]

D.    **All of the Securities Act claims must be dismissed because plaintiffs' allegations make it clear that plaintiffs' losses are not due to the revelation of alleged misstatements, but are instead due to other factors.**

Section 11 and 12(a)(2) claims must be dismissed when plaintiffs' allegations make it clear that their losses are not due to the revelation of alleged misstatements, but are instead due to other factors. *See In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 589 (S.D.N.Y. 2006); *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005); *In re Merrill Lynch & Co. Research Reports*, 272 F. Supp. 2d at 255. As discussed above in Section I.D, plaintiffs' Complaint only demonstrates that Ambac, like numerous other financial institutions, has suffered and disclosed losses in the wake of the mortgage and credit market downturns, and not due to any revelations of material misstatements by Ambac.[25] Accordingly, plaintiffs' Securities Act claims should be dismissed.[26]

## CONCLUSION

This Court should dismiss plaintiffs' Complaint in its entirety.

---

[24] Ambac and the individual defendants also adopt the points and authorities set forth in the Underwriters' Memorandum in Support of the Underwriter Defendants' Motion to Dismiss (Points I-IV) and the points and authorities set forth in KPMG's Memorandum in Support of KPMG's Motion to Dismiss (Points I-III), both filed contemporaneously with this brief.

[25] For the purposes of this motion to dismiss, it is sufficient to accept plaintiffs' allegation regarding the "current crisis in the U.S. residential mortgage market" (Compl. ¶ 55) without parsing all of the potential causes of Ambac's losses, including, in addition, fraud and other wrongdoing perpetrated on Ambac by sponsors and originators of RMBS.

[26] Plaintiffs' secondary liability claims against defendants Genader, Callen and Leonard for violation of Section 15 of the Securities Act (Compl. ¶¶ 503-510) must likewise be dismissed. *See supra* note 21; *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003).

WACHTELL, LIPTON, ROSEN & KATZ

/s/  Peter C. Hein_____
Peter C. Hein (PH-5279)
Warren R. Stern (WS-2957)
Joshua A. Naftalis (JN-8054)
C. Lee Wilson (CW-7925)
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Defendants Ambac Financial Group, Inc., Robert J. Genader, Sean T. Leonard, John W. Uhlein, III, David W. Wallis, Michael A. Callen, Phillip B. Lassiter, Jill M. Considine, W. Grant Gregory, Thomas C. Theobald, Laura S. Unger, Henry Wallace, Philip N. Duff.*

Dated:  October 21, 2008



## Exhibit A

Case-Shiller 20-City Composite Index Price Changes
and Certain Ambac Announcements of Writedowns, Losses and Loss Reserves

Note:  This chart was created using the July 2008 S&P/Case-Shiller Home Price Indices data (published Sept. 30, 2008).  This data is publicly available on Standard and Poor's website at  http://www2.standardandpoors.com/spf/pdf/index/CSHomePrice_History_093042.xls. This is the same data underlying the chart plaintiffs rely on in ¶ 106 of the Complaint.