UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

IN RE AMBAC FINANCIAL GROUP, INC.          Civil Action No. 08-00411-NRB
SECURITIES LITIGATION
                                                         ECF Case

-------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT KPMG LLP'S MOTION TO DISMISS

**WILLKIE FARR & GALLAGHER LLP**

**787 Seventh Avenue**
**New York, New York  10019-6099**
**(212) 728-8000 (telephone)**
**(212) 728-8111 (facsimile)**

**Attorneys for Defendant KPMG LLP**

## TABLE OF CONTENTS

                                                                        Page

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ............................................................................ 1

FACTS ................................................................................................................... 3

ARGUMENT ......................................................................................................... 9

I.      THE SUPPOSED MISSTATEMENTS DID NOT AFFECT THE "TOTAL MIX." ....... 10

II.     THE SUPPOSED MISSTATEMENTS WERE NOT FALSE. ........................... 13

III.    THE SUPPOSED MISSTATEMENTS WERE MATTERS OF JUDGMENT
        WHICH FAIL TO SUPPORT A SECTION 11 CLAIM .................................... 19

CONCLUSION ...................................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*In re Allied Capital Corp. Sec. Litig.*, 02 Civ. 3812, 2003 WL 1964184
(S.D.N.Y. Apr. 25, 2003)......................................................................17, 21

*Bell Atlantic Corp v. Twombly*, 127 S. Ct. 1955 (2007) ..............................14

*In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685 (S.D.N.Y. 2004) ...................13, 17, 19, 21

*In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993) .........................13

*Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) .......................13, 14

*Greene v. WCI Holdings Corp.*, 956 F. Supp. 509 (S.D.N.Y. 1997)......................21

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002)................................11

*Hinerfeld v. United Auto. Group*, 97 Civ. 3533, 1998 WL 397852
(S.D.N.Y. Jul. 15, 1998) ..............................................................19, 20. 21

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991)....................................3

*In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881 (8th Cir. 2002) .............................17

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416
(S.D.N.Y. 2003)............................................................................3

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662
(S.D.N.Y. 2008).......................................................................10, 14

*Press v. Quick & Reilly, Inc.*, 218 F.3d 121 (2d Cir. 2000).................................3

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ...........................................11

*In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248 (S.D.N.Y. 2005)................19

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996)................................................................3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ............................3

*In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173 (N.D. Cal. 2004) ..................13

*Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991)..............................................................19

## FEDERAL STATUTES

15 U.S.C. § 77k (2008) ........................................................................................................10

## OTHER SOURCES

Accounting for Contingencies, Statement of Fin. Accounting Standards No. 5
     (Fin. Accounting Standards Bd. 2008) .......................................................................15, 16

Accounting for Derivative Instruments and Hedging Activities, Statement of
     Fin. Accounting Standards No. 133 (Fin. Accounting Standards Bd. 2008)...............14, 16

Defendant KPMG LLP ("KPMG") submits this memorandum of law in support of its motion to dismiss plaintiffs' Consolidated Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Over the past eighteen months, the very underpinnings of the modern financial system have been called into question. The global credit crisis, the collapse of the subprime mortgage markets, the subsequent rating agency downgrades, and the resulting instability of Wall Street's most reputable financial institutions all have adversely affected the financial guarantee industry. Against this backdrop of sudden and unprecedented events, described by some as the worst since the Great Depression, it should come as no surprise that even Ambac Financial Group, Inc. ("Ambac") – one of the most reputable players in that industry – has suffered substantial losses due to its exposures to home mortgage securitization products, among them, credit default swaps on collateralized debt obligations ("CDOs") and direct financial guarantees on residential mortgage-backed securities ("RMBSs").

Ignoring the realities of this global financial crisis, plaintiffs attempt to construct a different tale of business reversal owing to a supposed decision made in 2005 by Ambac to move beyond its traditional municipal bond insurance business and enter into CDO- and RMBS-related products.[1] Plaintiffs allege that Ambac made a number of false disclosures beginning in 2006 that failed to properly value the company's exposure to these products in light of increased risks in the marketplace. Based on those allegations, plaintiffs assert securities fraud claims against a

---

[1]    For purposes of this motion to dismiss only, KPMG assumes the factual allegations contained in the complaint are true.

number of defendants, including Ambac and some of its current and former officers, blaming each for the decline in Ambac's stock.

Without getting to the folly of that story, plaintiffs' claim against KPMG is of a wholly different kind, and is even more fundamentally flawed. Plaintiffs assert a section 11 claim against KPMG premised upon two March 6, 2008 Ambac securities offerings that incorporated by reference 2007 financial statements audited by KPMG. The main thrust of this claim is that plaintiffs were misled into buying in these offerings, principally because Ambac failed to properly value and reserve against its CDO and RMBS exposures.

There are a number of problems with plaintiffs' claim, foremost among them that, by March 2008, the markets were so saturated with bad news about CDOs and RMBSs generally and Ambac's exposures to these products in particular that no one can credibly claim to have been misled here. By March 2008, the markets for CDOs, RMBSs, and related products had all but ceased to exist, and major financial institutions and public companies were in the midst of what would amount to hundreds of billions of dollars in write-downs. Ambac too had disclosed billions of dollars in write-downs and reserve increases related to CDO and RMBS products, lost its AAA credit rating from Fitch, and revealed that prospects were grim owing to the drag from these products. More than that, its CEO had resigned, its stock price had collapsed, and Ambac had disclosed the precise details of its CDO and RMBS exposures so that investors could judge the fallout for themselves. To say all of this differently, the market was so overwhelmed with bad news about Ambac guarantees on CDOs and RMBSs that any more would not have materially affected the "total mix" of information already out there.

For that matter, plaintiffs do not even plausibly allege that Ambac's CDO and RMBS accounting was wrong in the first place. Plaintiffs' claim against KPMG fails entirely to

describe how Ambac valued and reserved against its CDO and RMBS exposures, or what supposedly required Ambac to do so differently. Elsewhere in the complaint, plaintiffs allege that adjustments should have been made based on public indices of CDO and RMBS products. But plaintiffs identify nothing in GAAP requiring the approach they espouse, and no such GAAP authority exists. Nor, separately, do plaintiffs allege that KPMG either did not believe or lacked a reasonable basis for accepting anything having to do with Ambac's valuation and reserving – which is required given that valuation and reserving inherently are matters of judgment.

No section 11 claim exists against KPMG. The claim should be dismissed.

## FACTS

KPMG was the outside auditor of Ambac's December 31, 2007 financial statements.[2] Plaintiffs supposedly are buyers of securities sold by Ambac in two offerings on March 6, 2008, one of common stock and the other of equity units in the company.[3]

Ambac is what is known as a "monoline" insurer, that is, it is an insurance company that provides "one type of insurance – a guarantee to protect against credit risk, *i.e.*, the risk of default."[4] Founded in 1971, Ambac's traditional business was insuring against the risk of default on municipal bonds and, as the complaint itself acknowledges, the company earned a

---

[2]  October 21, 2008 Affidavit of Antonio Yanez, Jr. ("Yanez Aff.") Exh. 1 (Compl. ¶ 392); *see also* Yanez Aff. Exh. 2 (2/29/08 Form 10-K at S-1). On a motion to dismiss, the Court may consider documents that are incorporated into or relied upon in the complaint, *see San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 809 (2d Cir. 1996), publicly filed information, *see Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 129 (2d Cir. 2000), market phenomena, *see In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003), and other matters of which judicial notice may be taken, *see Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). *See also Tellabs Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007). The Court may therefore consider Ambac's SEC filings and the other documents cited in this brief.

[3]  Yanez Aff. Exh. 1 (Compl. ¶¶ 366–67).

[4]  Yanez Aff. Exh. 1 (Compl. ¶ 30).

reputation as "one of the leading financial guarantee insurers in the world."[5]  Over the years, Ambac also developed a reputation for superior underwriting and risk management and, as a result, earned top credit ratings from each of the three major rating agencies:  AAA ratings from Fitch and Standard and Poor's and an equivalent rating from Moody's.[6]

Then, beginning in 2005 (according to the complaint), Ambac started expanding the business that underlies this lawsuit, namely, the issuance of financial guarantees (insurance, basically) relating to CDOs and RMBSs.[7]  CDOs and RMBSs are "pools of assets whose cumulative cash flows are distributed in a structured manner to investors."[8]  Essentially, the CDO or RMBS structure issues securities divided into different classes or "tranches," each entitled to a defined interest rate and exposed to potential losses on a sliding scale.[9]  The most junior tranche (which receives the highest interest rate) is the first to absorb losses, and the most senior or "super-senior" tranche (which receives the lowest interest rate) is the last.[10]  Typically, Ambac provided guarantees in the form of credit default swaps on the "super-senior" tranches of CDOs and in the form of direct guarantees on investment grade tranches of RMBSs.[11]

---

[5]     Yanez Aff. Exh. 1 (Compl. ¶ 30).

[6]     Yanez Aff. Exh. 1 (Compl. ¶ 32).

[7]     Yanez Aff. Exh. 1 (Compl. ¶¶ 66, 69).

[8]     Yanez Aff. Exh. 1 (Compl. ¶ 43).

[9]     Yanez Aff. Exh. 1 (Compl. ¶ 47).

[10]    Yanez Aff. Exh. 1 (Compl. ¶¶ 46–47).

[11]    Yanez Aff. Exh. 1 (Compl. ¶ 136).  The complaint is inconsistent in its allegations as to the exposures for which Ambac provided direct financial guarantees.  In places, the complaint appears to allege that Ambac wrote direct guarantees only on RMBSs, while in other places it alleges that direct guarantees were written on certain CDOs as well.  *Compare* Yanez Aff. Exh. 1 (Compl. ¶ 449) (alleging that Ambac failed "to take required loss reserves on its Direct RMBS exposures" without mentioning any direct CDO exposures) *with* Yanez Aff. Exh. 1 (Compl. ¶ 454) ("Financial guarantees on the various RMBS and CDOs directly insured by Ambac are accounted for differently under GAAP than CDS [credit default swap] derivatives.").  Be that as it may, the analysis for purposes of this motion is the same whether direct guarantees were written on either or both.

A critical aspect of this business was that Ambac's exposure to CDOs and RMBSs was limited because, consistent with its historical business practice, Ambac provided guarantees that covered only credit risk.[12]  That is, Ambac would pay on its guarantees only if there were a default on the payments owed to the holders of CDO securities and RMBS obligations.[13]  Ambac was not at risk if guaranteed CDO securities or RMBSs lost value, for example, because trading slowed or stopped (so-called "liquidity risk") or because the interest rates offered on other CDOs and RMBSs were more attractive (so-called "interest rate risk") – even if these other risks caused the value of the securities to approach zero.[14]  Nor, insofar as is relevant here, was Ambac taking direct ownership of CDOs and RMBSs.[15]

In the late summer of 2007, however, the markets suddenly seized up.[16] "Virtually overnight the seemingly insatiable desire for financial risk came to an abrupt halt as the price of risk unexpectedly surged."[17]  CDO markets froze, active trading of many instruments all but stopped, and major institutions began a series of write-downs that continues today.[18]  For example, Merrill Lynch (before the still-unfolding crisis forced that company to sell itself) announced CDO-related and other write-downs totaling $19.4 billion beginning on October 24, 2007,[19] and write-downs were subsequently reported by Citigroup ($20.4 billion),[20] Morgan

---

[12]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 53).

[13]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 53).

[14]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 53).

[15]    Yanez Aff. Exh. 1 (Compl. ¶¶ 60–66).

[16]    Yanez Aff. Exh. 3 (Alan Greenspan, *The Roots of the Mortgage Crisis*, Wall St. J., Dec, 12, 2007, at A19).

[17]    Yanez Aff. Exh. 3 (Alan Greenspan, *The Roots of the Mortgage Crisis*, Wall St. J., Dec, 12, 2007, at A19).

[18]    Yanez Aff. Exh. 3 (Alan Greenspan, *The Roots of the Mortgage Crisis*, Wall St. J., Dec, 12, 2007, at A19).

[19]    Yanez Aff. Exh. 4 (Merrill Lynch 10/24/07 Form 8-K at 4); Yanez Aff. Exh. 5 (Merrill Lynch 1/17/08 Press Release).

Stanley ($9.4 billion),[21] Bear Stearns ($2.3 billion),[22] and more than 130 other public companies.[23]

Ambac suffered too. On October 10, 2007, Ambac announced a $743 million write-down on certain CDO exposures.[24] Soon after, an entire analyst call focused on concerns over whether Ambac's "capital would still be adequate to maintain" its then-AAA credit rating if additional CDO-related transactions were "downgraded to below investment-grade."[25] Analysts were separately commenting that "there's a panic level out there that the CDOs are termed to be worthless,"[26] and were asking whether Ambac would need to take (or should have taken) larger write-downs given that Merrill was "writing down half of the value of [its] Super Senior AAA CDO exposures."[27] And on December 21, 2007, Ambac announced that its AAA credit rating from Fitch, in fact, was in jeopardy as Fitch had placed that rating under "watch negative."[28]

After year end, the news only got worse. On January 16, 2008, Ambac disclosed a $5.4 billion mark-to-market write-down, including $1.1 billion of credit impairments on credit default swap exposures for CDOs backed by "subprime residential mortgage-backed securities

---

[20]    Yanez Aff. Exh. 6 (Citigroup 2/22/08 Form 10-K at 30, 48).

[21]    Yanez Aff. Exh. 7 (Morgan Stanley 1/27/08 Form 10-K at 34, 53).

[22]    Yanez Aff. Exh. 8 (Bear Stearns 1/29/08 Form 10-K at 42).

[23]    Yanez Aff. Exh. 9 (Meg Fletcher, *Trends: Subprime Fallout Could Cost Billions,* Bus. Ins., Apr. 21, 2008).

[24]    Yanez Aff. Exh. 1 (Compl. ¶ 285).

[25]    Yanez Aff. Exh. 10 (11/7/07 Analysts Call at 8).

[26]    Yanez Aff. Exh. 11 (10/24/07 Analysts Call at 16).

[27]    Yanez Aff. Exh. 11 (10/24/07 Analysts Call at 4); Yanez Aff. Exh. 1 (Compl. ¶ 285).

[28]    Yanez Aff. Exh. 12 (12/21/07 Press Release).

. . . internally downgraded to below investment grade."[29]  Ambac also increased loss reserves by $143 million as to its direct insurance RMBS exposure,[30] "relate[d] primarily to underperforming home equity line of credit and closed-end second lien RMBS securitizations."[31]  At the same time, the company announced a 67% reduction in a planned dividend payout, the need to raise at least $1 billion in capital, and the departure of its CEO and Chairman.[32]  Within days, on January 18, 2008, Ambac's AAA rating from Fitch was downgraded to AA, and comparable downgrades by Standard & Poor's and Moody's would follow a few months after that.[33]

By this point, Ambac's stock price had declined from a high of $96.08 in May 2007 to $6.24.[34]  Analyst reaction, in turn, had evolved from simple questioning to open skepticism about anyone's ability to accurately assess CDO and RMBS exposure, and Ambac (to its credit) was candidly telling the market that the unprecedented market turmoil essentially meant that nothing was sure.[35]  For instance, during a January 22 analyst call, one participant quite pointedly asked whether "three months from now [Ambac will] discover CDO rating methodology number five that warrants the high grade CDOs suddenly going to low investment

---

[29]     Yanez Aff. Exh. 13 (1/16/08 Press Release at 2).

[30]     Yanez Aff. Exh. 1 (Compl. ¶ 246).

[31]     Yanez Aff. Exh. 1 (Compl. ¶ 246).

[32]     Yanez Aff. Exh. 1 (Compl. ¶ 245).

[33]     Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 2–3).

[34]     Yanez Aff. Exh. 1 (Compl. ¶¶ 8, 317).  Nor was Ambac's experience unique among financial guarantors. As set forth in the Ambac Defendants' motion to dismiss brief, Ambac's competitors too announced billions in dollars in write-downs, had their ratings downgraded, and saw huge stock price declines.  *See* Memorandum in Support of Ambac and Individual Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, dated October 21, 2008 (the "Ambac Defendants' Brief") at 10.

[35]     Yanez Aff. Exh. 14 (1/22/08 Analysts Call at 17).

grade."[36]  Ambac's response was, "If the facts change, [Ambac] reserve[s] the right to change

[its] opinion . . . . based on the frankly unprecedented environment that we've got."[37]

Thereafter, on February 29, 2008, Ambac filed its 2007 Form 10-K, which

described the effects of the earlier-announced write-downs and reserve increases (including net

full-year mark-to-market losses on credit derivative contracts of over $6 billion, negative

revenue of over $4 billion, and net losses of over $3 billion), and was explicit that the future

looked both grim and uncertain.[38]  Among other things, Ambac warned that "further

deterioration" relating to its CDO and RMBS exposures was "generally expected";[39] that the

extent of the downturn was "unknown" and basically unknowable;[40] that there was "significant

financial stress" in these markets;[41] and that the risk of loss with respect to more recent CDOs

and RMBSs in particular "has been elevated."[42]  The 2007 Form 10-K stated:

- "We have insured, and written credit default swaps ("CDS") with respect to, RMBS and CDOs of ABS and are thus exposed to credit risk associated with those asset classes . . . *While further deterioration in performance of the subprime mortgage sector is generally expected, the extent and duration of any future continued deterioration of the credit markets is unknown,* as is the impact, if any, on potential claim payments and ultimate losses of the securities within Ambac Assurance's portfolio."[43]

---

[36]    Yanez Aff. Exh. 14 (1/22/08 Analysts Call at 17).

[37]    Yanez Aff. Exh. 14 (1/22/08 Analysts Call at 17).

[38]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 45).

[39]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 36).

[40]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 36).

[41]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 54).

[42]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 35–36, 55, 56, 58).

[43]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 35–36) (emphasis added).

- "*The risk of loss inherent in the 2005, 2006 and 2007 vintage sub-prime, mid-prime and second lien mortgage loans has been elevated due to a number of factors.* These factors increase current and potential future losses . . . ."[44]

- "*The speed and extent of the housing downturn has been significant and has resulted in significant losses for several major financial institutions and investors, including Ambac.* During the third and fourth quarters of 2007, the major rating agencies downgraded and put on watch for downgrade a significant number of RMBS and CDO of ABS, including securities guaranteed by Ambac."[45]

It was only after all of this – on March 6, 2008 – that the securities offerings underlying plaintiffs' claim against KPMG were made.[46] Plaintiffs assert that they were fooled into buying in the offerings by un unjustifiably rosy picture. The principal basis for this assertion is that the March 2008 offering documents (including Ambac's 2007 From 10-K which was incorporated by reference) violated GAAP by misstating the value of Ambac credit default swaps on CDOs and the level of reserves needed in connection with Ambac's direct guarantees on RMBSs.[47]

## ARGUMENT

Plaintiffs bring one claim against KPMG, under section 11 of the Securities Act of 1933.[48] Section 11 provides a cause of action where a registration statement pursuant to which securities were offered "contain[ed] an untrue statement of a material fact or omitted to

---

[44]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 55) (emphasis added).

[45]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 58) (emphasis added). Nor, by any means, were these the only negative disclosures by Ambac or, for that matter, the only pieces of bad news about Ambac or the market generally as set forth in the Ambac Defendants' Brief and the Memorandum of Law in Support of Underwriters' Motion to Dismiss. *See, e.g.,* Ambac Defendants' Brief at point II.B.1 and II.C.1; Memorandum of Law in Support of Underwriters' Motion to Dismiss at point I.B.1.

[46]    Yanez Aff. Exh. 1 (Compl. ¶¶ 358–65).

[47]    Yanez Aff. Exh. 1 (Compl. ¶¶ 446–48).

[48]    Yanez Aff. Exh. 1 (Compl. ¶ 485).

state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k (2008). To state a section 11 claim, a complaint must therefore allege both that the registration statement at issue contained a misstatement or omission, and that the alleged misstatement or omission was "material." *See, e.g., Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008).

Here, plaintiffs fail to state a section 11 claim against KPMG for a number of reasons. First, the supposed misstatements identified by plaintiffs did not materially alter the "total mix" of bad news in which financial markets were already wallowing. Second, plaintiffs do not adequately allege the existence of a false statement to begin with. Third, even crediting their allegations of falsity, plaintiffs fail to allege that KPMG either did not believe Ambac's accounting was GAAP-compliant or lacked a reasonable basis for its beliefs, which is required because valuation and loss reserves are matters of judgment.[49]

## I.    THE SUPPOSED MISSTATEMENTS DID NOT AFFECT THE "TOTAL MIX."

Plaintiffs fail altogether to identify anything materially misleading about Ambac's March 2008 securities offering documents.

A misstatement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Halperin v. eBanker*

---

[49] The complaint should be dismissed for at least two additional reasons set forth in the Ambac Defendants' Brief. First, the decline in Ambac's stock price (and, thus, plaintiffs' losses) were caused by factors independent of any supposed misstatements as to Ambac's accounting, and were a by-product of the overall declines caused by the collapse of the markets for mortgage-related products. *See* Ambac Defendants' Brief at point II.D. Second, plaintiffs lack standing to pursue a section 11 claim based on Ambac's March 6, 2008 equity units offering because none of the lead plaintiffs is alleged to have bought equity units either in the offering or traceable to the offering. *See* Ambac Defendants' Brief at point II.C.2. KPMG hereby adopts and incorporates these and the other arguments set forth in the Ambac Defendants' Brief, as well as the arguments set forth in the Memorandum of Law in Support of Underwriters' Motion to Dismiss.

*USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224,

231-32 (1988) (citation and internal quotations omitted)). "The touchstone of the inquiry is not

whether isolated statements within a document were true" but whether a defendant's statements

"would affect the total mix of information and thereby mislead a reasonable investor regarding

the nature of the securities offered." *Halperin*, 295 F.3d at 357. The test is "whether the

defendants' representations, taken together and in context, would have misled a reasonable

investor." *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (quoting *I. Meyer Pincus &

Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)).

      The thrust of plaintiffs' claim here, as noted, is that they were misled into buying

in Ambac's March 2008 securities offerings, principally because Ambac overstated the value of

its credit default swaps and understated its loss reserves on direct RMBS guarantees.[50] The

problem is that by March 2008 it was painfully apparent to anyone paying even casual attention

that the CDOs and RMBSs markets were in severe distress and that the prospects for any

company with CDO and RMBS exposure were uncertain at best. As set forth above, by March

2008, markets had seized, major financial institutions and public companies were taking billions

of dollars in write-downs, and the write-downs showed no signs of abating.[51]

      Nor can plaintiffs credibly assert they somehow were misled into thinking that

Ambac was immune. Once again, by March 2008, Ambac itself had recorded over $6 billion in

write-downs relating to its CDO and RMBS exposures ("staggering" amounts that "stunned

investors," according to the complaint).[52] More than that, the company had by that point seen its

---

[50]    Yanez Aff. Exh. 1 (Compl. ¶¶ 352, 448).

[51]    Yanez Aff. Exh. 9 (Meg Fletcher, *Trends: Subprime Fallout Could Cost Billions,* Bus. Ins., Apr. 21, 2008).

[52]    Yanez Aff. Exh. 1 (Compl. ¶¶ 13, 141–44). Indeed, plaintiff all but concedes that these write-downs brought at least Ambac's credit default swap valuations into line with what was to be expected based on the market generally. The complaint alleges that "[u]ntil January 16, 2008, Ambac's mark-to-market reporting

AAA credit rating downgraded by Fitch, lost its CEO, cut its dividend, announced a need to raise

capital, and warned in its 2007 Form 10-K (among other things) that "further deterioration" was

expected even while acknowledging that the extent of the future deterioration was "unknown."[53]

All of this, moreover, is before getting to the fact that the March 2008 offerings

were preceded by disclosure of Ambac's precise CDO and RMBS exposures – which plaintiffs

now use as a basis for challenging Ambac's valuations and loss reserves (albeit not in a section

of the complaint directed to KPMG) and which presumably could have been used to evaluate

Ambac's accounting before the March 2008 offerings as well.  The complaint is crystal clear that

by January 30, 2008 (a full five weeks before the offerings at issue here) detailed information

about Ambac's CDO and RMBS exposures was available publicly, and that the information was

sufficiently robust to permit evaluation of Ambac's CDO and RMBS exposures.  The complaint

states:

> Notably, Ambac did not identify the underlying collateral of its insured
> CDOs. . . .  Even as to the RMBS, investors could not, absent costly and
> arduous efforts and review of disparate sources of information, determine
> whether Ambac's statements about its mortgage collateral were true.
>
> *This changed on January 30, 2008*, when a third party posted on its
> website an "Open Source Model," which *listed all of Ambac's RMBS and
> CDO exposures*, including the securities comprising the collateral for
> Ambac's CDOs.  Lead Plaintiffs used the information included in the
> Open Source Model to analyze the performance of the collateral
> underlying Ambac's exposures . . .[54]

Again, plaintiffs use this information now to value Ambac's exposures, and could have used it

for the same purpose before buying Ambac securities in March 2008.

---

bore little relationship to the actual change in value of Ambac's credit default swaps relating to its CDO" –
leaving the implication that such a relationship existed from that point forward.  *See* Yanez Aff. Exh. 1
(Compl. ¶ 135).

[53]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 36).

[54]    Yanez Aff. Exh. 1 (Compl. ¶¶ 115–16) (emphasis added).

No reasonable investor was misled here given the "total mix of information." Plaintiffs' section 11 claim should therefore be dismissed.[55] *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008) (dismissing section 11 claim due to a failure to plead materiality on the grounds that "any reasonable investor" would have been aware of the alleged omission given what had been "specifically disclosed" and "publicly reported"); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004) (dismissing section 11 claim because alleged misstatements "would not have misled a reasonable investor about the nature of the securities offered"); *see also In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1182 (N.D. Cal. 2004) ("Because Van Wagoner's valuation policies were public, as well as all adverse information about the restricted securities in which Van Wagoner funds had invested," no material information had been concealed from its investors).

## II.    THE SUPPOSED MISSTATEMENTS WERE NOT FALSE.

A separate reason for dismissing the complaint is that it fails to adequately allege a false statement.

The Supreme Court recently held in *Bell Atlantic Corp v. Twombly*, 127 S. Ct. 1955 (2007), that "labels and conclusions, and [] formulaic recitation of the elements of a cause of action" will not suffice to survive a motion to dismiss. *Twombly*, 127 S. Ct. at 1965. Rather, a complaint must allege facts that "possess enough heft" to set forth "a plausible entitlement to relief." *Twombly*, 127 S. Ct. at 1966-67. Stated differently, a complaint must "amplify a claim" with factual allegations to the extent necessary "to render the claim plausible." *Garber v. Legg*

---

[55]    The complaint should be dismissed for a related reason set forth in the Ambac Defendants' Brief. Under the "bespeaks caution" doctrine, statements are not materially misleading when accompanied by sufficient cautionary language to put investors on notice of their uncertain and judgmental nature. *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1993). Given the graphic risk disclosures in the 2007 Form 10-K and the other information that was in the marketplace by March 2008, investors plainly were on notice of the uncertain and judgmental nature of Ambac's valuations and loss reserves here. *See* Ambac Defendants' Brief at point II.C.1.

*Mason, Inc.*, 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008) (quoting *Iqbal v. Hasty,* 490 F.3d 143,

157-58 (2d Cir. 2007)) (emphasis omitted); *see also Panther Partners, Inc. v. Ikanos Commc'ns,*

*Inc.*, 538 F. Supp. 2d 662, 669-70 (S.D.N.Y. 2008) (dismissing section 11 claim lacking facts

providing the "specificity and detail needed to rise above the 'speculative' level and into the

realm of a 'plausible' pleading") (citations omitted).

      Plaintiffs fail to satisfy these standards. Focusing first on the section of the

complaint explicitly directed to KPMG, plaintiffs literally do no more than couple a generic

recitation of applicable GAAP standards with the bare assertion that those standards were

violated. Thus, the complaint describes the GAAP standards applicable to Ambac's credit

default swaps (principally contained in Statement of Financial Accounting Standards No. 133

("FAS 133")), and then the complaint concludes:

> For its financial statements for the periods ended March 31, 2007,
> June 30, 2007, September 30, 2007 and December 31, 2007,
> Ambac failed to comply with SFAS 133 and 107 because it failed
> to properly value its CDS [credit default swaps] as required by
> SFAS 133.[56]

Likewise, the standards as to loss reserving are mentioned (principally, Statement of Financial

Accounting Standards No. 5 ("FAS 5")) followed by this: "Ambac's financial statements failed

to properly account for and report loss reserves as required under GAAP."[57] Nowhere in this

section does the complaint supply facts illustrating how Ambac valued credit default swaps and

established loss reserves, what Ambac should have done differently, or anything else to make

plausible plaintiffs' assertion that GAAP was violated.[58]

---

[56]    Yanez Aff. Exh. 1 (Compl. ¶ 461).

[57]    Yanez Aff. Exh. 1 (Compl. ¶ 466).

[58]    This does not change because plaintiffs seek to bolster their main GAAP allegations by asserting that
Ambac's financial statements violated a series of other GAAP provisions as well. For example, plaintiffs
assert supposed violations of GAAP provisions requiring that information presented in financial statements

Nor, to the extent it is even relevant to KPMG, do plaintiffs really do better when the complaint is considered more broadly.[59] The complaint elsewhere provides an analysis purportedly comparing Ambac's CDO and RMBS exposures to those underlying a series of CDO- and RMBS-related indices called ABX and TABX.[60] More precisely, the complaint first compares (supposedly based on the work of an unidentified expert) the collateral underlying Ambac's credit default swaps and direct guarantees with the collateral underlying the ABX and TABX indices, purportedly in order to establish a "high degree of correlation" between the two.[61] Plaintiffs then use the declines in certain ABX and TABX indices to assert that Ambac's write-downs and reserve increases should have been larger.[62] As to the company's credit default swaps, plaintiffs seek to conclude that Ambac should have made adjustments that were proportional to certain TABX index declines, and that GAAP required as much.

---

be "useful," "represent[] what it purports to represent," and other such general provisions. *See, e.g.*, Yanez Aff. Exh. 1 (Compl. ¶ 453). These assertions all appear to be based on plaintiffs' main claims that Ambac's valuations and reserves were misstated and fail to sufficiently allege any false statement for the same reasons as the main claims. Nor, to the extent these allegations are intended to assert independent violations of GAAP, are they accompanied by sufficient facts to state a claim under *Twombly*.

[59]   Yanez Aff. Exh. 1 (Compl. ¶¶ 135, 139). Plaintiffs state that only the Securities Act section of the complaint is directed to KPMG, and that the Securities Exchange Act sections are not alleged against KPMG. Yanez Aff. Exh. 1 (Compl. ¶¶ 351, 354). The Section 11 claim should nevertheless be dismissed because it "sounds in fraud" and is not pled with particularity under Federal Rule of Civil Procedure 9(b) for the reasons set forth in the Ambac Defendants' Brief at point II.A. Certainly, were the Court to consider in support of plaintiffs' section 11 claim the supposed "expert analysis" of the relationship between the ABX and TABX indices on the one hand and Ambac's valuation and reserves on the other, then the section 11 claim should be dismissed for failure to plead with particularity. *See* Ambac Defendants' Brief at point I.B.3–4.

[60]   Yanez Aff. Exh. 1 (Compl. ¶ 269).

[61]   Yanez Aff. Exh. 1 (Compl. ¶ 122). In fact, with respect to RMBSs, the complaint only really purports to have performed this analysis as to Ambac's "second-lien RMBS portfolio," that is, guarantees on securities that have as collateral home loans above the primary mortgage loan. *See* Yanez Aff. Exh. 1 (Compl. ¶ 128); *see also* Yanez Aff. Exh. 1 (Compl. ¶¶ 62-63). The complaint basically provides no analysis in support of its conclusion that Ambac misstated reserves on securities with initial mortgages as collateral.

[62]   Yanez Aff. Exh. 1 (Compl. ¶¶ 137, 269).

The problem – and one reason these allegations too fail to plausibly suggest a GAAP violation – is that plaintiffs point to nothing indicating that GAAP required what they describe. GAAP did not dictate specific techniques for valuing credit default swaps and establishing loss reserves. Rather, FAS 133 (the standard applicable to Ambac's credit default swaps) provided only that "[d]erivative instruments should be measured at fair value" without placing constraints on how those measurements were to be conducted.[63] FAS 5 (the standard for loss reserves) similarly provided that loss reserves should be established when "it is probable that . . . a liability has been incurred" and "[t]he amount of loss can be reasonably estimated," without specifying how that estimate was to be made.[64]

Ambac's disclosed approach to valuation and loss reserves was entirely consistent with these standards, nor is there anything in GAAP that required Ambac to have approached valuation and loss reserves differently. More precisely, Ambac used models to determine changes in the fair value of its credit defaults swaps – defined by the company as "the net present value of the difference between the fees Ambac originally charged for the credit protection and [Ambac's] estimate of what a comparable financial guarantee credit protection provider may charge" on the balance sheet date – taking into account such factors as "contractual terms, credit spreads and ratings on underlying referenced obligations, yield curves and tax-exempt interest ratios."[65] The company's loss reserves, in turn, were based upon "estimates and judgments with respect to the probability of default and the severity of loss upon default," that considered "credit

---

[63]     *See* Yanez Aff. Exh. 15 (FAS 133 ¶ 3(b)). Subsequently issued GAAP standards – most notably Statement of Financial Accounting Standards No. 157 – provide additional guidance for measuring fair value. But even today no provision of GAAP requires a specific technique for determining fair value.

[64]     *See* Yanez Aff. Exh. 16 (FAS 5 ¶ 8).

[65]     Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 52–53).

ratings," "historical default information," "loss severity" assumptions, and other factors.[66]

Plaintiffs might assert that their approach would have been better (a dubious proposition, as set

forth below), but that does not establish a violation of GAAP. *See, e.g., In re CIT Group, Inc.*,

349 F. Supp. 2d 685, 688 n.3, 689 (S.D.N.Y. 2004); *In re Allied Capital Corp. Sec. Litig.*, 02

Civ. 3812, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003) (rejecting claims of GAAP

violations that were premised on "plaintiffs' opinion that various valuations were

inappropriate"); *see also In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889-93 (8th Cir. 2002)

("GAAP are far from being a canonical set of rules that will ensure identical accounting

treatment of identical transactions. GAAP, rather, tolerate a range of 'reasonable' treatments,

leaving the choice among alternatives to management.") (internal quotations omitted).

       The simple matter, moreover, is that plaintiffs' proposed approach to valuation

and loss reserves is entirely illogical. For many reasons, it makes no sense to draw any

conclusions about the value of specific CDOs or RMBSs based on indices like the ABX and

TABX. For example, to the extent the collateral underlying CDOs and RMBSs guaranteed by

Ambac was actually included in the ABX and TABX, plaintiffs' approach is like using the Dow

Jones Industrial Average as a proxy for the stock price of Dow component Coca-Cola. On any

given day, the Dow's value might be (relatively) higher or lower than Coca-Cola based, for

example, on factors specific to other Dow component stocks or countless other factors.

Plaintiffs' approach is even more strained insofar as it purports to value CDOs and RMBSs that

do not form part of the ABX and TABX based on movements in those indices – which (to

continue with the example) is like using the Dow to value Bloomberg (a privately held company)

and, again, just makes no sense. In fact, the company that created both the ABX and TABX has

---

[66]     Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 37, 107).

stated clearly that comparisons like those plaintiffs seek to make here are wholly inappropriate. The company stated:

> The ABX may be a standardized and liquid tradable index but it was not designed to be uncritically extrapolated to the broader [Asset Backed Securities] market, and it was certainly not designed as a valuation tool for individual securities.[67]

Beyond this, plaintiffs' analysis is further flawed in that it suggests that Ambac should have written down its CDO-related exposures in direct proportion to certain TABX index declines. Among other things, this fails to take into account that Ambac's credit default swaps were limited to the risk of credit default.[68] Any price decline reflected in the TABX inevitably reflected changes in *all* the risks affecting the value of the subject CDOs, including the risk that a CDO might not trade owing to a lack of liquidity in the market and other factors which Ambac's guarantees explicitly did not cover. So, for example, the price of a particular CDO might decline on a particular day in part because the market perceives a heightened risk of default, in part because there is limited liquidity in the market generally, and in part because other comparable CDOs have come to market at a better interest rate. Ambac's guarantees cover only the first of these. That being the case, the portion of the price decline attributable to the other two factors is of less relevance to the value of Ambac's guarantees – which plaintiffs ignore.[69]

---

[67]     Yanez Aff. Exh. 17 (Ben Logan, *The ABX Index: A Pricing Conundrum*, Credit, May 1, 2008, at 48).

[68]     Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 53).

[69]     Nor are these the only defects in plaintiffs' so-called expert analysis. Among other things, the analysis also is flawed in that it fails to consider differences in the ratings of the collateral underlying Ambac's exposures and those underlying the TABX, differences in the composition in the underlying collateral, and other differences as set forth in the Ambac Defendants' Brief at point I.B.3.

III.    **THE SUPPOSED MISSTATEMENTS WERE MATTERS OF JUDGMENT WHICH FAIL TO SUPPORT A SECTION 11 CLAIM.**

Even crediting plaintiffs' analysis, plaintiffs still fail to state a section 11 claim in that valuation and reserves fundamentally are matters of judgment and the complaint provides no basis to conclude that KPMG did not believe the judgments expressed or had no basis for them.

Courts have acknowledged that issues such as valuation and reserves are matters of judgment and opinion. *See, e.g., In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) (finding that the results of complex financial valuation models "can only fairly be characterized as subjective opinions"); *In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004); *see also Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1095-96 (1991). Courts have also been clear that simple disagreement with such judgments is insufficient to state a section 11 claim. *See In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 689–90 (S.D.N.Y. 2004); *Hinerfeld v. United Auto. Group*, 97 Civ. 3533, 1998 WL 397852 at *7 (S.D.N.Y. Jul. 15, 1998). Rather, where an alleged misstatement is a judgment or matter of opinion, a section 11 plaintiff must make allegations showing that the defendant either "did not actually believe" the judgment expressed or "had no reasonable factual basis for [its] belief." *In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004); *see also Hinerfeld v. United Auto. Group*, 97 Civ. 3533, 1998 WL 397852 at *7 (S.D.N.Y. Jul. 15, 1998) (dismissing section 11 claim where allegations regarding reserve estimates were "conclusory and unsupported by additional factual allegations").

Here, Ambac's credit default swap valuations and loss reserves for direct guarantees were expressly described by the company as involving the application of judgment and subject to change. Ambac stated in its 2007 Form 10-K that its credit default swap valuations were based on "internally developed valuation models," that these models defined fair

value in part based on Ambac's "estimate" of what a company comparable to Ambac would charge for the same protection, and that its credit default swap valuations "could differ materially from amounts that would actually be realized in the market."[70]  Along the same lines, Ambac stated that it established its loss reserves "based upon estimates and judgments by management, including estimates and judgments with respect to the probability of default and the severity of loss upon default," and that "[u]ncertainty with respect to the ultimate performance of certain of our insured exposures may result in substantial changes in loss reserves."[71]

Plaintiffs do not dispute that these are matters of judgment.  At the same time, plaintiffs make no allegation that KPMG either disbelieved or lacked a reasonable basis as to anything about Ambac's valuation and reserves; indeed, they do not even try.  There is no allegation that KPMG failed to test Ambac's valuation or reserves.  There is no allegation that KPMG in any way departed from professional standards in conducting its testing.  There is no allegation that KPMG learned facts that should have caused it to alter either its testing or its conclusions.  There is nothing even close.

All that there is a disagreement about is how Ambac should have approached valuation and estimation of reserves – which fails to state a claim under section 11.  *See, e.g., In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004) (dismissing section 11 claim because allegations only showed that defendants were "incorrect or unskillful in determining exactly what amount of reserves would be adequate"); *Hinerfeld v. United Auto. Group*, 97 Civ. 3533, 1998 WL 397852 at *7 (S.D.N.Y. Jul. 15, 1998) ("The failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under

---

[70]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 110).

[71]    Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 37).

federal securities laws.") (citation omitted); *see also In re Allied Capital Corp. Sec. Litig.*, 02 Civ. 3812, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003) ("[T]he Complaint establishes nothing more than that the plaintiffs disagree with some of Allied's investment valuations – but given the difficulty of valuing illiquid securities, and the multitude of factors that may appropriately be taken into account, alleging disagreement with some of Allied's valuations does not equate to alleging fraud.") (citation omitted).

**CONCLUSION**

For the foregoing reasons, KPMG's motion to dismiss should be granted, and the complaint dismissed with prejudice to the extent directed to KPMG.[72]

Dated:   October 21, 2008

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

By:   *[signature]* /aŋ
Michael R. Young (MY-3041)
Antonio Yanez, Jr. (AY-8783)
(Members of the Firm)

787 Seventh Avenue
New York, New York  10019-6099
(212) 728-8000 (telephone)
(212) 728-8111 (facsimile)

Attorneys for Defendant KPMG LLP

Of Counsel:

Todd G. Cosenza (TC-5171)

---

[72] The consolidated amended complaint reflects the investigative efforts of over eight months. At this point, the Court may presume that plaintiffs have framed the pleading as well as they will ever be able to, and dismiss the complaint with prejudice. *See Greene v. WCI Holdings Corp.*, 956 F. Supp. 509, 518 (S.D.N.Y. 1997) (dismissing with prejudice where plaintiffs had "presented nothing to suggest that they could amend the complaint to adequately plead a . . . cause of action") (internal quotations omitted), *aff'd*, 136 F.3d 313 (2d Cir. 1998); *see also Hinerfeld v. United Auto. Group*, 97 Civ. 3533, 1998 WL 397852 at *8 (S.D.N.Y. Jul. 15, 1998).