UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE AMBAC FINANCIAL GROUP, INC.
SECURITIES LITIGATION

No. 08 Civ. 0411 (NRB)

ECF Case

## MEMORANDUM OF LAW IN SUPPORT OF
## THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS
## <u>THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Tel:  (212) 373-3000
Fax:  (212) 492-0007

*Attorneys for the Underwriter Defendants*

# TABLE OF CONTENTS

**Page**

Preliminary Statement ............................................................................................1

Factual Background ................................................................................................3

Argument ................................................................................................................5

I.    With Respect to Both the 2007 and 2008 Offerings, Plaintiffs Have Failed To
      Adequately Plead Materially False Statements ...............................................5

      A.    Plaintiffs' Allegations With Respect to the 2007 Offering Fail to State a
            Claim for Relief ......................................................................................6

      B.    Plaintiffs' Allegations With Respect to the 2008 Offerings Fail to State a
            Claim for Relief ......................................................................................8

            1.    Plaintiffs Ignore the Total Mix of Information Available to Investors ......10

            2.    The Offerings Disclosed That the Underwriters Had Different
                  Estimates of Ambac's Losses Than the Company ....................15

            3.    Plaintiffs Fail Adequately to Plead a Violation of GAAP ........16

            4.    Plaintiffs Fail to Demonstrate the Falsity of the Allegedly
                  Misleading Statements ..............................................................16

II.   With Respect to Both the 2007 and 2008 Offerings, It Is Apparent From the Face
      Of The Complaint That Plaintiffs Cannot Show Loss Causation ......................17

III.  Plaintiffs' Claims Arising From the 2007 Offering Are Time-Barred ..............18

      A.    The Securities Act Requires Plaintiffs To Bring Their Claims Within One
            Year After Being on Inquiry Notice of Those Claims ...........................18

      B.    There Were Sufficient Storm Warnings Prior to July 25, 2007 To Put
            Plaintiffs on Notice of a Duty To Inquire .............................................19

IV.   Plaintiffs Lack Standing To Assert Claims Arising From the March 2008 Equity
      Offering .....................................................................................................20

Conclusion ............................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Addeo v. Braver,*
956 F. Supp. 443 (S.D.N.Y. 1997) ................................................................. 18

*In re Alamosa Holdings Inc.,*
382 F. Supp. 2d 832 (N.D. Tex. 2005) .......................................................... 17

*In re Alstom SA Sec. Litig.,*
406 F. Supp. 2d 402 (S.D.N.Y. 2005)............................................................ 18

*In re Authentidate Holding Corp. Sec. Litig.,*
No. 05 Civ. 5323, 2006 WL 2034644 (S.D.N.Y. July 14, 2006) ................... 21

*Bell Atlantic v. Twombly,*
127 S. Ct. 1955 (2007)...................................................................................... 6

*In re CIT Group, Inc., Sec. Litig.,*
349 F. Supp. 2d 685 (S.D.N.Y. 2004).............................................................. 8

*Davidoff* v. *Farina,*
No. 04 Civ. 7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ................... 16

*Faulkner v. Verizon Comms., Inc.,*
156 F. Supp. 2d 384 (S.D.N.Y. 2001).............................................................. 8

*First Nationwide Bank* v. *Gelt Funding Corp.,*
27 F.3d 763 (2d Cir. 1994).............................................................................. 17

*Fogarazzo* v. *Lehman Bros., Inc.,*
341 F. Supp. 2d 274 (S.D.N.Y. 2004)............................................................. 18

*Garber* v. *Legg Mason, Inc.,*
537 F. Supp. 2d 597 (S.D.N.Y. 2008)................................................... 5, 6, 16

*Halperin v. eBanker USA.com, Inc.,*
295 F.3d 352 (2d Cir. 2002)............................................................................. 9

*Hinerfield v. United Auto Group,*
No. 97 Civ. 3533, 1998 WL 397852 (S.D.N.Y. Jul. 15, 1998) ................... 8, 16

*Iqbal v. Hasty,*
490 F.3d 143 (2d Cir. 2007)............................................................................. 6

*Lasker* v. *New York State Elec. & Gas Corp.,*
85 F.3d 55 (2d Cir. 1996)................................................................................. 7

*Lenz* v. *Associated Inns & Rests. Co. of America,*
    833 F. Supp. 362 (S.D.N.Y. 1993) ............................................................ 20

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................ 17, 18

*Panther Partners, Inc.* v. *Ikanos Communications, Inc.,*
    538 F. Supp. 2d 662 (S.D.N.Y. 2008) ........................................................ 6

*Rombach* v. *Chang,*
    355 F.3d 164 (2d Cir. 2004) ...................................................................... 7

*In re Salomon Analyst Level 3 Litig.,*
    350 F. Supp. 2d 477 (S.D.N.Y. 2004) ...................................................... 21

*In re Salomon Analyst Level 3 Litig.,*
    373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) .......................................... 8

*San Leandro Emergency Medical Group Profit Sharing Plan* v.
    *Philip Morris Companies, Inc.,*
    75 F.3d 801 (2d Cir. 1996) ........................................................................ 7

*Shah* v. *Meeker,*
    435 F.3d 244 (2d Cir. 2006) .................................................................... 18

*Shields* v. *Citytrust Bancorp,*
    25 F.3d 1124 (2d Cir. 1994) .................................................................... 17

*In re Ultrafem Inc. Sec. Litig.,*
    91 F. Supp. 2d 678 (S.D.N.Y. 2000) ........................................................ 18

*In re WorldCom, Inc. Sec. Litig.,*
    294 F. Supp. 2d 431 (S.D.N.Y. 2003) ...................................................... 18

*In re Zyprexa Prods. Liab. Litig.,*
    549 F. Supp. 2d 496 (E.D.N.Y. 2008) ...................................................... 20

## STATUTES

15 U.S.C. § 77k(a) ........................................................................................ 5, 20

15 U.S.C. § 77k(e) ............................................................................................ 17

15 U.S.C. § 77l(b) ............................................................................................ 17

15 U.S.C. § 77m .............................................................................................. 18

Defendants Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., HSBC Securities (USA) Inc., J.P. Morgan Securities Inc., Keefe, Bruyette & Woods, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, UBS Securities LLC, and Wachovia Capital Markets, LLC (collectively, the "Underwriter Defendants")[1] respectfully submit this memorandum of law in support of their motion, pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss with prejudice all claims against them—Counts III, IV, V, and VI—in the Consolidated Amended Class Action Complaint dated August 22, 2008.

## Preliminary Statement

This lawsuit is one of the scores of securities class actions filed in recent months that, through the lens of hindsight, allege deficiencies in offering materials based on the unforeseen and unprecedented implosion of world financial markets that no regulator or financial institution could have possibly predicted. Yet plaintiffs would seem to expect that Ambac and its underwriters, among the thousands of market participants who have suffered massive losses, could have predicted how the crisis would unfold. Plaintiffs are investors in securities of Ambac Financial Group, Inc. ("Ambac"), a company that provides financial guarantees for municipal bonds and structured finance products. Plaintiffs assert that Ambac's public filings, which were incorporated by reference in offering documents for Ambac securities in 2007 and 2008, misstated its underwriting standards for mortgage-backed securities and other financial instruments as well as its exposure to the mortgage and credit meltdown, thus giving rise to claims against the Underwriter Defendants under Sections 11 and 12(a)(2) of the Securities Act of 1933.

---

[1]    This action has been stayed as to defendant Lehman Brothers Inc. by operation of Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a).

In light of the monumental collapse of the credit markets, it is difficult to imagine how plaintiffs can reasonably suggest that the alleged misstatements are either actionable or caused their losses. The unprecedented mortgage and credit crisis has devastated numerous financial institutions, from Ambac's fellow bond insurers MBIA and FGIC, to mortgage lenders Fannie Mae and Freddie Mac, to investment and retail banking firms Bear Stearns and Washington Mutual, as well as some of the very underwriters in this action. Plaintiffs cannot conveniently ignore that the credit crisis affecting worldwide financial services companies caused Ambac to suffer the same fate as the rest of the industry, regardless of whatever prospectus nitpicks can be mustered with hindsight. Courts have not hesitated to dismiss securities fraud actions arising out of unforeseen macro-economic and industry-wide debacles (such as the S&L crisis), and the same result should obtain here. Against this backdrop, plaintiffs' Securities Act claims against the Underwriter Defendants are defective, and should be dismissed, for four reasons:

*First*, plaintiffs have not identified any actionable misstatement in the 2007 or 2008 offering documents. The materials at issue contained comprehensive disclosures about Ambac's financial statements, Ambac's underwriting standards for financial guarantee products, Ambac's efforts to track potential exposures, and Ambac's future business prospects. Ignoring these robust disclosures as well as the total mix of information available in the marketplace, plaintiffs focus on passing references that are either mere puffery or are actually consistent with the materials that plaintiffs proffer as evidence of their falsity. Furthermore, by the time of the March 2008 offerings, the market was well aware of all of the information that plaintiffs claim Ambac allegedly failed to disclose in its prior disclosures.

*Second*, it is apparent from the face of the complaint that, in light of the collapse of the credit and mortgage markets, plaintiffs cannot show that any alleged misstatements—as opposed to the broad-based credit crisis—caused their losses.

*Third*, plaintiffs' claims relating to the 2007 offering are time-barred. Plaintiffs were on inquiry notice of their claims more than one year before July 25, 2008, when they first asserted claims related to the 2007 offering. Publicly available information, including some of the very disclosures on which plaintiffs rely in their complaint, provided "storm warnings" prior to July 25, 2007 that would have put a reasonable person on "inquiry notice" of what plaintiffs claim to have been "the facts" about Ambac's underwriting standards and exposures.

*Finally,* plaintiffs lack standing to bring claims based on one of the 2008 securities offerings because none of the lead or named plaintiffs is alleged to have purchased or acquired securities in connection with that offering.

### **Factual Background**

Ambac, through various operating subsidiaries, provides financial guarantee products and financial services to clients in the public and private sectors. (Compl. ¶ 370.) As relevant to the allegations of the complaint, Ambac provides financial guarantee insurance to investors in residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") containing RMBS. (Compl. ¶ 7.)

In the first half of their complaint, plaintiffs claim the decline in Ambac's stock price during the putative class period is the result of fraud, and that Ambac and certain of its officers violated the Securities Exchange Act of 1934 (the "Exchange Act") by misrepresenting Ambac's underwriting standards, its tracking of its RMBS and CDO exposures, and its financial statements between October 25, 2006 and April 22, 2008. (Compl. ¶¶ 5-350.)

In the second half of their complaint, which plaintiffs seek to characterize as "in effect a separate complaint" (Compl. ¶ 351), plaintiffs purport to disclaim the intent to incorporate "any of the allegations contained in paragraphs 5-350" (Compl. ¶ 354), and assert claims under the Securities

Act of 1933 (the "Securities Act") (Compl. ¶¶ 351-510).  Those Securities Act claims include four counts against the Underwriter Defendants based on three separate securities offerings.

The 2007 Offering.  Counts III and IV of the Complaint allege claims relating to Ambac's February 7, 2007 offering (the "2007 Offering") of $400 million of directly issued subordinated capital securities, or DISCS.  Count III asserts a Section 11 claim against Ambac, certain Ambac officers and directors, Citigroup Global Markets Inc., Goldman, Sachs & Co., HSBC Securities (USA) Inc., J.P. Morgan Securities Inc., Lehman Brothers Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, UBS Securities LLC, and Wachovia Capital Markets, LLC; and Count IV asserts a Section 12(a)(2) claim against all of the foregoing except the Ambac officers and directors.

The 2008 Offerings.  Counts V and VI of the Complaint allege claims relating to Ambac's March 6, 2008 offering of 5 million equity units (the "2008 Equity Units Offering") and approximately 171 million shares of common stock (the "2008 Common Stock Offering," collectively, the "2008 Offerings").  Count V asserts a Section 11 claim against Ambac, certain Ambac officers and directors, Ambac's outside auditor KPMG, Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Keefe, Bruyette & Woods, Inc., and UBS Securities LLC; and Count VI asserts a Section 12(a)(2) claim against all of the foregoing except the Ambac officers and directors and KPMG.

Plaintiffs do not allege that any statements in the 2007 and 2008 offering materials were themselves false and misleading or omitted to state material facts.  Rather, plaintiffs assert that Ambac's earlier securities filings that were incorporated by reference in the 2007 and 2008 offering materials contained false and misleading statements about underwriting standards for RMBS and CDOs backed by RMBS; Ambac's efforts to track the value of the collateral underlying its RMBS and CDOs; Ambac's exposures to RMBS and CDOs; Ambac's expected loss severities and credit reserves

based on those exposures; and Ambac's quarterly and annual financial results from the fourth quarter of 2006 through the end of 2007. (Compl. ¶¶ 398-448.) As discussed in more detail below, plaintiffs' complaint ignores the extensive disclosures in the offering materials themselves which, in conjunction with the other information available in Ambac's securities filings and in the marketplace, are fatal to plaintiffs' claims.

### Argument

The Underwriter Defendants hereby adopt and incorporate, in support of their motion to dismiss, the points and authorities set forth in (a) Memorandum in Support of Ambac and Individual Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint dated October 21, 2008, and (b) the Memorandum of Law in Support of Defendant KPMG LLP's Motion to Dismiss dated October 21, 2008. In the discussion that follows, the Underwriter Defendants focus on the points that are particularly relevant to the claims against them, while attempting not to unnecessarily duplicate the arguments made in the briefs of the other defendants.

### I.

### WITH RESPECT TO BOTH THE 2007 AND 2008 OFFERINGS, PLAINTIFFS HAVE FAILED TO ADEQUATELY PLEAD MATERIALLY FALSE STATEMENTS

To state claims under Sections 11 and 12 of the Securities Act, plaintiffs must plead that the registration statements and prospectuses issued in connection with a securities offering contained an untrue statement of material fact or omitted to state a material fact necessary to make the statements therein not misleading. 15 U.S.C. § 77k(a); *Garber* v. *Legg Mason, Inc.*, 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008). The other defendants' memoranda correctly explain that plaintiffs' pleading here must satisfy the heightened pleading standards of Rule 9(b) because their allegations inherently sound in fraud notwithstanding their purported "disclaimer." But plaintiffs' pleading fails even to satisfy Rule 8 because it does not plead "enough facts to state a claim to relief that is plausible

on its face," and not merely "conceivable." *Bell Atlantic* v. *Twombly*, 127 S. Ct. 1955, 1974 (2007); *Iqbal* v. *Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). As set forth in *Twombly*, Rule 8 requires that the complaint "possess enough heft to 'sho[w] that the pleader is entitled to relief'" by providing "factual allegations plausibly suggesting (not merely consistent with)" the required elements of the asserted cause of action. *Id.* at 1966; *see also Panther Partners, Inc.* v. *Ikanos Communications, Inc.*, 538 F. Supp. 2d 662, 670 (S.D.N.Y. 2008) (dismissing Section 11 and 12 claims for failure to satisfy *Twombly*'s "plausibility" standard); *Garber*, 537 F. Supp. 2d at 609-10 (same). Plaintiffs have failed to do so here and their claims should be dismissed.

## A.    Plaintiffs' Allegations With Respect to the 2007 Offering Fail to State a Claim for Relief

Plaintiffs complain about statements excerpted in isolation from three securities filings incorporated by reference in the offering documents for the 2007 Offering:

- A statement from Ambac's CEO in Ambac's October 25, 2006 Form 8-K that Ambac was "witnessing a solid level of deal inquiries and opportunities" and "remain[s] steadfast in judiciously allocating our capital to transactions that enable us to continue to deliver superior returns." (Compl. ¶ 399.)

- Statements from Ambac's November 8, 2006 Form 10-Q that Ambac surveilled its insured portfolio by tracking "underperformance of the underlying collateral (for collateral dependent transactions such as mortgage-backed securitizations)" and "other adverse economic events or trends," that Ambac considered "historical default information" and "internally developed loss severities" in setting credit reserves, and that Ambac's "mortgage-backed and home equity ultimate [loss] severities have been better than or equal to our current severity assumption." (Compl. ¶¶ 402-04.)

- Statements from Ambac's January 31, 2007 Form 8-K disclosing Ambac's financial results for the fourth quarter 2006. (Compl. ¶¶ 406-07.)

For each of these statements, plaintiffs offer the same three reasons why each supposedly is false and misleading, ignoring Ambac's other disclosures and the historic market turmoil that was developing openly and in full view of the markets:

- "In 2006 mortgage originators lowered their underwriting standards for mortgages comprising Ambac's direct and derivative RMBS exposures."

- "Ambac had lowered its underwriting standards for RMBS and CDOs backed by RMBS."

- "The collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics."

(Compl. ¶¶ 400, 405, 408.) These allegations fail to adequately allege falsity in statements relating to the 2007 Offering for four reasons.

First, these allegations fail not only the applicable pleading standards, but also the more fundamental test of logic: nothing about plaintiffs' alleged reasons suggests that Ambac's statements above are false or misleading. General allegations that underwriting standards for mortgages underlying Ambac's exposures were lowered or that collateral supporting Ambac's exposures had declining performance simply do not demonstrate that there was anything false about Ambac's statements that it had a solid level of deal inquiries and opportunities, that it was monitoring its portfolio, that its loss severities "have been better than or equal to our current severity assumption," or about its financial results. Plaintiffs never allege that any particular item in Ambac's financial results for the quarter is incorrect. Thus, plaintiffs have failed to plead facts showing falsity.

Second, the statements from Ambac's CEO that Ambac is "witnessing a solid level of deal inquiries" and is "judiciously allocating" capital in order to obtain "superior returns" are general statements of optimism—puffery—that do not give rise to liability under the securities laws. See Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("Expressions of puffery and corporate optimism do not give rise to securities violations."); Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (dismissing claim upon holding that company's stated belief that its "business strategies [would] lead to continued prosperity" was not guarantee against decline in stock price); San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.,

75 F.3d 801, 813 (2d Cir. 1996) (finding optimistic statements about earnings and future performance were non-actionable "puffery").[2]

*Third*, as the Ambac defendants' motion to dismiss argues (at p. 16), Ambac's use of valuation models to value the collateral underlying its RMBS and CDO exposures is inherently a matter of opinion. *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005). Thus, plaintiffs may not second guess Ambac's judgments regarding those valuations. *See In re CIT Group, Inc., Sec. Litig.*, 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004) (holding that Securities Act plaintiffs failed "to plead any facts from which it could be inferred that defendant's belief in the adequacy of the [loan loss reserves] was beyond the pale of reason"); *Hinerfield* v. *United Auto Group*, No. 97 Civ. 3533, 1998 WL 397852, at *7 (S.D.N.Y. Jul. 15, 1998) ("There are no facts alleged to support an inference that [defendants' alleged] failure[s were] the result of anything but inaccurate forecasting or unforeseen circumstances.").

*Finally*, Ambac disclosed the risks presented by its guarantees of RMBS and CDOs. For instance, Ambac's November 8, 2006 Form 10-Q disclosed that it is "reasonably possible that a material change in actual loss severities and loss severity estimates can occur over time" as a result of Ambac's exposure to RMBS and CDOs. (Nov. 8, 2006 Form 10-Q at 27.)

## B.    Plaintiffs' Allegations With Respect to the 2008 Offerings Fail to State a Claim for Relief

Plaintiffs allege that false and misleading statements were contained in eleven separate securities filings between January 31, 2007 and February 29, 2008, all of which were allegedly incorporated by reference in the offering documents for the 2008 Offerings. In doing so, plaintiffs completely ignore the total mix of information pervading the market at the time, including the updated

---

[2]    *See also Faulkner* v. *Verizon Comms., Inc.*, 156 F. Supp. 2d 384, 398 (S.D.N.Y. 2001) ("mere opinions and predictions of future performance are not actionable under the securities laws unless they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them") (quotation omitted)).

information, apprising investors of more recent adverse developments, that was included by Ambac in the offering documents themselves. Even if the earlier statements plaintiffs cited had been inaccurate—which they have not adequately pleaded—the updated information provided in the offering documents rendered the earlier statements immaterial as they were overtaken by subsequent events. "The touchstone of the inquiry is not whether isolated statements within a document were true," but whether they "would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). Moreover, plaintiffs also ignore the numerous cautionary disclosures throughout Ambac's securities filings and the offerings documents themselves. Courts considering allegations that offering materials contain false or misleading statements will consider statements that "bespeak caution" in determining "whether a reasonable investor would have been misled." *Id.* at 360.

The allegedly false and misleading statements include:

- Statements reporting Ambac's quarterly financial results from the fourth quarter of 2006 through the fourth quarter of 2007 and annual financial results for 2006 and 2007, as well as Ambac's compliance with GAAP in reporting those financial results. (Compl. ¶¶ 406, 410, 412, 417, 420, 424, 429, 433, 436, 442, 447, 449-466.)

- Statements disclosing that Ambac was cutting its dividend, replacing its CEO, and estimating a $5.4 billion mark-to-market loss on its credit derivative portfolio for the fourth quarter of 2007. (Compl. ¶ 439-40.)

- Statements discussing Ambac's due diligence in underwriting structured finance products, the criteria Ambac uses to track its potential exposures, Ambac's expected loss severities based on those exposures, and Ambac's credit reserves. (Compl. ¶¶ 413-15, 421, 425, 430, 437, 443-44, 447.)

- Statements concerning Ambac's use of a proprietary valuation model to determine mark-to-market valuations on certain credit derivatives. (Compl. ¶¶ 412, 422, 431.)

Plaintiffs contend that these statements are false and misleading for the same three reasons offered with respect to the 2007 Offering documents, as well as the following:

- Ambac's financial statements for all four quarters of 2007 allegedly violated GAAP based on Ambac's alleged failure properly to mark to market the value of its CDS-related exposures and to record sufficient loss reserves. (Compl. ¶¶ 418, 423, 427, 432, 434, 438, 448, 461.)

- Ambac's credit reserves allegedly failed to account for negative trends in delinquencies and other key metrics in the collateral supporting Ambac's RMBS-exposures and CDOs backed by RMBS. (Compl. ¶¶ 418, 423, 427, 432, 434, 438.)

- Ambac's proprietary model to value its CDO exposures allegedly did not account for the fact that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices. (Compl. ¶¶ 423, 434, 438.)

Finally, plaintiffs also offer two reasons that apply only to specific securities filings:

- With respect to the 2006 Form 10-K, filed on March 1, 2007, plaintiffs allege that the financial results were false and misleading because after the date of the close of the 2006 financial period but before release of the Form 10-K, Ambac's CDO portfolio experienced an undisclosed mark-to-market decline that should have been disclosed. (Compl. ¶¶ 416.)

- For the January 16, 2008 press release and January 22, 2008 Form 10-K, announcing Ambac's $5.4 billion write-down and fourth quarter 2007 financial results, plaintiffs contend that the statements were false and misleading because the write-down, as well as the reserves and impairment charges, were lower than they allegedly should have been. (Compl. ¶¶ 441, 445, 448.)

Plaintiffs' allegations fail to adequately plead falsity in the statements made in connection with the 2008 Offerings for four reasons: (i) Plaintiffs ignore the total mix of information available to investors in March 2008, (ii) the offering documents specifically disclosed that the underwriters had different estimates of Ambac's losses than the Company, (iii) plaintiffs fail adequately to plead a violation of GAAP, and (iv) plaintiffs fail to demonstrate how any of Ambac's allegedly misleading statements are false.

### 1.    Plaintiffs Ignore the Total Mix of Information Available to Investors

Given the total mix of information available to investors at the time of the 2008 Offerings and the robust disclosures and cautionary language provided in the offering documents for the 2008 Offerings, plaintiffs fail to allege or demonstrate that the information provided for the 2008 Offerings was materially false or misleading. It is immaterial for purposes of the Securities Act

claims whether a statement in a securities filing one year before the offering was allegedly incorrect, where investors were provided updated information at the time of the 2008 Offerings alerting investors as to the true condition of Ambac. Considering plaintiffs' allegations of false and misleading statements in the context of the information available and disclosed at the time of the 2008 Offerings, it is clear that by March 2008, investors were aware of all of the information that plaintiffs contend should have been disclosed so that the offering documents for the 2008 Offerings were not false or misleading:

a.    *Disclosures About the Decline in Value of RMBS Collateral And Ambac's Expected Loss Severities and Credit Reserves*

Plaintiffs allege the statements concerning Ambac's due diligence in underwriting structured finance products, the criteria Ambac used to track its potential exposures, Ambac's proprietary model to value its CDO exposures, Ambac's expected loss severities based on those exposures, and Ambac's credit reserves to cover those exposures are false and misleading. But Ambac provided numerous disclosures and other cautionary language in its 2008 Offering materials and in other securities filings detailing the decline in the value of RMBS and their underlying collateral and Ambac's expected loss severities and credit reserves, including the following:

- *Industry-wide lowering of underwriting standards.* Ambac disclosed: "The underlying loans . . . are experiencing near-record volumes of delinquencies and losses, due to factors such as *weak mortgage industry underwriting standards*, declining home values, abrupt slowdowns in voluntary prepayments due to decreased availability of mortgage credit, and potential misrepresentations and/or fraud [by those requesting loans], among other factors." (2008 Common Stock Offering Prospectus Supp. at S-29 ("Stock Prospectus Supp"); 2008 Equity Units Offering Prospectus Supp. at S-49 ("Equity Prospectus Supp.") (emphasis added).)

- *Ability to manage exposure to underlying collateral.* Ambac disclosed: "We have established underwriting and risk management policies and practices which seek to mitigate our exposure to credit risk in our insured portfolio. *These policies and practices in the past have not insulated us from risks that were unforeseen and which had unanticipated loss severity and such policies and practices may not do so in the future.*" (Stock Prospectus Supp. at S-15; Equity Prospectus Supp. at S-38 (emphasis added); *see also* 2007 Form 10-K at 37; 2006 Form 10-K at 31.)

- *Risks in valuation models.* Ambac disclosed: "We also rely on internally and externally developed complex financial models . . . to analyze and predict performance of the insured obligations. Flaws in these financial models and/or faulty assumptions used by these financial models could lead to increased losses and loss reserving." (Stock Prospectus Supp. at S-15; Equity Prospectus Supp at S-38.)

- *Assumptions of loss severity.* Ambac disclosed: "Continued increases in RMBS defaults as a result of fraud, foreclosures, increases in interest rates, unemployment and/or personal bankruptcies *could adversely impact the probability of default and severity of loss for our transactions.* . . . [I]t is possible that our losses . . . could be substantially higher as a result of continued illiquidity of the mortgage market, continued deterioration in housing prices, and/or the effects of a weakened economy marked by growing unemployment and wage pressures. In other words, we believe that it is possible that the actual loss pattern for these transactions could be more severe and prolonged than we currently assume." (Stock Prospectus Supp. at S-29-30; Equity Prospectus Supp. at S-49 (emphasis added).)

b. *Disclosures About Ambac's Exposure to RMBS and CDOs*

Plaintiffs allege the statements concerning Ambac's exposure to RMBS and CDOs are false and misleading. But Ambac provided numerous disclosures in its securities filings about its direct RMBS portfolio and its RMBS exposure in CDOs, including the ratings, vintages, and loan types of the exposures. These materials, together with the disclosure of *all* of Ambac's RMBS and CDO exposures on the Internet, provided the necessary information to correct any misimpression plaintiffs claim that they were under.

- *Direct RMBS exposure by vintage.* Ambac disclosed in August 2007 the vintages of its financial guarantee products in its subprime RMBS portfolio. Ambac reported that it had $3.3 billion in subprime RMBS with vintages between 2005 and 2007, and that it internally rated 51% of its total subprime RMBS portfolio A, AA, or AAA and the remaining 49% BBB or below investment grade. (Aug. 9, 2007 Form 10-Q at 30-31.)

- *Direct RMBS exposure by type of loan.* Ambac disclosed in November 2007 the types of loans underlying its RMBS book of business, reporting exposure to $18.1 billion in second lien mortgage loans ($14.6 billion issued since 2005) and $8.8 billion in subprime mortgage loans ($3.2 billion issued since 2005). (Nov. 9, 2007 Form 10-Q at 33.) In February 2008, Ambac disclosed that 80% of its RMBS backed by second lien loans were rated BBB or worse (with 21% below investment grade), and 53.1% of the RMBS backed by subprime loans were rated BBB or worse (with 5% below investment grade). (Feb. 29, 2008 Form 10-K at 56.)

- *RMBS exposure in CDOs.* Ambac disclosed in 2007 that it had $26 billion of exposure to CDOs of high-grade RMBS, of which 39% of the underlying collateral was

12

subprime RMBS. (Aug. 9, 2007 Form 10-Q at 31-32; Nov. 9, 2007 Form 10-Q at 33-34.) In February 2008, Ambac identified each CDO in its portfolio that contained more than 25 percent RMBS exposure, and, for each, provided the percentage of subprime RMBS in the underlying collateral. (Feb. 29, 2008 Form 10-K at 58-59.)

In addition to these disclosures, the total mix of information available included *all* of Ambac's RMBS and CDO exposures, which, according to plaintiffs' own complaint, were listed in an "Open Source Model" on the Internet on January 30, 2008. (Compl. ¶ 116.)

    *c.*    *Disclosures and Cautionary Language About Ambac's Financial Results*

By March 2008, the total mix of information available to any investor who purchased stock or equity shares of Ambac in the 2008 Offerings—including Ambac's own extensive and detailed disclosures and cautionary language about its deteriorating financial condition, news articles and other publicly available information, and the offering documents for the 2008 Offerings—disclosed Ambac's dire straits.

- *Ambac's mark-to-market losses related to exposure to RMBS and CDOs.* Ambac reported unrealized mark-to-market losses on credit derivative exposures of $56.9 million in July 2007, $743 million in October 2007, and *$5.2 billion* in January 2008. (July 25, 2007 Form 8-K, Ex. 99.04 at 1; Oct. 24, 2007 Form 8-K, Ex. 99.06 at 1; Jan. 22, 2008 Form 8-K, Ex. 99.08 at 7.) Ambac explained that these losses resulted from "unfavorable market pricing" of CDOs containing significant amounts of subprime RMBS collateral (July 25, 2007 Form 8-K, Ex. 99.04 at 1; Oct. 24, 2007 Form 8-K, Ex. 99.06 at 1), "market concerns over the credit quality of the most recent vintages" of subprime RMBS (Nov. 9, 2007 Form 10-Q at 40), "the recent lack of liquidity" in the CDO market (*id.*), "poor collateral performance" (Jan. 22, 2008 Form 8-K, Ex. 99.08 at 7), rating agency downgrades (*id.*), and uncertainty regarding "the ultimate outcome of subprime residential mortgage-backed securities losses" (*id.*). Ambac also reported that it expected additional mark-to-market losses of $650 million for January 2008. (Stock Prospectus Supp. at S-4; Equity Prospectus Supp. at S-4.)

- *Ambac's credit impairment.* Ambac disclosed that its $5.2 billion write-down in January 2008 included $1.1 billion for estimated credit impairments related to CDOs backed by subprime RMBS that had been internally downgraded to below investment grade. (Jan. 16, 2008 Form 8-K, Ex. 99.01 at 2.) Ambac's management announced its expectation that it would have to make "claim payments on these exposures in the future." (Jan. 22, 2008 Form 8-K, Ex. 99.08 at 2.)

- *Ambac's disclosure of other related losses.* In January 2008, Ambac announced that it would report losses of $143 million for underperforming home equity lines of credit and second lien RMBS securitizations. (Jan. 16, 2008 Form 8-K, Ex. 99.01 at 2.)

- *Ambac's January 2008 disclosures.* On January 16, 2008, when Ambac announced the $5 billion write-down, it also disclosed that its CEO would resign effective immediately and that it would reduce its dividend to a penny a share. (Jan. 16, 2008 Form 8-K, Ex 99.01 at 2.) Ambac's stock price dropped from $21.14 on January 15 to $6.24 on January 17. (Compl. ¶¶ 316-17.)

- *Rating agency downgrades.* By March 2008, Fitch had downgraded Ambac from AAA to AA with a rating watch negative, S&P had placed Ambac on credit watch negative, and Moody's had announced a continuing review for a possible downgrade of Ambac's rating. (Stock Prospectus Supp. at S-1-2; Equity Prospectus Supp. at S-2.)

- *Ambac's future prospects.* Ambac reported that the second half of 2007 and the first two months of 2008 were "characterized by a global credit crisis that created difficult market conditions." (Feb. 29, 2008 Form 10-K at 48.) Ambac cautioned that "further deterioration in performance of the subprime mortgage sector is generally expected," and Ambac could not foresee the impact on "potential claim payments and ultimate losses of the securities" in Ambac's portfolio. (*Id.* at 36.) Ambac warned that the risk of RMBS losses was elevated due to "a notable increase in mortgage loan delinquencies and foreclosures" and that declining home prices nationally would diminish the value of collateral available to pay loan balances. (*Id.* at 55-56.) Thus, Ambac cautioned that "there can be no assurance that the actual payments we are ultimately required to make in respect of our [RMBS and CDO exposures] will not materially exceed our current disclosed estimates." (Stock Prospectus Supp. at S-9; Equity Prospectus Supp. at S-32.)

- *Media analysis of bond insurers.* At the time of the 2008 Offerings, numerous articles in the financial press had reported on the dire straits of monoline bond insurers such as Ambac, MBIA and FGIC, and the efforts to which they needed to go to raise capital, retain or recover their AAA ratings, and stay afloat. (*See* Declaration of Douglas M. Pravda ("Pravda Decl."), Exs. 1, 2 and 3.)[3]

Thus, by March 2008, Ambac had taken *more than $6 billion* in losses, including $1.1 billion in credit impairments, as a result of exposure to RMBS and CDOs backed by RMBS. Ambac also disclosed that "*we have been able to write only a limited amount of new financial guarantee business since November 2007, and we have written virtually no new business thus far in 2008.*" (Stock Prospectus Supp. at S-2; Equity Prospectus Supp. at S-2) (emphasis added). As a result of

---

[3] In January 2008, Ambac announced plans to raise $1 billion by issuing stock and equity-linked securities, which it withdrew when its share price plummeted. (Pravda Decl. Exs. 1 and 4.) Ambac announced talks with potential partners to boost its capital reserves. (*Id.* Ex. 4.) Another plan floated in the market involved splitting Ambac into two banks, one to hold the stable and profitable municipal bond business and the other to take the structured finance business, with all of its risky mortgage-backed securities. (*Id.* Ex. 5.) Ultimately, Ambac decided to raise capital by issuing stock through the equity and common stock offerings that plaintiffs now challenge.

these financial troubles, Ambac announced that it had decided to "[s]uspend underwriting all structured finance business . . . for six months in order to accumulate capital" and to "[d]iscontinue underwriting certain structured finance businesses," including CDOs and RMBS. (*Id.*) The purpose of the offering, therefore, was "part of a capital raising strategy focused on maintaining" Ambac's triple-A ratings. (Stock Prospectus Supp. at S-4; Equity Prospectus Supp. at S-4.)

   In light of these extensive, detailed and repeated disclosures and commentary, as well as the total mix of information available to investors, plaintiffs fail to allege or demonstrate that the information provided in the 2008 Offerings was materially false or misleading.

  **2. The Offerings Disclosed That the Underwriters Had Different Estimates Of Ambac's Losses Than the Company**

   To the extent plaintiffs assert they were misinformed with respect to Ambac's losses, mark-to-market losses, or credit impairments, the prospectus supplements for the 2008 stock and equity offerings disclosed that there were differences of opinion as to these numbers and, indeed, that underwriters had views that differed from those of Ambac:

> **Various third-party market participants, including several underwriters in this offering and in the concurrent Equity Units Offering, have made estimates of our losses, estimates of credit impairments and mark-to-market losses that in some cases materially exceed the amounts we have reported.** . . . We have been informed by certain of the underwriters in this offering . . . that their estimates of our losses and mark-to-market losses, which include estimates of our credit impairment, materially exceed the [amounts disclosed in the offering documents] and, in some cases, materially exceed the sum of the mark-to-market losses we have reported plus the amount of our loss reserve estimates.

(Stock Prospectus Supp. at S-9; Equity Prospectus Supp. at S-32) (emphasis in original). This disclosure adds to the total mix of information available to plaintiffs, and demonstrates that plaintiffs cannot show they were misinformed as to the reliability of estimates that were challenged in the offering materials themselves.

3.    **Plaintiffs Fail Adequately to Plead a Violation of GAAP**

The generalized allegations in the complaint fail to adequately plead that the financial information contained in the offering materials and incorporated documents for the 2008 Offerings violated GAAP because they did not properly account for mark-to-market losses.  (Compl. ¶¶ 449-466.)  Plaintiffs may not state a claim merely by citing to GAAP policies and requirements without showing precisely how each was violated.  Plaintiffs' failure to plead specific facts leaves the court with "no possibility at all of assessing materiality as a matter of law." *Garber* v. *Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (dismissing allegations that Legg Mason failed to disclose dramatically increasing expenses in excess of its budget for "fail[ing] . . . to describe in any way the magnitude of the increase, the initial projections, or by how much the actual costs exceeded the internal budget").[4]

4.    **Plaintiffs Fail to Demonstrate the Falsity of the Allegedly Misleading Statements**

Plaintiffs' allegations again fail to offer any facts that, as a matter of pure logic, would demonstrate any falsity in the statements they cite.  For example, plaintiffs allege that the 2006 Form 10-K was false and misleading because, between end of 2006 and the filing of the Form 10-K, there was a decline in the value of Ambac's CDO portfolio.  (Compl. ¶ 416.)  But plaintiffs do not allege in their Securities Act claims any facts supporting their allegation of a mark-to-market decline in Ambac's CDO portfolio between December 31, 2006 and March 1, 2007.  Similarly, plaintiffs' claims that Ambac's disclosures were misleading because Ambac allegedly failed to disclose that mortgage originators had lowered their underwriting standards offers no explanation as to how that allegation

---

[4]    *See also Davidoff* v. *Farina*, No. 04 Civ. 7617 (NRB), 2005 WL 2030501, at *13 (S.D.N.Y. Aug. 22, 2005) (dismissing as insufficiently particularized allegations relying on general statements by issuer's employees and corporate insiders because "in the absence of specifics about particular transactions, we cannot determine to what extent the allegedly wrongful conduct would affect Genuity's financial and press statements and render those statements materially misleading."); *Hinerfeld* v. *United Auto Group*, No. 97 Civ. 3533, 1998 WL 397852, at *7 (S.D.N.Y. Jul. 15, 1998) (allegations of mismanagement will not support Securities Act or proxy claims.).

shows that any of the challenged statements above, such as the statements that Ambac conducted "active surveillance of its insured portfolio," are false and misleading.

Because plaintiffs' allegations fail to adequately plead falsity in the statements made in connection with the 2008 Offerings, their claims with respect to those offerings should be dismissed.

## II.

### WITH RESPECT TO BOTH THE 2007 AND 2008 OFFERINGS, IT IS APPARENT FROM THE FACE OF THE COMPLAINT THAT PLAINTIFFS CANNOT SHOW LOSS CAUSATION

Under Sections 11 and 12 of the Securities Act, plaintiffs cannot recover for losses stemming from anything other than the false and misleading statements alleged in the offering documents. 15 U.S.C. §§ 77k(e), l(b). The Underwriter Defendants join in the showing in the Ambac defendants' motion to dismiss (at Part II.D.) that it is clear, based on the complaint and materials properly before the Court, that loss causation is absent here. *See, e.g., In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253-54 (S.D.N.Y. 2003) (dismissing Section 11 and 12(a)(2) claims "[w]here it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses"); *In re Alamosa Holdings Inc.*, 382 F. Supp. 2d 832, 865-66 (N.D. Tex. 2005) (dismissing Section 11 claim). Any losses here were plainly caused by the collapse of the credit markets and not anything related to the purported disclosure deficiencies. *Cf. First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994) (dismissing claim brought in the wake of real estate market downturn); *Shields v. Citytrust Bancorp*, 25 F.3d 1124 (2d Cir. 1994) (dismissing claim brought following the S&L crisis).

## III.

### PLAINTIFFS' CLAIMS ARISING FROM
### THE 2007 OFFERING ARE TIME-BARRED

Plaintiffs were on notice of their claims relating to the 2007 Offering before July 25, 2007, more than a year before they first asserted those claims on July 25, 2008.[5]  Accordingly, Counts III and IV are time-barred and should be dismissed.

**A.    The Securities Act Requires Plaintiffs To Bring Their Claims Within One Year After Being on Inquiry Notice of Those Claims**

Pursuant to Section 13 of the Securities Act, plaintiffs were required to file their Section 11 and 12 claims within one year after they discovered or should have discovered through reasonable diligence the alleged misstatements or omissions.  15 U.S.C. § 77m; *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 439-40, 444 (S.D.N.Y. 2003).  Plaintiffs are on "inquiry notice" when they receive sufficient "storm warnings"—including "any financial, legal, or other data, such as public disclosures in the media about the financial condition of the corporation"—that would "alert a reasonable person to the probability that there may have been either misleading statements or material omissions involved in the sale of the securities at issue." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005).[6]  Plaintiffs do not have to be on notice of "the full extent of defendant's deceit," rather, "the question is whether the materials suggested that there were *any* material misrepresentations." *Addeo v. Braver*, 956 F. Supp. 443, 450-51 (S.D.N.Y. 1997) (emphasis added)).

---

[5]  Plaintiffs' claims arising out of the 2007 Offering were first asserted in a complaint filed by plaintiffs on July 25, 2008 for the purpose of tolling the statute of limitations on these claims. *See Painting Industry Insurance & Annuity Funds v. Ambac Assurance Corp.*, et al., No. 08 Civ. 6602 (SHS) (S.D.N.Y.).

[6]  Analyst and market reports are sufficient to trigger a duty to inquire. *See e.g.*, *Shah v. Meeker*, 435 F.3d 244, 249-51 (2d Cir. 2006) (dismissing claims as time-barred under Section 13 where a single *Fortune* article triggered duty to investigate); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 265 (S.D.N.Y. 2003) (finding plaintiff on inquiry notice based on news articles); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 298 (S.D.N.Y. 2004) ("A plaintiff in a securities fraud case is charged with knowledge of publicly available news articles and analysts' reports to the extent that they constitute storm warnings sufficient to trigger inquiry notice." (internal quotation marks omitted)); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 692–93 (S.D.N.Y. 2000) (dismissing complaint as time-barred because one article triggered inquiry notice).

**B.     There Were Sufficient Storm Warnings Prior to July 25, 2007
        To Put Plaintiffs on Notice of a Duty To Inquire**

Based on Ambac's own disclosures and other information available in the marketplace concerning the quality of Ambac's underwriting standards and Ambac's potential losses on the mortgage products it guaranteed, a reasonable person should have been on "inquiry notice" of the claims brought in this lawsuit before July 25, 2007.

On May 10, 2007, Ambac disclosed $5.1 million in net mark-to-market losses on credit derivative contracts for the three months ended March 31, 2007, compared with gains of $2 million during the same quarter of 2006. (May 10, 2007 Form 10-Q at 32.) Although plaintiffs acknowledge this announcement in their complaint (¶ 184), they fail to mention the disclosure that immediately follows: "The change in the quarter was driven by wider spreads on certain credit derivative transactions. Most of the transactions that experienced spread widening had *sub prime mortgage exposure in the collateral pool*." (May 10, 2007 Form 10-Q at 32.)

Two weeks later, on May 24, 2007, MarketWatch reported on a presentation by Bill Ackman, president of Pershing Square Capital Management, explaining that Ambac had "$18.7 billion in subprime exposure through guarantees of MBS or CDOs." (Pravda Decl. Ex. 6 at 2.) Ackman warned that Ambac and fellow bond-insurer MBIA "are exposed to the fallout in the subprime mortgage sector and that may prove costly for the bond guarantors' policy holders who are probably holding the ultimate risk and could end up with the big losses." (*Id.* at 1.)

Yet again on July 11, 2007, an analyst cautioned that "[a]sset backed guarantors, such as Ambac and MBIA, might get hit hard. These 2 in particular have some $15B in market cap, but have guaranteed well over $1 trillion in debt." (Pravda Decl. Ex. 7 at 1.) As the analyst noted, the bond insurers' "methodology of assessing credit risk has to be seriously questioned and reviewed" and the benefit of diversifying these risks "is somewhat questionable when subprime exposure is liberally sprinkled over most all of these assets." (*Id.*)

19

Plaintiffs themselves concede that "investors became more sensitive to RMBS and CDO risks over the summer, including after the July 23, 2007 disclosures by Countrywide, once the country's biggest mortgage originator, of significant losses in its mortgage portfolio." (Compl. ¶ 95.)

Thus, by July 25, 2007, analysts, commentators and news reports – as well as Ambac's own first quarter 2007 disclosure – had expressly and publicly raised concerns about the quality of Ambac's underwriting standards and Ambac's potential losses on the mortgage products it guaranteed. Based on these "storm warnings," plaintiffs were on inquiry notice of the potential falsity of any misimpression they might have had with respect to "negative trends in delinquencies and other key metrics" (Compl. ¶¶ 400, 405, 408).

These storm warnings were sufficient to trigger the duty to inquire, as plaintiffs need only be on notice of some aspects of the alleged misrepresentations to trigger that duty. *See Lenz* v. *Associated Inns & Rests. Co. of America*, 833 F. Supp. 362, 370 (S.D.N.Y. 1993) ("[F]acts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry[,] which impose a duty of reasonable diligence.") (internal quotation marks omitted); *see also In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 534 (E.D.N.Y. 2008) ("Inquiry notice is triggered by evidence of the *possibility* of fraud, not full exposition of the scam itself.") (emphasis in original, internal quotation marks omitted). Because plaintiffs did not commence suit before July 25, 2008, Counts III and IV of the complaint should be dismissed as time-barred.

## IV.

## PLAINTIFFS LACK STANDING TO ASSERT CLAIMS ARISING FROM THE MARCH 2008 EQUITY OFFERING

To have standing to sue under the Securities Act, plaintiffs must demonstrate that they actually purchased the securities offered by the allegedly misleading registration statement. 15 U.S.C. § 77k(a) (providing cause of action to "any person *acquiring*" securities sold pursuant to registration statement containing material misstatements or omissions) (emphasis added). Here, none of the lead

or named plaintiffs are alleged to have purchased or acquired securities in connection with the 2008

Equity Units Offering.  Because plaintiffs lack standing to assert claims in connection with the 2008

Equity Units Offering, Counts V and VI should be dismissed to the extent they are based on that

offering.  *In re Authentidate Holding Corp. Sec. Litig.*, No. 05 Civ. 5323, 2006 WL 2034644, at *6-7

(S.D.N.Y. July 14, 2006) (to allege a Section 11 claim, "plaintiffs must at the very least identify

*named* class members who . . . have standing to bring such claims." (emphasis added)); *In re Salomon*

*Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004) ("[T]he selection of lead Plaintiffs

does not remove the basic requirement that at least one *named* Plaintiff must have standing to pursue

each claim alleged.") (emphasis in original).

## Conclusion

For the foregoing reasons and those set forth in the other defendants' submissions, the

Underwriter Defendants respectfully request that the Court dismiss plaintiffs' claims against them in

their entirety with prejudice.

Dated:  New York, New York
        October 21, 2008

                              Respectfully submitted,

                              PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP


                              By:  ___/s/ Brad S. Karp_____
                                   Brad S. Karp
                                   Charles E. Davidow
                                   Joyce S. Huang


                              1285 Avenue of the Americas
                              New York, New York 10019-6064
                              Tel:  (212) 373-3000
                              Fax:  (212) 492-0007
                              E-mail: bkarp@paulweiss.com

                              Attorneys for the Underwriter Defendants