# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMBAC FINANCIAL GROUP, INC. SECURITIES LITIGATION | Civil Action No. 08-00411-NRB<br><br>**JURY TRIAL DEMANDED** |

## LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox
Donald Hall
Hae Sung Nam
Melinda D. Rodon
Aviah Cohen Pierson
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212 ) 687-7714

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Steven B. Singer
Mark Lebovitch
Kurt Hunciker
Elliott Weiss
Lauren A. McMillen
1285 Avenue of the Americas
New York, New York 10019
Telephone: 212-554-1400
Facsimile:  212-554-1444

*Attorneys for the U.S. Public Pension Funds, and Co-Lead Counsel for the Class*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ...................................................................1

    A.   Overview of Exchange Act Claims...............................................................1
    B.   Overview of Securities Act Claims...............................................................4

II.  STATEMENT OF FACTS ......................................................................5

    A.   Ambac's Business Depended on Conservative Underwriting and
        Preserving its "AAA" Credit Ratings ....................................................5
    B.   The Exchange Act Defendants Become Aware That the Quality of
        Mortgage Loans Had Deteriorated.........................................................5
    C.   Ambac Secretly Lowers Its Own Underwriting Standards While
        Consistently Assuring Investors about the Superior Quality of Its RMBS
        Exposures Due to Its Conservative Underwriting ..................................7
    D.   As the Class Period Progresses, the Exchange Act Defendants Increasingly
        (and Falsely) Insist That Ambac's RMBS Exposures Perform Better Than
        the Plummeting Mortgage Market .......................................................11
    E.   Contemporaneous Information Available to The Exchange Act Defendants
        Showed that its Mortgage-Linked Products Performed No Better than The
        Market ..............................................................................................13
    F.   Ambac Begins to Take Massive Write-Downs and Reveals the Prior
        Inflated Values of Its RMBS-Related Portfolio....................................15
    G.   Ambac's Mark-To-Market Write-Downs Violated GAAP And It Failed to
        Take Adequate Reserves....................................................................16

III. LEGAL ARGUMENT REGARDING CLAIMS ARISING UNDER THE
    SECURITIES EXCHANGE ACT OF 1934....................................................19

    A.   Plaintiffs Satisfied The Pleading Standards of the PSLRA and Section
        10(b)................................................................................................19
    B.   The Complaint Alleges Material Misrepresentations and Omissions With
        More Than Enough Particularity ........................................................20

        1.   The Exchange Act Defendants' Statements about Underwriting
            Standards, Surveillance and the Quality of Ambac's Insured
            Exposures Were Materially Misleading...................................21
        2.   The Complaint Adequately Alleges That Ambac Violated GAAP ..........28

    C.   The Complaint Pleads Cogent and Compelling Facts Supporting a Strong
        Inference Of Scienter .........................................................................35

        1.   The Allegations Support a Strong Inference That the Exchange Act
            Defendants Knew Or Recklessly Disregarded Information
            Contradicting Their Public Statements ...................................36

        2.      Plaintiffs' Allegations Support A Strong Inference That the Exchange Act Defendants Were Motivated To Commit Fraud In Order To Maintain The Company's AAA Rating To Drive Short-Term Profits And Personal Compensation ...................................................45

        3.      The Exchange Act Defendants' Argument That There Is A More Compelling, Non-Culpable Inference Is Meritless ....................................47

  D.      Plaintiffs Properly Allege Loss Causation.............................................................49

IV.  FACTS AND LEGAL ARGUMENT REGARDING CLAIMS UNDER THE SECURITIES ACT ........................................................................................................53

  A.      Plaintiffs' Securities Act Claims Are Sufficiently Pleaded ...................................54

        1.      Rule 9(b) Does Not Apply to the Securities Act Claims ...........................56

        2.      The Complaint Properly Alleges that the Pertinent Registration Statement/Prospectus Falsely Misrepresented and Omitted Material Facts..............................................................................................58

        3.      Loss Causation Is Not An Element Of A Securities Act Claim ................65

        4.      The Claims Arising from the 2007 DISCS Offering Are Timely.............66

        5.      Plaintiffs Have Standing With Respect to the March 2008 Equity Units Offering .........................................................................................72

V.  DEFENDANTS' EXTRANEOUS EXHIBITS MAY NOT BE CONSIDERED FOR THE TRUTH OF THEIR CONTENTS ....................................................................74

# TABLE OF AUTHORITIES

## FEDERAL CASES

*60223 Trust v. Goldman Sachs & Co.*,
540 F. Supp. 2d 449 (S.D.N.Y. 2007)................................................................. 52

*Adair v. Bristol Tech. Systems*,
179 F.R.D. 126 (S.D.N.Y. 1998) ........................................................................ 64

*In re Adams Gold, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)................................................................................ 54

*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*,
525 F.3d 8 (D.C. Cir. 2008) ................................................................................ 54

*In re Alamosa Holdings, Inc. Sec. Litig.*,
382 F. Supp. 2d 832 (N.D. Tex. 2005) ............................................................... 65

*In re Alcatel Sec. Litig.*,
382 F. Supp. 2d 513 (S.D.N.Y. 2005)............................................................ 66, 67

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ................................................................................. 48

*In re Allied Capital Corp. Sec. Litig.*,
No. 02 Civ. 3812, 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)............................ 63

*In re American Express Co. Sec. Litig.*,
No. 02 Civ. 5533, 2008 WL 4501928 (S.D.N.Y Sept. 26, 2008)............................ 39

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004)................................................................. 47

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. Jan. 4, 2008) ...................................... 22, 23, 24, 47

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).................................................... 41, 42, 43, 56

*ATSI Comm'cns Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)............................................................................ 19, 73

*In re Axis Capital*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006).................................................................. 56

*Bamberg v. Cowen*,
    236 F. Supp. 2d 79 (D. Mass. 2002) ...................................................................... 21

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).......................................................................................... 20

*BMC-The Benchmark Mgmt. Co. v. Ceebraid-Signal Corp.*,
    508 F. Supp. 2d 1287 (N.D. Ga. 2007) ................................................................. 54

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)..................................................................... 28, 30, 63

*Burstyn v. Worldwide Xceed Group, Inc.*,
    No. 01 Civ. 1125, 2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002) ............................ 42

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002)..................................................................... 20, 35

*CalPERS v. Chubb*,
    394 F.3d 126 (3d Cir. 2004)........................................................................ 39

*In re CIT Group, Inc. Sec. Litig.*,
    349 F. Supp. 2d 685 (S.D.N.Y. 2004)............................................................... 63

*City of Brockton Ret. Sys. v. Shaw Group, Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008)............................................................... 44

*In re Comverse Tech., Inc. Sec. Litig.*,
    543 F. Supp. 2d 134 (E.D.N.Y. 2008) .............................................................. 39

*Conley v. Gibson*,
    355 U.S. 41 (1957)................................................................................... 49

*In re Converium Holding AG Sec. Litig.*,
    No. 04 Civ. 7897, 2007 U.S. Dist. LEXIS 67660 (S.D.N.Y. Sept. 14, 2007) ............... 32

*In re Countrywide Fin. Corp. Derivative Litig.*
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) .................................................. 23, 24, 38, 44

*In re Credit Suisse-AOL Sec. Litig.*,
    465 F. Supp. 2d 34 (D. Mass. 2006) ................................................................ 34

*In re DDi Corp. Sec. Litig.*,
    No. 03 Civ. 7063, 2005 WL 3090882 (C.D. Cal. July 21, 2005) ............................. 73

*Davidoff v. Farina*,
    No. 04 Civ. 7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ........................................... 63

*In re Direct General Corp. Sec. Litig.*,
    398 F. Supp. 2d 888 (M.D. Tenn. 2005) ..................................................................... 30

*Dodds v. Cigna Sec., Inc.*,
    12 F.3d 346 (2d Cir. 1993) .................................................................................... 66

*In re DoubleClick Inc. Privacy Litig.*,
    154 F. Supp. 2d 497 (S.D.N.Y. 2001) ......................................................................... 54

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) ....................................................................................... 49, 54

*In re Dynex Capital, Inc. Sec. Litig.*,
    No. 05 Civ. 1897, 2006 WL 314524, (S.D.N.Y. Feb. 10, 2006) ........................................... 23

*Eckstein v. Balcor Film Investors*,
    8 F. 3d 1121 (7th Cir. 1993) .................................................................................. 60

*Endo v. Albertine*,
    147 F.R.D. 164 (N.D. Ill. 1993) .............................................................................. 73

*Erickson v. Pardus*,
    127 S. Ct. 2197 (2007) ........................................................................................ 54

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ........................................................................................... 54

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008) ......................................................................... 24

*In re FirstEnergy Corp. Sec. Litig.*,
    316 F. Supp. 2d 581 (N.D. Ohio 2004) ........................................................................ 56

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) ............................................................................ 51, 65, 74

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004) ......................................................................... 34

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    411 F. Supp. 2d 377 (S.D.N.Y. 2006) ......................................................................... 64

*In re Fleming Companies Inc. Sec. & Deriv. Litig.*,
   No. 03 MDL 1530, 2004 WL 5278716 (E.D. Tex. June 16, 2004) ......................................... 73

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000)............................................................................ 20, 26

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008).......................................................... 55, 59, 63

*Gildepath Holding B.V. v. Spherion Corp.*,
   No. 04 Civ. 9758, 2007 WL 2176072 (S.D.N.Y. Jul. 26, 2007) ............................................ 46

*In re GlaxoSmithkline PLC*,
   No. 05 Cv. 3751(LAP), 2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006) ...................................... 45

*In re Global Crossing Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004)....................................................................... 28

*In re Global Crossing Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003)....................................................................... 72

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985)) ........................................................................... 19

*Griffin v. McNiff*,
   744 F. Supp. 1237 (S.D.N.Y. 1990),
   *aff'd without opinion*, 996 F.2d 303 (2d Cir. 1993)................................................... 61

*Hall v. The Children's Place Retail Stores, Inc.*,
   No. 07 Civ. 8252, 2008 WL 2791526 (S.D.N.Y. Jul. 18, 2008) .......................... 19, 42, 44, 59

*Hayes v. Gross*,
   982 F.2d 104 (3d Cir. 1992)............................................................................ 30

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)......................................................................... 53, 54, 64

*Hevesi v. Citigroup, Inc.*,
   366 F.3d 70 (2d Cir. 2004)........................................................................... 72

*Hinerfeld v. United Auto Group*,
   No. 97 Civ. 3533, 1998 WL 397852 (S.D.N.Y. July 15, 1998) ............................................ 63

*Holmes v. Baker*,
   166 F. Supp. 2d 1362 (S.D. Fla. 2001) ................................................................. 56

vi

*In re Indep. Energy Hldgs. PLC Sec. Litig.*,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001)..............................................................27

*In re Initial Public Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)................................................27, 54, 59

*In re Initial Public Offering Sec. Litig.*,
   341 F. Supp. 2d 328, 347 (S.D.N.Y. 2004)......................................................67

*In re Initial Pub. Offering Sec. Litig.*,
   358 F. Supp. 2d 189 (S.D.N.Y. 2004)..............................................................34

*Johnson v. NYFIX*,
   399 F. Supp. 2d 105 (D. Conn. 2005)..............................................................56

*In re Juniper Networks, Inc. Sec. Litig.*,
   542 F. Supp. 2d 1037 (N.D. Cal. 2008)...........................................................72

*Katz v. Image Innovations Holdings, Inc.*,
   542 F. Supp. 2d 269 (S.D.N.Y. 2008)..............................................................42

*Kramer v. Time Warner*,
   937 F.2d 767 (2d Cir. 1991).............................................................................74

*Lasker v. N.Y. State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996) ................................................................................58

*LC Capital Partners, L.P.  v. Frontier Ins. Group, Inc.*,
   318 F.3d 148 (2d Cir. 2003)................................................................66, 67, 70

*In re LDK Solar Sec. Litig.*,
   No. 07 Civ. 05182, 2008 WL 2242185 (N.D. Cal. May 29, 2008) .................48

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005)................................................................48, 68, 69

*Levine v. Atricure, Inc.*,
   508 F. Supp. 2d 268 (S.D.N.Y. 2007)..............................................................64

*Levitt v. Bear Stearns & Co.*,
   340 F.3d 94 (2d Cir. 2003)...............................................................................65

*Lewin v. Lipper Convertibles, L.P.*,
   No. 03 CV 1117, 2004 WL 1077930, (S.D.N.Y. May 13, 2004) ....................42

*In re Livent, Inc. Noteholders Sec. Litig.,*
   151 F. Supp. 2d 371 (S.D.N.Y. 2001)...................................................... 53, 59, 60, 64

*In re Majesco Sec. Litig.,*
   No. 05 Civ. 3557, 2006 WL 2846281 (D.N.J. Sept. 29, 2006)......................................... 49, 56

*Marksman Partners, L.P. v. Chantal Pharm. Corp.,*
   927 F. Supp. 1297 (C.D. Cal. 1996) ................................................................. 32

*In re Merrill Lynch & Co., Inc., Research Reports Sec. Litig.,*
   272 F. Supp. 2d 243 (S.D.N.Y. 2003)............................................................... 65

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
   289 F. Supp. 2d 416 (S.D.N.Y. 2003)............................................................... 74

*In re Merrill Lynch & Co., Inc.  Research Reports Sec. Litig.,*
   568 F. Supp. 2d 349 (S.D.N.Y. 2008)............................................................... 52

*In re Merrill Lynch Ltd. P'ship Litig.,*
   154 F.3d 56 (2d Cir. 1998)....................................................................... 66

*Milman v. Box Hill Systems, Corp.,*
   72 F. Supp. 2d 220 (S.D.N.Y. 1999)................................................................ 53

*In re MobileMedia Sec. Litig.,*
   28 F. Supp. 2d 901 (D.N.J. 1998) .................................................................. 72

*Nappier v. Pricewaterhouse Coopers,*
   227 F. Supp. 2d 263 (D.N.J. 2002) ................................................................. 30

*In re Nationsmart Corp. Sec. Litig.,*
   130 F.3d 309 (8th Cir. 1997) ..................................................................... 61

*In re New Century,*
   No. CV 07-00931, 2008 WL 5147991 (C.D. Cal. Dec. 3, 2008) ............................ 3, 25, 31, 47

*Newman v. Warnaco Group, Inc.,*
   335 F.3d 187 (2d Cir. 2003)................................................................... 66, 67

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.,*
   840 F. Supp. 243 (S.D.N.Y. 1993)................................................................ 67

*In re Nortel Network, Corp. Sec. Litig.,*
   238 F. Supp. 2d 613 (S.D.N.Y. 2003)............................................................. 24

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000) .............................. 35, 41, 43

*Ong v. Sears, Roebuck & Co.*,
　388 F. Supp. 2d 871 (N.D. Ill. 2004) .................................................................... 23

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
　538 F. Supp. 2d 662 (S.D.N.Y. 2008)................................................................ 59, 62

*Pension Comm. of the Univ. of Montreal Pension Plan*,
　446 F. Supp. 2d 163 (S.D.N.Y. 2006)..................................................................... 45

*In re PMA Capital Corp. Sec. Litig.*,
　No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) ......................................... 23, 30, 72

*Provenz v. Miller*,
　102 F.3d 1478 (9th Cir. 1996) ............................................................................. 30

*In re Prudential Sec. Ltd. P'ships Litig.*,
　930 F. Supp. 68 (S.D.N.Y. 1996)........................................................................... 60

*In re Raytheon Sec. Litig.*,
　157 F. Supp. 2d 131 (D. Mass. 2001) .................................................................... 30

*In re Refco, Inc. Sec. Litig.*,
　503 F. Supp. 2d 611 (S.D.N.Y. 2007)................................................................ 39, 55

*In re Regeneron Pharm., Inc. Sec. Litig.*,
　No. 03-3111 (RWS), 2005 U.S. Dist. LEXIS 1350 (S.D.N.Y. Feb. 3, 2005) ................... 26, 27

*In re Rhodia S.A. Sec. Litig.*,
　531 F. Supp. 2d 527 (S.D.N.Y. 2007)..................................................................... 51

*Rivell v. Private Health Care Sys., Inc.*,
　520 F.3d 1308 (11th Cir. 2008) ............................................................................ 54

*Robbins v. Moore Medical Corp.*,
　788 F. Supp. 179 (S.D.N.Y. 1992).......................................................................... 61

*Rombach v. Chang*,
　355 F.3d 164 (2d Cir. 2004)........................................................................ 27, 54, 56, 64

*Roth v. Jennings*,
　489 F.3d 499 (2d Cir. 2007).......................................................................... 73, 74

*Rothman v. Gregor,*
  220 F.3d 81 (2d Cir. 2000)....................................................................................... 41, 42, 48

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
  441 F. Supp. 2d 579 (S.D.N.Y. 2006)........................................................................ 65

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,*
  75 F.3d 801 (2d Cir. 1996).......................................................................................... 58

*In re Saxon Sec. Litig.,*
  No. 82 Civ. 3103, 1984 WL 2399 (S.D.N.Y. Feb. 23, 1984) .................................. 71

*Schnall v Annuity and Life Re (Holdings), Ltd.,*
  No. 02-2133, 2004 U.S. Dist. LEXIS 2859 (D. Conn. Feb. 22, 2004) ...................... 30

*In re Scholastic Corp. Sec. Lit.,*
  252 F.3d 63 (2d Cir. 2001).......................................................................................... 42

*In re Scottish Re Group Sec. Litig.,*
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................................ 41, 42, 47

*SEC v. Caserta,*
  75 F. Supp. 2d 79 (E.D.N.Y 1999) ........................................................................ 28, 30

*SEC v. Dunn,*
  No. 07 Civ. 2058, 2008 U.S. Dist. LEXIS 77341, (S.D.N.Y. Sept. 30, 2008) ......... 19

*SEC v. Simpson Capital Mgmt, Inc.,*
  07 Civ. 6072, 2008 WL 4093046 (S.D.N.Y. Sept. 3, 2008)................................... 19

*Shapiro v. UJB Fin. Corp.,*
  964 F.2d 272 (3d Cir. 1992)................................................................................... 23, 30

*Shields v. Citytrust Bancorp, Inc.,*
  25 F.3d 1124 (2d Cir. 1994)...................................................................................... 45

*Staehr v. The Hartford Fin. Servs. Group, Inc.,*
  547 F.3d 406 (2d Cir. 2008)...................................................................................... 67

*Stolz Family P'ship, L.P. v. Daum,*
  355 F.3d 92 (2d Cir. 2004)........................................................................................ 27

*In re Suprema Specialties, Inc. Sec. Litig.,*
  438 F.3d 256 (3d Cir. 2006)...................................................................................... 55

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)....................................................................... 45

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05 Civ. 1898, 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005)............................ 24

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)..................................................................................... 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)................................................................... 19, 35, 39, 56, 73

*The Dweck Law Firm, L.L.P. v. Mann*,
    340 F. Supp. 2d 353 (S.D.N.Y. 2004)....................................................................... 74

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ..................................................................... 59

*In re Vivendi Universal, S.A.*
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)............................................................... 57, 58

*Weil v. Long Island Sav. Bank*,
    77 F. Supp. 2d 313 (E.D.N.Y. 1999) ....................................................................... 66

*In re Wells Fargo Sec. Litig.*,
    12 F.3d 922 (9th Cir. 1993) ...................................................................................... 30

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3rd Cir. 1996) ...................................................................................... 29

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003), *aff'd*, 366 F.3d 70 (2d Cir. 2004) ............. 54

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 431 (S.D.N.Y. 2003)................................................................. 65, 71

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288, 2004 WL 555697 (S.D.N.Y. Mar. 19, 2004) ............................. 71

*In re Worldspace Sec. Litig.*,
    07 Civ. 2252, 2008 WL 2856519 (S.D.N.Y. July 21, 2008) ................................... 19

*In re WRT Energy Sec. Litig.*,
    96 Civ. 3610, 2005 U.S. Dist. LEXIS 1894 (S.D.N.Y. Feb. 8, 2005), *vacated in part on
    other grounds*, 2005 U.S. Dist. LEXIS 18701 (S.D.N.Y. Aug. 30, 2005) ................55

*In re Xethanol Corp. Sec. Litig.*,
  No. 06 Civ. 10234(HB), 2007 WL 2572088 (S.D.N.Y. Sept. 7, 2007)...................................... 44

## Federal Statutes

15 U.S.C. §77k ........................................................................................................... 53, 54

15 U.S.C. §77l(a)(2)................................................................................................... 53, 55

15 U.S.C. §77z-2 ............................................................................................................. 60

15 U.S.C. §77m ............................................................................................................... 65

15 U.S.C. §78u-4 ............................................................................................................. 19

15 U.S.C. §78u-5 ....................................................................................................... 27, 73

## Federal Rules

17 C.F.R. §240.10b-5 ................................................................... 19, 29, 30, 56, 63

Fed. R. Civ. P. 8 ................................................... 4, 19, 29, 30, 54, 55, 57, 58

Fed. R. Civ. P. 9(b) ................................................................ 19, 46, 55, 56

Fed. R. Civ. P. 12(b)(6) .................................................................. 60, 73, 74

Court-appointed Lead Plaintiffs, the Public School Teachers' Pension and Retirement Fund of Chicago, the Arkansas Teachers Retirement System, and the Public Employees' Retirement Systems of Mississippi (collectively "Lead Plaintiffs") submit this Omnibus Opposition to Defendants Motions to Dismiss.

## I.     PRELIMINARY STATEMENT

### A.     OVERVIEW OF EXCHANGE ACT CLAIMS

The Exchange Act Defendants seek dismissal of this case by saying that the Complaint alleges that they failed to predict the mortgage market meltdown or failed to disclose to investors the fact that Ambac guaranteed mortgage-related securities.[1]   The Exchange Act Defendants attempt to distract the Court with theories that Plaintiffs have not asserted.   In no way do Plaintiffs' claims rely on the Exchange Act Defendant's failure to foresee the credit crisis. Nor do Plaintiffs' allegations rest on a failure to disclose the fact that Ambac insured mortgage-related securities.   To the contrary, the Complaint alleges in specific detail that the Exchange Act Defendants misrepresented and/or failed to inform Ambac investors of known material facts which placed Ambac's existence at risk.   Thus, the Exchange Act Defendants' arguments ignore the detailed allegations of the Complaint.

Throughout the Class Period, Ambac—an insurer whose ability to maintain its AAA rating was the key to its success—repeatedly represented that it employed "rigorous," "strict" and "conservative" underwriting standards; that it only guaranteed transactions of high credit-quality and diligently monitored its portfolio; and that it was exposed to minimal risk of loss. Even as the investing public became increasingly concerned about the deteriorating mortgage markets and their potential impact on Ambac, the Exchange Act Defendants went on the

---

[1]  The "Complaint" refers to the Consolidated Amended Class Action Complaint filed by Lead Plaintiffs on August 22, 2008.  Capitalized terms, unless otherwise defined, have the same meaning as those used in the Complaint.

offensive, assuring investors that the Company's mortgage-related exposures involved far less risk than the market in general, and that Ambac was not being negatively affected by the mortgage crisis. Indeed, as late as November 2007, Defendant Genader, Ambac's CEO, appeared on CNBC to tell investors that Ambac's mortgage portfolio was "very solid and very safe," and that its performance was "very different than the rest of the market." These representations – which went to the heart of the Company's business – were critical to investors and analysts, who relied upon them in concluding that Ambac was, in fact, well-protected against the mortgage downturn. Based on information disseminated to the market by the Exchange Act Defendants, one analyst noted in mid-2007, "[g]iven Ambac's strict underwriting standards, risk assessment skills, and small exposure relative to the overall market, we believe Ambac will not suffer from credit losses."

As was ultimately revealed, Ambac's consistent statements about its superior underwriting standards and portfolio performance were materially false and misleading. In reality, unbeknownst to investors, by the start of the Class Period, Ambac had drastically lowered those standards so that it could guarantee billions of dollars of high risk securities in an attempt to meet Defendant Genader's mandate that the Company earn $1 billion annually. As the Complaint alleges in detail, in June 2006, Ambac's Credit Risk Committee, which included Defendants Genader, Uhlein and Wallis, fundamentally changed Ambac's underwriting standards to allow the Company to guarantee mortgage-linked deals that were considered too risky and would not pass muster under the Company's long-standing guidelines. This critical revision—which was not disclosed to investors—had a catastrophic effect on the quality of Ambac's portfolio of residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") supported by RMBS. Indeed, in the fall of 2006, the head of one Ambac's

structured finance groups was so concerned about the poor quality of the mortgages in that portfolio that he wrote a memo specifically advising the Credit Risk Committee that Ambac was insuring transactions that its own underwriters "***would not touch with a ten foot pole***."

On January 16, 2008—less than two months after Defendant Genader had assured investors that Ambac's mortgage portfolio was not exposed to any material losses—Ambac disclosed: (a) $5.4 billion in "mark-to-market" write-downs of its CDO exposures; (b) a staggering $1.1 billion of CDO impairments; (c) a dramatic tripling of its RMBS loss reserves; (d) a 67% reduction in its dividend (in order to preserve capital); and (e) its CEO's unexpected "resignation." With the disclosure of this news, the Company's stock plummeted 70% in just two days, from $21.14 per share on January 15 to $6.24 per share by January 17, 2008. These write-downs alone wiped out the Company's previously reported earnings going back to 2002. Promptly after making these disclosures to investors, Ambac lost its "AAA" credit rating, without which it cannot run its business.

In response to these detailed allegations, the Exchange Act Defendants assert that they were innocent victims of an industry downturn and argue that their statements about Ambac's underwriting and the performance of its portfolio are immaterial "puffery" or otherwise not actionable as securities fraud. Such arguments must fail. Courts refuse to infer that sophisticated players in the mortgage-related industries were simply innocent victims of unforeseeable market forces, or that affirmative misrepresentations of core business practices such as underwriting standards and portfolio performance are mere "puffery" or "corporate optimism." *See, e.g.*, *In re New Century*, No. CV 07-00931, 2008 WL 5147991 (C.D. Cal. Dec. 3, 2008); *In re Countrywide Fin. Corp. Sec. Litig.*, No. CV-07-05295, 2008 WL 5100124 (C.D. Cal. Dec. 1, 2008) (hereinafter "*Countrywide Securities*"). Moreover, these arguments raise

contested issues of fact that cannot be decided on this motion. *See* Section III.B.1, *infra*. The Complaint also details the Exchange Act Defendants' knowledge or reckless disregard of whether their public statements were deceiving investors – first by approving and then concealing the Company's lowering of underwriting standards and by touting the Company's supposedly superior mortgage portfolio performance while receiving monthly reports showing dramatic deterioration of that same portfolio. *See* Section II.C-E., *infra*. In sum, Plaintiffs' allegations are more than sufficient to state a claim for securities fraud.

**B.    OVERVIEW OF SECURITIES ACT CLAIMS**

Plaintiffs' claims under the Securities Act of 1933 (the "Securities Act") are governed by the notice pleading requirements of Fed. R. Civ. P. 8(a). As such, Plaintiffs sufficiently allege that statements made in the relevant Registration Statements/Prospectuses[2] were false and misleading because material contemporaneous facts regarding lowered underwriting standards and improper valuation of RMBS-related securities were undisclosed. Nevertheless, the Securities Act Defendants attempt to impose heightened pleading requirements by arguing that Plaintiffs' allegations "sound in fraud." They are wrong. The Complaint carefully and systematically segregates the fraud allegations from the non-fraud allegations, leaving no basis to impose heightened pleading standards. *See* Section IV., *infra*.

---

[2] The "Registration Statements/Prospectuses" refers to (i) the DISCS Registration Statement/Prospectus for the offering of DISC securities in February 2007 and (ii) the Equity Units Registration Statement/Prospectus and the Common Stock Registration Statement/Prospectus for the public offering of Ambac securities in March 2008. Each offering and Registration Statement/Prospectus is described in the Complaint in ¶¶355-65. "¶" or "¶¶" refers to a paragraph in the Complaint.

## II.    STATEMENT OF FACTS

### A.    AMBAC'S BUSINESS DEPENDED ON CONSERVATIVE UNDERWRITING AND PRESERVING ITS "AAA" CREDIT RATINGS

Ambac followed a simple business model:  it guaranteed municipal bonds and structured finance securities against default in exchange for premiums.  Ambac's clients paid lower interest on the debt they sold to investors because the interest coupons were based on Ambac's "AAA" credit ratings instead of the clients' "non-investment grade" credit ratings.  ¶¶20, 30.  Investors, analysts and Defendants alike knew that for Ambac, losing its AAA rating[3] would severely impact the Company's ability to generate new business—as one analyst noted, for Ambac, "[t]here is no AA+ . . . it's AAA or nothing."[4]  ¶¶33-34.

Ambac's reputation for strict underwriting standards was critical to maintaining its AAA ratings.  ¶37.  If Ambac were to lower its underwriting standards, guarantee riskier bonds or securities, or face significant losses, its AAA rating would be threatened and its business model severely compromised.  ¶¶35-38.

### B.    THE EXCHANGE ACT DEFENDANTS BECOME AWARE THAT THE QUALITY OF MORTGAGE LOANS HAD DETERIORATED

Ambac provided guarantees for mortgage-linked securities in two ways: (1) direct financial guarantee insurance on RMBS-related instruments; and (2) selling credit default swaps ("CDS") that effectively insured against defaults of CDOs supported by RMBS.  ¶¶43-54; 60-66. For years, Ambac had guaranteed RMBS-related securities that rarely, if ever, defaulted.  Ambac achieved low historical default rates due to its (i) strict selection of lenders whose loans could be

---

[3] By the beginning of the Class Period, Ambac had received and maintained AAA ratings (or their equivalent highest rating) from the three leading credit rating agencies for decades—Standard & Poor's ("S&P") (since 1979), Moody's Corporation ("Moody's") (since 1986) and Fitch Ratings ("Fitch") (since 1994).  ¶¶32, 34.

[4] Under S&P's rating guidelines, "AA+" is one level below "AAA."

included in the RMBS-related products; (ii) own conservative underwriting standards; and (iii) continued surveillance and monitoring of its mortgage related portfolio. ¶¶5, 10, 30-31, 72, 78.

By 2005, however, driven by Wall Street's desire to package mortgages into structured securities, certain mortgage originators relaxed their lending standards by, among other things, issuing: (1) first mortgages as well as home equity lines of credit ("HELOCs") and closed-end second liens ("CES") to borrowers who were likely to default if home prices did not continue to rise; (2) low documentation or "Liar Loans" in which a borrower provided little or no documentation of his or her income or assets; (3) loans with high loan to value (LTV) ratios, in which the borrowers had little equity in the property; and (4) "piggyback" loans, in which the borrowers applied the proceeds of a second lien loan to cover their down payment. ¶¶ 55-59, 62-63, 81-82, 322.

The Exchange Act Defendants learned firsthand about these relaxed lending standards by 2005. According to CW 3, a former underwriter in Ambac's RMBS group, as a result of "on-site due diligence" of mortgage originators, servicers, issuers and managers, the Exchange Act Defendants gained insight into the way the country's largest mortgage originators lowered underwriting standards and placed poor quality mortgages as collateral for RMBS and CDOs generally. ¶¶77-89.

During the same time period, according to CW 1, a former underwriter and analyst at Ambac, Defendant Genader issued a company-wide mandate to achieve a 25% increase in net income, from $724 million to $1 billion a year in the near future. ¶¶67, 69, 74. Genader pushed all units of the Company to increase gross premium income while resisting the increased staffing and other risk control expense needed to ensure proper underwriting and risk monitoring for Ambac's expanded portfolio. ¶67. Thus, Ambac faced a critical choice: either maintain its

conservative underwriting principles and refuse to insure the riskier RMBS-related securities entering the market or lower its standards in order to meet Genader's aggressive earnings mandate. Unbeknownst to investors, Ambac chose to sacrifice its stringent risk-management polices for short term gain.

## C. AMBAC SECRETLY LOWERS ITS OWN UNDERWRITING STANDARDS WHILE CONSISTENTLY ASSURING INVESTORS ABOUT THE SUPERIOR QUALITY OF ITS RMBS EXPOSURES DUE TO ITS CONSERVATIVE UNDERWRITING

In the months prior to the start of the Class Period, Ambac secretly lowered its internal underwriting standards to ensure that it could guarantee the lower quality and higher risk RMBS-related deals entering the markets. ¶¶79-89. First, Ambac dramatically lowered the amount of overcollateralization required to approve the insurance of RMBS comprised of HELOC.[5] ¶¶80-81. Ambac also began to insure inherently riskier RMBS because they were backed by "Piggy-Back" second liens, which borrowers used to cover the initial down-payment, thus buying a home without putting any "skin in the game." ¶82.[6]

Then, in June 2006, Ambac altered its RMBS underwriting model for HELOC loans so that it could approve deals without examining the risk characteristics of the underlying loan pool. ¶¶83-87. According to CW 3, this change resulted from a memo written by Pat McCarthy, First Vice President in the Consumer Asset-Backed Securities Group. ¶84. Under Ambac's prior model, Ambac reviewed the characteristics of each individual loan in the underlying mortgage pool to predict that loan's performance and assess risk. Under the new model, however, Ambac did not look at *any* of the actual loans in the mortgage pool (which the Exchange Act Defendants

---

[5] Overcollateralization refers to the amount by which the principal assets in the underlying pool is greater than the principal amount of mortgage-backed securities issued on the pool. Overcollateralization was one of the principal mechanisms used by packagers of mortgage-backed securities to ensure that the securities would be repaid in full. Lowering the amount of required overcollateralization enhances of risk that the securities will not be repaid in full.

[6] Since second lien loans are wiped out before first lien incur any losses, these "piggy-back" loans were highly risky in a market with declining property values. *Id.*

knew were of inferior quality based on the "on-site due diligence" described above), and instead relied only on the cumulative historic default rates provided by the loan originators. ¶¶85-86. As the Exchange Act Defendants knew, by focusing only on historical loan performance data, they were ignoring the fact that the originators had recently changed their underwriting standards rendering historical data unreliable. Ambac never disclosed to the public these material changes in its underwriting methodology. ¶87.

Ambac's CDO business reflected the Exchange Act Defendants' undisclosed acceptance of poor quality mortgage collateral in order to drive short term earnings. Between 2004 and 2007, Ambac's net exposure to CDOs consisting of more than 25% RMBS increased from $900 million to *$29 billion*, skyrocketing from just 5.8% of Ambac's total domestic CDO exposure to *57.5% of the portfolio*. ¶66. By the end of 2006, Ambac's most senior employees were openly discussing the deteriorating quality of Ambac's mortgage portfolio. In October 2006, Iain Bruce, the head of Ambac's Consumer Asset-Backed Securities group, sent a memo to Ambac's Credit Risk Committee (which included Defendants Genader, Uhlein and Wallis), complaining that Ambac's CDOs were backed by RMBS collateral that the Company's RMBS underwriting group "*would not touch with a ten foot pole*." ¶¶12, 88-89. Similarly, Jeff Nabi, a Managing Director in Ambac's Consumer Asset-Backed Securities Group, complained that the Credit Risk Committee "didn't look at and evaluate CDO exposure with the same scrutiny" and that the CDO deals did not face the same degree of stress-testing as other types of transactions. ¶90.

As a result of Ambac's lowered underwriting standards, by late 2006, the performance of its RMBS-related securities had begun a steep decline, a fact undisclosed to the investing public. By early 2007, investors, unaware that Ambac's lowered underwriting standards had already resulted in a material decline in the performance of Ambac's own RMBS-related portfolio, began

to question whether the decline in the general market was a sign of problems for Ambac's RMBS-related securities.[7]  ¶138.  Indeed, throughout the Class Period, investors and analysts publicly questioned whether Ambac risked significant exposure from mortgage market declines and whether Ambac had sufficient capital to cover any potential negative exposure.  ¶¶92-95.

In response to these questions, the Exchange Act Defendants repeatedly assured investors that as a result of Ambac's "strict" and "conservative" underwriting, the Company did business with only healthy mortgage originators and that the RMBS-related securities Ambac guaranteed were performing ***better than*** the broader market, leaving Ambac with limited exposure and more than sufficient capital.  In fact, from the start of the Class Period, the Exchange Act Defendants touted Ambac's "cautious position" and stated that the Company was "very selective" in choosing CDOs qualified for its insurance portfolio.  ¶92 (quoting Defendant Leonard). Similarly, Defendant Genader wrote a letter to investors in Ambac's 2006 Annual Report, asserting that the Company would "continue to be disciplined and rigorous in our scrutiny" of mortgage-linked exposures.  ¶94.

As the Class Period progressed and investors' concerns about mortgage exposure grew, the Exchange Act Defendants continued to insist that Ambac's RMBS-related portfolio was not exposed to the problems affecting the weaker parts of the housing market.  For example, during a March 6, 2007 conference call, Defendant Uhlein insisted that Ambac "maintained the same conservative [underwriting] standards over the years" and that the Company's surveillance process included "monthly [and] quarterly reports on all the transactions that we guarantee."

---

[7] The steep decline of the RMBS-backed securities market was most readily transparent in two market based proxies for the market—the ABX and the TABX indices.  The ABX is a group of market indices that track the value of CDS written as insurance against dozens of representative RMBS, similar to the manner in which the S&P 500 index is a proxy for the performance of large publicly-traded companies.  The TABX is an index that tracks the price of CDS based on lower-rated tranches of the ABX indices (BBB and BBB-), based on year of origination and that tranche's level of subordination.  Plaintiffs focused on the sections of these indices that shared similar characteristics to Ambac's CDS exposures.  ¶111, n.4&5.  By March 2007, both the ABX and TABX indices had declined markedly.

¶173.  On June 12, 2007, Uhlein asserted that the "turmoil in the market" was actually **good** for Ambac because the Company had "been pretty conservative," and "w[as] comfortable with our current book of business, even in this environment."  ¶¶94, 188.  In a July 25, 2007 press release, Genader touted Ambac's "positive results despite the turmoil in the subprime mortgage market," reiterated the "unlikely event of default" on any CDO exposures, and highlighted the Company's "rigorous and proven approach" to selecting and monitoring its RMBS exposure.  ¶¶95, 190, 192.  Defendant Leonard similarly insisted that Ambac was "conservative," "cautious and selective" in insuring RMBS-backed CDOs.  ¶¶95, 193.

Ambac's reassuring statements about the quality of its underwriting were extremely important to investors and analysts alike.  One analyst wrote in December 2006 that "we highly doubt management would lower its underwriting standards just to post top line growth."  ¶93.  On July 26, 2007, Deutsche Bank issued a report emphasizing that Ambac has a "*[r]igorous CDO underwriting process*" and that **"*Ambac is not the market.*"** ¶10 (Emphasis in original).  The report further stated:

> If we assume that its underwriting was done properly, its credit performance should not reflect the average or fall even close to the average. . . . Given Ambac's **strict underwriting standards, risk assessment skills, and small exposure relative to the overall market**, **we believe Ambac will not suffer from credit losses**.  *Id.* (Emphasis added.)

As the Complaint alleges, the Exchange Act Defendants' statements regarding Ambac's "conservative," "disciplined and rigorous" underwriting and "cautious" selection of RMBS risk were demonstrably false.  In reality, Ambac, without significantly increasing its capital cushion or informing investors of a sea change in its underwriting methodology, had become the guarantor of billions of dollars of extremely risky residential mortgage default risk—in direct contradiction to the image it affirmatively promoted to investors.

**D.  AS THE CLASS PERIOD PROGRESSES, THE EXCHANGE ACT DEFENDANTS INCREASINGLY (AND FALSELY) INSIST THAT AMBAC'S RMBS EXPOSURES PERFORM BETTER THAN THE PLUMMETING MORTGAGE MARKET**

As the mortgage market continued to decline in the second half of 2007, the Exchange Act Defendants became even more insistent about the superior quality and performance of Ambac's RMBS-related portfolio.  For example, on July 25, 2007, after analysts noted the failing broader RMBS market indices, Ambac Senior Managing Director Gandolfo insisted that "I look at the same indexes [referring to the ABX and TABX] that you look at… [but] ***when we look at our deals, we don't feel we underwrite the market***."  ¶195 (Emphasis added).

Moreover, even when Ambac began to disclose certain losses on its CDO portfolio, senior management took steps to assure investors that such losses would be minimal and have no effect on the Company.  Thus, when Ambac issued a press release announcing a $743 million "Unrealized Mark-to-Market Loss" on its CDO portfolio on October 10, 2007, Ambac assured investors that the write-downs did not indicate actual losses, with Defendant Genader stating that he "remain[ed] confident in [Ambac's] underwriting abilities, credit standards and the transactions we have insured," and Defendant Leonard confirming that "Ambac does not view the current adjustments as predictive of future claims . . . [and that] management believes that the potential for material paid claims is very low."  ¶¶206-07.  Significantly, Ambac's stock price actually increased after this disclosure, and an October 11, 2007 *Dow Jones* article attributed this increase to the press release "calm[ing] concerns about the impact of the mortgage crisis on the company."  An October 11, 2007 Bank of America analyst report stated: "[w]e view Ambac's pre-announcement as a net positive," adding that "[***i***]*t all comes down to underwriting standards and the bond insurers have a long and strong track record of high-quality underwriting with minimal losses as a percentage of par outstanding*."  ¶208 (emphasis added).

As the market continued to deteriorate, Ambac not only continued to defend the strength and quality of Ambac's RMBS-related portfolio, but it angrily challenged analysts who questioned the Company's exposure. On November 1, 2007, Defendant Genader gave a nationally televised interview from the floor of the New York Stock Exchange, in which he insisted, among other things, that "*[o]ur performance, as Ambac, is very different than the rest of the market*." ¶¶9, 217-18 (emphasis added). Genader also touted Ambac's "good selection and . . . initial underwriting" and "good modeling to ensure that you are dealing with the best possible issuers*.*" ¶218. The next day, however, Morgan Stanley analyst Ken Zerbe issued a skeptical research report. ¶220. Ambac responded angrily on November 6, 2007, issuing a press release which defended the Company's statements about its portfolio and took the analyst to task for "*assuming that the Ambac ABS CDO book will reflect the performance of the ABX index of 2006 and 2007 vintage sub prime collateral and ignor[ing] the actual vintage diversification and asset quality triggers inherent in Ambac's book*." ¶¶220-23 (emphasis added). The next day, in a public senior management conference call, Genader challenged certain "misperceptions," including that "Ambac's insured portfolio mirrors the ABX," and that the Company's "$14 billion capital [was] inadequate." ¶¶227-28.

The Exchange Act Defendants' insistence that Ambac was protected from the broader mortgage market problems became even more strident as the market collapse worsened. Indeed, throughout November 2007, these Defendants repeatedly stated that the transactions which Ambac insured were vastly different than the transactions included in the ABX and TABX indices, which had shown dramatic deterioration. On November 13, 2007, Ambac filed a Form 8-K highlighting the Company's independent review of its mortgage-related exposures, reiterating that "*Ambac is not a proxy for the mortgage market: we are not a mortgage*

*guarantor, we did not wrap any of the deals on the ABX index*." ¶¶234-35 (emphasis added). As late as November 27, 2007, Leonard and Wallis spoke at a conference, stating that the Company's "business model is investment grade underwriting." ¶238. In response to a specific question about their collateralized CDOs, Wallis stated that "they're performing just fine. We're not anticipating losses in that portfolio." ¶239. ***The next day***, Defendant Genader assured the investors once again that Ambac's "transactions ***do not replicate the ABX index,***" and that the ABX index ***"is not Ambac***." ¶241 (emphasis added).

E.    **CONTEMPORANEOUS INFORMATION AVAILABLE TO THE EXCHANGE ACT DEFENDANTS SHOWED THAT ITS MORTGAGE-LINKED PRODUCTS PERFORMED NO BETTER THAN THE MARKET**

The Exchange Act Defendants' statements that Ambac's portfolio: (1) was performing as expected; (2) was not comparable to the broader and deteriorating mortgage securities market; and (3) did not require any write-down or loss reserve adjustments were false. Using the delinquency data that was available to the Exchange Act Defendants as part of the Company's self-described surveillance process, the Complaint alleges that Ambac's RMBS-related portfolio did not perform better than the market, as the Exchange Act Defendants represented, but instead performed in line with the market. ¶¶111-33. In short, Plaintiffs' consultants (which including mortgage industry specialists, economists and statisticians) replicated the "surveillance" that Ambac publicly asserted it performed throughout the Class Period. ¶128. Plaintiffs' analysis demonstrates that the Exchange Act Defendants knew or were reckless in not knowing that their statements about the performance of Ambac's RMBS-related portfolio were false and misleading. ¶¶111-33.

Focusing on the CDOs of RMBS issued in 2006 and 2007, Plaintiffs' consultants extracted the underlying RMBS collateral from a representative set of five CDOs that accounted for approximately 25% of Ambac's approximately $29 billion total CDO of RMBS portfolio.

Plaintiffs then compared the performance of that collateral to the RMBS comprising six comparable ABX indices, *i.e.*, high-grade indices similar in both year of issue and credit rating to the collateral in Ambac's CDOs.  *See* ¶¶117-24.[8]

Plaintiffs' consultants also compared the performance of Ambac's CDOs to the performance of the CDOs comprising the TABX index, which isolates for "subordination" protection provided to higher tranches of CDOs by lower tranches that will suffer "first-loss" as collateral deteriorates.  In making this comparison, Plaintiffs' consultants gave Defendants the benefit of the doubt, basing the comparison on the most senior TABX index tranche, which reflects a substantially higher subordination level (40%) than most of Ambac's CDOs.  ¶¶ 120, 123-24.

The analysis conducted by Plaintiffs' consultants showed that at least two-thirds of the RMBS that actually comprise the ABX high-grade indices were contained in one or more of Ambac's representative CDOs. ¶121[9], and there is a close correlation in delinquency rates between the RMBS in Ambac's CDOs and the conservatively chosen ABX and TABX indices. ¶¶125-26.  Indeed, the Complaint includes a chart illustrating that, contrary to the Exchange Act Defendants' public statements, the collateral supporting Ambac's CDOs performed directly in line with (*i.e.,* just as poorly as) the collateral comprising the ABX and TABX indices.  ¶126. Thus, in direct contrast to the Exchange Act Defendants statements that Ambac did not insure the market, in fact, Ambac did insure the "market."

---

[8] This analysis could not have been performed by investors or analysts before January 30, 2008 because Ambac did not sufficiently identify its CDOs before then.  Even as to the directly insured RMBS, investors could not, absent an arduous amount of investigation and analysis, determine whether Ambac was telling the truth about its mortgage collateral.  ¶115.  However, it is important to note that the information used by Plaintiffs' consultants was readily available to the Exchange Act Defendants during the relevant period.

[9] Accordingly, the Exchange Act Defendants' insistence that Ambac did not "wrap" any of the securities on the ABX is a half truth at best.  It is as if an investor that owns derivative securities linked to 20 of the 30 components of the Dow Jones Industrial Index asserted that its portfolio was unlike the market.

14

Plaintiffs' comparison of Ambac's HELOC and CES portfolios to the ABX and TABX provided similar results. ¶¶128-32. By no later than the first quarter of 2007, Ambac's HELOC and CES exposures performed almost identically (*i.e.*, just as poorly) as the underlying collateral represented in the more conservative ABX and TABX indices. *Id.*

In sum, Ambac's CDO and RMBS exposures performed just as poorly as—not better than—the relevant ABX and TABX indices: (a) delinquency rates of the underlying RMBS collateral skyrocketed *over 600%* between June 2006 and January 2008 (¶¶125-27); (b) there was a clear deterioration in the underlying assets of Ambac's HELOC and CES portfolios directly in line with the deterioration seen in the ABX and TABX indices by no later that the first quarter of 2007 (¶¶128-31); and (c) Ambac's own recent disclosures confirm that from mid-2006 to the end of 2007, delinquencies in the HELOC and CES underlying mortgages jumped by 400% (¶¶132-33). The Exchange Act Defendants' repeated affirmative statements that their RMBS-related products were not the market and were better than the ABX and TABX were false, and Plaintiffs' consultants' analysis—using data available to the Exchange Act Defendants throughout the Class Period—provides further support of their knowledge of that falsity.

## F.  AMBAC BEGINS TO TAKE MASSIVE WRITE-DOWNS AND REVEALS THE PRIOR INFLATED VALUES OF ITS RMBS-RELATED PORTFOLIO

On January 16, 2008 – *less than two months* after the Exchange Act Defendants emphatically insisted that Ambac's RMBS-related exposures were "performing just fine" and were not performing like the ABX mortgage security index, Ambac shocked investors by announcing: (a) *$5.4 billion* in "mark-to-market" write-downs on its then $29 billion portfolio of CDOs supported by RMBS; (b) *$1.1 billion* of actual impairments on these exposures; (c) a near tripling of its loss reserves due to deterioration of its direct RMBS portfolio; (d) a 67% reduction in its dividend payouts (in order to preserve capital); and (e) its CEO's unexpected "resignation"

from the Company.  ¶¶13, 315-19.  Ambac's stock price plummeted 70% on the news, from a closing price of $21.14 on January 15, 2008 to a closing price of $6.24 on January 17, as investors realized that Ambac's underwriting could not have been "strict," "conservative" or "rigorous" and that, despite the Exchange Act Defendants' repeated and emphatic statements to the contrary, Ambac's RMBS-related exposures had performed no better than the rest of the mortgage market.  ¶¶316-17.

Amazingly, Ambac, despite these disclosures, continued to reassure investors that the losses on its mortgage-related exposures were contained.  During a January 22, 2008 conference call, Defendant Leonard stated: "Ambac continues to believe that the balance of the mark-to-market losses taken to date are not predictive of future claims, and that in the absence of further credit impairment, that the cumulative marks would be expected to reverse over the remaining life of the insured transactions."  ¶251.

Contradicting Leonard's assurances, on April 23, 2008, Ambac announced a net quarterly loss of $1.66 billion, driven by a further impairment of $1.045 billion of HELOC and CES deals, and a further mark-to-market loss of $1.725 billion on Ambac's CDOs.  ¶¶320-23.  Defendant Leonard admitted that "on some exposures . . . *losses could reach as high possibly as 80%*." ¶320 (emphasis added).  Investors now fully recognized the massive deterioration of Ambac's underwriting of RMBS exposures and Ambac's stock price dropped to $3.46 per share.  ¶¶322-23.  Ambac's common stock, which traded as high as $96.08 during the Class Period, never recovered and today, trades at approximately $1.30 per share.

## G.    AMBAC'S MARK-TO-MARKET WRITE-DOWNS VIOLATED GAAP AND IT FAILED TO TAKE ADEQUATE RESERVES

The Exchange Act Defendants' misstatements about the quality of Ambac's RMBS-related portfolio caused the Company's publicly reported financial statements to be materially

misstated. As required by Generally Accepted Accounting Principles ("GAAP"), Statement of Financial Accounting Standards ("SFAS") 133 and 107, and FASB Interpretations ("FIN") 45, Ambac should have recorded billions of dollars in mark-to-market write-downs of its CDS of CDO portfolio. ¶¶134-45; 269-92.

Specifically, Ambac disregarded the requirement in SFAS 133 that it calculate fair value and mark its obligations based on the best available market data. As discussed above, the underlying assets in Ambac's CDO and RMBS portfolio performed in line with the ABX and TABX. Had Ambac properly marked its portfolio, it would have marked its exposures down by billions of dollars beginning in March 2007.

In order to calculate a market value that most closely correlated to the value of Ambac's CDO exposures, Plaintiffs compared Ambac's disclosed write-downs to the write-downs implied by the TABX.[10]  Plaintiffs determined the mark-to-market write-downs by linking the pertinent TABX indices to Ambac's similar CDOs, arriving at the following (¶¶140-45, 283):

|  | Ambac's Publicly Reported Write-Down | The Write-Down Ambac Should Have Taken |
|---|---|---|
| March 30, 2007 | $5.124 Million | $2.068 Billion |
| June 30, 2007 | $56.8 Million | $2.716 Billion |
| September 30, 2007 | $743 Million | $8.923 Billion |
| December 31, 2007 | $5.4 Billion | $3.672 Billion |
| **2007 Total** | **$6.1 Billion** | **$17.379 Billion** |

Ambac's mark-to-market methodology was inherently flawed because Ambac failed to mark its portfolio based on the decline in the underlying assets. ¶¶287-88. For example, although a CDS obligation originally purchased in January 1, 2007 for $100 million may have

---

[10] Plaintiffs chose TABX 40-100 because it is the most senior TABX index tranche assuming subordination of 40%. This is a very conservative comparison because the 40-100 TABX subordination level is much larger that the Ambac representative CDOs. Indeed, over half of the Ambac representative CDOs attached below the 20% level of subordination and the average subordination level of the 2006 and 2007 CDOs was 24%. ¶124. This fact addresses Ambac's assertion that it had structure protections in place.

had a resale price of only $75 million by September 2007, Ambac's mark-to-market methodology assumed that asset value as of September 30, 2007 remained at the same $100 million amount. All that Ambac took into account was a higher cash spread that would be charged to insure the remaining asset value and assumed no decrease in value of the underlying asset. *Id.* If Ambac attempted to sell the asset to another market participant – the SFAS 133 standard - the person purchasing the CDS would insist on a payment from Ambac to cover the decline in value of the insured assets. ¶¶288-93. Ambac's assumptions were unreasonable and inflated the reported value of Ambac's CDO exposures. *Id.*

Ambac also violated SFAS 5 by failing to take adequate active credit reserves to reflect the deterioration of the credit quality of the RMBS assets. ¶¶293-300. Under SFAS 5, Ambac was required to disclose if there was a "reasonable possibility" – *i.e.*, that it was "more than remote but less than likely" – that a loss may have been incurred. ¶298. Ambac's failure to estimate probable losses – or at least disclose that a contingent loss was reasonably possible – violated SFAS 5, given the extreme deterioration of Ambac's RMBS-related insured assets. In fact, ***Ambac's loss reserves covered only 0.5% of its total RMBS exposure, and .04% of its net exposure from the fourth quarter of 2006 through the third quarter of 2007***.[11]

---

[11] Ambac also violated Item 303 of Regulation S-K, *Management's Discussion and Analysis (MD&A) of Financial Condition and Results of Operations*, which specifically requires MD&A disclosures regarding "any known trends" that could affect Ambac's liquidity, capital resources, results of operations and contractual obligations, among other things. ¶266. Ambac violated SEC Item 303 by failing to disclose negative trends, such as the declining underwriting standards of mortgage originators, Ambac's own weaker underwriting guidelines, and the impact of the declining housing market, rising interest rates and observed collateral deterioration on Ambac's RMBS-related exposures. ¶¶266-68; *see also* ¶¶76-77; 78-91; 111-45; 259-307.

### III.     LEGAL ARGUMENT REGARDING CLAIMS ARISING UNDER THE SECURITIES EXCHANGE ACT OF 1934

**A.     PLAINTIFFS SATISFIED THE PLEADING STANDARDS OF THE PSLRA AND SECTION 10(b)**

The Complaint asserts, with detailed supporting allegations, that each of the Exchange Act Defendants are liable for violating Section 10(b) of the Exchange Act (¶¶330-42), and that Genader and Leonard are liable as control persons pursuant to Section 20(a) of the Exchange Act (¶¶343-50).[12]   On a motion to dismiss, the court must accept Plaintiffs' allegations as true and draw all inferences in the plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007); *ATSI Comm'cns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The court's function on this motion is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *SEC v. Simpson Capital Mgmt, Inc.*, 07 Civ. 6072, 2008 WL 4093046, at *1 (S.D.N.Y. Sept. 3, 2008) (*citing Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)); *In re Worldspace Sec. Litig.*, 07 Civ. 2252, 2008 WL 2856519, at *3 (S.D.N.Y. July 21, 2008) (same).

The elements of a claim under Section 10(b) and Rule 10b-5 promulgated thereunder require Plaintiffs to allege that the Exchange Act Defendants "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which Plaintiffs relied, and (5) that Plaintiffs' reliance was the proximate cause of its injury." *ATSI*, 493 F.3d at 105.

Plaintiffs' Section 10(b) allegations are subject to the pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *ATSI*, 493 F.3d at 99; *Hall v. The Children's Place Retail Stores, Inc.*, No. 07 Civ. 8252, 2008 WL 2791526, at *4-5

---

[12] As acknowledged by the Exchange Act Defendants, the survival of a Section 20(a) claim rests on a sufficient pleading of a primary violation of Section 10(b). *See* Ambac Mem. at 31, n.21. As Plaintiffs have sufficiently alleged a Section 10(b) violation, the Exchange Act Defendants' motion to dismiss should also be denied with respect to the Section 20(a) allegations.

(S.D.N.Y. Jul. 18, 2008).  The "primary purpose" of Rule 9(b) is "to afford defendant fair notice of the plaintiff's claim" and not to create "an insurmountable hurdle."  *SEC v. Dunn*, No. 07 Civ. 2058, 2008 U.S. Dist. LEXIS 77341, at *53 (S.D.N.Y. Sept. 30, 2008) (citations omitted).  The PSLRA requires that:

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78 u-4(b)(1)(B); *Tellabs,* 127 S. Ct. at 2508.  The PSLRA also requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *see Tellabs*, 127 S. Ct. at 2508.

**B.    THE COMPLAINT ALLEGES MATERIAL MISREPRESENTATIONS AND OMISSIONS WITH MORE THAN ENOUGH PARTICULARITY**

The Complaint more than adequately pleads the material and false statements by the Exchange Act Defendants.  "At the pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir. 2000); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 329 (2d Cir. 2002) (an omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted)).  A "complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Ganino,* 228 F.3d at 162 (internal citations omitted).

1.    **The Exchange Act Defendants' Statements about Underwriting Standards, Surveillance and the Quality of Ambac's Insured Exposures Were Materially Misleading**

Throughout the Class Period, the Exchange Act Defendants made numerous false and misleading statements about the single most important facet of Ambac's business–the strength of its underwriting practices and the purportedly superior performance of its mortgage-related exposures.  See Section II.D., *supra*.  While the Exchange Act Defendants were weakening Ambac's underwriting standards and exposing the Company to increased risk (¶¶12, 13, 79-91, 320-22) they publicly touted Ambac's conservative model, representing, *inter alia*,  that Ambac was "very selective" and "maintained the same conservative [underwriting] standards." ¶¶148, 173.

The Exchange Act Defendants likewise made repeated misrepresentations about the performance of Ambac's RMBS-related securities, touting their superior performance despite knowing that the opposite was true, *i.e.*, as a result of Ambac's weakened underwriting, the Company had guaranteed risky securities that performed as poorly as the rest of the market.  For example, the Exchange Act Defendants represented that Ambac's portfolio was "performing satisfactorily" and suffered no "significant deterioration." ¶¶173, 180.

In November and December 2007, Ambac reassured investors that its portfolio did not "reflect[] the performance of the ABX index," "did not wrap any of the deals on the ABX index," and was not "a proxy for the mortgage market." *See, e.g.,* ¶¶223, 227, 235, 241, 243.

Contrary to Ambac's repeated representations and, as a consequence of the Company's lowering of its own standards and disregard for the lowered standards of mortgage originators, Ambac's RMBS-related exposures performed the same as the market and suffered from materially increased default rates and losses.  ¶111-33.  The Exchange Act Defendants' statements about Ambac's underwriting standards and the performance of its RMBS-related

21

portfolio misleadingly distinguished Ambac apart from the rest of the market amidst the general mortgage meltdown.  As discussed below, the materiality of these misstatements is beyond doubt and the Exchange Act Defendants' arguments to the contrary must fail.

      *a.*      *The Exchange Act Defendants' Misrepresentations of the Company's Underwriting Practices Were Material*

The Exchange Act Defendants argue that their statements about Ambac's underwriting standards are inactionable examples of "puffery" or "corporate optimism" because they were "generalizations" upon which the investing public did not rely.  Ambac Mem. at 14.[13]  To the contrary, Ambac's "underwriting practices would be among the most important information looked to by investors."  *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1154-55 (S.D. Cal. 2008) (plaintiffs alleged actionable false and misleading statements regarding defendants' underwriting practices) (hereinafter "*Accredited*").

In fact, sophisticated securities analysts who covered Ambac relied heavily on these specific statements and believed them to be important indicators of Ambac's financial health. *See, e.g.*, ¶93 (Morgan Stanley analyst Zerbe wrote on December 14, 2006 that "we highly doubt management would lower its underwriting standards just to post top line growth"); ¶197 (Morgan Stanley July 25, 2007 report highlighted that Ambac's "in-depth discussion . . . about how it protects itself against CDO losses and the favorable outlook for new business seemed to go a long way toward alleviating investor concerns"); *id*. (July 26, 2007 Deutsche Bank report emphasized that Ambac has a "[r]igorous CDO underwriting process," that "Ambac is not the market," and that "Given Ambac's strict underwriting standards, risk assessment skills, and

---

[13] Puffery has been defined as "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."  *Bamberg v. Cowen*, 236 F. Supp. 2d 79, 83 (D. Mass. 2002) (citation omitted).  A statement of corporate optimism is innocuous *only* if the company's disclosures are "[]consistent with current data."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994).

small exposure relative to the overall market, we believe Ambac will not suffer from credit losses"); ¶204 (August 23, 2007 Piper Jaffray report said that a "key takeaway" from Ambac's engaged in a "highly regimented process" for underwriting of CDOs); ¶215 (October 24, 2007 Bank of America report concluded that "[u]nderwriting discipline is the key to the divergence we expect to see between the performance of Ambac's insured portfolio and the continued deterioration in the general market place").  The specific analyst commentary about these statements, taken alone, is sufficient to establish their materiality.

Moreover, as the court recently recognized in *In re Countrywide Financial Securities Litigation,* statements about the nature and quality of underwriting and surveillance standards are material and essential for a company whose financial health was linked to mortgages. *Countrywide Securities*, 2008 WL 5100124, at **8-9 (false statements about the quality of a mortgage market participant's underwriting practices are material); *see also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1057 (C.D. Cal. 2008) (hereinafter "*Countrywide Derivative*") (statements that Countrywide was "well-positioned with a . . . high quality credit profile in our loan portfolio" and "has . . . very strong discipline in the origination of sub-prime loans" were actionable because they "misled the public with regard to the rigor of Countrywide's loan origination process, the quality of its loans, and the Company's financial situation . . ."); *Accredited*, 556 F. Supp. 2d at 1155 ("[A]s a mortgage lender...underwriting practices would be among the most important information looked to by investors.")[14]  Indeed, the Third Circuit recognized over fifteen years ago that:

---

[14] S*ee also In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897, 2006 WL 314524, at *10 (S.D.N.Y. Feb. 10, 2006) (plaintiffs adequately alleged actionable misrepresentations and omissions regarding defendants' underwriting practices), *rev'd on other grounds sub. nom.*, 531 F.3d 190 (2d Cir. 2008); *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *10 (E.D. Pa. July 27, 2005) (misrepresentations regarding a company's underwriting practices are actionable); *Ong v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 898-99 (N.D. Ill. 2004) (misrepresentation regarding underwriting standards along with other misrepresentations regarding portfolio quality and loan loss reserves was sufficient to withstand dismissal).

> where a defendant affirmatively characterizes management practices as
> "adequate," "conservative," "cautious," and the like, the subject is "in play." For
> example, if a defendant represents that its lending practices are "conservative"
> and that its collateralization is "adequate," the securities laws are clearly
> implicated if it nevertheless intentionally or recklessly omits certain facts
> contradicting these representations. Likewise, if a defendant characterizes loan
> loss reserves as "adequate" or "solid" even though it knows they are inadequate or
> unstable, it exposes itself to possible liability for securities fraud. By addressing
> the quality of a particular management practice, a defendant declares the subject
> of its representation to be material to the reasonable shareholder, and thus is
> bound to speak truthfully.

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992).

In sum, the Exchange Act Defendants also argue that Plaintiffs have not shown that the alleged changes in Ambac's underwriting standards were "imprudent" or "materially increased the risks of Ambac's business." Ambac Mem. at 14.[15] In effect, they are asking the Court to make factual determinations and draw unreasonable inferences against Plaintiffs. The Complaint alleges in detail that Ambac materially lowered its underwriting practices for the specific purpose of transacting in riskier deals, and the underwriting changes at issue led to the very losses that the Company incurred.[16] In any event, those changed standards were in fact imprudent, as internally recognized by Ambac's own employees. *See* ¶¶12, 77-90. The Court should reject the Exchange Act Defendants' invitation to weigh competing factual arguments about the "prudence" of Ambac's weakened underwriting standards.

---

[15] The Exchange Act Defendants cite no case requiring that misrepresentations about underwriting must conceal an "imprudent" change in underwriting standards to be actionable. *See* Ambac Mem. at 14.

[16] In *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008), cited by Ambac (Ambac Mem. at 14), the court held that where a company in general terms described the goals of its risk compliance program but "carefully avoid[ed] making any claims about the program's effectiveness both in the description of its aims and in the cautionary statement following that description," plaintiff failed to state a claim that the description was misleading. Here Ambac represented that its underwriting and surveillance programs were effective and had immunized it from the problems occurring in the general marketplace.

The Exchange Act Defendants' public statements about Ambac's strict underwriting and monitoring of its RMBS and CDO exposures, coupled with their statements that Ambac's exposures performed better than the mortgage markets in general, are material and actionable.[17]

> b.    *The Exchange Act Defendants' Misrepresentations About Ambac's Superior Portfolio Performance Were Material*

As detailed in the Complaint, and summarized above, the Exchange Act Defendants repeatedly assured investors that, despite the failing mortgage market in general, Ambac's conservative underwriting and careful surveillance helped it avoid the problems facing the broader market. The Exchange Act Defendants attempt to turn Plaintiffs' allegations on their head by arguing that because the condition of the housing and mortgage markets was a matter of public knowledge, "no investor could have been misled on that score." Ambac Mem. at 12-13. This ignores the fact that the Exchange Act Defendants told the public that the performance of Ambac's RMBS-related portfolio was materially different than that of the market. This argument, on its face, is illogical and without merit.

As Courts have recently concluded, cautionary statements about the deteriorating mortgage industry in general do not protect defendants from liability when company-specific

---

[17] The Exchange Act Defendants' alleged misstatements are also not examples of "corporate optimism." Ambac Mem. at 14. Rather, their statements regarding the very nature of its underwriting process and that its exposures were performing **better** than the market were material misstatements of Ambac's historical and contemporary performance, not merely optimistic projections of future performance. Where misstatements are "not simply 'soft predictions' but contained recitations of (allegedly inaccurate) historical facts," they are not mere "corporate optimism." *In re Nortel Networks Corp. Sec. Litig.,* 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003); *see also Countrywide Derivative,* 554 F. Supp. 2d at 1057 (statements that Countrywide were "well-positioned with a . . . high quality credit profile in our loan portfolio" and "has . . . very strong discipline in the origination of sub-prime loans" were actionable because they "misled the public with regard to the rigor of Countrywide's loan origination process, the quality of its loans, and the Company's financial situation . . ."); *see also Accredited,* 556 F. Supp. 2d at 1149-50, 1154 (statements that Accredited's "underwriting procedures were better and more conservative" than other lenders and that "Accredited was committed to a disciplined approach that focused on credit quality" were actionable); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* No. 05 Civ. 1898, 2005 WL 2148919, at *56 (S.D.N.Y. Sept. 6, 2005) ("[i]t cannot be said, as a matter of law, that the information available to investors concerning the problems with the collateral was sufficient to overcome the representations of 'rigorous underwriting' made by defendants in their offering documents").

problems are undisclosed.  *See, e.g., In re New Century*, 2008 WL 5147991 at *16 (finding defendants' generalized cautionary statements about the deteriorating sub-prime industry "appear largely unrelated to whether the alleged statements [about New Century's performance] were false and misleading," and do not support dismissal at the pleading stage); *Countrywide Securities*, 2008 WL 5100124, at *28 (defendants can not shield themselves from liability by claiming that market forces caused the company's decline when the company's "operations so diverged from soundness that [its] repeated assurances of good practices, quality loan operations and consistently prudent underwriting guidelines were rendered false").  Put another way, warning that housing markets *could* turn negative and loss severity estimates *could* materially change is no substitute for informing investors that Ambac's own portfolio had *already undergone* a significant deterioration or that Ambac materially altered its risk management approach to take on riskier exposures.  *See In re Regeneron Pharm., Inc. Sec. Litig.,* No. 03-3111, 2005 U.S. Dist. LEXIS 1350, at *54 (S.D.N.Y. Feb. 3, 2005) ("A warning that fails to disclose specific known facts is insufficiently precise and will not insulate Defendants' statements from liability…").[18]

The Exchange Act Defendants also assert that, because "Ambac was not in the business of guaranteeing mortgages, but instead typically guaranteed investment-grade tranches of MBS and super-senior tranches of CDOs of MBS, with a variety of deal protections," Plaintiffs did not prove that increased delinquency rates in Ambac's underlying mortgage collateral meant that

---

[18] The "truth on the market" defense, which allows "[a] defendant [to] rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the *truth of the matter was already known*," *Ganino*, 228 F.3d at 167 (emphasis added), can not apply here.  This defense "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."  *Id.*  Here, the Complaint alleges that the Exchange Act Defendants repeatedly assured investors that, based on their underwriting and surveillance, Ambac's exposures were immunized from ongoing declines in the broader housing markets.  *See, e.g. Bombardier,* 2005 U.S. Dist. LEXIS 19506, at *56 ("It cannot be said, as a matter of law, that the information available to investors concerning the problems with the collateral was sufficient to overcome the representations of 'rigorous underwriting' made by defendants in their offering documents").

Ambac was suffering losses.  Ambac Mem. at 13.  This argument completely ignores the detailed allegations in the Complaint demonstrating that Ambac's CDO exposures performed in-line with relevant indices, even when accounting for "deal protections" and, while these indices were plummeting, the Exchange Act Defendants continued to maintain that Ambac was not experiencing any loss in value due to its CDO exposures.  *See, e.g.*, ¶¶111-33.

In sum, rather than absolving the Exchange Act Defendants of liability, investor awareness of housing and market troubles highlights the materiality and deceptive nature of the Exchange Act Defendants' alleged false statements about Ambac's position in the market.

<em>c.     The PSLRA Safe Harbor for Forward Looking Statements Does Not Apply</em>

The Exchange Act Defendants' effort to invoke the PSLRA safe harbor fails.[19]  Ambac Mem. at 14.  The safe harbor and the related "bespeaks caution" doctrine only apply to "forward-looking statements" and the cautionary language must "warn investors of *exactly* the risk that plaintiffs claim was not disclosed."  *In re Indep. Energy Hldgs. PLC Sec. Litig.*, 154 F. Supp. 2d 741, 755 (S.D.N.Y. 2001), *abrogated on other grounds by In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) (hereinafter "*In re IPO I*") (citation omitted; emphasis in original); *see also Stolz Family P'ship, L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").  Indeed, "even when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply."  *In re Regeneron Pharm.,* 2005 U.S. Dist. LEXIS 1350, at **39-40.

---

[19]  Under the PSLRA safe harbor provisions, a forward looking statement generally does not give rise to a securities fraud claim if: (i) it is accompanied by meaningful cautionary language, or (ii) the plaintiff fails to prove the statement was made with actual knowledge that it was false and misleading.  15 U.S.C. § 78u-5(c).

The Exchange Act Defendants affirmatively concealed that significant credit deterioration had already taken place in Ambac's RMBS-related exposures, while specifically contrasting the supposed high quality of its exposures to those that were plummeting in value in the general marketplace. Indeed, the risk factor that the Exchange Act Defendants refer to (but conspicuously do not quote) in their memorandum of law is a boiler-plate paragraph in an October 25, 2007 press release that is so generalized as to be legally meaningless.[20]

## 2. The Complaint Adequately Alleges That Ambac Violated GAAP

The Exchange Act Defendants dispute Plaintiffs' GAAP accounting allegations by raising issues of fact which are not appropriate on a motion to dismiss. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) (reversing 12(b)(6) dismissal because "it is a factual question whether [the Company's] accounting practices were consistent with GAAP"). Plaintiffs' GAAP allegations are well-founded and properly pleaded. *See In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 338-39 (S.D.N.Y. 2004) (finding that sufficiency of allegations of GAAP violations "cannot be determined in advance of the development of the record"); *SEC v. Caserta*, 75 F. Supp. 2d 79, 91 (E.D.N.Y. 1999) ("[w]hether GAAP has been violated is a fact-specific issue.").

### a. *Ambac's Mark-to-Market of its CDO Exposures Violated FAS 133*

Under SFAS 133, entitled "Accounting for Derivative Instruments and Certain Hedging Activities," Ambac was required to account for the value of its credit default swap exposures to

---

[20] The Exchange Act Defendants identify **only one statement** that they allege was protected by the safe harbor—a statement by Leonard in a conference call related to Ambac's expectation that the Company's third quarter 2007 $743 million market to market loss would not result in future write-downs or the payout of claims. The risk disclosure cited by the Exchange Act Defendants appears in an October 24, 2007 press release attached to Ambac's Form 8-K of the same date, and in a conference call transcript of the same day. *See* Ambac Mem. at 14; Wilson Aff. Ex. 70 at 7; Wilson Aff. Ex. 47 at 1. The disclosure is one paragraph long and contains a laundry list of thirteen short hypothetical and generalized risk factors. The press release also refers to the risk factors in Ambac's Form 10-K, which the Complaint alleges in detail were materially false and misleading. ¶¶165-72.

CDOs at "fair value," which is "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." ¶134. SFAS 133 emphasizes that fair value is "*not an entity-specific measurement*," and "should be determined based on the assumptions that *market participants would use* in pricing the asset or liability." *Id*. (emphasis added).

The Complaint pleads with specificity that Ambac's CDO mark-to-market valuations were materially deficient. Until January 2008, Ambac's mark-to-market write-downs of its CDO exposures were minimal – Ambac took losses of $5.124 million as of March 31, 2007, $56.87 million as of June 30, 2007 and $743 million as of September – compared to $20 billon, $24.3 billion and $26.2 billion, respectively, of CDO exposure. ¶¶141-43. Ambac's reported write-downs were also miniscule compared to those of other financial firms who held equivalent CDOs. ¶¶220, 285, 290-91. For example, Merrill Lynch's write-downs for the third quarter of 2007 represented approximately half the value of its highest-grade CDO exposures – while Ambac's write-down was only 1.8% of its similar CDO exposures. ¶285.

In arguing that Plaintiffs improperly use the TABX as a proxy for the write-downs Ambac should have reported, the Exchange Act Defendants not only raise an inappropriate factual argument, they also ignore the remarkable similarity between the TABX and Ambac's CDO portfolio. The components of the TABX index showed *the same delinquency rates* as the RMBS in the CDOs that Ambac insured. ¶¶124-26. Yet the TABX index had declined by *two-thirds* to approximately *33% of par*, while Ambac's write-downs were less than 2% thus implying that the collateral was still valued at 98% of par. ¶¶138, 143. The Complaint pleads specific mark-to-market values by quarter (based on Plaintiffs' consultants' analysis) for Ambac's exposures utilizing the TABX market spreads. ¶¶141-45. The Complaint therefore

provides a strong factual basis for alleging that Ambac's mark-to-market was materially deficient.

The Exchange Act Defendants seek to refute the Complaint's detailed allegations by arguing that GAAP is a matter of judgment. *See* Ambac Mem. at 15-16. For one thing, Courts have repeatedly held that misstatements regarding loss reserves and other financial statement matters of "judgment" can violate Rule 10b-5 where, as here, Plaintiffs have alleged that showing that those "judgments" were contradicted by then-existing facts. *See, e.g.*, *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 (3rd Cir. 1996) (allegedly misstating the loss reserves were "adequate" and established in compliance with GAAP); *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993) ("While the setting of loan loss reserves is, by all accounts, an 'art and not a science,' . . . [Rule 10b-5] . . . . is implicated when plaintiffs allege specific misrepresentations or material nondisclosures in violation of the federal securities laws."); *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992); *In re Direct General Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 896 (M.D. Tenn. 2005); *In re PMA Capital*, 2005 WL 1806503, at *6; *Schnall v Annuity and Life Re (Holdings), Ltd.*, No. 02-2133, 2004 U.S. Dist. LEXIS 2859, at *24-25 (D. Conn. Feb. 22, 2004). As one court has stated, there is "nothing unique about representations . . . regarding loan loss reserves that removes them from the purview . . . of the federal securities laws." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992).

Moreover, the disparity between Ambac's marks and those indicated by the most pertinent market-based index are so substantial that they should be considered materially false and misleading. At minimum, the parties' dispute about whether Ambac's marks complied with GAAP raises factual and expert questions that cannot be resolved on a motion to dismiss. *See In re Burlington Coat Factory,* 114 F.3d at 1421; *Nappier v. Pricewaterhouse Coopers,* 227 F.

Supp. 2d 263, 276 (D.N.J. 2002) ("the determination of 'what accounting practices comprise GAAP is a question of fact best addressed through expert testimony and thus is inappropriate for resolution on a motion to dismiss'"); *see also Provenz v. Miller,* 102 F.3d 1478, 1490 (9th Cir. 1996); *In re Raytheon Sec. Litig.,* 157 F. Supp. 2d 131, 147 (D. Mass. 2001); *Caserta,* 75 F. Supp. 2d at 91.

In fact, courts that have recently addressed the issue of loss reserves reporting in the mortgage industry have held that loss reserve allegations should withstand motions to dismiss on similar grounds. *See, e.g., In re New Century*, 2008 WL 5147991, at *20 (C.D. Cal. Dec. 3, 2008) (finding that the allegations regarding defendants' reckless accounting through their failure to set the proper loss reserves was sustainable on a motion to dismiss).

The Exchange Act Defendants' additional arguments are also meritless. *First*, the Exchange Act Defendants rely upon media articles and their own self-serving statements to argue that the ABX and TABX are unreliable pricing tools. Ambac Mem. at 16. Besides being wholly outside the scope of the Complaint, these materials and assertions raise complex factual disputes. FAS 133 requires a determination of ***market price*** or a reliable proxy for market price. The Exchange Act Defendants' self-serving critique of the ABX and TABX cannot possibly override Plaintiffs' specific showing that Ambac's CDO and RMBS portfolios actually performed in line with ***the very market indices that analysts and investors consistently referred to in assessing Ambac's reported marks***. *See, e.g.,* ¶¶111-33, 136 (analysis of Plaintiffs' consultant regarding Ambac's RMBS-related holdings); ¶195 (Gandolfo's statement in July 2007 that Ambac does not underwrite the market); ¶220 (Morgan Stanley's concerns that Ambac is not looking to TABX and ABX for its valuations); ¶223 (Ambac's continual denial that the

performance of its portfolio is similar to the market).  In fact, Defendants themselves compared Ambac favorably to these indices during the Class Period.  *See, e.g.*, ¶¶223, 227, 235, 241, 243.

*Second*, the Exchange Act Defendants argue that the TABX was comprised of subprime mortgages, whereas Ambac's exposures consisted of higher grade collateral, and that comparisons of the two are inappropriate.  Ambac Mem. at 17-18.  This argument not only ignores that Plaintiffs gave Ambac the benefit of conservative assumptions by comparing Ambac's supposedly higher quality collateral, but fails to recognize that Ambac's ***higher*** grade collateral was performing in-line with TABX's ***lower*** quality collateral.  ¶¶111-33.  The similarity of performance is the key issue.  Indeed, Ambac's argument supports Plaintiffs' allegations.  The fact that its higher grade collateral was performing similarly to lower grade collateral demonstrates that Ambac's CDO exposure was severely overvalued.

*Third*, the Exchange Act Defendants argue that "Ambac repeatedly disclosed how it valued its CDO guarantees."  Ambac Mem. at 18.  In fact, the specific models and inputs were ***not*** disclosed.  *See, e.g.*, Ambac 2006 Form 10-K (Wilson Aff. Ex. 30) at 41-42; Ambac 2007 Form 10-K (Wilson Aff. Ex. 31) at 27.  As a Piper Jaffrey analyst wrote on August 23, 2007, "[d]espite any analyst or investor's best attempt, the information flow on a deal by deal basis simply can not be granular enough to come to any real conclusion about" the structure of Ambac's insured CDOs.  ¶204.[21]  Also, until January 30, 2008, when a third party posted an

---

[21] Contrary to the Exchange Act Defendants' arguments, the mere fact that Ambac's accountant, KPMG, may have been aware of Ambac's mark-to-market model does not immunize them from liability.  *See In re Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897, 2007 U.S. Dist. LEXIS 67660 at *7-8 (S.D.N.Y. Sept. 14, 2007) (rejecting the argument that even "an unchallenged audit opinion by [the Company's auditor] undercuts Lead Plaintiffs' claim that loss reserves were deficient" because "at this stage of the litigation, a court may not 'weigh the evidence that might be presented at trial'") (citations omitted);  *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 (C.D. Cal. 1996) ("The fact that Chantal's independent auditor may have approved the accounting methods will not shield Chantal from liability for deception such methods may have caused.") (citation omitted).

"Open Source Model" on its website, Ambac never disclosed the names and components of specific CDO exposures.  ¶¶115-16.

*Fourth*, the Exchange Act Defendants seek to justify their minimal write-downs on CDOs by saying the securities were often rated AAA by Moody's and S&P.[22]  Nothing in FAS 133 says that a credit rating is a substitute for contemporaneous information showing the securities' actual value, like market prices and data showing poor performance.  Indeed, Ambac itself publicly asserted that when it internally considered a security's investment quality, it did not rely on the rating agencies.  *See, e.g.,* ¶104.

*Fifth,* the Exchange Act Defendants argue that an August 12, 2008 transaction in which Citigroup cancelled an Ambac guarantee of a CDO in return for an $850 million payment by Ambac supports their argument that Ambac engaged in proper accounting, because "[p]rior to that date, however, Ambac had recorded a $1.0 billion write down on that CDO."  Ambac Mem. at 19.  For one thing, this write-down occurred at the end of the Class Period.  Moreover, this fact supports Plaintiffs' argument that, prior to this write-down, Ambac had been improperly valuing its CDO exposure.  Ambac's mark-to-market methodology prior to this write-down wrongly assumed there was no decrease in the value of the underlying asset.  The Citigroup transaction was an acknowledgement that, in reality, Ambac had been improperly ignoring the decrease in value of the underlying asset in prior periods.  *See* ¶¶288-89.

      b.    *Ambac Violated SFAS 5 by Failing to Take Adequate Loss Reserves*

Under SFAS 5, *Accounting for Contingencies*, Ambac was required to disclose contingencies for which no accrual (*i.e.*, no reserve) was made where "there is at least a

---

[22] This argument is based on Moody's and S&P rating history charts attached to the Wilson Affidavit.  As with other submissions by Ambac, the relevance – and weight of these documents – goes far beyond the four corners of the Complaint and should not be considered – much less accepted as fact – on a motion to dismiss.

reasonable possibility that a loss or an additional loss may have been incurred." ¶298.  SFAS 5 further provides that "[t]he disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made." *Id.*  The Complaint alleges in detail that, during the Class Period, Ambac took negligible reserves on its RMBS exposures even though its portfolio showed the same delinquency trends as the ABX and TABX indices.[23]  ¶¶124, 130-33.

The Exchange Act Defendants argue that they did not violate SFAS 5 since they disclosed "exposures to which material changes in loss severity are possible, one of which is RMBS." Ambac Mem. at 20. For this point, however, they cite a boilerplate disclosure prior to year-end 2007 that "[i]ncreases in loss mortgage rates, unemployment and/or personal bankruptcies could adversely impact residential real estate values and the probability of default and severity of loss for our transactions."  Ambac Mem. at 20.  Immediately following the passage quoted by the Exchange Act Defendants, the relevant disclosure states that "[a]s a result of our experience to date, we note that the mortgage-backed and home equity severities have usually been less than or equal to our current severity assumption."  Ambac hardly warned investors about the drastic increases in default rates or reserves and losses taking place in Ambac's insured RMBS exposures.

      *c.*    <u>Ambac Failed to Disclose Known Trends</u>

Contrary to the Exchange Act Defendants' argument, a violation of Regulation SK, Item 303 can be actionable and, in any event, they were under a duty to disclose known trends.  A

---

[23] For the third quarter of 2007, Ambac took minimal reserve increases on its second lien exposures, increasing case basis reserves by $59.8 million for two HELOC transactions which Ambac described as "idiosyncratic" and unrepresentative of its other exposures.  ¶¶210, 212.  For the fourth quarter of 2007, Ambac increased its Active Credit Reserves by $196.7 million, "driven by unfavorable credit activity within the home equity line of credit and closed-end second lien RMBS portfolio, partially offset by favorable credit activity within the public finance portfolio.  ¶250.  Finally, on April 23, 2008, Ambac stunned the market by announcing a further impairment of $1.045 billion on its HELOC and closed end second deals.  ¶320.

violation of Item 303 is plainly actionable under Section 11 of the 1933 Act. *See In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004) (hereinafter "*In re IPO II*") ("An omission of fact 'required to be stated' under Item 303 will generally produce liability under section 11.") (citation omitted). The case relied on by the Exchange Act Defendants states only that an Item 303 violation, **taken alone**, is not enough to allege a Section 10(b) violation. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 263 (S.D.N.Y. 2004). But a violation of Item 303, taken together with the other materially false statements and omissions, can clearly be actionable under Section 10(b). *See In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 57 (D. Mass. 2006) (finding that defendants' failure to disclose "the existence of uncertainties of facts that may have a material impact on a company's financial health," as required by Item 303, supports a reasonable inference of a material misrepresentation). Further, since the Exchange Act Defendants repeatedly made false disclosures about trends affecting Ambac's structured finance business, the failure to disclose the actual performance trends was a material omission. *See Caiola*, 295 F.3d at 331 ("upon choosing to speak, one must speak truthfully about material issues. . .").

## C.    THE COMPLAINT PLEADS COGENT AND COMPELLING FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

Plaintiffs have more than adequately alleged that the Exchange Act Defendants acted with scienter. The Supreme Court has ruled that the PSLRA's "strong inference" standard is satisfied when the answer to the following question is affirmative: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 127 S. Ct. at 2511. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'" *Id.* at 2510. Scienter is adequately pleaded

35

where the inference of fraud is *equally* as likely as any non-culpable explanation of defendants' alleged conduct. *Id.* Further, Plaintiffs' scienter allegations should not be addressed piecemeal. The "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 2511.

The strong inference standard is satisfied where the complaint sufficiently alleges "defendants' knowledge of facts or access to information contradicting their public statements" or "that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *See Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000). As applied to a corporate defendant, plaintiffs must plead such knowing or reckless conduct was committed by "someone whose intent could be imputed to the corporation[.]" *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).[24]

### 1. The Allegations Support a Strong Inference That the Exchange Act Defendants Knew Or Recklessly Disregarded Information Contradicting Their Public Statements

The Complaint pleads in detail how and why the Exchange Act Defendants knew or were reckless in not knowing that, contrary to the Company's public disclosures, Ambac had dramatically lowered its underwriting standards and that its RMBS-related exposures were performing as badly as or worse than the market in general. The Company's supposedly conservative underwriting standards and strong portfolio performance were the two core aspects of Ambac's business that investors and analysts relied upon throughout the Class Period.

---

[24] A plaintiff can satisfy this test "without being able to name the individual who concocted and disseminated the fraud[,]" for example, by alleging that a material announcement "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Dynex Capital*, 531 F.3d at 195-96 (*citation omitted*). Although the Complaint identifies the specific speakers of the allegedly false statements, it also supports the inference that corporate actors with scienter controlled Company sponsored statements.

Plaintiffs allege the direct role that the Exchange Act Defendants played in managing (and ultimately weakening) Ambac's underwriting processes, and the information they learned through Ambac's surveillance of RMBS transactions. The Exchange Act Defendants' scienter is further supported by their direct and unequivocal false statements in response to specific inquiries by investors and analysts regarding underwriting and the performance of Ambac's RMBS-related exposures.

The Complaint is replete with specific allegations demonstrating the Exchange Act Defendants' knowledge and reckless disregard of facts contradicting their public statements. Plaintiffs allege that at a company meeting in 2005, Defendant Genader set an aggressive target of "$1 billion a year in net income," which represented a 38% increase over the prior year's income of $724 million. ¶¶67, 74. Against this backdrop, the Exchange Act Defendants knew or had access to the fact that mortgage originators had lowered their underwriting standards for residential mortgages that Ambac insured. ¶¶76-77. In order to meet Genader's aggressive near-term income target, the Exchange Act Defendants materially lowered their underwriting standards in order to guarantee the riskier RMBS-related instruments that are at issue here. ¶¶67, 74, 78, 80-81. The Complaint cites to internal Company documents which show that the Company's most senior officers not only knew that their underwriting standards had been weakened, but that Ambac was insuring transactions which it shouldn't have "touched with a 10 foot pole." Based on their direct access to performance data, which they emphasized to the investing public, the Exchange Act Defendants knew or should have known that the RMBS collateral that Ambac insured deteriorated in lockstep with the performance of the pertinent ABX and TABX indices (¶¶111-45) and that Ambac violated GAAP by not taking the proper mark-to-market write-downs on its CDO portfolio (¶¶134-45, 259-307).

Moreover, the Exchange Act Defendants understood that coming clean with investors about the Company's shift towards assuming greater risk and the disastrous consequences of their actions would jeopardize Ambac's essential "AAA" rating – the key to the Company's business model – in serious doubt.  ¶¶30-42.  The Exchange Act Defendants thus had a strong reason to hide the truth.

    a.    *The Exchange Act Defendants Knew that Mortgage Origination Underwriting Standards Declined While Ambac Secretly Lowered Its Own Underwriting Standards*

Defendants Genader, Wallis and Uhlein were members of Ambac's Credit Risk Committee, [25] which was responsible for approving Ambac's RMBS-related deals and policies during the Class Period, according to CW 4.[26]  ¶99.  The Exchange Act Defendants learned, through due diligence visits to mortgage originators, that lending standards had deteriorated markedly and the mortgage collateral being placed in RMBS was less stable and secure than was historically the case.  ¶77.  As CW 3, a former underwriter in Ambac's RMBS group from October 2001 through February 2007, explained, before the Company changed its underwriting standards, Ambac saw many lucrative RMBS deals go to competitors because the Company's existing model rejected these deals as too risky.  ¶¶86-87.  In response, the Credit Risk Committee specifically approved a memorandum that *weakened* Ambac's underwriting

---

[25] CW 4 is a former First Vice President in Ambac's Consumer Asset-Backed Securities Group.  ¶90.

[26] These Defendants' position on the Credit Risk Committee, alone, supports an inference of scienter because of the central role played by that Committee in assessing and approving all RMBS-related transactions.  *See Countrywide Derivative*, 554 F. Supp. 2d at 1062-63 (finding that facts gave rise to a strong inference of scienter because the individual defendants, as members of the Credit Committee "charged with oversight of Countrywide's risk exposures" were in a unique position to "recognize the significance of [] red flags" and "investigate the extent to which underwriting standards had been abandoned").

standards and *lowered* Ambac's protection against risk via overcollateralization requirements and allowance of structurally riskier RMBS collateral.  ¶¶77, 80-87.

In addition, the Exchange Act Defendants knew or were reckless in not knowing that Ambac guaranteed CDOs supported by very low quality RMBS collateral.  Ambac's willingness to bear excessive mortgage risk in the CDO portfolio alarmed certain senior managers, including Iain Bruce and Jeff Nabi of the Consumer Asset-Backed Securities Group at Ambac, who internally expressed their concerns regarding the low level of scrutiny being applied to CDO transactions.  ¶¶87-90.   In an October 2006 memorandum to Defendant Uhlein, Bruce questioned, "Why are we willing to insure stuff in the [CDO] market that we would not touch with a ten foot pole in the [RMBS] market?"  ¶89.[27]  Nabi likewise complained internally about the fact that CDOs were not scrutinized or stress-tested to the same extent as RMBS.  ¶90.  The Exchange Act Defendants' personal knowledge about Ambac's lowering of its underwriting standards, coupled with the admissions of senior managers in the Consumer Asset-Backed Securities Group, constitute strong evidence of scienter and "red flags" concerning the inadequacy of Ambac's underwriting standards for RMBS and CDOs.[28]

The Exchange Act Defendants assert that Plaintiffs have not established that each of the individual changes in underwriting standards was material, arguing, by way of example, that

---

[27] The Exchange Act Defendants discount the internal memos identified in the Complaint by citing to inapplicable case law.  Unlike the complaint in *CalPERS v. Chubb*, 394 F.3d 126 (3d Cir. 2004), the Complaint here adequately identifies this internal memo.  In *Chubb*, the Court noted that plaintiffs had failed to identify who authored the document, when it was authored, who reviewed the document and what data its conclusions were based upon. *Id.* at 147.  Here, all these facts have been detailed, satisfying the PSLRA pleading standards.  *See* ¶¶ 83-88.

[28] The numerous "red flags" known or recklessly disregarded by the Company and its highest officers support scienter here.  *See, e.g., In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 142 (E.D.N.Y. 2008) (finding scienter where it was alleged that red flags were so obvious that defendants "must have been aware" of the alleged fraud); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("The inquiry into whether corporate officers should have known of facts indicating the falsity of public statements is a fact-specific one; scienter may be found where there are 'specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice' that the public statements were false.") (Internal citations omitted).

despite the substantial lowering of overcollateralization requirements, "management could have reasonably concluded that other deal protections preserved Ambac's cautious underwriting standards." Ambac Mem. at 22-23. This speculation, of course, raises further questions as it is not supported by anything in the record. Moreover, *Tellabs* requires that "a reasonable person deem the inference of scienter at least as strong as any opposing inference." *Tellabs*, 127 S. Ct. at 2511. On this point, it is completely unreasonable to infer that Ambac's management reasonably considered it "cautious" or conservative to cease examining underlying mortgage collateral after Ambac discovered that the mortgage originators had systematically dropped their underwriting standards for the sake of deal volume.[29]

> b.   *The Exchange Act Defendants Knowingly Concealed the Deterioration of Ambac's RMBS-Related Portfolios In-Line With Relevant Market Indices*

The Exchange Act Defendants also knew or recklessly disregarded information contradicting their public assertions about the performance of Ambac's RMBS-related portfolios. By late 2006, the signs of a severe housing downturn were prevalent – housing sales were down, interest rates were up, and default and delinquency rates were starting to spike. ¶106. Moreover, in late 2006 and early 2007, a trend of weakening mortgage loan quality had emerged. ¶108. Likewise, by early 2007, two market based indices, the ABX and TABX, exhibited significant declines and there was growing concern in the market that the declining values in these indices reflected deteriorating values of RMBS and CDOs backed by RMBS collateral. ¶111. Investors questioned whether the cash flows supporting the RMBS and CDOs that Ambac guaranteed were

---

[29] The Exchange Act Defendants reliance on *In re American Express Co. Sec. Litig.*, No. 02 Civ. 5533, 2008 WL 4501928 (S.D.N.Y Sept. 26, 2008) is misplaced. Unlike *American Express*, the Exchange Act Defendants made statements regarding their underwriting and surveillance practices that directly contradicted the practices at Ambac, practices that the Exchange Act Defendants, in fact, implemented. Here, the Exchange Act Defendants made statements concerning their actual risk management practices and strength of their portfolio that were in direct contradiction to the facts known by them.

eroding.  ¶109.

In order to allay investor concerns about whether Ambac's RMBS-related exposures were experiencing the same deteriorating trends as the broader markets, the Exchange Act Defendants specifically represented that the Company was closely monitoring the performance of these assets and that "over the entire portfolio, we are not seeing" increased stress.  ¶196. Indeed, Ambac executives explained consistently that "Ambac is not a proxy for the mortgage market: we are not a mortgage guarantor, we did not wrap any of the deals on the ABX Index…" and that "[o]ur transactions do not replicate the ABX Index[.]"  *See, e.g.*, ¶¶235, 241, 243.

Plaintiffs have shown that the Exchange Act Defendants' public statements distinguishing Ambac's RMBS-related portfolios are not reconcilable with the performance data that was admittedly made available to the Exchange Act Defendants as part of Ambac's "monitoring" process.  Plaintiffs' consultants' analysis examined the actual delinquency rates of the RMBS collateral in Ambac's portfolio and showed that Ambac was experiencing delinquencies equivalent to those represented in the ABX and TABX indices.  ¶¶117-30. Significantly, it is undisputed that the Exchange Act Defendants had access to the pertinent information about Ambac's CDOs, as well as the ABX and TABX indices, about which they commented repeatedly.

Indeed, rather than arguing that they were unaware of this information, the Exchange Act Defendants argue that the delinquency and default data that they viewed through the Company's surveillance efforts does not prove that they "knew that this information rendered any of Ambac's statements false" and misleading.  Ambac Mem. at 24-25.  It is not Plaintiffs' burden to disprove illogical excuses such as the excuse that defendants with direct information contradicting their public statements did not appreciate the contradiction.  To the contrary,

where, as here, a complaint alleges "defendants' knowledge of facts or access to information *contradicting* their public statements" or the defendants failed to check information they had a duty to monitor, scienter is adequately alleged. *Novak*, 216 F.3d at 308 (emphasis added).[30]

Moreover, the Exchange Act Defendants' reporting of grossly misleading mark-to-market write-downs further supports a finding that they acted with scienter. ¶¶259-307. *See Novak*, 216 F.3d at 309; *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 393 (S.D.N.Y. 2007), ("where such allegations [of GAAP violations] are coupled with evidence of corresponding fraudulent intent," they may give rise to a strong inference of scienter); *Children's Place Retail Stores, Inc.*, 2008 WL 2791526, at *9 (finding scienter was adequately alleged where allegations of GAAP violations were coupled with evidence of corresponding fraudulent intent).

Indeed, the $5.4 billion that Exchange Act Defendants wrote down for Ambac's CDOs of RMBS in the fourth quarter of 2007 alone was such an enormous sum that it resulted in a reported loss *for the year* of $3.24 billion, nearly wiping out the Company's entire reported earnings from 2002 through the first two quarters of 2007. ¶¶8, 145. The magnitude of the write-downs – especially coming less than two months after Defendants Genader and Leonard insisted that Ambac was not facing any meaningful losses – strongly support an inference that the alleged misstatements were "no mere error caused by the improper application of hyper-technical accounting rules-[they] indicate[] that there were systemic accounting abuses[.]" *Atlas Air*, 324 F. Supp. 2d at 489, (finding accounting adjustments which erased $185 million in earnings and resulted in a $178 million loss supported an inference of scienter); *Lewin v. Lipper*

---

[30] *See also Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000), (a plaintiff is required only to "supply some factual basis for the allegation that the defendants had reached this conclusion at some point during the time period alleged.") (internal citations omitted); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 495 (S.D.N.Y. 2004) ("[A] plaintiff is not required to plead internal reports to demonstrate that contradictory facts were available to the defendants when they made certain statements…where it is alleged the defendants were reckless[.]").

*Convertibles, L.P.*, No. 03 CV 1117, 2004 WL 1077930, at *2 (S.D.N.Y. May 13, 2004) (ruling that GAAP violations supported finding scienter because "the accounting violations alleged are on such a repeated and pervasive scale that, if proven, they could provide strong circumstantial evidence of recklessness")  Thus, the massive write-downs and GAAP violations alleged by Plaintiffs in the Complaint provide additional support for a compelling inference of scienter.[31]

The Exchange Act Defendants also argue that Plaintiffs have not established that Plaintiffs' consultants' index-based valuation model referenced in the Complaint is "the only reasonable model," and that they should escape liability because valuing RMBS-related assets is a complex, technical matter.  Ambac Mem. at 25.  However, it is not Plaintiffs' burden to foreclose the use of other models or to prove the correct valuation model at this stage of the litigation.  Plaintiffs have alleged, based on a specific expert analysis, that even after making conservative assumptions as to the quality of the collateral, the subordination levels and other relevant criteria, Ambac's reported mark-to-market losses during the Class Period departed so drastically from reasonable concepts of "fair value" that they support an inference of scienter.

c.    *The Exchange Act Defendants' Effort to Exclude Plaintiffs' Confidential Witness Statements Are Meritless*

The Exchange Act Defendants have no viable response to Plaintiffs' allegations based on the statements of former Ambac employees – including that Ambac made a deliberate decision in 2006 to lower its RMBS underwriting standards and that the Credit Risk Committee was

---

[31] *See* also *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (holding that a large write down supported a finding of recklessness); *Rothman*, 220 F.3d at 92 (finding that the magnitude of a write-off rendered less credible the proposition that defendants believed they were properly capitalizing certain expenses); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (finding that the magnitude of the alleged fraud provided additional circumstantial evidence of scienter); *Scottish Re*, 524 F. Supp. 2d at 394 ("[T]he fact that there was a large, $112 million 'surprise' valuation that allegedly wiped out a year's worth of the Company's earnings also provides some circumstantial evidence of scienter."); *Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125, 2002 WL 31191741, at *6 (S.D.N.Y. Sept. 30, 2002) (stating that "the magnitude of the adjustments raises questions about defendants' credibility, makes the press statements increasingly suspect, and by doing such, further supports a strong inference of scienter").

specifically warned that the CDO group was assuming mortgage risk that the RMBS group "would not touch with a ten foot pole." ¶¶88-90.  Instead, the Exchange Act Defendants argue that Plaintiffs' descriptions of the confidential witnesses are insufficiently particular and that their statements should be excluded or severely discounted.  Ambac Mem. at 27.  This argument is baseless.

Plaintiffs have met their obligation to describe confidential sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314; *see also Atlas Air*, 324 F. Supp. 2d at 493 ("Plaintiffs are not required to plead exact job titles, describe the sources' responsibilities and duties in detail or allege access to specific company documents").  Plaintiffs detail the basis for each confidential witness's knowledge, generally including their specific job titles, the divisions in which they worked, and the dates of their employment.[32]  Moreover, confidential witnesses are reliable so long as the complaint alleges with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Countrywide Derivative*, 554 F. Supp. 2d at 1058 (citation omitted).  The Court can readily conclude, for example, that CW 3, "a former underwriter in Ambac's RMBS group from October 2001 through February 2007," would possess first-hand knowledge concerning Ambac's RMBS underwriting policies and practices during this period, as detailed in paragraphs 77 through 89 of the Complaint.  Moreover, to the extent that the confidential witnesses' knowledge overlap and their statements corroborate each other, such corroboration from multiple sources

---

[32] *See* ¶67 (describing CW 1, "a former underwriter and quantitative analyst at Ambac between 1997 and 2005"); ¶75 (describing CW 2, "a former Assistant Vice President from March 2002 thought August 2006, who worked in Ambac's financial control group"); ¶77 (describing CW 3, "a former underwriter in Ambac's RMBS group from October 2001 to February 2007"); ¶90 (describing CW 4, "a former First Vice President…in Ambac's Consumer Asset-Backed Securities Group from July 2002 to April 2007"); ¶91 (describing CW 5, "a former Vice President of Ambac between January 2005 and July 2007").

supports an inference of scienter. *Tellabs*, 513 F.3d at 712. Thus, Plaintiffs have alleged ample information supporting the confidential witnesses' personal knowledge of the facts they provided.[33]

### 2. Plaintiffs' Allegations Support A Strong Inference That the Exchange Act Defendants Were Motivated To Commit Fraud In Order To Maintain The Company's AAA Rating To Drive Short-Term Profits And Personal Compensation

Plaintiffs have also sufficiently alleged that the Exchange Act Defendants had the motive and opportunity to commit the fraud alleged in order to maintain the AAA rating that would drive Ambac's short-term profits and capitalize on incentive-based compensation. The strong inference standard may be satisfied by sufficiently pleading "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged" and that defendants possessed "the means and likely prospect of achieving [the] concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130 (2d Cir. 1994).[34]

Ambac's business and economic strength was derived from lending its AAA-rating to companies seeking better interest rates and spreads on their securities. Without that rating, as is now the case, Ambac is unable to generate new business and increase profits. Although all rated

---

[33] Additionally, while the Exchange Act Defendants cite to courts outside this Circuit for the proposition that post-*Tellabs*, allegations from confidential witnesses' should be "discounted," courts in this circuit continue to consider statements by confidential witnesses post-*Tellabs* without applying any such discount. *See, e.g., City of Brockton Ret. Sys. v. Shaw Group, Inc.*, 540 F. Supp. 2d 464, 474 (S.D.N.Y. 2008); *Children's Place*, 2008 WL 2791526 at **9-10; *In re Xethanol Corp. Sec. Litig.*, No. 06 Civ. 10234, 2007 WL 2572088, at *3, n.3 (S.D.N.Y. Sept. 7, 2007). There is no merit to Exchange Act Defendants' arguments that the statements provided by CWs here should be excluded or discounted.

[34] Under this "motive and opportunity" test, "courts in this District 'often assume that ... corporate directors would have the opportunity to commit fraud if they so desired.'" *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 297 (S.D.N.Y. 2008) (quoting *Pension Comm. of the Univ. of Montreal Pension Plan,* 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006)); *see also In re GlaxoSmithkline PLC,* No. 05 Cv. 3751, 2006 WL 2871968, at *6 (S.D.N.Y. Oct. 6, 2006) ("Where a plaintiff alleges securities fraud against a public company and its officers and directors, it is motive rather than opportunity that is at issue.").

companies seek to maintain the highest credit rating possible, Ambac was unique in that without a AAA rating, its business would founder and profits dry up.

The Exchange Act Defendants benefited personally from the misrepresentations concerning Ambac's underwriting standards and financial strength that falsely supported the Company's AAA rating following Ambac's covert move toward insuring riskier products. For example, Defendant Genader's compensation, including salary, bonus and stock and option awards, nearly doubled from $5,873,674 in 2005 to $11,235,531 in 2006.  ¶68.  Likewise, Uhlein received a payment of approximately $2 million for his role in helping Ambac's Structured Finance Group (the division responsible for Ambac's CDSs and other derivatives-based business) achieve a record year in 2006.  ¶23.  Allegations of incentive-based compensation, taken together with the detailed allegations here that Ambac was seeking to avoid the loss anticipated in its municipal bond insurance business by secretly lowering its underwriting standards for RMBS products, are sufficiently cogent to support a strong inference of scienter. *See, e.g.*, *Gildepath Holding B.V. v. Spherion Corp.*, No. 04 Civ. 9758, 2007 WL 2176072, at *14 (S.D.N.Y. Jul. 26, 2007) (analyzing Second Circuit cases and finding that "a business seeking to avoid a loss or induce a beneficial sale has sufficient motive to commit fraud to raise the requisite 'strong inference' of fraud under Rule 9(b)").

Moreover, the Exchange Act Defendants had a strong reason to commit fraud by hiding Ambac's losses in order to stay employed.  The proof is that when Ambac's CDO losses finally became too massive to hide and the Company disclosed its problems on January 16, 2008, Defendant Genader not only lost incentive compensation, he lost his job.  ¶21.

### 3.    The Exchange Act Defendants' Argument That There Is A More Compelling, Non-Culpable Inference Is Meritless

Ignoring all of the allegations in the Complaint and disregarding the fact that the Court must take these allegations as true for the purpose of the present motion to dismiss, the Exchange Act Defendants suggest that a ***more*** compelling inference is that Ambac "suffered from unexpected market downturns and updated its financial disclosures accordingly as developments unfolded." Ambac Mem. at 28. Defendants are free to press this argument at trial, but where, as here, the complaint specifically alleges that defendants made false statements and contradicted by then-known information specific to Ambac's financial condition, the Court cannot at the pleading stage make such a significant leap of logic.

Plaintiffs' allegations are not, as Exchange Act Defendants claim, "fraud-by-hindsight" allegations. They are allegations primarily concerning misrepresented *historical* facts and financial statements that should have reflected the impairment of assets that had *already* occurred. Ambac Mem. at 28-29. As Judge Scheindlin held in *Scottish Re*, "[t]his is not a case where plaintiffs are pleading fraud based on changed circumstances that were unforeseen by defendants at the time they made their statements. Rather, plaintiffs have cited *contemporaneous circumstances*…of which [the defendants] were aware, and which made their failure to take an earlier valuation allowance tantamount to conscious misbehavior[.]" 524 F. Supp. 2d at 394 (emphasis added); *see also Schnall v. Annuity & Life Re (Holdings) Ltd.,* No. 02 Civ. 3133, 2004 WL 231439, at *8 (D. Conn. Feb. 4, 2004) ("[F]inancial disclosures…were not disclosures concerning future performance. These were statements about past performance…as to which [defendant] had knowledge or should have had knowledge.").

Moreover, contrary to the Exchange Act Defendants' suggestion that courts are "skeptical" of fraud claims arising in the context of a market downturn, courts have commonly

upheld such claims, including cases in the context of the present housing market downturn. *See, e.g.*, *In re New Century*, 2008 WL5147991 at *19 ("The inference of deliberate recklessness as to false statements regarding loan quality and underwriting is at least as compelling as inferring that the Officer Defendants were simply unaware of New Century's practices when the statements were made, or taken by surprise when the market took an unexpected turn for the worse."); *Countrywide Securities*, 2008 WL 5100124 at *28 (sustaining securities fraud claims, and dismissing defendants' insistence that the mortgage originators' decline was due to an "'unprecedented' external 'liquidity crises,'" rather than defendants' knowingly false "repeated assurances of good practices, quality loan origination, and consistently prudent underwriting guidelines" in the face of this market downturn); *Accredited*, 556 F. Supp. 2d 1142 (upholding securities fraud complaint filed in August 2007 alleging that defendants failed to increase reserves when they became aware that the company had deviated from its mortgage underwriting policies and that the quality of the company's mortgage portfolio would decrease); *see also In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004) (denying motion to dismiss securities fraud claims for misstatements of internet business's revenues arising in the wake of the bursting of the "internet bubble").

In further support of their argument that inferences should be drawn in their favor, the Exchange Act Defendants point to facts that, at best, are neutral with respect to culpability. The Exchange Act Defendants argue that Ambac's pre-announcement of third quarter 2007 results, Ambac's voluntary disclosures on its website concerning its risk exposures (including subprime exposures), and the lack of a restatement of its financials demonstrate non-culpability. Ambac Mem. at 29-30. Voluntary disclosures that do nothing to shed light on the alleged fraud cannot support a non-culpable inference. Neither the pre-announcement nor the website disclosures

reveals, in any way, that, in order to generate greater revenue, Ambac abandoned its strict underwriting practices and Ambac's RMBS-related holdings were experiencing severe deterioration. Accordingly, nothing in these disclosures supports an inference of non-culpability.

Finally, the fact that Ambac has not restated its financials for the Class Period does not undermine Plaintiffs' scienter allegations. Ambac Mem. at 30. Plaintiffs asserting Section 10(b) claims, even those which involve GAAP violations, are not required to plead a restatement of the defendant company's audited financial statements. Numerous courts have upheld such claims where there were no restatements. *See, e.g., Rothman*, 220 F.3d at 93 (denying motion to dismiss Section 10(b) claim where plaintiff alleged defendant improperly capitalized royalty advances even though there was no restatement and defendant's auditor issued a clean audit opinion); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 72 (1st Cir. 2002) ("[T]he fact that the financial statements for the year in question were not restated does not end [the plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA."); *In re LDK Solar Sec. Litig.*, No. 07 Civ. 05182, 2008 WL 2242185, at *11 (N.D. Cal. May 29, 2008) (Section 10(b) claims of accounting fraud uphold despite no restatement); *In re Majesco Sec. Litig.*, No. 05 Civ. 3557, 2006 WL 2846281 (D.N.J. Sept. 29, 2006) (denying motion to dismiss Section 10(b) claim for accounting fraud even though there was no restatement). Thus, Exchange Act Defendants have failed to present a non-culpable inference which is more compelling than the inference of scienter.

## D.   PLAINTIFFS PROPERLY ALLEGE LOSS CAUSATION

The Exchange Act Defendants' arguments about loss causation should be rejected. As the Supreme Court made clear in *Dura Pharmaceuticals, Inc. v. Broudo*, a complaint need only provide a "'short and plain statement' [that] provide[s] the defendant with 'fair notice …'" of plaintiffs' theory of loss causation. 544 U.S. 336, 346 (2005) (quoting *Conley v. Gibson*, 355

U.S. 41, 47 (1957)).  The Second Circuit has held that a complaint satisfies this pleading requirement if it alleges *either* a corrective disclosure *or* the materialization of a concealed risk that has some logical connection to the losses that plaintiffs allege they suffered.  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005).

Plaintiffs have far surpassed these standards.  The Complaint alleges in considerable detail how the alleged corrective statements by the Exchange Act Defendants disclosed both Ambac's fraudulent concealment of its secretly weakened underwriting standards and the consequent severe deterioration in the value of the RMBS and CDOs that Ambac guaranteed. *See* ¶¶ 310-23.  Specifically, on October 24, 2007, Ambac's disclosure of a $60 million increase in case loss reserves on two HELOC deals of recent vintage, along with the Company's concurrent internal downgrades of four additional high grade and mezzanine CDOs, was corrective by calling into question the Company's statements about the quality of its underwriting and surveillance for the first time.  That disclosure caused a stock drop of 9% and 14% on October 24 and 25, respectively.  ¶¶310-11.  Notably, a prominent research analyst from Morgan Stanley singled out these disclosures as troubling signs of problems within Ambac's portfolio.  ¶¶312-13.

The January 16, 2008 disclosures of $5.4 billion in mark-to-market write-downs and increased loss reserves for CDOs and RMBS indicated to investors that Ambac's securities were no better than those failing in the market and that Ambac would, contrary to prior statements by the Exchange Act Defendants, suffer significantly from the broader housing and mortgage market meltdown.  ¶¶315-18.  This disclosure caused a 38.65% drop in Ambac's stock price, falling from $21.14 on January 15 to $12.97 on January 16.  ¶316.  Finally, the April 23, 2008 disclosure of a massive $1 billion increase in RMBS reserves, which Ambac finally admitted

was an impairment resulting from the riskier characteristics of the underlying mortgages, and a further mark-to-market loss of $1.725 billion in CDS exposures, informed investors of the true deterioration of the Company's second lien exposures and disclosed that Ambac had, in fact, lowered its underwriting standards across the board. ¶¶320-23. This disclosure caused the stock to drop by another 43%, falling to $3.36 at the close of business on April 23, the last day of the Class Period. ¶¶320, 323. Thus, loss causation is adequately pleaded.

None of the cases cited by the Exchange Act Defendants support a different result, and, in fact the recent decision in *Countrywide Securities*, directly rebuts the Exchange Act Defendants' argument that Plaintiffs cannot plead loss causation because the "downturn" in the credit and mortgage markets prevent sufficient apportionment of the loss to fraud. That Court, in rejecting defendants attempt to defeat loss causation through the invocation of "unprecedented" market forces, found that:

> The CAC's basic theory is simple: Countrywide's operations so diverged from soundness that Countrywide's repeated assurances of good practices, quality loan origination, and consistently prudent underwriting guidelines were rendered false. This triggered a sharp decline in the value of Countrywide-related securities as the truth emerged. Even as the market began its recent downturn, Countrywide held itself out for a long while as situated differently from other subprime lenders. Thus, the CAC alleges, Countrywide's continued misrepresentations and omissions-made concurrently with some alleged corrective disclosures-extended the class period into early 2008.

> *****

> The Court will not be distracted by liquidity versus solvency and other macroeconomic arguments. The CAC's allegations invite the cogent and compelling inference that Countrywide's deteriorating lending standards were causally linked to at least some of the macroeconomic shifts of the past year.

*Countrywide Securities*, 2008 WL 5100124 at **28-29.

The cases cited by the Exchange Act Defendants also support the sufficiency of Plaintiffs' loss causation allegations. In *In re Rhodia S.A. Sec. Litig.*, the court found that "courts

in this District generally have found that a public disclosure, when alleged properly, *is the incident which satisfies the loss causation requirement*." 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007) (emphasis added). The court then illustrates the application of this rule by describing a case in which "plaintiffs adequately pleaded loss causation because they alleged that the value of their securities dropped immediately following defendants' announcement," *id*. — exactly what happened after Ambac made each of the three partial corrective disclosures that Plaintiffs allege. *See* ¶¶311, 316, 320. Likewise, *First Nationwide Bank v. Gelt Funding Corp*., 27 F.3d 763, 772 (2d Cir. 1994) does not support the Exchange Act Defendants' assertion that Plaintiffs are required to apportion their losses between the Exchange Act Defendants' misrepresentations and other factors in the Complaint. In dismissing a non-class action RICO claim, the *Gelt Funding* court simply held that a *five year gap* between the alleged misrepresentations and plaintiff's losses, which overlapped a real estate market crash, did not sufficiently allege loss causation. *Id.* No such attenuated circumstances exist here; the allegedly false statements were made during (and in response to) the concerns raised by the weakening housing and mortgage markets. Defendants' reliance on *60223 Trust v. Goldman Sachs & Co*., 540 F. Supp. 2d 449 (S.D.N.Y. 2007), and *In re Merrill Lynch & Co. Research Reports Sec. Litig*., 568 F. Supp.2d 349 (S.D.N.Y. 2008) (hereinafter "*Merrill Lynch Research Reports I*") is also misplaced. Both cases involved claims alleging false and misleading analysts' reports and involved stock declines caused by the collapse of the internet bubble that predated the alleged corrective disclosures. The court in *Merrill Lynch Research Reports I* cited Judge Griesa's reasoning in *Goldman Sachs*:

> The essential point is that by the time of the disclosures which allegedly caused the economic loss (as defined by the loss causation doctrine) the stock had already lost almost all of its value. . . . The loss in value occurred gradually over the course of the entire class period, . . . during the time when the alleged false and misleading comments of an optimistic nature were being issued.

568 F. Supp. 2d at 364 (quoting *Goldman Sachs*, 540 F. Supp. 2d at 461).

Plaintiffs' alleged losses took place in direct response to Ambac's corrective disclosures, as specified in the Complaint, and only after the risks that the Exchange Act Defendants fraudulently failed to disclose had materialized.  Plaintiffs have adequately alleged that the Exchange Act Defendants' securities violations caused a loss; a determination of *how much* of that loss may be attributed to market forces is not appropriate on a motion to dismiss.  *See*, e.g., *Countrywide Securities*, 2008 WL 5100124 at *28.

## IV.    FACTS AND LEGAL ARGUMENT REGARDING CLAIMS UNDER THE SECURITIES ACT

Counts III through VII of the Complaint assert violations of the Securities Act in connection with the February 2007 DISCS Offering, the March 2008 Equity Units Offering and the March 2008 Common Stock Offering (collectively, the "Offerings").  *See generally* ¶¶355-510.  Plaintiffs allege their Securities Act claims against Ambac, the Ambac representatives who signed the Registration Statements/Prospectuses at issue, including Genader, his replacement as CEO Michael Callen, Leonard and the members of the board of directors during the respective offerings (*see* ¶¶370-80), the Underwriter Defendants (identified in ¶¶381-91) that underwrote one or more of the Offerings, and KPMG in its connection with the unqualified audit opinion it allowed to be published in connection with the March 2008 Offerings (¶392).

Section 11 of the Securities Act establishes a private cause of action against, *inter alia*, issuers, signatories to, and certain participants in a registration statement if "any part of the registration statement . . . contain[s] an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k(a); *see also Herman & MacLean v. Huddleston,* 459 U.S. 375, 382 (1983).  Section 12(a)(2) of the Securities Act imposes liability upon "[a]ny person who . . . offers or sells a security . . . by the use of any means or instruments . . . in interstate commerce or

of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. §77l(a)(2). Section 12 establishes liability "for statements made in connection with the offering and sale of a security," which includes statements made in a prospectus. *See Milman v. Box Hill Systems, Corp.,* 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999).

## A.    PLAINTIFFS' SECURITIES ACT CLAIMS ARE SUFFICIENTLY PLEADED

Under Section 11, the issuer faces strict liability for any material misrepresentation or omission in a registration statement.  15 U.S.C. §77k(b)(3)(A); *see Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 208 (1976).  Section 11 identifies other defendants, such as corporate directors who sign the registration statement, underwriters or expert auditors, may have an affirmative defense of due diligence, but those defenses are generally not suitable for adjudication at the motion to dismiss stage.  *See, e.g., In re Adams Gold, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) (an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)); *In re DoubleClick Inc. Privacy Litig.,* 154 F. Supp. 2d 497, 507 (S.D.N.Y. 2001).[35]

The Second Circuit has acknowledged that "fraud is not an element or a requisite to a claim under Sections 11 and 12(a)(2)," and that a plaintiff "need allege no more than negligence to proceed under Sections 11 and 12(a)(2)."  *Rombach*, 355 F.3d at 171.  Aggrieved investors need not plead or prove at trial scienter or reliance.  *See* 15 U.S.C. §77k(a); *see also Herman*, 459 U.S. at 382.

"[T]he PSLRA pleading requirements have no application to claims that arise under § 11 or other provisions of the Securities Act (e.g., Section 15)."  *In re IPO I*, 241 F. Supp. 2d at 338;

---

[35] Like Section 11, Section 12 does not require a plaintiff to plead scienter or reliance, and provides for an affirmative defense of "reasonable care." 15 U.S.C. §77l(a)(2).

*see also Rombach*, 355 F.3d at 170.  "Section 11 'places a relatively minimal [pleading] burden on a plaintiff,' requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact." *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F. Supp. 2d 371, 408 (S.D.N.Y. 2001) (citations omitted).  Thus, a complaint need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief" in compliance with Rule 8(a) of the Federal Rules of Civil Procedure. *See In re WorldCom, Inc. Sec. Litig.,* 294 F. Supp. 2d 392, 406 (S.D.N.Y. 2003), *aff'd*, 366 F.3d 70 (2d Cir. 2004); *see also Tellabs,* 127 S. Ct. at 2507 (explaining that for non-fraud claims "the complaint must say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests'") (quoting *Dura Pharms.,* 544 U.S. at 346-47).[36]

Defendants' challenges to Plaintiffs' Securities Act claims fail.  Plaintiffs' Securities Act claims do not "sound in fraud" and only the notice pleading requirement of Rule 8(a) is required. S*ee* Section IV.A.1, *infra*.  Second, Plaintiffs have adequately alleged material misrepresentations in each Offering.  The February 2007 DISCS Registration Statement failed to disclose that Ambac had weakened its internal underwriting standards in 2006 and that its insured mortgage collateral showed negative delinquency trends.  Although the March 2008 Offerings came after some increased loss reserves on RMBS products, the Registration Statements failed to disclose the true extent and cause of these losses, *i.e.*, the risky mortgage

---

[36] The Securities Act Defendants make conclusory statements suggesting that under the Supreme Court's *Twombly* decision, Plaintiffs have not satisfied the Rule 8(a) pleading standards.  As many courts have recognized, *Twombly* did not change the notice pleading requirements under Rule 8(a). *See Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam) (the complaint "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'"); *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008); *BMC-The Benchmark Mgmt. Co. v. Ceebraid-Signal Corp.*, 508 F. Supp. 2d 1287, 1290 (N.D. Ga. 2007); *see also Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008) ("*Twombly* leaves the longstanding fundamentals of notice pleading intact.").  Here, each Securities Act Defendant is on notice of what statements are at issue, why such statements are false and the basis for their liability.

lending characteristics of the underlying collateral, which were only disclosed on April 23, 2008 and thereafter.  *See* Section IV.A.2, *infra*.

### 1.    Rule 9(b) Does Not Apply to the Securities Act Claims

The Securities Act Defendants incorrectly argue that Plaintiffs' Section 11 and 12(a)(2) claims must comply with the heightened pleading requirements of Rule 9(b) because these claims "sound in fraud."  *See* Ambac Mem. at 32.  To the contrary, the Complaint is carefully structured so as to draw a clear distinction between negligence/strict liability and fraud claims, providing, effectively two stand-alone complaints.  ¶351 ("The following allegations are in effect a separate complaint.  For the following claims there is ***no allegation of fraud, scienter or recklessness***.") [37]  Where, as here, Plaintiffs' claims are clearly negligence based, Rule 9(b) does not apply and Plaintiffs' claims are governed by Rule 8(a).  *See, e.g., In re WRT Energy Sec. Litig.*, 96 Civ. 3610, 2005 U.S. Dist. LEXIS 1894, at *18 (S.D.N.Y. Feb. 8, 2005), *vacated in part on other grounds*, 2005 U.S. Dist. LEXIS 18701 (S.D.N.Y. Aug. 30, 2005); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008).

Where, as here, plaintiffs specifically plead alternate theories of fraud and negligence, and do not allege fraud in connection the Securities Act claims, courts have found Securities Act claims do not sound in fraud.  *In re Refco*, 503 F. Supp. 2d at 632 (recognizing that the "complaint in this case is carefully structured so as to draw a clear distinction between negligence and fraud claims"); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) (where plaintiffs asserted Securities Act and Exchange Act claims in the same complaint and ordinary negligence was alleged, the Securities Act claims did not sound in fraud); *In re*

---

[37] In addition, Plaintiffs have alleged "[t]hese claims, brought under Sections 11, 12 and 15 of the Securities Act of 1933, are based **solely** on claims of strict liability and/or the absence of any affirmative defense based on the reasonableness of the pertinent defendants' investigation into the true facts."  (¶351) (emphasis added).  Plaintiffs have also structured the Complaint so that, for each Securities Act count (Counts III-VII at ¶¶467-510), Plaintiffs only re-allege the paragraphs beginning at ¶351.

*Majesco,* 2006 WL 2846281, at *1  (finding that Rule 9(b) did not apply to Securities Act claims where plaintiff, *inter alia,* "systematically separated" Securities Act claims from Exchange Act claims); *Atlas Air,* 324 F. Supp. 2d at 503 (S.D.N.Y. 2004) (concluding that Section 11 claims against certain individual defendants did not sound in fraud where, among other things, plaintiffs "alleged facts independent of their scienter allegations").[38]

Ignoring the above precedents, the Securities Act Defendants contend that "Plaintiffs 'cannot evade Rule 9(b)'s strictures' by simply splitting their Complaint into two parts . . . ." Ambac Mem. at 32.  The cases cited by the Securities Act Defendants do not support their position, since not one of those cases involved bifurcated complaints like the one at bar and, instead, involved mixed allegations of fraud and negligence.[39]

The Securities Act Defendants also argue that the Securities Act claims "sound in fraud" because Plaintiffs "identify the same statements they identified in their Exchange Act claims and argue that those statements are false for the same reasons plaintiffs had previously argued they were fraudulent."  Ambac Mem. at 32.  This argument ignores that the same misrepresentations can give rise to negligence/strict liability claims under Section 11 and fraud claims under Section 10(b) of the Exchange Act.  "The same course of conduct that would support a Rule 10b-5 claim may as well support a Section 11 claim or a claim under Section 12(a)(2)."  *Rombach*, 355 F.3d at 171.  Taken to its logical conclusion, the Securities Act Defendants' argument would mean

---

[38] *See also In re FirstEnergy Corp. Sec. Litig.,* 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004) (declining to apply heightened pleading standard to Securities Act claims where plaintiffs "have purposely not premised their claims on any allegations of fraud"); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1372 (S.D. Fla. 2001) (declining to apply heightened pleading standard to Section 11 claim where plaintiff does not "rel[y] on the Exchange Act claims under the Section 11 claim of the complaint" and plaintiff "steadfastly does not allege scienter" in the Section 11 claim).

[39] *See Rombach*, 355 F.3d 164 (complaint not bifurcated); Miller v. Lazard, Ltd., 473 F. Supp. 2d 571 (complaint not bifurcated); *In re Axis Capital,* 456 F. Supp. 2d 576 (S.D.N.Y. 2006) (complaint not bifurcated); *see also, Johnson v. NYFIX,* 399 F. Supp. 2d 105, 122 (D. Conn. 2005) (complaint incorporates the Securities Act allegations into the Exchange Act allegations).

that that any complaint alleging both Securities Act and Exchange Act claims will automatically "sound in fraud."  The judicially created "sounds in fraud" exception would then swallow the legislatively crafted rule that Section 11 claims need only satisfy Fed. R. Civ. P. 8.

**2.    The Complaint Properly Alleges that the Pertinent Registration Statement/Prospectus Falsely Misrepresented and Omitted Material Facts**

To satisfy the pleading requirements of the Securities Act, Plaintiffs need only identify false and misleading statements or material omissions in the relevant registration statements or prospectuses and provide enough detail to explain why a statement is false to put defendants on notice of the claim.  There is no particularity requirement.  *See In re Vivendi Universal, S.A.* 381 F. Supp. 2d 158, 173 (S.D.N.Y. 2003).  Plaintiffs have satisfied the notice pleading standards identifying the false statements at issue.

a.    *The Complaint Sufficiently Alleges False and Misleading Statements in the Registration Statement/Prospectuses*

i.    February 2007 DISCS Offering

The Complaint identifies and explains why each challenged representation or omission in the February 2007 DISCS Registration Statement/Prospectus was false and misleading.  In particular, the DISCS Registration Statement/Prospectus failed to disclose that:  (1) mortgage originators had lowered their underwriting standards for mortgages comprising Ambac's direct and derivative RMBS exposure; (2) Ambac had lowered its own underwriting standards; and (3) the mortgage collateral underlying Ambac's RMBS-related exposure was exhibiting negative trends in delinquencies and other key metrics.  ¶¶399-408.    The DISCS Registration Statement/Prospectus also incorporated by reference earnings figures and other press releases that misrepresented or omitted the above circumstances.  *Id*.  These misrepresentation and omissions are more than sufficient to inform the Securities Act Defendants as to why the statements alleged were false and misleading under Rule 8(a).  *See Vivendi Universal,* 381 F.

58

Supp. 2d at 173 (allegations that Vivendi improperly consolidated investments and reported inflated (and therefore misrepresented) revenues in the October 2000 registration statement and prospectus satisfied Securities Act pleading standards).

The Securities Act Defendants' demand for more detail is misplaced. For example, the Securities Act Defendants argue that Plaintiffs have not adequately alleged why Genader's statement about Ambac "judiciously allocating our capital to transactions that enable us to continue to deliver superior returns," in the October 25, 2006 press release, was false.[40] Ambac Mem. at 34; Underwriters' Mem. at 6. That statement was misleading without the further context that Ambac was achieving "superior returns" by lowering its internal underwriting standards to generate more business.[41] ¶400. This allegation suffices to put the Securities Act Defendants on notice of the claims against them.

The Securities Act Defendants also argue that Ambac's statements in its 2006 third quarter Form 10-Q regarding Ambac's "active surveillance" and the better than expected performance of its loss severities (¶¶402-04) along with the 2006 fourth quarter Form 10-Q disclosing Ambac's financial results (¶406), failed to state a claim for relief. Ambac Mem. at 33-35; Underwriters' Mem. at 6. As alleged in the Complaint, these statements were misleading because they failed to disclose that Ambac had lowered its underwriting standards and that the

---

[40] Genader asserted: "We are currently witnessing a solid level of deal inquiries and opportunities . . .. We remain steadfast in judiciously allocating our capital to transactions that enable us to continue to deliver superior returns." ¶399.

[41] Genader's statement cannot be categorized as inactionable puffery. Unlike the cases cited by the Securities Act Defendants, this case involves undisclosed facts that were contrary to specific representations made by defendants. *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (no undisclosed fact contradicted the alleged misstatements); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (finding that statements that the company was optimistic about earnings and that it expected to perform well is inactionable puffery where alleged undisclosed fact could not have misled a reasonable investor to believe that the company had irrevocably committed itself to a particular marketing strategy); *Rombach v. Chang*, No. 00 CV 0958, 2002 WL 1396986, at *5 (E.D.N.Y. June 7, 2002) (finding announcement that recent acquisitions have "firmly established Family Golf Centers as a leader in family-oriented recreation" is puffery).

collateral supporting Ambac's RMBS-exposures and CDOs backed by RMBS showed negative trends in delinquencies and other key metrics. ¶402-08[42]  This information should have been disclosed to investors.[43]

ii.    The March 2008 Offerings

The misstatements alleged in the registration statements/prospectuses for the March 2008 Offerings[44] are also false and misleading.  Each set of allegedly false statements is followed by facts that either demonstrates the falsity of the statement, or the omission of which renders the statement false.  *See generally* ¶¶409-48.  Nothing more is required under applicable law. Moreover, as further set forth below, the Securities Act Defendants' arguments with respect to the March 2008 Offerings regarding immateriality or adequate disclosure raise factual disputes that cannot be decided on this motion.

> b.    *There Misstatements and Omissions in the Registration Statements/Prospectuses Are Material and None of the Securities Act Defendants' Disclosures Adequately "Bespeak Caution"*

Materiality is generally a question of fact, not to be resolved on a motion to dismiss.  *See In re Livent*, 151 F. Supp. 2d at 408; *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201

---

[42] The Securities Act Defendants' argue that the Securities Act claim requires that they "possessed the omitted information." Ambac Mem. at 33.  However, knowledge, i.e., scienter, is not required under these claims.  *See In re IPO I*, 241 F. Supp. 2d at 343 (finding that Section 11 does not require plaintiffs to plead knowledge of alleged omission); *In re Livent*, 151 F. Supp. 2d at 408 ("[T]here is no requirement under § 12(a)(2) that a plaintiff shows scienter or negligence . . .").

[43] Once an issuer makes a statement about a subject, it had has a duty to disclose all material facts relevant to that statement.  *See Children's Place*, 2008 WL 2791526, at *5 ("Once defendants choose to speak about their company, they undertake a duty 'to speak truthfully and to make such additional disclosures as . . . necessary to avoid rendering the statements misleading.'") (deletion in original; citations omitted).  Moreover, Item 303 of Regulation S-K "requires a registrant to disclose any *known trends* or *uncertainties* that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Garber*, 537 F. Supp. 2d at 611 (emphasis added; citation omitted).  "Failure to make the requisite disclosures under Regulation S-K will generally produce liability under the Securities Act." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008) (citation omitted).

[44] The respective registration statements for the March 2008 Equity Units Offering and the March 2008 Common Stock Offering are substantively identical for present purposes.

60

(E.D.N.Y. 2000).  A claim pursuant to Section 11 of the Securities Act "may not properly be dismissed pursuant to Rule 12(b)(6) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *In re Livent,* 151 F. Supp. 2d at 408.

The Securities Act Defendants erroneously argue that the misstatements and omissions alleged in the Complaint are immaterial because there were "extensive risk disclosures" which "bespeak caution," bringing the false statements within the PSLRA's statutory safe harbor, 15 U.S.C. § 77z-2.  Ambac Mem. at 34, 38-39; Underwriters' Mem. at 8-10.  As Judge Pollock observed in *In re Prudential Sec. Ltd. P'ships Litig.*:

> The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away. The bespeaks caution doctrine requires a contextual analysis and, in context, even apparently specific risk disclosures like those in Polaris' prospectus are misleading if the risks are professionally stamped in internal undisclosed analyses (as they were here) as significantly greater or more certain than those portrayed in the prospectus.

930 F. Supp. 68, 72 (S.D.N.Y. 1996); *see also Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993) ("A prospectus stating a risk that such a thing *could* happen is a far cry from one stating that this *had* happened.  The former does not put an investor on notice of the latter.") (emphasis in original).  The various challenged misrepresentations and omissions in the Registration Statements/Prospectuses are materially false because, notwithstanding risk disclosures about the ***possibility*** that reported write-downs of CDO exposures or of an increase in the reserves for RMBS to date were too low, material facts regarding Ambac's lowered underwriting practices (including the correspondingly lower characteristics of the RMBS Ambac had insured during the prior 18 months) were undisclosed.

i.    February 2007 DISCS Offering

To bar Plaintiffs' claims, the cautionary language cited by the Securities Act Defendants "must *precisely* address the substance of the specific statement or omission that is challenged." *Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 301 (S.D.N.Y. 2000) (emphasis added; citation omitted). Furthermore, "the bespeaks caution doctrine cannot immunize the defendants from liability under [the Securities Act] if they omitted material information from the offering materials." *In re Nationsmart Corp. Sec. Litig.*, 130 F.3d 309, 318 (8th Cir. 1997) (citing *Griffin v. McNiff*, 744 F. Supp. 1237, 1254 (S.D.N.Y. 1990), *aff'd without opinion*, 996 F.2d 303 (2d Cir. 1993); *Robbins v. Moore Medical Corp.*, 788 F. Supp. 179, 185 (S.D.N.Y. 1992)).

None of the alleged cautionary language identified by the Securities Act Defendants meets this standard because they are too general to adequately bespeak caution. For example, the statements that Ambac is "subject to credit risk" or that Ambac "faces the risk that changes in general economic conditions . . . could adversely affect its business," Ambac Mem. at 34, are generally applicable to all businesses and do not provide warnings of the specific facts necessary for investors to accurately assess the risk of investing in Ambac's business, *i.e.*, lowered underwriting standards, negative performance of underlying assets, etc.. Further, disclosing that "Ambac faces the risk that accounting rules that require it to mark certain of its guarantees to market could result in stated losses" (Ambac Mem. at 34) is hardly a disclosure that Ambac was improperly applying GAAP by understating its losses, as Plaintiffs allege. Similarly, the disclosure that "Ambac faces the risk that its AAA ratings may be downgraded" (Ambac Mem. at 35) does not explain that Ambac placed those ratings in jeopardy by lowering underwritings standards and assuming riskier transactions without a corresponding increase to its cushion for absorbing losses.

The Securities Act Defendants further argue that statements in their November 8, 2006 Form 10-Q sufficiently disclose the risks Plaintiffs allege were omitted: "that loss severity estimates for CDOs and MBS may face material changes in the case of '[i]ncreases in mortgage rates … [that would] adversely impact residential real estate values and the severity of loss for our transactions.'"  Ambac Mem. at 35; Underwriters' Mem. at 8.  Since these disclosures are framed as hypothetical, and they ignore the contemporaneous facts, *i.e.*, the lowering of underwriting standards by third parties and by Ambac itself and the negative trends in the collateral underlying Ambac's RMBS-related exposure, they do not adequately "bespeak caution." *See Panther Partners*, 538 F. Supp. 2d at 669 (general risk disclosures are insufficient "in the face of specific known risks [that]. . . border on certainties").

ii.    The March 2008 Offerings

The Securities Act Defendants' purported risk disclosures in the offering materials for the 2008 Offerings are too general to adequately bespeak caution or fall within the PSLRA's safe harbor.  Ambac Mem. at 38-39; Underwriters' Mem. at 11-14.  These inadequate "disclosures" include the statements regarding volatility of net income and earnings; that past policies did not anticipate unforeseen risks; that flaws in financial models could lead to increased losses; and, that Ambac faces the risk of having its rating downgraded.  Ambac Mem. at 39.  None of these risk disclosures alerted investors that, at this time, Ambac's accruals and loss reserves for its RMBS-related exposure remained inadequate, *i.e.,* that Ambac had lowered its internal underwriting standards in 2006 in order to accept RMBS supported by lower quality mortgage collateral.

c.    *Plaintiffs Have Adequately Alleged GAAP Violations*

The Securities Act Defendants contend that Plaintiffs must show precisely how each GAAP provision was violated.   The cases cited by the Securities Act Defendants are

inapplicable, as they either (1) do not discuss pleading GAAP violations, or (2) discuss pleading GAAP violations in the context of fraud-based claims. *See In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881 (8th Cir. 2002) (discussing GAAP in context of violation of Section 10(b)); *Garber*, 537 F. Supp. 2d at 613 (no GAAP violations alleged).[45]  Plaintiffs' GAAP allegations for their Securities Act claims sufficiently set forth the GAAP principles that were violated and how such principles were violated. *See* ¶¶449-66.  Moreover, KPMG improperly argues the merits of the case by asserting that Ambac's valuation and loss reserves for its RMBS-related exposure was consistent with GAAP. *See* KPMG Mem. at 14-18.  Merits based arguments are inappropriate on motion to dismiss. *In re Burlington Coat Factory,* 114 F.3d at 1421 (reversing 12(b)(6) dismissal because "it is a factual question whether BCF's accounting practices were consistent with GAAP").[46]

KPMG's argument that the accounting principles at issue are based on judgment and opinion fares no better. KPMG Mem. at 19-21.  Plaintiffs allege that (i) Ambac disregarded objective market data, and therefore failed to properly account for the Company's derivative exposure to CDOs, in violation of SFAS 133 and (ii) Ambac violated SFAS 5, which requires that companies account for loss contingencies before the actual event of default or other triggering event occurs. *See* ¶¶449-55.  These allegations tell the defendants which statements are allegedly false and why they are alleged to be false, and therefore suffice to state a claim

---

[45] *See also Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *13 (S.D.N.Y. Aug. 22, 2005) (discussing GAAP in context of violation of Rule 10b-5; *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 688 n.3 (S.D.N.Y. 2004) (finding that the alleged GAAP violations "are completely dependent upon the underlying statements at issue," thus declining to address the alleged GAAP violations because the "Court finds no material misstatements"); *In re Allied Capital Corp. Sec. Litig.*, No. 02 Civ. 3812, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003) (discussing GAAP in context of violation of Section 10(b)); *Hinerfeld v. United Auto Group*, No. 97 Civ. 3533, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (no GAAP violations alleged).

[46] KPMG quarrels with Plaintiffs' consultants' analysis regarding Ambac's valuations of its RMBS-related exposure.  As set forth in Section III, *supra*, this argument is without merit.

under the Securities Act.  It is up to KPMG to prove the reasonableness of its investigation – its *affirmative defense* of due diligence.  By arguing that a Securities Act claim requires a plaintiff to show that an auditor did not honestly believe that GAAP was complied with, KPMG effectively incorporates intent, *i.e.*, scienter, as an element in Securities Act claims against an auditor in a public offering.  This is contrary to the plain language of the Securities Act.  *See In re Livent,* 151 F. Supp. 2d at 408.[47]

### 3.    Loss Causation Is Not An Element Of A Securities Act Claim

The Securities Act Defendants argue that Plaintiffs failed to allege loss causation. Ambac Mem. at 40.  Loss causation is not an element under Sections 11 or 12(a)(2). *See Herman*, 459 U.S. at 382; *Rombach*, 355 F.3d at 169 n.4; *Adair v. Bristol Tech. Systems*, 179 F.R.D. 126, 135 (S.D.N.Y. 1998).   As clearly set forth in the statutory language of Sections 11 and 12, "the absence of loss causation, also known as 'negative causation,' [is] an affirmative defense to reduce or avoid liability under § 11.  As an affirmative defense, the burden of disproving loss causation falls on defendants…."  *Levine v. Atricure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006) ("[T]o establish a prima facie fraud claim under § 11 of the Securities Act[,] a plaintiff is not required to plead loss causation.").[48]  Section 11 creates a "factual presumption that 'any decline in value is . . . caused by the misrepresentation in the registration statement.'" *Levine*, 508 F. Supp. 2d at 272 (ellipses in original; citation and internal quotation marks omitted).   This presumption can only be overcome, and the case dismissed, "[w]here it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses."  *In re Merrill Lynch & Co.,*

---

[47] To the extent the case law cited by KPMG requires intent to be alleged, such case law is contrary to the statutory language of the Securities Act and established case law holding that scienter/intent is not an element of Securities Act claims.

[48] As set forth in Section III.D., *supra*, the Exchange Act section of the Complaint sufficiently pleads loss causation.

*Inc., Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003) (hereinafter "*Merrill Lynch Research Reports II*").

The Securities Act Defendants argue that "[a]ny losses here were plainly caused by the collapse of the credit market." Underwriters' Mem. at 17.[49]  However, the Securities Act allegations never refer to the collapse of the credit market. ¶¶351-510.  Moreover, as the recent *Countrywide Securities* opinion explained in the context of underwriter defendants' invocations of a negative causation defense, "[i]t is not the Courts role to speculate on the causes of the current economic situation."  2008 WL 5100124 at *28.  Loss causation is clearly apparent from the allegations in the complaint; the presumption of causation is not overcome.

### 4.    The Claims Arising from the 2007 DISCS Offering Are Timely

The one-year statute of limitations applicable to claims under Sections 11 and 12(a)(2) of the Securities Act "begins to run after the plaintiff obtains ***actual knowledge*** of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge."  *In re WorldCom, Inc. Sec. Litig.,* 294 F. Supp. 2d 431, 444 (S.D.N.Y. 2003) (hereinafter "*In re WorldCom I*") (quoting *Levitt v. Bear Stearns & Co.,* 340 F.3d 94, 101 (2d Cir. 2003)) (citation omitted, emphasis added); *see also* 15 U.S.C. § 77m.  The Securities Act Defendants argue that Plaintiffs' claims arising out of the February 2007 DISCS offering are time-barred and should be dismissed.  Ambac Mem. at 35; Underwriters' Mem. at 18.  To prevail, the Securities Act Defendants must show that Plaintiffs were on inquiry notice that Ambac falsely misrepresented the quality and performance of the Company's RMBS-linked

---

[49] The cases cited by the Securities Act Defendants demonstrate the error in their argument.  The authorities they cite are either inapplicable because the cases involved fraud based allegations or the allegations on the face of the complaint demonstrated no loss causation.  *See Gelt Funding*, 27 F.3d 763 (fraud based claim); *Shields*, 25 F.3d 1124 (same); *In re Salomon Smith Barney Mut. Fund Fees Litig*., 441 F. Supp. 2d 579 (S.D.N.Y. 2006) (plaintiffs alleged losses not recognized by the Securities Act); *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832 (N.D. Tex. 2005) (negative causation apparent on the face of the complaint); *Merrill Lynch Research Reports II*, 272 F. Supp. 2d 243 (apparent from face of complaint that loss causation was lacking).

exposures more than one year before July 25, 2008, the date the first complaint alleging Securities Act violations was filed.   "[D]efendants bear a heavy burden in establishing that plaintiffs were on inquiry notice" and, here, Securities Act Defendants have not met that burden. *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 523 (S.D.N.Y. 2005).   Because the Securities Act Defendants have failed to cite any facts establishing that Plaintiffs had either actual or constructive notice of the Securities Act violations prior to July 25, 2007, their argument fails.

A plaintiff is on inquiry notice of the existence of a claim when he or she is aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge of the defendant's misrepresentations. *See Weil v. Long Island Sav. Bank,* 77 F. Supp. 2d 313, 326 (E.D.N.Y. 1999) ("A defrauded party must have either inquiry notice or actual notice of the injury 'such that a reasonable investor of ordinary intelligence would have discovered the existence of the fraud.'") (quoting *In re Merrill Lynch Ltd. P'ship Litig.,* 154 F.3d 56, 60 (2d Cir. 1998)).   The facts relied upon to support inquiry notice must rise to a level of more than mere suspicion.   A duty of inquiry arises only "[w]hen the circumstances would suggest to an investor of ordinary intelligence the *probability* that she has been defrauded." *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir. 1993) (emphasis added); *LC Capital Partners, L.P.  v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 154 (2d Cir. 2003);  *see also Newman v. Warnaco Group, Inc.,* 335 F.3d 187, 194 (2d Cir. 2003) ("[T]he existence of fraud must be a probability, not a possibility.").

Information that triggers the notice – often referred to as "storm warnings" – "must be such that it relates directly to the misrepresentations and omissions the [p]laintiffs later allege in their action against the defendants." *Newman*, 335 F.3d at 193.  Moreover, "*defendants bear a heavy burden* in establishing that the plaintiff was on inquiry notice as a matter of law.  Inquiry

notice exists only when *uncontroverted evidence irrefutably demonstrates* when plaintiff discovered or should have discovered the fraudulent conduct." *Id.* at 194-95 (emphasis added; citations omitted); *see also Nivram Corp. v. Harcourt Brace Jovanovich, Inc.,* 840 F. Supp. 243, 249 (S.D.N.Y. 1993) (because the statute of limitations is an affirmative defense, Defendants bear a heavy burden of proof in establishing that Plaintiffs were on inquiry notice).

The issue of inquiry notice is generally considered inappropriate for determination on a motion to dismiss. *See Staehr v. The Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 412 (2d Cir. 2008) (citing *LC Capital Partners,* 318 F.3d at 156); *Bombardier,* 2005 U.S. Dist. LEXIS 19506 at *17-*18 ("[O]n a motion to dismiss, 'unless Defendants can produce uncontroverted evidence [that] irrefutably demonstrates when plaintiff discovered or should have discovered the [violation],' they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law.") (quoting *In re Initial Pub. Offering Sec. Litig.,* 341 F. Supp. 2d 328, 347 (S.D.N.Y. 2004)); *In re WorldCom, Inc. Sec. Litig.,* No. 02 CV 3288, 2003 WL 22790942, at *4 (S.D.N.Y. Nov. 25, 2003) (court can resolve notice issue on motion to dismiss only "if the facts needed to make the determination 'can be gleaned from the complaint and papers integral to the complaint'").

Moreover, "[i]nvestors are not placed on inquiry notice, despite the existence of storm warnings, when 'the warning signs [we]re accompanied by reliable words of comfort from management' such that an investor of ordinary intelligence would reasonably have relied on the statements to allay his or her concern." *Alcatel*, 382 F. Supp. 2d at 523-24 (quoting *LC Capital Partners*, 318 F.3d at 155) (second alteration in original). Thus, the purported storm warnings must be examined in light of any contemporaneous statements by management that temper the impact of the storm warning.

The Securities Act Defendants identify several events as purported "storm warnings." Ambac Mem. at 35-37; Underwriters' Mem. at 19-20. Notably, if they are right about what investors should have known by July 25, 2007, they are effectively conceding that the Exchange Act Defendants acted with scienter when making contrary statements about Ambac's RMBS exposures well after that date. In any event, none of the "storm warnings" that the Securities Act Defendants identify placed Plaintiffs on inquiry notice, especially in light of the fact that statements made by Ambac and its officers were designed to, and did, allay investor concerns.

Citing media and research analyst statements in the first half of 2007 linking the weakening of the housing market with the weakening of the RMBS and CDO markets, the Securities Act Defendants assert that general conditions in the housing market and performance of RMBS-related instruments constitute storm warnings which put Plaintiffs on inquiry notice. Ambac Mem. at 35-37; Underwriters' Mem. at 19-20. The Securities Act Defendants argue that Ambac's publicly known business of guaranteeing RMBS and CDOs suggested to Plaintiffs that "Ambac might face losses on the RMBS and CDOs it chose to guarantee." Ambac Mem. at 37. This is a red-herring. The fact that Ambac participated in the RMBS and CDO business does not warn investors that, *inter alia*, Ambac had lowered its underwriting standards, Ambac's reported losses were understated, and the assets underlying Ambac's actual RMBS-related exposure was experiencing negative trends in key metrics.

Indeed, the Second Circuit has explicitly held that general market information will not constitute storm warnings for purposes of providing inquiry notice. *See Hartford*, 547 F.3d 406; *Lentell*, 396 F.3d 161. In *Hartford*, defendants argued that plaintiffs were on inquiry notice of The Hartford's illicit "kickback" insurance practices by citing to over one dozen articles discussing illicit practices in the insurance industry in general, although The Hartford was

mentioned briefly in only one of the articles.  The court rejected defendants' argument, finding that, for inquiry notice to exist, the triggering information must relate directly to the misrepresentations and omissions alleged against a defendant.  *Hartford*, 547 f.3d at 430.  The court also noted that the one article that mentioned The Hartford was not sufficiently detailed for the court to say "either that this article would have come to the attention of a reasonable investor of ordinary intelligence, or that, if it had, its contents were sufficient to place such an investor on notice of the probability of fraudulent conduct by The Hartford."  *Id.* at 431.  In *Lentell*, defendants similarly argued that plaintiffs were on inquiry notice of conflicts of interests at Merrill Lynch based on numerous published articles regarding structural conflicts in Wall Street companies.  *Lentell*, 396 F.3d at 170, 172.  The Court found that the companies in question were not mentioned in any of the articles relied upon by the District Court.  *Id.* at 171.  The Court went on to explain that "[t]he articles cited by the district court describe the conflicted situation of Wall Street's research analysts; but evidence of the outright falsity of Merrill Lynch's investment recommendations is stray and indiscriminate at best, and is insufficient to put plaintiffs on inquiry notice . . . ."  *Id.*

Moreover, statements made by Ambac and its officers and directors contemporaneously with the alleged "storm warnings" offset the impact, if any, of those "warnings."  Indeed, as late as November 2007, Defendant Genader insisted that Ambac's RMBS-related portfolio "is in very good shape," that Ambac "is very solid and very safe" and that "[o]ur performance, as Ambac, is very different from the rest of the market."  This sentiment was expressed throughout the Class Period.  For example, while Securities Act Defendants point to statements made by John Uhlein explicitly referencing "turmoil" in the mortgage markets at a conference in June 2007, they fail to add that Uhlein assured investors that "[Ambac was] be[ing] pretty

conservative and so we are very comfortable with our current book of business, even in this environment" and that "a little turmoil in the market, to be honest, that's actually a good thing for financial guarantors."  Clearly, no investor could deduce that anything was amiss at Ambac from this statement.  Similarly, although at a conference in March 2007, Uhlein "fielded numerous questions from investors about Ambac's mortgage-related exposures," Ambac Mem. at 36, he affirmatively stated that "[t]he deals we ensure must meet Ambac's strict underwriting standards" and that Ambac has "maintained the same conservative standards over the years."[50]

Ambac repeatedly made statements that effectively communicated that the securities insured or wrapped by Ambac, and the RMBS-related collateral underlying those securities, were different from and superior to the rest of the market that Ambac has conservative risk limits, takes cautious positions with respect to CDOs, and "will continue to be disciplined and rigorous in [its] scrutiny of [the sub-prime MBS] asset class."  These misrepresentations are not unmasked by the general market-based disclosures identified by the Securities Act Defendants, and they trigger no duty of inquiry.  *See, generally*, Section II.C-E., *supra* (setting forth statements made by Ambac and its officers and directors reassuring the market about Ambac's RMBS-related exposures).

The Securities Act Defendants also claim inquiry notice since at least May 2007, when MarketWatch published an article about investor Bill Ackman's presentation regarding the subprime mortgage sector.  Ambac Mem. at 37; Underwriters' Mem. at 19.  First, the court must look to the complaint and papers integral to the complaint.  *See LC Capital Partners*, 318 F.3d at

---

[50] The Underwriters also point to the May 10, 2007 Form 10-Q disclosure that "[m]ost of the transactions that experienced spread widening had sub prime mortgage exposure in the collateral pool" as a trigger of inquiry notice. Underwriters' Mem. at 19.  The issue here is not whether Ambac had subprime mortgage exposures or whether there was turmoil in the market.  The issue is whether the Securities Act Defendants failed to inform investors that Ambac had materially lowered mortgage origination standards and that it was experiencing negative trends in its RMBS-related portfolio.

156; *In re WorldCom I*, 294 F. Supp. 2d at 445. Second, this article summarizes the statements of a well-known short-seller who had been critical of the housing market and bond insurers for years. The assertions of a short-seller, who would profit from a decrease in Ambac's stock price, cannot impute inquiry notice on Plaintiffs, especially, in light of the fact that the Company was making statements directly contrary to his statements.[51]

None of the alleged "storm warnings" put Plaintiffs on inquiry notice of any wrongdoing at Ambac. Plaintiffs did not have knowledge of the facts before July 25, 2007, as argued by the Securities Act Defendants, and the statute of limitations has not run.[52]

### 5. Plaintiffs Have Standing With Respect to the March 2008 Equity Units Offering

A plaintiff with standing to pursue a Securities Act claim on behalf of purchasers of one security of a particular issuer may represent the interests of purchasers of other types of securities of the same issuer in a class action where the alleged harm stems from the same allegedly improper conduct. *See, e.g., In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288, 2004 WL 555697, at *7 (S.D.N.Y. Mar. 19, 2004) (purchasers of one type of debt security (domestic) had standing to pursue claims of purchasers of a second type of debt security (foreign) issued pursuant to the same registration statement); *In re Saxon Sec. Litig.,* No. 82 Civ. 3103, 1984 WL 2399, at *7 (S.D.N.Y. Feb. 23, 1984) ("[D]ebenture holders have an interest identical to that of the holders of common stock in demonstrating a common course of fraudulent conduct[.]").

---

[51] The Underwriter Defendants also refer to an analyst's comments regarding Ambac made on July 11, 2007. Underwriters' Mem. at 19. The analyst comments simply caution that the weakness in the mortgage markets may hurt monoline insurers. Statements by Ambac and its management alleviated any concerns that general market conditions could have an effect on Ambac. *See, generally*, Section II.C-E.

[52] To the extent the Securities Act Defendants claim inquiry notice based on incomplete disclosures on Ambac's website, they are wrong. The website disclosures only disclosed the identity of hundreds of Ambac's direct RMBS holdings, not information regarding the performance of these holdings. Indeed, these disclosures do not even identify Ambac's CDO holdings.

There is no dispute that Plaintiffs have standing with respect to the March 2008 Common Stock Offering. Accordingly, Plaintiffs also have standing with respect to the March 2008 Equity Units Offering. In *In re PMA Capital Corp.*, 2005 WL 1806503, the court denied a motion to dismiss and found the plaintiffs able to pursue both Sections 11 and 12 claims for a debenture offering despite not purchasing those debentures, stating: "Plaintiffs may pursue claims on behalf of the entire class because they were appointed to oversee litigation on behalf of the class. The PSLRA does not require that the lead plaintiff have standing to sue on every available cause of action." *Id.* at *18 (citing *Hevesi v. Citigroup, Inc.,* 366 F.3d 70, 82-83 (2d Cir. 2004)) (refusing to adopt a *per se* rule that the district court must choose a lead plaintiff with standing to sue on every available cause of action because the PSLRA requires courts choose a party who has the largest financial stake in the outcome). Similarly, the court in *In re MobileMedia Sec. Litig.* noted that "[c]ourts have allowed those with valid securities claims to represent the interests of the purchasers of other types of securities in class action suits." 28 F. Supp. 2d 901, 911 n.7 (D.N.J. 1998); *see also In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003) ("Judges presiding over complex securities class actions under the PSLRA have repeatedly rejected arguments . . . that seek to . . . claim that the individual lead plaintiff must have standing to bring all of the claims asserted in the class action complaint."). Here, Plaintiffs were appointed by this Court to represent the entire class of purchasers. The determination of whether purchasers of one type of security can represent purchasers of another type of security should be addressed at the class certification stage, not on a motion to dismiss. *See, e.g., In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037 (N.D. Cal. 2008); *In re DDi Corp. Sec. Litig.*, No. 03 Civ. 7063, 2005 WL 3090882, at *6 (C.D.

Cal. July 21, 2005) ("Concerns over whether stock purchasers should represent notes purchasers are better addressed at the time of class certification.").[53]

## V.    DEFENDANTS' EXTRANEOUS EXHIBITS MAY NOT BE CONSIDERED FOR THE TRUTH OF THEIR CONTENTS

In deciding a Rule 12(b)(6) motion, the Court may only consider: (i) the complaint, (ii) statements or documents incorporated into the complaint by reference, including public disclosure documents filed with the SEC (which may be considered only to demonstrate what was disclosed and cannot be used to resolve disputed factual issues), (iii) documents possessed by or known to the Plaintiffs and relied upon in bringing the lawsuit, and (iv) matters of which the Court may take judicial notice. *Tellabs,* 127 S. Ct. at 2509; *ATSI*, 493 F.3d at 98; *see also,* 15 U.S.C. §78u-5(e). Defendants submitted over 100 exhibits in connection with their motions to dismiss, including text books about the mortgage industry, articles about the mortgage meltdown, and other extrinsic documents. In ruling on a motion to dismiss under Rule 12(b)(6), courts may, in certain circumstances, consider documents other than the complaint. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). However, the Court cannot accept these documents for the truth of the matters asserted. *Id.* ("Consideration of such documents filed with the SEC is appropriate with respect to a nondisclosure or misrepresentation claim because 'no serious question as to their authenticity can exist,' and because the court is to consider them on a Rule 12(b)(6) motion 'only to determine what the documents stated,' and 'not to prove the truth of their contents.'") (emphasis in original, citation omitted). Similarly, even where the court takes judicial notice of an extrinsic document, "it does so in order 'to determine what statements [they]

---

[53] *See also In re Fleming Companies Inc. Sec. & Deriv. Litig.*, No. 03 MDL 1530, 2004 WL 5278716, at *48 (E.D. Tex. June 16, 2004) ("class representative who purchased stocks can represent purchasers of debt instruments in the same lawsuit"); *Endo v. Albertine*, 147 F.R.D. 164, 167 (N.D. Ill. 1993) ("[A] class of plaintiffs who purchased different types of securities may properly be certified with a representative party who only purchased one type of security.").

contained' - but 'again not for the truth of the matters asserted.'"    *Roth*, 489 F.3d at 509

(citations omitted, emphasis in original).

       Plaintiffs generally do not oppose having the Court consider the existence of documents

that are routinely and properly judicially noticed.  However, Defendants' request should be

denied to the extent that Defendants seek to have the Court take judicial notice of irrelevant

information or seek to have the Court accept documents for their truth and to draw improper

inferences in their favor.  *See The Dweck Law Firm, L.L.P. v. Mann*, 340 F. Supp. 2d 353, 359

n.5 (S.D.N.Y. 2004) ("Mann is correct in arguing that the Court may take judicial notice of the

existence of the litigation between Mann and First Union.  However, Mann is... asking the Court

to make inferences and draw conclusions regarding that lawsuit, and use those conclusions to

reject the allegations contained in Dweck's complaint.  The Court cannot do this on a motion to

dismiss.") (emphasis in original, citation omitted).  For the Court's convenience, Plaintiffs attach

as Exhibit 1 a chart of the documents Defendants improperly rely upon in their motions, with a

short description of the reason the Court should disregard the exhibit.

Dated: December 19, 2008               Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**      **BERNSTEIN LITOWITZ BERGER**
                                         **& GROSSMANN LLP**

/s/ Donald Hall                      /s/ Mark Lebovitch
Frederic S. Fox                     Steven B. Singer
Donald Hall                         Mark Lebovitch
Hae Sung Nam                   Kurt Hunciker
Melinda D. Rodon               Elliott Weiss
Aviah Cohen Pierson           Lauren A. McMillen
850 Third Avenue, 14th Floor      1285 Avenue of the Americas, 38th Floor
New York, NY 10022            New York, New York 10019
Telephone: (212) 687-1980        Telephone: 212-554-1400
Facsimile: (212 ) 687-7714        Facsimile:  212-554-1444

*Attorneys for the U.S. Public Pension Funds, and Co-Lead Counsel for the Class*

# EXHIBIT 1

**I.**    **The following exhibits are not subject to judicial notice as they represent opinions of the authors, and are being offered to resolve disputed factual matters, which is inappropriate at this procedural juncture.**

| Exhibit No. | Description | Cited |
|---|---|---|
| Wilson 2 | "When Fortune Frowned,"  The Economist Oct. 9, 2008 | Ambac Br. at 1 |
| Wilson 4 | IMF Global Financial Stability Report (April 2007) | Ambac Br. at 8-9 |
| Wilson 5 | Alan Greenspan, The Roots of the Mortgage Crisis, Wall St. J., Dec. 12, 2007. | Ambac Br. at 9 |
| Wilson 6 | Floyd Norris, It's a Crisis and Ideas are Scarce, NY Times (April 11, 2008) | Ambac Br. at 9 |
| Wilson 7 | Eric Dinallo, Tackle false rumors about insurance companies, Financial Times (London) July 31, 2008 | Ambac Br. at 9 |
| Wilson 8 | Alan Greenspan, We Will Never Have a Perfect Model for Risk, Financial Times (London) July 31, 2008 | Ambac Br. at 10 |
| Wilson 9 | "Europe Formulates Sweeping Crisis Plan,"  Wall St. J. (Oct. 12, 2008) | Ambac Br. at 11 |
| Wilson 10 | Edmund Conway, "IMF warns of world financial system 'meltdown,'" Telegraph (UK) (Oct. 12, 2008) | Ambac Br. at 11 |
| Wilson 19 | Deborah Solomon, "U.S. to Buy Stakes in Nation's Largest Banks," Wall St. J. (Oct. 14, 2008) | Ambac Br. at 10 |
| Wilson 20 | Carrick Mollenkamp, "Lehman Files for Bankruptcy, Merrill Sold, AIG Seeks Cash,"  Wall St. J. (Sept. 16, 2008) | Ambac Br. at 10 |
| Wilson 21 | Robin Sidel, WaMU is Seized, sold off to J.P. Morgan, in largest failure in banking history," Wall St. J. (Sept. 26, 2008) | Ambac Br. at 10 |
| Wilson 22 | Deborah Solomon, "Mortgage Bailout is Greeted with Relief, Fresh Questions,"  Wall St. J. (Sept. 9, 2008) | Ambac Br. at 10 |
| Wilson 23 | Matthew Karnitschnig, "U.S. to Take Over AIG in $85 Billion Bailout,"  Wall St. J. (Sept. 16, 2008) | Ambac Br. at 10 |
| Wilson 24 | JP Morgan Press Release Announcing Purchase of Bear Stearns | Ambac Br. at 10 |
| Wilson 25 | Bank of America Press Release Announcing Purchase of Merrill Lynch | Ambac Br. at 10 |
| Wilson 26 | Wachovia Press Release Announcing Sale to Wells Fargo | Ambac Br. at 10 |
| Wilson 67 | FGIC Press Releases announcing Quarterly results dated October 30, 2007, March 17, 2008 and May 23, 2008 | Ambac Br. at 10 |

| Exhibit No. | Description | Cited |
|---|---|---|
| Wilson 68 | Moody's and S&P Ratings Actions on FGIC dated June 20, 2008 and March 28, 2008 | Ambac Br. at 10 |
| Wilson Wilson 69 | Moody's Ratings Action on CIFG dated May 20, 2008 | Ambac Br. at 10 |
| Yanez 3 | The Roots of the Mortgage Crisis, December 12, 2007, The Wall Street Journal | KPMG Br. at 5 |
| Yanez 9 | Trends: Subprime Fallout Could Cost Billions, Business Insurance, April 21, 2008 | KPMG Br. at 6 |
| Pravda 1 | Bond Insurers Weather Hit to Ratings – Investors Are Steady As First Downgrades Had Been Expected, The Wall Street Journal, January 19, 2008 | Underwriters' Br. at 14 |
| Pravda 2 | New York Seeks Bailout of Bond Insurers, The Wall Street Journal, January 24, 2008 | Underwriters' Br. at 14 |
| Pravda 3 | Rescue Plans Won't Prevent Downgrades – Banks Trying to Salvage Bond Insurers Realize Ratings Will Still Suffer, The Wall Street Journal, February 7, 2008 | Underwriters' Br. at 14 |
| Pravda 4 | Credit Crunch: Markets' Ride: Bond Insurer Ambac in Talks with Potential Partners, The Wall Street Journal, January 23, 2008 | Underwriters' Br. at 14 |
| Pravda 5 | Ambac Hopes Capital Infusion Will Save Rating – Strategy to Sell Shares May Be Prelude to Split; Spitzer Deadline Passes, The Wall Street Journal, February 19, 2008 | Underwriters' Br. at 14 |

**II.    The following exhibits are not subject to judicial notice because Defendanta are inappropriately seeking a finding of inquiry notice based on a determination of Bill Ackman's credibility:**

| Exhibit No. | Description | Cited |
|---|---|---|
| Wilson 15 | Alistair Barr, "Pershing's Ackman knocks MBIA, Ambac," MarketWatch (May 24, 2007) | Ambac Br. at 37 |
| Wilson 16 | Pershing Square, "Who's Holding the Bag?", Ira Sohn Conference (May 2007) | Ambac Br. at 37 |
| Wilson 17 | Gabrielle Stein, "Ackman Casts First Doubt on Monolines," Asset Securitization Reporter (Jan. 14, 2008) | Ambac Br. at 37 |
| Wilson 18 | Michael Rudnick, "Ackman targets FSA," Daily Deal (June 28, 2008) | Ambac Br. at 37 |
| Pravda 6 | Pershing's Ackman knocks MBIA, Ambac, MarketWatch, May 24, 2007 | Underwriters' Br. at 19 |
| Pravda 7 | Bullet: US ABS/SubPrime, MarketWatch, July 11, 2007 | Underwriters' Br. at 19 |

**III.     The following exhibits contain financial information pertaining to other companies and are irrelevant for a motion to dismiss.**

| Exhibit No. | Description | Cited |
|---|---|---|
| Wilson 61 | MBIA Forms 8-K dated October 25, 2007, January 31, 2008 and May 12, 2008 | Ambac Br. at 10, 17 |
| Wilson 62 | MBIA Historical Stock Prices from May 2007-June 30, 2008 | Ambac Br. at 10 |
| Wilson 63 | MBIA Forms 8-K dated June 25, 2008 and June 6, 2008 | Ambac Br. at 10 |
| Wilson 64 | Security Capital Assurance Forms 8-K dated October 25, 2008, March 13, 2008 and May 8, 2008 | Ambac Br. at 10, 17 |
| Wilson 65 | Security Capital Assurance Historical Stock Prices from May 2007 and July 15, 2008 | Ambac Br. at 10 |
| Wilson 66 | Security Capital Assurance Form 8-K dated June 23, 2008 | Ambac Br. at 10 |
| Yanez 6 | Citigroup Inc. Form 10-K for year ended December 31, 2007 | KPMG Br. at 5 |
| Yanez 7 | Morgan Stanley's Form 10-K for year ended November 30, 2007 | KPMG Br. at 6 |
| Yanez 8 | The Bear Stearns Companies Inc.'s Form 10-K for year ended November 30, 2007 | KPMG Br. at 6 |

**IV.     The following exhibits are used by Defendants to make merits-based arguments, which are inappropriate at the motion to dismiss stage.**

| Exhibit No. | Description | Cited |
|---|---|---|
| Wilson 1 | Case-Shiller 20 (city Composite Index Price changes with Ambac announcements | Ambac Br. at 10 |
| Wilson 11 | Laurie S. Goodman et al., Subprime Mortgage Credit Derivatives (2008) | Ambac Br. at 16 |
| Wilson 12 | Ben Logan, "The ABX Index:  A Pricing Conundrum," Credit (May 1, 2008) | Ambac Br. at 16 |
| Wilson 13 | "Don't Mark to Markit," Economist (Mar. 6, 2008) | Ambac Br. at 16 |
| Wilson 14 | Moody's and S&P Ratings for the 5 CDOs that plaintiffs use for their "expert" analysis from issuance through August 2008 | Ambac Br. at 19 |
| Yanez 17 | The ABX Index:  A Pricing Conundrum, Credit, May 1, 2008 | KPMG Br. at 17-18 |

**V.    The following exhibits are not the proper subjects of judicial notice because there is a dispute as to the accessibility, timeliness and availability of these documents.**

| Exhibit No. | Description | Cited |
|---|---|---|
| Oehrig 1a | 4th Quarter 2005 (documents posted on or about 1/25/06)  Consumer Asset-Backed Securities ("CABS") Exposure (including MBS) | Ambac Br. at 29, 37 |
| Oehrig 1b | 4th Quarter 2005 (documents posted on or about 1/25/06)  Pooled Debt Obligation Exposure (including CDOs) | Ambac Br. at 29 |
| Oehrig 2a | 1st Quarter 2006 (documents posted on or about 4/26/06) CABS Exposure (including MBS) | Ambac Br. at 37 |
| Oehrig 2b | 1st Quarter 2006 (documents posted on or about 4/26/06) Pooled Debt Obligation Exposure (including CDOs) | Not Cited |
| Oehrig 3a | 2d Quarter 2006 (documents posted on or about 7/26/06) CABS Exposure (including MBS) | Ambac Br. at 37 |
| Oehrig 3b | 2d Quarter 2006 (documents posted on or about 7/26/06) Pooled Debt Obligation Exposure (including CDOs) | Not Cited |
| Oehrig 4a | 3d Quarter 2006 (documents posted on or about 10/25/06) CABS Exposure (including MBS) | Not Cited |
| Oehrig 4b | 3d Quarter 2006 (documents posted on or about 10/25/06) Pooled Debt Obligation Exposure (including CDOs) | Not Cited |
| Oehrig 5a | 4th Quarter 2006 (documents posted on or about 1/31/07) CABS Exposure (including MBS) | Ambac Br. at 7 |
| Oehrig 5b | 4th Quarter 2006 (documents posted on or about 1/31/07) Pooled Debt Obligation Exposure (including CDOs) | Ambac Br. at 7 |
| Oehrig 5c | 4th Quarter 2006 (documents posted on or about 1/31/07) Exposure to Sub-Prime through MBS and CDOs | Ambac Br. at 7, 29 |
| Oehrig 6a | 1st Quarter 2007 (documents posted on or about 4/25/07) CABS Exposure (including MBS) | Not Cited |
| Oehrig 6b | 1st Quarter 2007 (documents posted on or about 4/25/07) Pooled Debt Obligation Exposure (including CDOs) | Not Cited |

4

| Exhibit No. | Description | Cited |
|---|---|---|
| Oehrig 6c | 1st Quarter 2007 (documents posted on or about 4/25/07)<br>Exposure to Sub-Prime through MBS and CDOs | Not Cited |
| Oehrig 7a | 2d Quarter 2007 (documents posted on or about 7/25/07)<br>CABS Exposure (including MBS) | Not Cited |
| Oehrig 7b | 2d Quarter 2007 (documents posted on or about 7/25/07)<br>Pooled Debt Obligation Exposure (including CDOs) | Not Cited |
| Oehrig 7c | 2d Quarter 2007 (documents posted on or about 7/25/07)<br>Exposure to Sub-Prime through MBS and CDOs | Not Cited |
| Oehrig 7d | 2d Quarter 2007 (documents posted on or about 7/25/07)<br>CABS Exposure re: CDO overview | Ambac Br. at 6, 18, 29 |
| Oehrig 8a | 3d Quarter 2007 (documents posted on or about 10/24/07)<br>CABS Exposure (including MBS) | Not Cited |
| Oehrig 8b | 3d Quarter 2007 (documents posted on or about 10/24/07)<br>CDO Overview | Not Cited |
| Oehrig 8c | 3d Quarter 2007 (documents posted on or about 10/24/07)<br>Exposure to Sub-Prime through MBS and CDOs | Not Cited |