UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMBAC FINANCIAL GROUP, INC.<br>SECURITIES LITIGATION | )<br>)  Lead Case No. 08-CV-411 (NRB)<br>)<br>)  ECF Case<br>) |

REPLY MEMORANDUM IN FURTHER SUPPORT OF AMBAC AND
INDIVIDUAL DEFENDANTS' MOTION TO DISMISS THE
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Peter C. Hein
Warren R. Stern
Joshua A. Naftalis
C. Lee Wilson
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000

*Attorneys for Defendants Ambac Financial
Group, Inc., Robert J. Genader, Sean T.
Leonard, John W. Uhlein, III, David W.
Wallis, Michael A. Callen, Phillip B.
Lassiter, Jill M. Considine, W. Grant
Gregory, Thomas C. Theobald, Laura S.
Unger, Henry Wallace, Philip N. Duff.*

Dated:  February 10, 2009

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 1

I.      THE COMPLAINT FAILS TO ADEQUATELY PLEAD MATERIAL
MISREPRESENTATIONS OR SCIENTER AND THUS PLAINTIFFS'
EXCHANGE ACT CLAIMS SHOULD BE DISMISSED ...................................... 1

      A.    Plaintiffs plead no legally cognizable motive for the alleged fraud. ................. 4

      B.    Plaintiffs fail to plead fraud with particularity .................................................. 4

            1.    The "facts" Plaintiffs allege regarding Ambac's underwriting practices
are insufficient to plead fraud. ................................................................. 5

            2.    The "facts" Plaintiffs allege regarding Ambac's writedowns, loss
reserving, and related GAAP violations are insufficient to plead fraud. ... 6

      C.    Even had Plaintiffs pled a cogent and compelling inference of scienter,
the more compelling inference is that Ambac, like many other financial
institutions, has suffered from severe market downturns and appropriately
updated writedowns and losses as the scope and severity of the downturns
unfolded. ............................................................................................................ 9

II.     THE COMPLAINT'S FAILURE TO SUFFICIENTLY PLEAD LOSS
CAUSATION IS A SEPARATE GROUND FOR DISMISSAL .......................... 10

III.    PLAINTIFFS' SECURITIES ACT CLAIMS SHOULD BE DISMISSED
— IN ADDITION TO THE REASONS ADDRESSED IN
DEFENDANTS' MOVING BRIEFS AND UNDERWRITERS' AND
KMPG'S REPLY BRIEFS, THESE CLAIMS "SOUND IN FRAUD" BUT
FAIL TO MEET RULE 9(B)'S STRINGENT STANDARD. ............................. 10

# TABLE OF AUTHORITIES

**Case**                                                                 <u>Page</u>

*In re Aegon N.V Sec. Litig.*,
   2004 U.S. Dist. LEXIS 11466 (S.D.N.Y. 2004)..................................8

*In re American Express Co. Sec. Litig.*,
   2008 WL 4501928 (S.D.N.Y. 2008)...................................1, 2, 5

*Atlas* v. *Accredited Home Lenders Holding Co.*,
   556 F. Supp. 2d 1142 (S.D. Cal. 2008)..................................2

*In re Cardinal Health Inc. Sec. Litigs.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006).............................7 n.7

*In re Ceridian Corp. Sec. Litig.*,
   542 F.3d 240 (8th Cir. 2008)...........................2 n.1, 6 n.5

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004)..................................4

*Constr. Laborers Pension Trust of Greater St. Louis* v. *Neurocrine Biosciences, Inc.*,
   2008 U.S. Dist. LEXIS 73020 (S.D. Cal. 2008)..................................6

*In re Countrywide Fin. Corp. Deriv. Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008)..................................2, 3

*In re Countrywide Fin. Corp. Sec. Litig.*,
   2008 WL 5100124 (C.D. Cal. 2008)..................................2, 3

*Cozzarelli* v. *Inspire Pharms. Inc.*,
   549 F.3d 618 (4th Cir. 2008)...........................2 n.1

*In re Dell Inc. Sec. Litig.*,
   2008 U.S. Dist. LEXIS 86054 (W.D. Tex. 2008)..................................10

*(Dynex) Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*,
   531 F.3d 190 (2d Cir. 2008)...........................1, 2, 3, 3 n.2, 4, 5, 6

*ECA* v. *JP Morgan Chase Co.*,
   2009 WL 129911 (2d Cir. 2009)...........................1, 2, 4, 5, 8

*In re Elan Corp. Sec. Litig.*,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008)..................................6

*In re eSpeed, Inc. Sec. Litig.*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006)..................................3 n.2

*In re Federated Dept. Stores, Inc. Sec. Litig.*,
   2004 WL 444559 (S.D.N.Y. 2004)..................................3 n.2

*In re GeoPharma, Inc. Sec. Litig.*,
   399 F. Supp. 2d 432 (S.D.N.Y. 2005)..................................4

*Gildepath Holding B.V.* v. *Spherion Corp.*,
   2007 WL 2176072 (S.D.N.Y. 2007)..................................4 n.4

Page

*Gold* v. *Morrice,*
    2008 WL 467619 (C.D. Cal. 2008) ................................................................. 3 n.3

*Good Hill Partners L.P.* v. *WM Asset Holdings Corp.,*
    583 F. Supp. 2d 517 (S.D.N.Y. 2008) .......................................................... 6

*Indiana Elec. Workers' Pension Trust Fund IBEW* v. *Shaw Group, Inc.,*
    537 F.3d 527 (5th Cir. 2008) ..................................................................... 8 n.8

*Ladmen Partners, Inc.* v. *Globalstar, Inc.,*
    2008 WL 4449280 (S.D.N.Y. 2008) ............................................................ 10

*Mizzaro* v. *Home Depot, Inc.,*
    544 F.3d 1230 (11th Cir. 2008) ................................................................... 2 n.1

*In re New Century,*
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...................................................... 2

*Novak* v. *Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ....................................................................... 6

*In re Novastar Fin. Inc. Sec. Litig.,*
    2008 U.S. Dist. LEXIS 44166 (W.D. Mo. 2008) ...................................... 3 n.3

*Patel* v. *Parnes,*
    253 F.R.D. 531 (C.D. Cal. 2008) ............................................................... 3 n.3

*In re Refco, Inc. Sec. Litig.,*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ........................................................ 10

*Rombach* v. *Chang,*
    355 F.3d 164 (2d Cir. 2004) ....................................................................... 10

*In re Scottish Re Group Sec. Litig.,*
    524 F. Supp. 2d 370 (S.D.N.Y 2007) ........................................................ 9 n.9

*Shapiro* v. *UJB Fin. Corp.,*
    964 F.2d 272 (3d Cir. 1992) ....................................................................... 9 n.9

*Steinberg* v. *Ericsson LM Tel. Co.,*
    2008 WL 5170640 (S.D.N.Y. 2008) ........................................................... 9

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007) ................................................................................ 2, 9 n.13

*Thor Power Tool Co.* v. *Comm'r,*
    439 U.S. 522 (1979) .................................................................................... 7

*Tripp* v. *IndyMac Fin. Inc.,*
    2007 WL 4591930 (C.D. Cal. 2007) ......................................................... 3 n.3

*Zucco Partners, LLC* v. *Digimarc Corp.,*
    2009 WL 57081 (9th Cir. 2009) ................................................................. 2, 2 n.1, 6, 6 n.5

<u>Page</u>

<u>Statutes</u>

15 U.S.C. § 78u-4 (PSLRA) ...............................................................................1, 3 n.2, 7

Statement of Fin. Accounting Standards No. 133 (FAS 133) ....................................7 n.6

Statement of Fin. Accounting Standards No. 157 (FAS 157) ....................................7 n.6

Statement of Auditing Standards No. 69 (SAS 69) .........................................................7

## PRELIMINARY STATEMENT

Neither the Complaint nor Plaintiffs' Opposition Brief ("PB") identifies any significant difference between the timing of Ambac's announcements of writedowns and losses as the credit and mortgage market downturns unfolded and those of many of its financial guarantor competitors. It defies rationality to suggest that all of these companies were simultaneously defrauding the market.

Plaintiffs thus face a heavy burden of identifying specific motives unique to Ambac's management for committing fraud and concrete evidence showing Ambac's management knowingly concealed Ambac's mortgage-related risk from the market. Neither the Complaint nor Plaintiffs' Opposition meet this burden. Plaintiffs point to a handful of cases involving mortgage originators, but can only even attempt to analogize to those cases by exaggerating the allegations of the Complaint here. The Complaint as actually pled is plainly deficient under *Dynex* and *American Express*, both of which dismissed securities fraud actions premised on allegations that financial institutions failed to timely disclose certain business risks. Indeed, the stringent application of the PSLRA's pleading standard was underscored by the Second Circuit just last month in *ECA* v. *JP Morgan*, which affirmed dismissal — notwithstanding acknowledged accounting violations and unlawful conduct — because plaintiffs had failed to plead fraud or material misstatements adequately.

## I.   THE COMPLAINT FAILS TO ADEQUATELY PLEAD MATERIAL MISREPRESENTATIONS OR SCIENTER AND THUS PLAINTIFFS' EXCHANGE ACT CLAIMS SHOULD BE DISMISSED

Defendants' moving brief ("MB") showed that precedent from this Circuit requires dismissal. MB 21-24. In *Dynex*, the Second Circuit held that management's access to "raw data" contradictory to public statements is *not* sufficient to create a "strong" inference of scienter. 531 F.3d at 196 (access to "collection data" showing high delinquencies rejected as basis for knowledge that public statements about strength of bonds were false). Here, Plaintiffs allege that the defendants knew of changes in the price of the ABX/TABX indices and were aware of the securities Ambac guaranteed. But this "data," even accepting plaintiffs' methodology, only has meaning after purported anonymous "expert" analysis showing an alleged correlation between the delinquency rates of the ABX/TABX's RMBS collateral and Ambac's RMBS collateral. This chain of reasoning from "raw data" to knowledge of falsity is more attenuated than even that rejected in *Dynex.* Yet Plaintiffs ig-

nore *Dynex*'s key holding (*cf.* PB 36).

Plaintiffs likewise effectively ignore *American Express* (discussed MB 23-24), where plaintiffs (like here) had alleged that the company ignored risks associated with securities, failed to take proper impairment charges for those securities, and publicly misrepresented its risk management policies. 2008 WL 4501928, at *1 (S.D.N.Y. 2008). Judge Pauley dismissed the complaint without leave to amend, finding *inter alia* that "confidential witness" allegations that senior management was "warned of the risks" were not sufficient to plead scienter. *Id.* at *7. Plaintiffs devote only a footnote to attempting to distinguish *American Express*, pointing to one alleged change in the Ambac underwriting criteria for one type of product (HELOC) that allegedly rendered Ambac's general statements about the quality of its underwriting standards false. PB 40 n.29. As shown below, this allegation about a change in underwriting criteria for one product type shows nothing of the sort.

The Second Circuit's decision in *ECA* v. *JP Morgan*, 2009 WL 129911 (2d Cir. 2009), further confirms that Plaintiffs have failed to plead scienter. In *ECA*, the court accepted that the complaint pleaded misstatements and accounting violations regarding JP Morgan's dealings with Enron, but nonetheless upheld dismissal with prejudice, finding that plaintiffs had failed to plead materiality or scienter with particularity. *Id.* at *9-10. *ECA* underscores *Tellabs*'s stringent requirement that plaintiffs must plead "an inference of scienter" that is "more than merely 'reasonable' or 'permissible' — it must be cogent and compelling, thus strong in light of other explanations." 127 S. Ct. 2499, 2510 (2007). Numerous other Courts of Appeal have also recently emphasized this burden.[1]

Unable to distinguish this Circuit's controlling precedent, Plaintiffs rely instead on several inapposite California district court cases — *New Century; Countrywide Fin. Sec. Litig.; Countrywide Fin. Deriv. Litig.* and *Atlas.* Notably, each of these decisions predates the Ninth Circuit's recent decision in *Zucco Partners, LLC* v. *Digimarc Corp.*, 2009 WL 57081 (9th Cir. 2009), which strictly applied the *Tellabs* standard for pleading scienter, disregarded extensive confidential witness allegations, and upheld dismissal of various 10b-5 claims. Also, insofar as these decisions rely on imput-

---

[1] *See, e.g., Zucco Partners, LLC* v. *Digimarc Corp.*, 2009 WL 57081 (9th Cir. 2009); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240 (8th Cir. 2008); *Mizzaro* v. *Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008); *Cozzarelli* v. *Inspire Pharms. Inc.*, 549 F.3d 618 (4th Cir. 2008).

ing knowledge of wrongdoing to senior management on the basis of their positions at the company, e.g., *Countrywide*, 2008 WL 5100124, at *42 (*cf.* PB 38), they are contrary to the import of *Dynex*.[2]

In addition, the complaints in those cases included significantly more specific allegations of widespread fraud. For example, in *Countrywide Deriv.*, the court found that the complaint's "allegations create[d] a cogent and compelling inference that . . . Countrywide had virtually abandoned its own loan underwriting practices." 554 F. Supp. 2d at 1057. Here, however, Plaintiffs point only to (a) "raw data" that after "expert" analysis allegedly demonstrates Ambac overvalued certain guarantees, (b) confidential witness statements that vaguely describe modified underwriting standards for *one particular type* of mortgage collateral, HELOC, and (c) vague warnings about underwriting for guarantees of CDOs. Plaintiffs have not pled with particularity that Ambac "virtually abandoned" its underwriting standards, let alone that Defendants knew of any such "abandonment."[3]

Moreover, in Plaintiffs' California cases, defendants were mortgage originators who could potentially benefit from abandoning their underwriting standards as their business model was to package a significant portion of the loans they originated into MBS and effectively *sell* the risk of those loans to others. *E.g.*, *Countrywide Sec.*, 2008 WL 5100124, at *16. By contrast, Ambac, in guaranteeing senior tranches of MBS or CDOs, *assumed* the risk of any lowered underwriting standards, rendering any lowering of standards counterproductive. In addition, whereas the "core operation" of the California defendants was mortgage origination (*e.g.*, *id.* at *42-43), Ambac provided financial guarantees on a variety of securities, including municipal bonds, CDOs of corporate bonds, international bonds, etc. — not simply mortgage-related securities. MB 3; PB 5. Further, Ambac did not guarantee mortgages or entire RMBS or CDOs but only senior, investment grade tranches of those securities (MB 3-6). Thus, adverse trends in mortgage performance would not necessarily im-

---

[2] *See Dynex*, 531 F.3d at 193-94, 196; *see also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 294 n. 209 (S.D.N.Y. 2006) (questioning whether "core operations" method of pleading scienter is valid post-PSLRA); *In re Federated Dept. Stores, Inc., Sec. Litig.*, 2004 WL 444559, at *6 (S.D.N.Y. 2004).

[3] In any event, multiple other district courts, in contrast to the decisions that plaintiffs cite, have dismissed securities actions arising out of the current market downturns brought directly against mortgage originators. *See, e.g.*, MB 28-29 (citing *In re Novastar Fin., Inc., Sec. Litig.*, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. 2008); *Tripp* v. *IndyMac Fin. Inc.*, 2007 WL 4591930 (C.D. Cal. 2007)); *Gold* v. *Morrice*, 2008 WL 467619 (C.D. Cal. 2008); *see also, e.g., Patel* v. *Parnes*, 253 F.R.D. 531 (C.D. Cal. 2008) (homebuilding corp). In those cases, the complaints, like the one in this case, relied on vague statements attributed to confidential witnesses and conclusory allegations of shifts in risk management.

pair the value of Ambac's guarantees.  MB 5-6, 13, 24-25.  In any event, imputation of knowledge here based on senior management's positions is contrary to the import of *Dynex* (*see* note 2 *supra*).

### A.     Plaintiffs plead no legally cognizable motive for the alleged fraud.

To support an inference of scienter, an allegation of motive must show that defendants "'benefited in some concrete and personal way from the purported fraud'.  Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA*, 2009 WL 129911, at *6 (2d Cir. 2009).  Yet "common" motives are the only motives Plaintiffs identify — a desire to increase revenue (PB 6, Compl. ¶¶ 67, 74), maintain the appearance of success (PB 45-46) and increase compensation and preserve job security (Compl. ¶ 68, PB 46).  Moreover, in *Dynex*, the Second Circuit specifically rejected allegations that defendants were motivated by a desire "to avoid fully disclosing the impaired quality of the collateral" backing bonds the company owned, noting that it was just a variant of the "desire to maintain the appearance of profitability" motive "consistently rejected as insufficient in securities fraud pleading." *Dynex*, 531 F.3d at 196-97.  Such an alleged motive is particularly implausible here, in light of close monitoring by insurance regulators and rating agencies, as well as KPMG's audits. *See In re GeoPharma Sec. Litig.*, 399 F. Supp. 2d 432, 449-50 (S.D.N.Y. 2005) (discounting scienter allegations where "alleged scheme could not possibly have succeeded" given regulatory and media scrutiny of company).[4]

### B.     Plaintiffs fail to plead fraud with particularity.

As Plaintiffs cannot show "motive" for fraud, "the strength of [Plaintiffs'] circumstantial allegations must be correspondingly greater." *ECA*, 2009 WL 129911, at *6.  Allegations of bad decisions or mismanagement are insufficient. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376 (S.D.N.Y. 2004).  As shown below, Plaintiffs' vague confidential witness statements and conclusory "expert" analysis does not support a cogent, compelling inference of scienter. *See also* MB 21-30.  Indeed, plaintiffs do not even plead a misstatement. *See also* MB 12-21.

---

[4] *Gildepath Holding* (cited PB 46), on the other hand, involved a complaint that "allege[d] ten different financial reasons that motivated Defendant to commit fraud" including "avoid[ing] nearly . . . 7,000,000 in existing liabilities" and inducing a "beneficial sale" of the company — not simply the generalized motive allegations of the type here. *Id.* at *14.

1.  The "facts" Plaintiffs allege regarding Ambac's underwriting practices are
    insufficient to plead fraud.

Plaintiffs plead four sets of "facts" in support of their assertion that defendants knowingly misstated Ambac's underwriting standards as "careful" and "judicious." Compl. ¶¶ 77, 80, 85, 89-91. Notably, the Second Circuit recently rejected similar general statements announcing "highly disciplined" risk management as inactionable "puffery." *ECA*, 2009 WL 129911, at *12-13 (*cf.* PB 3). ECA's holding requires dismissal here without the need to parse Plaintiffs' allegations in detail. In any event, none of Plaintiffs' four sets of "facts" is sufficient to plead a misstatement.

First, Plaintiffs argue that, according to CW 3, "Defendants learned . . . that [mortgage originator] lending standards had deteriorated." PB 38, 6. This exaggerates the Complaint's allegations. CW 3 only stated generally that "*Ambac*" had learned of the deterioration — not that any *individual Defendant* did. Compl. ¶ 77. *Dynex* and *American Express* reject such generalized allegations of knowledge as a basis for scienter. MB 21-24. Moreover, CW 3 only stated that Ambac "learned" of deterioration — there are no particularized allegations that Ambac knowingly guaranteed MBS backed by loans originated under deteriorated standards or that any effect thereof was material. *See ECA*, 2009 WL 129911, at *9-10 (dismissing for failure to plead materiality with particularity).

Second, Plaintiffs argue that the Defendants approved a "sea change in [Ambac's] underwriting methodology." PB 10, 2. Again, this overstates the Complaint. CW 3 only states that Ambac's credit committee approved changes in the standard for HELOC deals, one particular type of RMBS, not wide-ranging changes. Compl. ¶¶ 80-81, 85-86. And CW 3 does not particularize how the changes in over-collateralization levels — only one possible deal protection — were material or even unduly risky for even HELOC deals in light of the overall terms of potential credit protection (such as pool policies and excess spread). MB 22-23, PB 40. Also, Plaintiffs do not allege particularized facts showing that the affected HELOC deals resulted in losses material to Ambac arising out of the alleged change in standards. Plaintiffs argue Defendants' identification of pleading failures is "not supported by anything in the record." PB 40. But it is *Plaintiffs'* responsibility to support their claim with particularity. MB 11; *ECA*, 2009 WL 129911, at *9 (upholding dismissal when facts pleaded do not "give a fact-finder a basis on which it could find" materiality).

      <u>Third</u>, Plaintiffs refer to alleged criticisms by members of Ambac's CABS group regarding underwriting standards used by a separate group at Ambac for CDOs. PB 3, 8, 39; Compl. ¶¶ 89, 91. But these comments, at most, suggest that members of one division might disagree with practices of another division, which courts reject as insufficient to plead scienter.[5] Moreover, the simple fact of complaints does not mean they were correct. *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 213 (S.D.N.Y. 2008) (risk warnings were not red flags unless defendants knew risks were substantiated). Here, the alleged complaints are far from substantiated. One is based on a single line that CW 3 saw on a computer screen (PB 39 n.27) with no discussion of the "data its conclusions were based upon." *Cf.* PB 39 n.27; *see also Constr. Laborers* v. *Neurocrine*, 2008 U.S. Dist. LEXIS 73020, at *12 (S.D. Cal. 2008). The other is based on statements overheard in an uncertain context by CW 4. *See Zucco*, 2009 WL 57081, at *16 (rejecting confidential witness testimony that relied on hearsay).

      <u>Fourth</u>, Plaintiffs allege that CW 5 stated that Ambac was "churning out" CDO guarantees without performing in-depth analysis. But CW 5 is identified solely as a VP at Ambac — Plaintiffs provide no basis for why "a person in [that] position . . . would possess the information alleged." *Novak*, 216 F.3d at 314 (cited PB 44). Moreover, there is no allegation CW 5's opinions were communicated to senior management. *See Dynex*, 531 F.3d at 196. In any event, a single employee's belief is not the type of particularized allegation that can support a securities fraud action. MB 11.

### 2. The "facts" Plaintiffs allege regarding Ambac's writedowns, loss reserving, and related GAAP violations are insufficient to plead fraud.

      Plaintiffs heavily rely on their anonymous "expert" analysis to support their claims of insufficient writedowns, loss reserves, and GAAP violations. PB 13-18, 29-30, 41-42. But valuations and reserves are complex matters of judgment that must be shown to be both objectively *and* subjectively false when made. MB 15-16; *Good Hill Partners*, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008).

      <u>First</u>, Plaintiffs fail to plead that Ambac's valuations were objectively false (MB 18-19). Plaintiffs present no information about Ambac's actual valuation method, discuss whether it was fol-

---

[5] *See, e.g., Zucco*, 2009 WL 57081, at *12 (rejecting allegations that "demonstrate only that there was some disagreement within the corporation."); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d at 247-48 (disagreement between controller and fired employee regarding interpretation of GAAP did not support inference of scienter).

lowed, or analyze whether it complied with GAAP. Plaintiffs only present their own "expert" analysis and claim that, because it gives different results, Ambac's valuations were false. Even Plaintiffs admit that GAAP only requires Ambac to record its CDO guarantees at "fair value" (PB 28-29).[6] GAAP allows "a range of reasonable treatments." MB 18, 15 (citing *Thor Power Tool*, 439 U.S at 544). By entirely failing to address Ambac's actual valuation method, Plaintiffs do not meet their PSLRA-mandated burden to plead particularized facts demonstrating that Ambac's valuation method was a departure "from reasonable concepts of 'fair value.'" *See* PB 43.

Plaintiffs identify no financial institution that valued its CDO exposures with a method different than Ambac's. MB 18-19   Many of Ambac's competitors — like Ambac — announced significantly increased writedowns between 3Q and 4Q 2007. MB 10 & Wilson Exs. 61, 64, 67.[7] And Moody's and S&P rated the CDOs used for Plaintiffs' expert analysis at AAA until well into 2008. MB 19. That Ambac's approach was consistent with other companies' further indicates that Ambac's method was reasonable. Indeed, GAAP explicitly includes the "prevalent practice in a particular industry" as an element of reasonableness. *See* Statement of Auditing Standards No. 69, ¶ 5(d).

<u>Second</u>, in any event, Plaintiffs have failed to plead that Ambac's writedowns were subjectively false (MB 23-24). Plaintiffs only assert that the Defendants were aware of the *inputs* to Plaintiffs' "expert" analysis (*i.e.*, the details of the CDOs and RMBS Ambac guaranteed and the declines in the ABX/TABX indices) and therefore contend Defendants must have known the results of that analysis. But access to "raw data" cannot create an inference of scienter. *See supra* 2-3. And even if knowledge of the results of that "expert" analysis was imputed to the Defendants, Defendants could have reasonably believed that Plaintiffs' method was simply a possible alternative approach to valuation, not that Ambac's method was unreasonable — particularly since the results Ambac's

---

[6] In their opposition (PB 28-29), like in the Complaint (¶ 134), Plaintiffs state that FAS 133 requires Ambac to record its CDO guarantees at "fair value," then misleadingly define "fair value" by quoting FAS 157 — *not* FAS 133. MB 18 n.17.

[7] The analyst from whom plaintiffs excerpt a question concerning Merrill Lynch's 3Q '07 writedowns (Compl. ¶ 285, PB 29) himself acknowledged that Ambac's levels of writedowns for 3Q '07 were "very similar" to that of other financial guarantors in a portion of the transcript plaintiffs neglect to include in their Complaint. *See* Wilson Ex. 47 at 5. Furthermore, courts are free to, and frequently do, take judicial notice of "legally required public disclosure documents filed with the SEC." MB 1 n.1, *In re Cardinal Health*, 426 F. Supp. 2d 688, 713 (S.D. Ohio 2006) (considering competitors' SEC filings in analyzing whether losses were caused by "general market downturn, not fraudulent misstatements").

method yielded were consistent with the results reported by other bond insurers, the rating agencies maintained high ratings on the senior securities Ambac guaranteed (*e.g.*, MB 19, showing AAA ratings into 2008 for five CDOs used in Plaintiffs' "expert" analysis), and KMPG audited and issued unqualified opinions on Ambac's financials.[8]

Plaintiffs also argue that the size of Ambac's announced writedown in January 2008, coming two months after defendants Genader and Leonard stated they did not expect Ambac to face losses on its guarantees of CDOs, is evidence of scienter. PB 2, 42-43. This is a quintessential example of impermissible fraud-by-hindsight. Indeed, Moody's and S&P rated the CDOs Plaintiffs used for their "expert" analysis at AAA into 2008. *E.g.*, MB 19; *see In re Aegon N.V Sec. Litig.*, 2004 U.S. Dist. LEXIS 11466, at *18-19 (S.D.N.Y. 2004) (allegations regarding size of accounting charge for losses in bond portfolio, a majority of which were rated 'A' and above, amount to fraud by hindsight). The cases Plaintiffs cite to the contrary dealt with companies that made large restatements or companies that announced losses absent marketwide downturns. PB 42-43. Moreover, here there are plausible explanations for the increased losses — *e.g.*, it only became evident by early 2008 that the decline in housing prices was accelerating. *See* MB Ex. A.[9]

Third, while either of the foregoing pleading failures standing alone requires dismissal, it is also apparent that Plaintiffs' use of their "expert" analysis is fundamentally flawed and thus cannot meet Plaintiffs' burden of pleading particularized facts (MB 15-17). Contrary to Plaintiffs' assertion (PB 29), the Court can take notice of the fact that the creator of the ABX/TABX indices stated that they were not intended for valuing individual securities (MB 16-17). Courts frequently take notice of industry literature that allows the court to inform itself about matters before it. *See ECA*, 2009 WL 129911, at *7 n.3, 4 (reviewing accounting textbooks to glean more information on a particular type of transaction).[10] And even if the indices were useful for valuing some securities, Plaintiffs fail

---

[8] *See Indiana Elec. Workers*, 537 F.3d at 535-36 (assertion that executive "must have known of the alleged accounting irregularities because they [we]re so massive, disprove[d] itself" where company had received clean audit opinion).

[9] Given the inherent lag in reporting, data reflecting, *e.g.*, Aug '07 data only became available at end of Oct '07, *see* http://www2.standardandpoors.com/portal/site/sp/en/us/page.topic/indices_csmahp/0,0,0,0,0,0,0,0,0,1,1,0,0,0,0,0.html.

[10] *See also Shapiro*, 964 F.2d 272, 281 (3d Cir. 1992) (cited PB 24) (reviewing banking and accounting literature to educate court about loan loss reserves); *Scottish Re*, 524 F. Supp. 2d at 376 n.22 (cited PB 42-43) (reviewing IMF "Coordinated Portfolio Investment Survey Guide" to inform court about income-related effects of asset securitization).

to effectively answer a key flaw Defendants identified in using them to value Ambac's guarantees, *i.e.*, ignoring that Ambac's CDOs were typically high-grade CDOs, while the TABX is akin to a mezzanine CDO, making comparison apples to oranges even if the underlying mortgage collateral for both had similar delinquency rates. MB 17-18. Thus, contrary to Plaintiffs' assertions, *e.g.*, PB 25, they have not shown Ambac was "the market"[11] or that their analysis accounts for all "deal protections."[12]

> ### C. Even had Plaintiffs pled a cogent and compelling inference of scienter, the more compelling inference is that Ambac, like many other financial institutions, has suffered from severe market downturns and appropriately updated writedowns and losses as the scope and severity of the downturns unfolded.

This non-fraudulent inference is well supported: (1) to date, Ambac has not been required to restate its financial results, despite the fact that Ambac is subject to additional regulation as an insurance company and monitored by ratings agencies; (2) the pattern of Ambac's reported losses and writedowns were consistent with numerous other bond insurers (*see* page 7 & n.7 *supra*); (3) Ambac repeatedly voluntarily released earnings weeks prior to quarterly filing deadlines — a fact Plaintiffs do not dispute — and Ambac supplemented those announcements with detailed information regarding both its CDO and RMBS exposures posted to its website (MB 28-30).[13]

Plaintiffs respond — without citation — that "voluntary disclosures that do nothing to shed light on the alleged fraud cannot support a non-culpable inference." PB 48-49. Precedent is to the contrary. *See* MB 29; *Steinberg* v. *Ericsson Tel.*, 2008 WL 5170640, at *12 n.6 (S.D.N.Y. 2008). Plaintiffs also cite cases holding that they are not *required* to plead a restatement (PB 49), but these cases do not contradict that the lack of a restatement *strengthens* the non-culpable inference. MB 30.

---

[11] Plaintiffs' (undocumented) allegation (¶ 121, PB 14 & n.9) that 2/3 of the RMBS underlying the ABX high-grade indices were also in CDOs that Ambac guaranteed is at best misleading. Each CDO can include portions of hundreds of RMBS among its collateral. The ABX index includes 20 RMBS. Even if portions of 2/3, or 13, of the RMBS in the ABX high-grade indices are among the portions of hundreds of RMBS that may make up the collateral for Ambac's CDOs, that says little or nothing about the *quantity* of the RMBS in question that are in Ambac-insured CDOs and *nothing* about the security of the senior CDO tranches insured by Ambac. Also, Plaintiffs do not allege that Ambac *did* directly wrap any of the RMBS underlying the ABX.

[12] Plaintiffs' other alleged GAAP violations were fully addressed at MB 19-21 and KPMG Br. 15-16.

[13] According to Exhibit 1 Part V to their brief, Plaintiffs did not object to the Court taking judicial notice of Oehrig Aff. Exs. 9a-c and 10a-c (website disclosures for 4Q 2007 and 1Q 2008). Plaintiffs only dispute the earlier website disclosures. Defendants are not offering these disclosures for the truth of the underlying figures, but only to show that Ambac has long voluntarily released a substantial amount of information on its MBS exposures. Moreover, it is undisputed that a court can consider documents referenced by the Complaint, *Tellabs*, 127 S. Ct. at 2509, and Plaintiffs do not dispute that various allegations of their Complaint refer to information made available on Ambac's website, *see* MB 6 n.2.

II.   **THE COMPLAINT'S FAILURE TO SUFFICIENTLY PLEAD LOSS CAUSATION
IS A SEPARATE GROUND FOR DISMISSAL.**

Plaintiffs' own brief contradicts their theory of loss causation.  While arguing in one place that Ambac's announcement of quarterly results from 3Q 2007 to 1Q 2008 were corrective disclosures that disclosed concealed risks (PB 50-51), at another point Plaintiffs assert that Ambac's disclosures at the end of 3Q 2007 did nothing "to shed light on the alleged fraud [that] in order to generate greater revenue, Ambac abandoned its strict underwriting practices" (PB 48-49).  Plaintiffs thus expressly *admit* that Ambac's 3Q 2007 announcements of writedowns and losses were not "corrective disclosures" — and the substance of Ambac's 4Q 2007 and 1Q 2008 disclosures was no different.  As the announcements did nothing to "shed light on the alleged fraud," the only cause for the stock drops apparent from the face of the Complaint is the market-wide market downturns.  Thus, Plaintiffs have failed to plead loss causation.  MB 30-31; *see also Dell*, 2008 U.S. Dist. LEXIS 86054, at *73 ("Disappointing earnings" do not reveal falsity of prior representations).

III.   **PLAINTIFFS' SECURITIES ACT CLAIMS SHOULD BE DISMISSED — IN ADDITION TO THE REASONS ADDRESSED IN DEFENDANTS' MOVING BRIEFS AND UNDERWRITERS' AND KMPG'S REPLY BRIEFS, THESE CLAIMS "SOUND IN FRAUD" BUT FAIL TO MEET RULE 9(B)'S STRINGENT STANDARD.**

That their complaint "systematically segregates" the Exchange Act allegations from the Securities Act allegations (PB 4, 56-57) cannot undermine *Rombach*'s holding that claims (like Plaintiffs' Securities Act claims) that use the "wording and imputations . . . classically associated with fraud," such as "inaccurate *and* misleading" and "*untrue* statements of material facts," sound in fraud and must be pled with particularity.  355 F.3d at 172.  Unlike plaintiffs in *In re Refco* (cited PB 56) who "carefully couched [their claims] in the language of negligence," 503 F. Supp. 2d at 632, the only theory Plaintiffs here provide for misstatements is the theory of fraud they present in the first half of their "bifurcated" Complaint.  *Rombach* holds that Rule 9(b) extends to such pleadings. *Rombach*, 355 F.3d at 171.  Moreover, in their Securities Act allegations, Plaintiffs point to statements of opinion and assert they are false (*e.g.*, "Ambac continues to believe that the balance of the mark-to-market losses taken to date are not predictive of future claims." ¶ 440).  But to plead that a matter of opinion is false, even under Section 11, Plaintiffs must plead that the opinion was *both* objectively *and* subjectively false (*i.e.*, fraudulent). *See Ladmen Partners*, 2008 WL 4449280, at *11-13.

- 10 -

WACHTELL, LIPTON, ROSEN & KATZ

/s/ Peter C. Hein
Peter C. Hein (pchein@wlrk.com)
Warren R. Stern (wrstern@wlrk.com)
Joshua A. Naftalis (janaftalis@wlrk.com)
C. Lee Wilson (clwilson@wlrk.com)
51 West 52nd Street
New York, New York  10019
(212) 403-1000

*Attorneys for Defendants Ambac Financial Group, Inc., Robert J. Genader, Sean T. Leonard, John W. Uhlein, III, David W. Wallis, Michael A. Callen, Phillip B. Lassiter, Jill M. Considine, W. Grant Gregory, Thomas C. Theobald, Laura S. Unger, Henry Wallace, Philip N. Duff.*

Dated:  February 10, 2008

# Response to Exhibit 1

**Response to Exhibit 1 to Lead Plaintiffs' Opposition Brief**

**Plaintiffs' Category I:**  This category of documents provides background on the dramatic scope and extent of the mortgage and credit market downturns.  Courts have repeatedly taken judicial notice of such marketwide phenomena.  *See* MB 1 n.1.  In addition, a number of the exhibits (*e.g.*, Wilson Exs. 19-26) simply reference well-publicized transactions in the news, and Wilson Exs. 67-69 present indisputable public record information as to rating agencies' ratings, analogous in character to the stock price data and SEC Filings that courts routinely judicially notice.  *See* MB 1 n.1; Category III *infra*.

| Exhibit No. | Description |
|---|---|
| Wilson 2 | "When Fortune Frowned," The Economist Oct. 9, 2008 |
| Wilson 4 | IMF Global Financial Stability Report (April 2007) |
| Wilson 5 | Alan Greenspan, The Roots of the Mortgage Crisis, Wall St. J., Dec. 12, 2007. |
| Wilson 6 | Floyd Norris, It's a Crisis and Ideas are Scarce, NY Times (April 11, 2008) |
| Wilson 7 | Eric Dinallo, Tackle false rumors about insurance companies, Financial Times (London) July 31, 2008 |
| Wilson 8 | Alan Greenspan, We Will Never Have a Perfect Model for Risk, Financial Times (London) July 31, 2008 |
| Wilson 9 | "Europe Formulates Sweeping Crisis Plan," Wall St. J. (Oct. 12, 2008) |
| Wilson 10 | Edmund Conway, "IMF warns of world financial system 'meltdown,'" Telegraph (UK) (Oct. 12, 2008) |
| Wilson 19 | Deborah Solomon, "U.S. to Buy Stakes in Nation's Largest Banks," Wall St. J. (Oct. 14, 2008) |
| Wilson 20 | Carrick Mollenkamp, "Lehman Files for Bankruptcy, Merrill Sold, AIG Seeks Cash," Wall St. J. (Sept. 16, 2008) |
| Wilson 21 | Robin Sidel, "WaMU is Seized, sold off to J.P. Morgan, in largest failure in banking history," Wall St. J. (Sept. 26, 2008) |
| Wilson 22 | Deborah Solomon, "Mortgage Bailout is Greeted with Relief, Fresh Questions," Wall St. J. (Sept. 9, 2008) |
| Wilson 23 | Matthew Karnitschnig, "U.S. to Take Over AIG in $85 Billion Bailout," Wall St. J. (Sept. 16, 2008) |
| Wilson 24 | JP Morgan Press Release Announcing Purchase of Bear Stearns |
| Wilson 25 | Bank of America Press Release Announcing Purchase of Merrill Lynch |
| Wilson 26 | Wachovia Press Release Announcing Sale to Wells Fargo |
| Wilson 67 | FGIC Press Releases announcing Quarterly results dated October 30, 2007, March 17, 2008 and May 23, 2008 |
| Wilson 68 | Moody's and S&P Ratings Actions on FGIC dated June 20, 2008 and March 28, 2008 |
| Wilson 69 | Moody's Ratings Action on CIFG dated May 20, 2008 |

**Plaintiffs' Category II:** Courts routinely take judicial notice of public materials in determining whether plaintiffs were on inquiry notice of fraud for statute of limitations purposes — which is why these materials were offered. *See, e.g., L.C. Capital Partners, L.P.* v. *Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003).

| Exhibit No. | Description |
|---|---|
| Wilson 15 | Alistair Barr, "Pershing's Ackman knocks MBIA, Ambac," MarketWatch (May 24, 2007) |
| Wilson 16 | Pershing Square, "Who's Holding the Bag?", Ira Sohn Conference (May 2007) |
| Wilson 17 | Gabrielle Stein, "Ackman Casts First Doubt on Monolines," Asset Securitization Reporter (Jan. 14, 2008) |
| Wilson 18 | Michael Rudnick, "Ackman targets FSA," Daily Deal (June 28, 2008) |

**Plaintiffs' Category III:**     These documents include "legally required public disclosure documents filed with the SEC" that courts can consider on a motion to dismiss. *See* MB 1 n.1, Reply Br. 7 n.7. In addition, stock price data is routinely judicially noticed, *see Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000). Furthermore, these documents also provide background on the scope and effects of the mortgage and credit market downturns. *See* Category I *supra.*

| Exhibit No. | Description |
|---|---|
| Wilson 61 | MBIA Forms 8-K dated October 25, 2007, January 31, 2008 and May 12, 2008 |
| Wilson 62 | MBIA Historical Stock Prices from May 2007-June 30, 2008 |
| Wilson 63 | MBIA Forms 8-K dated June 25, 2008 and June 6, 2008 |
| Wilson 64 | Security Capital Assurance Forms 8-K dated October 25, 2008, March 13, 2008 and May 8, 2008 |
| Wilson 65 | Security Capital Assurance Historical Stock Prices from May 2007 and July 15, 2008 |
| Wilson 66 | Security Capital Assurance Form 8-K dated June 23, 2008 |

**Plaintiffs' Category IV:**     With regard to "Wilson 1," Plaintiffs do not dispute that they themselves rely on precisely the same Case-Shiller data in their complaint (presented in a different format). *See* MB 9-10; Wilson Ex. 1. The Court may consider "documents incorporated into the complaint by reference" and "documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." MB 1 n.1. In addition, as to "Wilson 12" and "13," plaintiffs have sought to rely upon the ABX/TABX indices — published descriptive information about the indices plaintiffs rely upon is appropriate to consider, *cf.* MB 1 n.1, and Wilson 14 is indisputably public record information regarding rating agency actions. *See* Category I *supra.* Moreover, as to all of the exhibits in

2

this Category, as explained in Defendants' reply brief, courts frequently take notice of industry literature that allows the court to inform itself about matters before it. Reply Br. 8 & n.10.

| Exhibit No. | Description |
|---|---|
| Wilson 1 | Case-Shiller 20 (city Composite Index Price changes with Ambac announcements |
| Wilson 11 | Laurie S. Goodman et al., Subprime Mortgage Credit Derivatives (2008) |
| Wilson 12 | Ben Logan, "The ABX Index: A Pricing Conundrum," Credit (May 1, 2008) |
| Wilson 13 | "Don't Mark to Markit," Economist (Mar. 6, 2008) |
| Wilson 14 | Moody's and S&P Ratings for the 5 CDOs that plaintiffs use for their "expert" analysis from issuance through August 2008 |

**Plaintiffs' Category V:**    Plaintiffs do not dispute that they themselves relied on information made available on Ambac's website in their Complaint and for this reason the Court may appropriately consider this material. *See* MB 1 n.1.; MB 6 n.2; Reply Br. 9 n.13. In addition, defendants offer these disclosures not for the truth of the underlying figures, but to show that Ambac has long voluntarily released a substantial amount of information on its MBS-related exposures. *See Benak ex rel. Alliance Premier Growth Fund* v. *Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (noting that the Court may consider materials that "serve . . . to indicate what was in the public realm at the time, not whether the contents . . . were in fact true").

| Exhibit No. | Description |
|---|---|
| Oehrig 1a | 4th Quarter 2005 (documents posted on or about 1/25/06) Consumer Asset-Backed Securities ("CABS") Exposure (including MBS) |
| Oehrig 1b | 4th Quarter 2005 (documents posted on or about 1/25/06) Pooled Debt Obligation Exposure (including CDOs) |
| Oehrig 2a | 1st Quarter 2006 (documents posted on or about 4/26/06) CABS Exposure (including MBS) |
| Oehrig 2b | 1st Quarter 2006 (documents posted on or about 4/26/06) Pooled Debt Obligation Exposure (including CDOs) |
| Oehrig 3a | 2d Quarter 2006 (documents posted on or about 7/26/06) CABS Exposure (including MBS) |
| Oehrig 3b | 2d Quarter 2006 (documents posted on or about 7/26/06) Pooled Debt Obligation Exposure (including CDOs) |
| Oehrig 4a | 3d Quarter 2006 (documents posted on or about 10/25/06) CABS Exposure (including MBS) |
| Oehrig 4b | 3d Quarter 2006 (documents posted on or about 10/25/06) Pooled Debt Obligation Exposure (including CDOs) |
| Oehrig 5a | 4th Quarter 2006 (documents posted on or about 1/31/07) CABS Exposure (including MBS) |

| Oehrig 5b | 4th Quarter 2006 (documents posted on or about 1/31/07) Pooled Debt Obligation Exposure (including CDOs) |
|-----------|--------------------------------------------------------------------------------------------------------------|
| Oehrig 5c | 4th Quarter 2006 (documents posted on or about 1/31/07) Exposure to Sub-Prime through MBS and CDOs |
| Oehrig 6a | 1st Quarter 2007 (documents posted on or about 4/25/07) CABS Exposure (including MBS) |
| Oehrig 6b | 1st Quarter 2007 (documents posted on or about 4/25/07) Pooled Debt Obligation Exposure (including CDOs) |
| Oehrig 6c | 1st Quarter 2007 (documents posted on or about 4/25/07) Exposure to Sub-Prime through MBS and CDOs |
| Oehrig 7a | 2d Quarter 2007 (documents posted on or about 7/25/07) CABS Exposure (including MBS) |
| Oehrig 7b | 2d Quarter 2007 (documents posted on or about 7/25/07) Pooled Debt Obligation Exposure (including CDOs) |
| Oehrig 7c | 2d Quarter 2007 (documents posted on or about 7/25/07) Exposure to Sub-Prime through MBS and CDOs |
| Oehrig 7d | 2d Quarter 2007 (documents posted on or about 7/25/07) CABS Exposure re: CDO overview |
| Oehrig 8a | 3d Quarter 2007 (documents posted on or about 10/24/07) CABS Exposure (including MBS) |
| Oehrig 8b | 3d Quarter 2007 (documents posted on or about 10/24/07) CDO Overview |
| Oehrig 8c | 3d Quarter 2007 (documents posted on or about 10/24/07) Exposure to Sub-Prime through MBS and CDOs |