UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

IN RE AMBAC FINANCIAL GROUP, INC.
SECURITIES LITIGATION

Civil Action No. 08-00411-NRB

ECF Case

------------------------------------------------------------x

# REPLY MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT KPMG LLP'S MOTION TO DISMISS

WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000 (telephone)
(212) 728-8111 (facsimile)

Attorneys for Defendant KPMG LLP

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT...................................................................................................................................2

I.   THE SUPPOSED MISSTATEMENTS DID NOT AFFECT THE "TOTAL MIX." .........2

II.  THE SUPPOSED MISSTATEMENTS WERE NOT FALSE............................................4

III. THE SUPPOSED MISSTATEMENTS WERE MATTERS OF JUDGMENT
     WHICH FAIL TO SUPPORT A SECTION 11 CLAIM......................................................8

CONCLUSION...............................................................................................................................10

## PRELIMINARY STATEMENT

At least two things are not in dispute. The first is that the sole claim against KPMG is based on two securities offerings that did not take place until March 2008. The second is that, by March 2008, investors had been overwhelmed with bad news about the problems in the mortgage industry in general and Ambac mortgage-related exposures in particular.

Indeed, as to the latter, plaintiffs' brief concedes that, two months before the March offerings, Ambac had announced the need for some $6 billion in mortgage-related write-downs, resulting in a $3.24 billion loss that "nearly wip[ed] out the Company's entire reported earnings from 2002 through the first two quarters of 2007."[1] Plaintiffs' brief concedes that they therefore had concluded that Ambac's mortgage-related exposures "were no better than those failing in the market."[2] And plaintiffs' brief concedes that "[p]romptly after making these disclosures," Ambac lost its AAA credit rating from Fitch, "without which it cannot run its business."[3] As one analyst glumly noted, for Ambac, "There is no AA+" because "it's AAA or nothing."[4]

For that matter, plaintiffs' brief also concedes that the same information used to value Ambac's mortgage-related exposures in the complaint had been made available to plaintiffs before the March offerings. More specifically, Ambac's precise CDO exposures were publicly disclosed on January 30, 2008 and Ambac's RMBS exposures had been public

---

[1]   Plaintiffs' Opp. at 42.

[2]   Plaintiffs' Opp. at 50; *see also* Plaintiffs' Opp. at 9, n. 7 and 16.

[3]   Plaintiffs' Opp. at 3.

[4]   Plaintiffs' Opp. at 5.

throughout the class period.[5] This is precisely the information plaintiffs use to value Ambac's exposures now.[6]

## ARGUMENT

### I. THE SUPPOSED MISSTATEMENTS DID NOT AFFECT THE "TOTAL MIX."

Boiling it down, plaintiffs' argument is that investors, at the time of the March offerings, were misled about two things. The first is that Ambac had "secretly lower[ed] its own underwriting standards."[7] The second is that Ambac had falsely "assur[ed] investors about the superior quality of its [mortgage-related] exposures."[8] Plaintiffs explain: "The Company's supposedly conservative underwriting standards and strong portfolio performance were the two core aspects of Ambac's business that investors and analysts relied upon throughout the Class Period."[9]

But without getting to whether that was ever true, it certainly was not by the time of the March offerings. Plaintiffs establish as a cornerstone of their case that they actually learned the supposed truth about these "two core aspects" before the March offerings even took place. Specifically, plaintiffs contend that, two months before the March offerings, Ambac issued a January press release that "shocked investors" by announcing multi-billion dollar writedowns, impairments in excess of a billion dollars, a "near tripling" of loss reserves due to portfolio deterioration, a massive reduction in dividend payouts to preserve capital, and the CEO's resignation. Plaintiffs describe this press release, dated January 16, 2008, as follows:

---

[5] Plaintiffs' Opp. at 14 n.8; see also Yanez Aff. Exh. 1 (Compl. ¶¶ 115–16).

[6] In addition to the arguments in this reply brief, KPMG adopts and incorporates all the arguments in the other defendants' reply briefs relevant to KPMG, including arguments about causation, "sounds in fraud," and plaintiffs' lack of standing. (See Ambac Reply Brief at 10; Underwriters' Reply Brief at 7-10.)

[7] Plaintiffs' Opp. at 7.

[8] Plaintiffs' Opp. at 7.

[9] Plaintiffs' Opp. at 36.

> On January 16, 2008 – *less than two months* after the Exchange Act Defendants emphatically insisted that Ambac's RMBS-related exposures were "performing just fine" and were not performing like the ABX mortgage security index, Ambac shocked investors by announcing: (a) *$5.4 billion* in "mark-to-market" write-downs on its then $29 billion portfolio of CDOs supported by RMBS; (b) *$1.1 billion* of actual impairments on these exposures; (c) a near tripling of its loss reserves due to deterioration of its direct RMBS portfolio; (d) a 67% reduction in its dividend payouts (in order to preserve capital); and (e) its CEO's unexpected "resignation" from the Company.[10]

Plaintiffs argue that, "With the disclosure of this news, the Company's stock plummeted 70% in just two days" and that "[t]hese write-downs alone wiped out the Company's previously reported earnings going back to 2002."[11] Ambac also lost its triple-A rating from Fitch.[12]

According to plaintiffs, it was this press release that constituted the watershed event with regard to both of the "two core aspects" of Ambac's business that had supposedly been misrepresented. As to the "conservative underwriting standards," the effect of the January press release was that "investors realized that Ambac's underwriting could not have been 'strict,' 'conservative' or 'rigorous.'"[13] As to the "strong portfolio performance," the effect of the press release was that investors realized that "Ambac's RMBS-related exposures had performed no better than the rest of the mortgage market."[14]

In an attempt to stretch things out beyond March, plaintiffs point to a press release issued the following month, specifically on April 23. That April press release, plaintiffs argue,

---

[10] Plaintiffs' Opp. at 15-16.

[11] Plaintiffs' Opp. at 3.

[12] Plaintiffs' Opp. at 3.

[13] Plaintiffs' Opp. at 16. Ambac's 2007 Form 10-K also warned that underlying loans for certain RMBS "are experiencing near-record volumes of delinquencies and losses, due to factors such as weak mortgage industry underwriting standards." Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 51).

[14] Plaintiffs' Opp. at 16.

reported a "further impairment" of assets and a "further mark-to-market loss" than had been reported in January.[15] Plaintiffs argue that it took this additional press release to correct their earlier supposed misimpressions.

But the April press release is utterly unremarkable in its content and introduces no new issues – without getting to the fact that plaintiffs readily acknowledge that their supposed misimpressions had already been corrected in January. The main theme of the press release was that the earlier-reported downward trends were continuing insofar as (as the press release itself put it), "The housing market crisis continues to disrupt the global credit markets and our credit derivatives and direct mortgage portfolios were severely impacted once again."[16] And while the stock price fell just over $2.50 on April 23, the stock price rebounded almost immediately (rising almost $2.00 by May 2).[17] In any event, this stock price movement was inconsequential compared to the almost $90 drop that had already taken place prior to the issuance of the press release.[18]

## II.    THE SUPPOSED MISSTATEMENTS WERE NOT FALSE.

Plaintiffs are no more successful in asserting that KPMG made a false statement. Even accepting the main story of plaintiffs' case – that "Ambac secretly lowered its internal

---

[15]   Plaintiffs' Opp. at 16.

[16]   April 23, 2008 Press Release at 2.

[17]   Ambac's historical stock prices are listed at http://finance.yahoo.com/q/hp?s=ABK.

[18]   Plaintiffs also argue that materiality is a "factual dispute[] that cannot be decided on this motion." Plaintiffs' Opp. at 60. But just last month, the Second Circuit affirmed a Rule 12(b)(6) dismissal of a section 11 claim because "[p]laintiffs failed to allege any misstatements or omissions [] that could be found to be material." *ECA v. JP Morgan*, 2009 WL 129911, at * 13 (2d Cir. Jan. 21, 2009). Indeed, even the cases cited by plaintiffs themselves acknowledge that materiality may be considered on a motion to dismiss. *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 408 (S.D.N.Y. 2001); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000). The law is clear that where alleged misstatements are so obviously unimportant that reasonable investors would not rely on them (which is the case here), the action should be dismissed. *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612-14 (S.D.N.Y. 2008); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 688 (S.D.N.Y. 2004).

underwriting standards" while supposedly touting the "superior quality" of its mortgage-related exposures – it centers on business judgments that have absolutely nothing to do with KPMG. KPMG's role was to issue an audit report on Ambac's financial statements. KPMG was not responsible for either the company's business judgments or its descriptions of them.

True, KPMG did have responsibility for its audit report and its opinion on the financial statements' conformity to GAAP. But the allegations against KPMG contain nothing that calls KPMG's audit report into question other than bland summaries of GAAP provisions and the generic allegations that:

> Ambac failed to properly account for the Company's derivative exposure to CDS by failing to properly mark their reported CDS values to the market, in violation of SFAS 133. Additionally, Ambac failed to make adequate loss reserve disclosures for its direct RMBS exposure.[19]
>
> * * *
>
> Ambac failed to comply with SFAS 133 and 107 because it failed to properly value its CDS as required by SFAS 133.[20]
>
> * * *
>
> Ambac's financial statements failed to properly account for and report loss reserves as required under GAAP.[21]

The crux of the Supreme Court's holding in *Bell Atlantic Corp v. Twombly*, 127 S. Ct. 1955 (2007), was that a complaint must allege facts that "possess enough heft" to set forth "a plausible entitlement to relief." *Twombly*, 127 S. Ct. at 1966-67. The Second Circuit's articulation is that "a complaint must plead 'enough facts to state a claim to relief that is

---

[19] Yanez Aff. Exh. 1 (Compl. ¶ 455).

[20] Yanez Aff. Exh. 1 (Compl. ¶ 461).

[21] Yanez Aff. Exh. 1 (Compl. ¶ 466). Moreover, plaintiffs' description of FAS 133 is not even technically correct. Plaintiffs assert that FAS 133 required Ambac to value its CDO exposures at "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." Plaintiffs' Opp. at 29 (citing Compl. ¶ 134). Plaintiffs also state that under FAS 133 fair value is "not an entity-specific measurement" and "should be determined based on the assumptions that market participants would use." Plaintiffs' Opp. at 29 (citing Compl. ¶ 134). But the quoted language did not appear in FAS 133. It was introduced in FAS 157, which did not apply to Ambac's 2007 financial statements. Yanez Aff. Exh. 2 (2/29/08 Form 10-K at 52-54, 109-11, 114).

plausible on its face.'" *ECA v. JP Morgan*, 2009 WL 129911, at *4 (2d Cir. Jan. 21, 2009) (quoting *Twombly*, 127 S. Ct. at 1974); *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008). The allegations against KPMG, premised on the conclusory generalizations quoted above, do not even come close.[22]

Nor does the "expert analysis" deployed against the "Exchange Act Defendants" add anything. For this purpose, we accept plaintiffs' insistence that they have constructed "effectively two stand-alone complaints" and carefully sought to isolate from KPMG the fraud-based allegations of the section 10(b) claim.[23] None of the "expert analysis" directed against the Exchange Act Defendants to establish scienter, therefore, is directed against KPMG. Plaintiffs cannot have it both ways: that the contentions underlying scienter are not directed against KPMG except where they are needed to satisfy *Twombly*.

In any event, even a redirection of the "expert analysis" against KPMG would not make a difference. GAAP required no specific valuation or reserving technique and instead called for judgments about "fair value," the probability of loss, and loss estimates without elaborating as to how those judgments were to be made.[24] Plaintiffs argue that these judgments

---

[22] Plaintiffs rely on *Erickson v. Pardus*, 127 S. Ct. 2197 (2007) (per curiam), in arguing that they need not state facts in support of their claim even after *Twombly*. (Plaintiffs' Opp. at 55, n.36.) But the Second Circuit expressly considered *Erickson* in holding that that a complaint must "amplify a claim" with facts sufficient "to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 156-57 (2d Cir. 2007); *see also ECA v. JP Morgan*, 2009 WL 129911, at *4 (2d Cir. Jan. 21, 2009). Two of the other cases cited by plaintiffs recognize that *Twombly* requires enough facts to make a claim plausible. *BMC-The Benchmark Mgmt. Co. v. Ceebraid Signal Corp.*, 508 F. Supp. 2d 1287, 1290 (N.D. Ga. 2007); *Rivell v. Priv. Health Care Sys., Inc.*, 520 F.3d 1308, 1310 (11th Cir. 2008). And while *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans, Inc.* (another case cited by plaintiffs) might articulate a different pleading standard, the D.C. Circuit in that case acknowledged that the Second Circuit's post-*Twombly* standard is more stringent. 525 F.3d 8, 15 n.3 (D.C. Cir. 2008).

[23] Plaintiffs' Opp. at 56. Rule 9(b) further requires dismissal of plaintiffs' section 11 claim, particularly so if the court were to consider the so-called "expert analysis" in support of that claim. *See* Ambac Reply Brief at 10; Ambac Opening Brief at point I.B.3–4.

[24] Yanez Aff. Exh. 15 (FAS 133 at ¶ 3(b)); Yanez Aff. Exh. 16 (FAS 5 at ¶ 8).

should have been governed by the ABX and TABX indices.[25] But even the creators of the indices deny their usefulness in measuring the value of individual financial instruments,[26] and plaintiffs' assertion otherwise amounts to nothing more than an argument for their valuation approach over Ambac's. Courts have repeatedly found such argument insufficient to state a claim. *See, e.g., In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004); *In re Allied Capital Corp. Sec. Litig.*, 02 Civ. 3812, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003); *Hinerfeld v. United Auto. Group*, 97 Civ. 3533, 1998 WL 397852 at *7 (S.D.N.Y. Jul. 15, 1998).[27]

Beyond that, plaintiffs identify nothing indicating how the valuation approach actually employed by Ambac violated GAAP. The complaint does not dispute that GAAP contemplates the use of financial models in valuation determinations. And the complaint does not describe, let alone identify fault with, the models used by Ambac except to the extent they failed to track precisely the ABX or TABX indices. None of that shows a violation of GAAP.[28]

---

[25] Plaintiffs' Opp. at 17.

[26] Yanez Aff. Exh. 17 (Ben Logan, *The ABX Index: A Pricing Conundrum*, Credit, May 1, 2008, at 48).

[27] Plaintiffs seek to distinguish *In re CIT Group* and *Hinerfeld* on the basis that they "do not discuss pleading GAAP violations" and *In re Allied Capital* on the basis that it "discuss[es] pleading GAAP violations in the context of fraud-based claims." Plaintiffs' Opp. at 64-65. But, contrary to plaintiffs' assertion, both *In re CIT Group* and *Hinerfeld* in fact did involve accounting allegations. *See, e.g., CIT Group*, 349 F. Supp. 2d at 688 ("statements concerning CIT's loan loss reserves made in the registration statement" were allegedly false); *Hinerfeld*, 1998 WL 397852 at *7 ("defendants knew or should have known about the inadequacy of the reserves"). And while *In re Allied Capital* is a section 10(b) case, plaintiffs cite no authority establishing that mere disagreement with an accounting judgment sufficiently alleges a section 11 claim any more than it does a section 10(b) claim. In any event, the Second Circuit's recent decision, *ECA v. JP Morgan*, 2009 WL 129911 (2d Cir. Jan. 21, 2009), forecloses any argument that a section 11 claim premised on generalized allegations of GAAP violations can survive a motion to dismiss. *Id.* at * 9 n.8, *13 (dismissing section 11 claim where plaintiffs "fail[ed] to plead materiality" of alleged GAAP violations).

[28] Plaintiffs' Opp. at 31. Plaintiffs claim that "KPMG improperly argues the merits . . . by asserting that Ambac's valuation and loss reserves [were] consistent with GAAP." Plaintiffs' Opp. at 64. But that misses the point entirely, which is that, to survive a motion to dismiss, plaintiffs must sufficiently allege a GAAP violation (as that is the basis of the claim against KPMG), and they have not. *In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 688 n.3, 689 (S.D.N.Y. 2004). Nor, contrary to plaintiffs' suggestion, does *In re Burlington Coat Factory* suggest anything different. Plaintiffs' Opp. at 64. The crux of the Third Circuit's decision in that case was that the lower court should not have resolved a dispute as to what accounting

Indeed, even accepting plaintiffs' incorrect assertion that the ABX and TABX indices provided "the best available information" accomplishes nothing here because plaintiffs themselves have not faithfully derived their analysis from the ABX or TABX. Instead, they have injected into their "expert analysis" an obvious bias toward hoped-for outcomes. Among other things, plaintiffs' supposed analysis involved only five of 19 CDOs at issue,[29] looked only at "second lien" RMBS exposures rather than everything,[30] and completely disregarded 18 of the 24 ABX indices and 23 of 24 TABX indices that were available at the time plainitffs filed their complaint.[31] As a supposed measure of value, plaintiffs' approach establishes nothing.[32]

### III. THE SUPPOSED MISSTATEMENTS WERE MATTERS OF JUDGMENT WHICH FAIL TO SUPPORT A SECTION 11 CLAIM.

An additional defect is that plaintiffs attack judgment calls in fast-evolving financial markets without support. Plaintiffs allege absolutely nothing calling into question whether KPMG genuinely believed in the judgments inherent in Ambac's valuation and reserving determinations. Rather, plaintiffs argue that "notice pleading" excuses them from that kind of detail.

That is not the law. The law is that an allegation premised upon the supposed falsity of a matter of judgment or opinion requires supporting allegations that the defendant

---

standards were applicable on a motion to dismiss. 114 F.3d 1410, 1421 (3d Cir. 1997). That in no way relieves plaintiffs here of their obligation to sufficiently plead falsity. Far from it, the Third Circuit affirmed the lower court's holding that falsity was not sufficiently alleged under Rule 9(b) and only reversed the lower court's decision to the extent it denied leave to amend. *Id.* at 1435.

[29] Plaintiffs' Opp. at 13.

[30] Yanez Aff. Exh. 1 (Compl. ¶¶ 62-63; ¶ 128)

[31] The ABX and TABX indices are listed at http://www.markit.com/information/products/category/indices/tabx.html and http://www.markit.com/information/products/category/indices/abx.html.

[32] As set forth in our opening brief and the other defendants' briefs, these are not by any means the only defects in plaintiffs' expert analysis. KPMG Opening Brief at 15, 17-18; Ambac Opening Brief at 16-18.

either "did not actually believe" the judgment or "had no reasonable factual basis for [its] belief." *In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004); *see also Virgina Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095 (1991) ("A statement of belief may be open to objection . . . solely as a misstatement of the psychological fact of the speaker's belief . . ."). Simple disagreement does not suffice to state a section 11 claim. *See In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 689-90 (S.D.N.Y. 2004); *Hinerfeld v. United Auto. Group*, 97 Civ. 3533, 1998 WL 397852 at *7 (S.D.N.Y. Jul. 15, 1998).

These cases do not, as plaintiffs suggest, run afoul of "the plain language of the Securities Act" by "incorporat[ing] intent . . . as an element in Securities Act claims."[33] Whether or not this is a Securities Act claim has nothing to do with it. The issue, rather, turns on the long-established distinction between statements of fact and statements of opinion. *See Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1095-96 (1991). Unlike a statement of fact, a statement of opinion implicates the speaker's state of mind such that an opinion can only be false if the speaker does not in fact hold that opinion. *See Virginia Bankshares*, 501 U.S. at 1095-96; *see also In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004).

Nor does anything change because plaintiffs assert that "it is up to KPMG to prove the reasonableness of its investigation – its affirmative defense of due diligence."[34] That in no way relieves plaintiffs of the need to plead the elements of a claim to begin with.

---

[33] Plaintiffs' Opp. at 65 and n. 47.

[34] Plaintiffs' Opp. at 65. Plaintiffs appear to rely upon *In re Livent*, 161 F. Supp. 2d 371 (S.D.N.Y. 2001), to assert a conflict between the Securities Act and the requirement that a section 11 claim plead that a defendant "did not honestly believe" an opinion alleged to be false. But *In re Livent* says no such thing and did not involve matters of judgment like those at issue here.

## CONCLUSION

We respectfully submit that KPMG's motion to dismiss should be granted and the complaint dismissed with prejudice to the extent directed to KPMG.[35]

Dated:   February 10, 2009

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

By: _____
Michael R. Young
myoung@willkie.com
Antonio Yanez, Jr.
ayanez@willkie.com
(Members of the Firm)

787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000 (telephone)
(212) 728-8111 (facsimile)

Attorneys for Defendant KPMG LLP

Of Counsel:

Todd G. Cosenza
tcosenza@willkie.com

4656946.18

---

[35]   Plaintiffs motion to strike should be denied. Plaintiffs concede that the Court may consider documents "to determine what statements they contain," and that is the purpose for which Yanez Affidavit Exhibits 3, 6, 7, 8 and 9 are offered. *See* Plaintiffs' Opp. at 74-75. Yanez Affidavit Exhibit 17 – a document prepared by the creators of the ABX and TABX indices which identifies certain limitations of those indices – is integral to the complaint and may be considered by the Court given plaintiffs' reliance on the ABX and TABX in their complaint. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 809 (2d Cir. 1996) (documents integral to the complaint may be considered even if not attached to the complaint or incorporated by reference). But the Court need not consider any of these exhibits to grant KPMG's motion to dismiss.

## CERTIFICATE OF SERVICE

The undersigned, a member of the bar of this court, hereby certifies that the Reply Memorandum of Law in Support of Defendant KPMG LLP's Motion to Dismiss was duly served this 10th day of February 2009 by overnight courier to:

Steven B. Singer
Bernsetin Litowitz Berger & Grossman LLP
1285 Avenue of the Americas, 38th Floor
New York, NY 10038

Frederic S. Fox
Kaplan Fox & Kilsheimer LLP
850 Third Avenue, 14th Floor
New York, NY 10022

Peter Hein
Warren R. Stern
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019

Charles Davidow
Joyce Huang
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019

_/s/ Todd G. Cosenza_
Todd G. Cosenza