UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE AMBAC FINANCIAL GROUP, INC. SECURITIES LITIGATION | ) Lead Case No. 08-CV-411 (NRB) <br> ) <br> ) ECF Case <br> ) |

# DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY

Peter C. Hein
Warren R. Stern
Joshua A. Naftalis
C. Lee Wilson
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Defendants Ambac Financial Group, Inc., Robert J. Genader, Sean T. Leonard, John W. Uhlein, III, David W. Wallis, Michael A. Callen, Phillip B. Lassiter, Jill M. Considine, W. Grant Gregory, Thomas C. Theobald, Laura S. Unger, Henry Wallace, Philip N. Duff.*

Dated:  May 19, 2009

Ambac and the individual defendants respectfully submit this Notice of Supplemental Authority to bring to this Court's attention decisions in five cases issued after the close of briefing on their Motion to Dismiss.

1.  *Ashcroft* v. *Iqbal*, 556 U.S. ___, No. 07-1075, slip op. (U.S. May 18, 2009) (Ex. A).  In *Iqbal*, the Court ruled that the complaint failed to meet the requirements of Fed. R. Civ. P. 8.  *Id.* at 23.  The Court held that its prior decision in *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007), was not limited to antitrust disputes, and instead "expounded the pleading standard for all civil actions."  *Id.* at 20 (quotation omitted); *see* MB 33. [1]  Thus, in all civil cases, a complaint that "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility'" set out by *Twombly*.  *Id.* at 14.  Factual allegations merely "consistent" with plaintiffs' theory of liability cannot support a complaint if "given more likely explanations, they do not plausibly establish" that theory.  *Id.* at 17.  The Court noted that in *Twombly* there had been a "well-pleaded, nonconclusory factual allegation of parallel behavior" which "was consistent with an unlawful agreement," but that it "did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior."  *Id.* at 16.  Furthermore, in *Iqbal*, the Court made clear that a court may look to well-known events — in *Iqbal*, facts related to the perpetrators of the September 11th attacks (here, the declines in the mortgage and credit markets) — in determining whether a claim is sufficiently "plausible."  *Id.* at 18; *see* MB 33.

*Iqbal* was not a securities case.  It addresses the general pleading standard that all cases must meet to survive a motion to dismiss.  Here, the heightened particularity standards of Fed. R. Civ. P. 9(b) and the PSLRA raise the pleading bar even higher.

2.  *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009) (Ex. B).  Plaintiffs alleged that PXRE, a provider of catastrophe reinsurance products, initially announced

---

[1] Reference is made to the points in defendants' moving and reply briefs for which the new cases provide further support.  Those briefs are cited herein as MB __ (Memorandum of Law in Support of Ambac and the Individual Defendants Motion to Dismiss) and RB __ (Reply Memorandum of Law in Support of Ambac and the Individual Defendants Motion to Dismiss).

loss estimates that were too low (because they were based on flawed loss estimation methodologies), and concealed from investors the full impact of Hurricanes Katrina, Rita and Wilma on its business. *Id.* at 515-17. PXRE later announced that its loss estimates increased by around $300 million (to over $750 million), resulting in the downgrade of PXRE's credit rating and a 65.94% stock price drop. *Id.* at 522. Plaintiffs allege that PXRE and its officers were motivated to deceive its investors in order to maintain its credit rating and in order to sell over $450 million of securities. *Id.* at 516-17.

The court dismissed the complaint with prejudice because plaintiffs had failed to plead a strong inference of scienter. *Id.* at 548. The court specifically rejected allegations that an insurer "had the motive to keep . . . loss estimates low to protect the very survival of [the Company]" and its critical A-level rating as an "insufficient motive[]" to create a strong inference of scienter. *Id.* at 530-33 (citing *Coronel* v. *Quanta Capital*, 2009 WL 174656, at *16, *26 n.14 (S.D.N.Y. 2009) and *Zirkin* v. *Quanta Capital*, 2009 WL 185940, at *12 (S.D.N.Y. 2009))[2]; *see* MB 26-27; RB 4. Moreover, the court noted the "seeming futility" of plaintiffs' theory of scienter, because if "Defendants knew the true extent of PXRE's loss estimates, as Plaintiff alleges, [then] payment [of the losses] was inevitable, as was the downgrade of PXRE's credit rating." *Id.* at 533; *see* MB 26-27; RB 3.

The court found that the "widespread publicity" of problems in an industry is not "*specific* contradictory information" available to defendants because it would not necessarily indicate to management that those problems were not being taken into account by the company's loss estimate models. *Id.* at 536, 542-44; *see* MB 12-13; RB 5. Likewise, the court stated that management's "generalized awareness of . . . [employee] 'concerns' [does not make] it reckless for the individual Defendants to rely on [standard practices]," particularly when the alleged concerns "were of a gen-

---

[2] *Zirkin* and *Coronel* both also dismissed various Section 11 claims premised on allegations that defendant's (a reinsurer) initial loss estimates must have been false because *inter alia* the company later admitted it had been experiencing internal control problems at the time, concluding that the complaint did not put forth sufficient factual allegations to render the claims "plausible." *Coronel*, 2009 WL 174656, at *15, *23; *Zirkin*, 2009 WL 185940, at *7, *11. The decisions also dismissed certain of the Section 11 claims under the "bespeaks caution" doctrine and — for those claims that "sounded in fraud" — for failure to meet Rule 9(b)'s heightened pleading standards. *Coronel*, 2009 WL 174656, at *15-18; *Zirkin*, 2009 WL 185940, at *11-13.

eral nature." *Id.* at 539; *see* MB 22-24; RB 6.  Finally, the court held that the fact that PXRE's initial loss estimates made in the aftermath of Hurricane Katrina turned out to be significantly wrong could not support an inference of scienter, reasoning that in the wake of such an unprecedented event, it is very difficult to determine the "'sufficiency' of . . . loss estimates." *Id.* at 544 &n.31, 546; *see* MB 16, 25.

The court identified various facts that it found best supported the nonculpable inference that PXRE, faced with "an unprecedented and uncertain situation," simply had difficulty in determining the impact on its business.  *Id.* at 548.  First, the court noted that while plaintiffs allege PXRE should have used a particular higher total loss estimate promulgated by one advisory company, two other advisory companies suggested total loss estimates on the order of what PXRE used, and only four of PXRE's eleven peer companies had adopted the higher numbers at the time of PXRE's alleged misstatements.  *Id.* at 541-42, 546; *see* MB 10; RB 9.  Furthermore, the court in *PXRE* pointed to PXRE's "willingness to issue a steady stream of press releases, replete with cautionary language, informing the public of PXRE's updated initial loss estimates as more information became available" as further evidence undermining any inference of scienter.  *Id.* 533-34, 546; *see* MB 10, 29-30; RB 9.

3. ***In re Radian Sec. Litig.*, 2009 WL 974324 (E.D. Pa. 2009) (Ex. C).  Plaintiffs alleged that Radian, a provider of credit protection products such as mortgage guarantee insurance, made false and misleading statements about the profitability and liquidity of an affiliate, C-BASS, in which Radian had a large stake.  *Id.* at \*1-3.  When Radian subsequently announced a large impairment on its investment in C-BASS, Radian's stock price dropped significantly.  *Id.* at \*7-9.  Plaintiffs alleged that defendants knew and should have told investors of problems at C-BASS months earlier, following declines in the mortgage markets, but that defendants were motivated to delay any impairment announcement to allow the completion of a merger.  *Id.* at \*13.  The court dismissed, finding plaintiffs had failed to adequately plead a strong inference of scienter.  *Id.* at \*26.**

**The court noted that a motive to complete a merger is not "distinctively unique" and is like the "motives that have been found to be generally possessed by most corporate directors," and that plaintiffs had failed to identify any "concrete and personal benefit" defendants would receive as a**

3

result of completing the merger. *Id.* at *12-14; *see* MB 26-27; RB 3.

The court dismissed plaintiffs' claim that Radian's failure to take an impairment charge on its investment in C-BASS earlier than it did violated Rule 10b-5, noting that GAAP "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Id.* at *17. Only an "extreme departure from the range of reasonable treatments under GAAP" can support an inference of scienter. *Id.* at *18; *see* MB 19-21. In any event, the court noted that Radian's competitor's similar timing for announcing an impairment charge on its investment in C-BASS only further "add[ed] to the Court's conclusion that the plaintiffs ha[d] not shown strong circumstantial evidence that the defendants' actions constitute[d] an extreme departure from the standards of ordinary care" necessary to support an inference of scienter. *Id.* at *19; *see* MB 10, RB 9. The court noted that in coming to its conclusions, it was appropriate to utilize public documents — including SEC filings from other companies, *id.* at *26 n.29 — in weighing competing inferences offered by defendants. *Id.* at *15 n.18.

The court also rejected plaintiffs' allegations that defendants must have been aware of problems at C-BASS because of their senior positions and C-BASS's role in the "core activities" of Radian. *Id.* at *20; *see* RB 3. The court noted that any imputation of knowledge based on a "core activities" theory still requires particularized allegations demonstrating defendants had "ample reason to know of the falsity of their" allegedly misleading statements. *Id.* at *20-22. Allegations about deteriorating conditions in the subprime mortgage markets that were "known by the plaintiffs and by the market at large" could not support an inference of scienter. *Id.* at *22; *see* MB 12-13; RB 5. Even if plaintiffs' allegations were sufficient to "establish declining conditions in the subprime market and at C-BASS, they are not particularized evidence that the defendants knew or must have known that their statements and omissions presented a danger of misleading buyers or sellers." *Id.* at *22. Nor are they evidence of "an egregious departure from the range of reasonable business decisions, even in light of the deteriorating subprime market." *Id.* at *21-22.

4. *Fort Worth Employers' Retirement Fund* v. *Biovail Corp.*, No. 08-CV-8592-CM (S.D.N.Y. May 8, 2009) (Ex. D). The court dismissed a securities class action brought against phar-

4

maceutical manufacturer Biovail with prejudice. Plaintiffs alleged that Biovail violated Rule 10b-5 by publicly stating that it hoped its new drug would be approved shortly, despite knowing that it had failed to submit a "single-dose" study with its application for FDA approval, which defendants allegedly knew increased the risk the FDA would not approve the new drug. *Id.* at 2. Instead, Biovail used a "multiple-dose" study. *Id.* Biovail's stock price then fell when the FDA initially rejected the new drug application for failure to include such a "single-dose" study; the FDA later approving the application upon resubmission. *Id.* at 3, 7-8. The court dismissed.

The court stated that Biovail's decision not to submit a "single-dose" study and rely on a "multi-dose" study could not support an inference of scienter because plaintiffs identified nothing that would have caused defendants to believe that a "single-dose" study was required by the FDA, *id.* at 13, and defendants were never "explicitly warned" that their "multi-dose" study would be insufficient, *id.* at 15. *See* MB 15, 18; RB 6-7. Indeed, as the court pointed out, there were "several reasons why defendant quite logically would not have reached" the conclusion that a "single-dose" study was required. *Id.* at 13; *see* MB 16.

The *Biovail* court also dismissed for failure to plead loss causation, noting that the FDA's announcement that it had not approved Biovail's new drug was not a "corrective disclosure" of some prior untruth and that it was "all-but-inevitable" that a negative FDA announcement would cause a large stock price drop, even in the absence of fraud. *Id.* at 17; *see* MB 30; RB 10. Finally, the court dismissed for failure to plead any actionable misstatement, holding *inter alia* that statements about a company's expectations and hopes are "nonactionable expressions of corporate optimism." *Id.* at 19; *see* MB 14; RB 5.

    5. *Pittleman* v. *Impac Mortgage Holdings, Inc.,* 2009 WL 648983 (C.D. Cal. 2009) (Ex. E). The court dismissed Rule 10b-5 claims with prejudice, holding that plaintiff failed to plead a strong inference of scienter with particularity. Plaintiff had alleged that Impac, a mortgage lender, had misled the market about the quality of its Alt-A loans, and was in fact making those loans to less creditworthy borrowers.

In dismissing, the court first rejected vague confidential witness statements about manage-

5

ment's non-compliance with due diligence or the company's underwriting standards as insufficient to plead a strong inference of scienter because the statements were not sufficiently particularized, *i.e.* they did not "identif[y] specific actions or specific due diligence procedures" or "particular loan pools or why they did not satisfy Impac's guidelines." *Id.* at *3; *see* MB 14-15; RB 5-6. The court also rejected plaintiff's attempt "to rely on the 'core operations inference' to argue that it ha[d] sufficiently pled scienter" because plaintiff's allegations did not describe one of those "exceedingly rare" cases "where an event is so prominent that it would be 'absurd' to suggest that key officers lacked knowledge of it." *Id.*; *see* RB 3. The court stated that in its view the "case is about a company involved in a volatile industry at the onset of a long, destructive economic downturn." *Id.* at *4.

          Respectfully Submitted,

          WACHTELL, LIPTON, ROSEN & KATZ

          By  /s/  Peter C. Hein
          Peter C. Hein (PCHein@wlrk.com)
          Warren R. Stern (WRStern@wlrk.com)
          Joshua A. Naftalis (JANaftalis@wlrk.com)
          C. Lee Wilson (CLWilson@wlrk.com)

          51 West 52nd Street
          New York, NY  10019
          (212) 403-1000

          *Attorneys for Defendants Ambac Financial Group, Inc., Robert J. Genader, Sean T. Leonard, John W. Uhlein, III, David W. Wallis, Michael A. Callen, Phillip B. Lassiter, Jill M. Considine, W. Grant Gregory, Thomas C. Theobald, Laura S. Unger, Henry Wallace, Philip N. Duff.*

Dated:  New York, New York
       May 19, 2009

6