UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE AMBAC FINANCIAL GROUP, INC. SECURITIES LITIGATION | Civil Action No. 08-00411-NRB<br><br>**ANSWER OF AMBAC FINANCIAL GROUP, INC., ROBERT J. GENADER, SEAN T. LEONARD, JOHN W. UHLEIN, III, DAVID W. WALLIS, MICHAEL A. CALLEN, JILL M. CONSIDINE, W. GRANT GREGORY, PHILIP B. LASSITER, THOMAS C. THEOBALD, LAURA S. UNGER, and HENRY WALLACE** |

Defendants Ambac Financial Group, Inc. ("Ambac"), Robert J. Genader, Sean T. Leonard, John W. Uhlein, III, David W. Wallis, Michael A. Callen, Jill M. Considine, W. Grant Gregory, Philip B. Lassiter, Thomas C. Theobald, Laura S. Unger, and Henry Wallace, through their attorneys, hereby answer the Consolidated Amended Class Action Complaint (the "Complaint"), dated August 22, 2008. The allegations in the Complaint as to Philip N. Duff relate only to certain March 2008 offerings, as to which the Court has determined that plaintiffs have failed to state an actionable claim, and therefore no answer by Philip N. Duff is required. References to "Defendant" or "Defendants" herein refer to one or more of the defendants answering herein.

In responding to the allegations below, each Defendant (i) incorporates into each response a denial of any allegations in the Amended Complaint to the extent such allegations assert or suggest that such Defendant made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading, (ii) to the extent that

any response is required, denies any averments in the headings and subheadings of the

Complaint, and (iii) intends to respond only as to allegations directed at each of them

individually, and none of them should be deemed to be responding to allegations that are directed

solely to other defendants.

The Defendants respond to the specific allegations in the Complaint as follows:

## I.     Complaint Allegations

1.     This is a securities class action brought under Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o; Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

> **Answer:**     Acknowledge that plaintiffs purport to bring claims under the
>
> referenced statutes and regulation, but dispute and deny that any claim
>
> is properly asserted; except as specifically admitted, otherwise deny the
>
> allegations of paragraph 1.

2.     This court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

> **Answer:**     Aver that the allegations of paragraph 2 reflect plaintiffs' legal
>
> conclusions to which no response is required; to the extent a response is
>
> required, deny such allegations.

3.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b) and (c).  Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District, and Ambac maintains its principal office in New York, New York.

> **Answer:**     Aver that the allegations of the first sentence reflect plaintiffs' legal
>
> conclusions to which no response is required; to the extent a response is
>
> required, deny such allegations; admit the portion of the second

sentence that alleges that Ambac maintains its principal office in New

York, New York; aver that the remainder of the second sentence is

general in nature and does not particularize factual allegations to which

a response can meaningfully be made, and deny that any such acts

constituted violations of law; except as specifically admitted, otherwise

deny the allegations of paragraph 3.

4.     In connection with the acts and omissions alleged in this Consolidated Amended Class Action Complaint, all of the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**Answer:**     Deny that Defendants used the means and instrumentalities of interstate

commerce to in any way commit any violation of law.

5.     Ambac provided guarantees in connection with billions of dollars worth of extraordinarily risky mortgage-related securities.  Yet throughout the Class Period, Ambac repeatedly assured investors, through public filings and direct statements by its executive officers, that its rigorous and conservative underwriting standards ensured that it only guaranteed the safest transactions, that it diligently monitored its insured portfolios, and that it was exposed to no material risk of loss.  In reality, unbeknownst to investors, at the direction of its executive officers, Ambac had drastically lowered its underwriting standards to ensure that it could "wrap", or guarantee, billions of dollars of high risk securities.  As set forth below, the Exchange Act Defendants knew, or were reckless in not knowing, that these securities were drastically losing market value because of an increasing likelihood of default, and significant occurrences of default would leave Ambac exposed to tens of billions of dollars of losses and write-downs that its capital structure could not afford.

**Answer:**     Aver that the allegations in the second sentence are general in nature

and do not particularize factual allegations to which a response can

meaningfully be made; to the extent a response is required, deny such

allegations; otherwise deny the allegations of paragraph 5.

6.     Ambac's senior officers pursued this risky strategic shift, which remained hidden from investors, in order to satisfy the mandate set by CEO Robert Genader, in 2005, to focus on intense revenue growth and to achieve net income of $1 billion a year in the near future.  The Exchange Act Defendants misused Ambac's historic reputation for careful and conservative risk control and assessment as a cover for pursuing revenue growth in the riskiest corners of the

derivative securities business.  The depth and nature of Ambac's foray into these avenues were concealed from investors, who were consistently assured that Ambac's prior conservatism remained in full force setting it apart – and above – market forces.  In reality and unbeknownst to investors, in order to continue to pursue risky mortgage-linked deals, Ambac abandoned its prior model of conservative underwriting and risk management, and faced the same declining market forces as other failing institutions.

> **Answer:**    Admit that Robert J. Genader was Ambac's CEO in 2005; except as
>
> specifically admitted, otherwise deny the allegations of paragraph 6.

7.      Central to satisfying Defendant Genader's net income goal was Ambac's guarantee of billions of dollars of structured financial instruments supported by collateral including residential mortgages.  These instruments were primarily residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDOs") supported by large bundles of RMBS.[1]  Ambac directly insured RMBS and it issued credit default swaps ("CDS") as a derivative guarantee of CDOs of RMBS.

> **Answer:**    Admit that certain of Ambac's subsidiaries provided guarantees on
>
> certain structured financial instruments, including RMBS, which are
>
> asset-backed securities where the underlying collateral is mortgage
>
> loans, and CDOs, which are asset-backed securities where the
>
> underlying collateral is, in whole or part, other asset-backed securities
>
> (such as RMBS); admit that certain Ambac subsidiaries directly insured
>
> tranches of RMBS; admit that certain Ambac subsidiaries provided
>
> credit protection on CDOs through the issuance of CDS, though aver
>
> that Ambac's CDS were modified from the standard form of CDS;
>
> except as specifically admitted, otherwise deny the allegations of
>
> paragraph 7.

7 n.1.   RMBS are securities collateralized by pools of residential mortgages.  Securities for each pool are issued in different "tranches," with the higher-rated tranches of securities supposedly bearing lower repayment risk while the lower tranches offer more risk, but potentially greater returns.  CDOs are structured investments supported by cash flows from various underlying asset-backed securities, including RMBS.

> **Answer:**     Admit that RMBS include *inter alia* asset-backed securities where the underlying collateral is mortgage loans; admit that RMBS commonly employ a "tranched" structure where one or more securities tranches are subordinated to the more senior tranches, and aver that in the direct RMBS business Ambac generally insured the most senior tranche of the RMBS; admit that CDOs are asset-backed securities where the underlying collateral is, in whole or part, other asset-backed securities such as (but not limited to) RMBS; except as specifically admitted, otherwise deny the allegations of paragraph 7, footnote 1.

8.     Prior to and during the Class Period, Ambac reported strong earnings, which grew from $433 million in 2002 to $876 million in 2006, and $386.3 million in the first two quarters of 2007, driving Ambac's stock price from $57.14 per share in January 2002 to a high of $96.08 in May 2007. Unfortunately for Ambac shareholders, these earnings were false and were achieved only by improperly marking Ambac's book of highly risky securities. As a result, the over $3.7 billion of earnings would be more than wiped out by the massive write-downs and increased reserves that Ambac would take beginning in October 2007 related to Ambac's RMBS and CDO exposures. These write-downs and reserves would also cause Ambac's stock price to decline from the class period high of $96.08 on May 16, 2007 to a low of $1.16 on July 2, 2008.

> **Answer:**     Respectfully refer the Court to Ambac's annual reports and other public filings for the amounts of Ambac's earnings during the indicated period; admit that Ambac's stock price closed at $57.14 on January 8, 2002, $96.08 on May 18, 2007, and $1.16 on July 2, 2008; except as specifically admitted, otherwise deny the allegations of paragraph 8.

9.     Significantly, as the real estate markets worsened during the Class Period, the Exchange Act Defendants repeatedly assured investors that its RMBS and CDO mortgage-related exposures involved far less risk than the market in general and that Ambac was not negatively affected by the mortgage and credit crisis. Indeed, as late as November 2007, Defendant Genader, appeared on CNBC and insisted that Ambac's RMBS-related[2] portfolio "is in very good shape," that Ambac "is very solid and very safe" and that "*[o]ur performance, as Ambac, is very different than the rest of the market*." Throughout the Class Period, the Exchange Act Defendants took specific steps to distinguish their portfolio and their RMBS-related exposures from the seemingly similar securities that were plummeting in value in the

market.  To that end, the Exchange Act Defendants consistently told investors that problems affecting the credit markets in general should not be read as a sign of severe write-downs or credit problems for Ambac because Ambac relied on underwriting standards more stringent than even those employed by ratings agencies for AAA-rated mortgage securities.

**Answer:**    Admit that Genader was interviewed on CNBC in or about early November 2007, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the record of the interview for the complete contents and context thereof; admit that Ambac made certain public filings and that certain other Defendants made certain public statements during the Class Period, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to those filings and statements for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; aver that the remainder of paragraph 9 is general in nature and does not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations; except as specifically admitted, otherwise deny the remaining allegations of paragraph 9.

9 n.2.   The term RMBS-related as used herein means Ambac's directly insured RMBS and its credit default swaps on CDOs of RMBS.

**Answer:**    Aver that no response is required to plaintiffs' definition of terms in this footnote; to the extent a response is required, deny the allegations of paragraph 9, footnote 2.

10.     Investors and market analysts relied on the statements of Ambac's senior officers, concluding that Ambac's supposedly superior underwriting and surveillance of its exposures would protect investors.  A July 25, 2007 Morgan Stanley report highlighted that "[t]he company's in-depth discussion on the conference call about how it protects itself against CDO losses and the favorable outlook for new business seemed to go a long way toward alleviating investor concerns....."  A Deutsche Bank report the next day emphasized that Ambac has a "***[r]igorous CDO underwriting process***" and that "***Ambac is not the market***."  (Emphasis in original.)  The report further stated:

> If we assume that its underwriting was done properly, its credit performance should not reflect the average or fall even close to the average. . . .  Given Ambac's ***strict underwriting standards, risk assessment skills, and small exposure relative to the overall market***, we believe Ambac will not suffer from credit losses. (Emphasis added.)

**Answer:**     Deny knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 10.

11.     The Exchange Act Defendants' statements about Ambac's "rigorous" underwriting standards and the distinction between its exposures and the market in general were false.  As set forth below, Lead Plaintiffs retained industry experts, who analyzed the same information that Ambac's senior executives – but not the general public – had in their possession and had said were being reviewed throughout the Class Period.  This analysis illustrates that the performance of the mortgage collateral that Ambac directly or indirectly insured in its RMBS-related portfolio was no better, and often worse, than the performance of the mortgage collateral supporting the securities losing value in the market.

**Answer:**     Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents or nature of the alleged analysis by, the

Lead Plaintiffs' alleged (and anonymous) consultants; otherwise deny

the allegations of paragraph 11.

12.     Moreover, while touting its rigorous underwriting principles, Ambac was simultaneously lowering its underwriting standards to insure even riskier instruments.  Even before the Class Period, Ambac learned first-hand that the country's largest mortgage originators had lowered their own lending standards and were selling lower quality mortgages into RMBS-related securities.  (See ¶¶55-59; 76-79).  Rather than avoid these risky securities, Ambac embraced them in an effort to reach Defendant Genader's mandate of hitting $1 billion in annual net income.  By June 2006, Ambac's Consumer/Mortgage Backed Credit Risk Committee, comprised of Ambac's senior managers (the "Credit Risk Committee"), approved a fundamental change in its underwriting standards, which permitted Ambac to wrap RMBS that previously would have been too risky for the Company to insure.  (See ¶¶83-87).  In October 2006, a

Managing Director in Ambac's Structured Finance Group sent a memo to Ambac's Credit Risk Committee, stating that Ambac was insuring CDOs with RMBS collateral of such low quality that the Company's RMBS underwriting group, even with its fundamentally lowered standards, "***would not touch [them] with a ten foot pole***."

> **<u>Answer:</u>**    Aver that the allegations in the second sentence are general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations; admit that Ambac maintained a committee (the "Securitization Senior Credit Committee") responsible for reviewing and approving the insurance of certain RMBS and that the committee included certain Ambac executives; except as specifically admitted, otherwise deny the allegations of paragraph 12.

13.    On January 16, 2008 – ***less than two months*** after the Exchange Act Defendants assured investors that Ambac's RMBS-related exposures were of a superior quality and that the Company was not exposed to material credit losses – Ambac stunned investors by disclosing: (a) ***$5.4 billion*** in "mark-to-market" write-downs on its then $29 billion in exposure to CDOs supported by RMBS; (b) a staggering ***$1.1 billion*** of actual impairments on these exposures; (c) a near tripling of its loss reserves due to deterioration of its direct RMBS portfolio; (d) a 67% reduction in its dividend payouts (in order to preserve capital); and (e) its CEO's unexpected "resignation" from the Company.

> **<u>Answer:</u>**    Admit that Ambac reported certain mark-to-market losses, certain impairments, an increase in loss reserves, a reduction in dividend payouts, and the resignation of Robert Genader in a January 16, 2008 press release, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to Ambac's January 16, 2008 press release for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 13.

14.    Ambac's mark-to-market losses substantially exceeded the more than $3.7 billion of net income that Ambac reported for the period from 2002 through mid-2007.  In response to the devastating disclosure on January 16, the price of Ambac's common stock plummeted from $21.14 at the close of trading on January 15, 2008, to $6.24 per share by the close of trading on January 17, 2008, an over 70% decline, on unprecedented trading volume.  Ambac became the first major monoline financial guarantor to ever lose its treasured investment grade credit rating a few days later when the Fitch rating agency downgraded Ambac from "AAA" to "AA".

> **Answer:**    Respectfully refer the Court to Ambac's annual reports and other public
>
> filings for the amounts of Ambac's net income during the indicated
>
> period; admit that Ambac's stock price closed at $21.14 on January 15,
>
> 2008 and $6.24 on January 17, 2008; admit that Fitch publicly
>
> announced a downgrade of Ambac's rating from "AAA" to "AA"
>
> (which, contrary to the allegations of paragraph 14, is also an
>
> investment grade credit rating) on or about January 18, 2008; except as
>
> specifically admitted, otherwise deny the allegations of paragraph 14.

15.    Even then, the full facts about Ambac's abandonment of its underwriting standards and exposure to highly risky mortgages were not disclosed.  On April 23, 2008, Ambac reported a net loss for its first quarter 2008 of $1.66 billion on continued CDO write-downs, as well as a more than $1 billion increase to its loss reserves on second-lien RMBS exposures.  In explaining the severe and surprising loss on the second-lien securities, Ambac finally disclosed that these portfolios included a wide range of loans whose characteristics were far riskier than had been disclosed to investors.  Ambac's stock price was again cut in half, closing on April 23, 2008, at ***$3.46 per share***, as the Company disclosed its massive RMBS and CDO loss exposures. In less than one year, Ambac stock lost more than 95% of its value, falling from a closing price of $96.08 on May 18, 2007, to $3.46 at the end of the Class Period.  Today, the Company's ability to survive past its RMBS-related losses remains in question.

> **Answer:**    Deny the first sentence; respectfully refer the Court to Ambac's April
>
> 23, 2008 press release for the amounts of earnings, mark-to-market
>
> losses, and loss reserves announced therein and the complete contents
>
> and context thereof, including the cautionary statements and risk factors
>
> referred to therein; deny the third sentence; admit that Ambac's stock
>
> price closed at $3.46 on April 23, 2008 and $96.08 on May 18, 2007;

aver that the allegations of the last sentence are general in nature and do

not particularize factual allegations to which a response can

meaningfully be made; to the extent a response is required, deny such

allegations; except as specifically admitted, otherwise deny the

allegations of paragraph 15.

16.    On May 9, 2008, the Honorable Judge Naomi Reice Buchwald appointed the U.S. Public Pension Funds as Lead Plaintiffs in this Action.

**Answer:**    Admit the fact that the Court so acted, but specifically deny that this

action may appropriately be maintained as a class action and deny that

U.S. Public Pension Funds may appropriately act as class

representative.

17.    Chicago Teachers is a public pension fund established by the Illinois General Assembly in 1895 for the benefit of certain certificated teachers employed primarily by the Board of Education of the City of Chicago. Chicago Teachers is headquartered in Chicago, Illinois and has total assets of approximately $12 billion. Chicago Teachers purchased shares of common stock of Ambac during the Class Period on the open market, and suffered damages as a result of the violations of the federal securities laws alleged herein. Chicago Teachers' purchases and sales of Ambac securities during the Class Period are listed in the Chicago Teachers' certification attached as Exhibit A to the Consolidated Amended Class Action Complaint.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

truth of the allegations in the first two sentences; deny that Defendants

violated any federal securities laws and deny that Chicago Teachers

suffered damages as a result of any such alleged violations; deny

knowledge or information sufficient to form a belief as to the truth of

the allegation that Chicago Teachers purchased or sold Ambac

securities as reflected in its certification; otherwise deny the allegations

of paragraph 17.

18.     Arkansas Teachers is a public pension fund organized in 1937 for the benefit of the current and retired public school teachers of the State of Arkansas.  Arkansas Teachers is headquartered in Little Rock, Arkansas and has total assets of approximately $10 billion. Arkansas Teachers purchased shares of common stock of Ambac during the Class Period on the open market, and suffered damages as a result of the violations of the federal securities laws alleged herein.  Arkansas Teachers' purchases and sales of Ambac securities during the Class Period are listed in the Arkansas Teachers' certification attached as Exhibit B to the Consolidated Amended Class Action Complaint.

**Answer:**     Deny knowledge or information sufficient to form a belief as to the

truth of the allegations in the first two sentences; deny that Defendants

violated any federal securities laws and deny that Arkansas Teachers

suffered damages as a result of any such alleged violations; deny

knowledge or information sufficient to form a belief as to the truth of

the allegation that Arkansas Teachers purchased or sold Ambac

securities as reflected in its certification; otherwise deny the allegations

of paragraph 18.

19.     Mississippi PERS is a public pension fund established by the Mississippi Legislature in 1952 that provides benefits to over 75,000 retirees and future benefits to more than 250,000 current and former public employees.  Mississippi PERS has total assets of approximately $21 billion.  Mississippi PERS purchased shares of common stock of Ambac during the Class Period on the open market, and suffered damages as a result of the violations of the federal securities laws alleged herein.  Mississippi PERS' purchases and sales of Ambac securities during the Class Period are listed in the Mississippi PERS' certification attached as Exhibit C to the Consolidated Amended Class Action Complaint.

**Answer:**     Deny knowledge or information sufficient to form a belief as to the

truth of the allegations in the first two sentences; deny that Defendants

violated any federal securities laws and deny that Mississippi PERS

suffered damages as a result of any such alleged violations; deny

knowledge or information sufficient to form a belief as to the truth of

the allegation that Mississippi PERS purchased or sold Ambac

securities as reflected in its certification; otherwise deny the allegations

of paragraph 19.

20.     Defendant Ambac is a holding company with numerous subsidiaries that provide financial guarantee products and other financial services to clients in both the public and private sectors around the world.  Ambac's primary operating subsidiary, Ambac Assurance Corporation ("Ambac Assurance"), was the first company to offer insurance on municipal bonds.  By the beginning of the Class Period, Ambac Assurance was the cornerstone of Ambac's core business areas, which involved issuing insurance and insurance-like credit default swap protection in public, structured and international finance.  Ambac is regulated by the Wisconsin Office of the Commissioner of Insurance.  Ambac went public in 1991, and its common stock is traded on the New York Stock Exchange.  As of December 31, 2006, Ambac had only 359 employees worldwide.  That headcount was 367 at year end 2007.

**Answer:**     Admit that Ambac is a holding company and that certain of Ambac's

subsidiaries provide certain financial guarantees and financial services

in both the public and private sectors around the world; admit that

Ambac Assurance Corporation ("Ambac Assurance") is an operating

subsidiary of Ambac and that Ambac Assurance is the company that

wrote the first municipal bond insurance policy; admit that certain of

Ambac's subsidiaries provide financial guarantee insurance and other

credit enhancement products, such as credit default swaps, and that the

financial guarantee products of Ambac and its subsidiaries have been

sold in three principal markets: the U.S. public finance market, the U.S.

structured finance and asset-backed market, and the international

finance market; admit that Ambac Assurance is subject to insurance

laws and regulations of the State of Wisconsin (among other states) and

that the Wisconsin Office of the Commissioner of Insurance plays a

regulatory role; admit that Ambac went public in 1991 and that its

common stock traded on the New York Stock Exchange throughout the

-12-

Class Period; admit that as of December 31, 2006, Ambac and its

subsidiaries had approximately 359 employees, and that as of December

31, 2007, Ambac and its subsidiaries had approximately 367

employees; except as specifically admitted, otherwise deny the

allegations of paragraph 20.

21.    Defendant Robert J. Genader ("Genader") was a director, President and Chief Executive Officer ("CEO") of Ambac, as well as Chairman of the Board from 2004 until January 16, 2008, when he resigned from the Company.  Genader additionally served as Chairman, President and CEO of Ambac Assurance.  Throughout the Class Period, Genader was an informal member of the Credit Risk Committee, a committee responsible for approving all RMBS-related transactions.  Several transactions were approved by the Credit Risk Committee based on Genader's direct instructions.  From 2004 through 2006, Genader received compensation totaling $18,576,106 – more than 60% of which was earned in 2006.  Through powers-of-attorney issued to Defendant Sean T. Leonard, Genader signed Ambac's 2006 Form 10-K, which was also incorporated in Ambac's 2006 Annual Report.  He executed certifications in connection with Ambac's 2006 Form 10-K and relevant Form 10-Q filings.  Also, Genader directly made false and misleading statements during a November 1, 2007 CNBC televised interview, a November 7, 2007 conference call, and a November 27, 2007 Friedman Billings conference.

**Answer:**    Admit that Genader served as a director, President and CEO of Ambac

from January 27, 2004 through January 16, 2008 when he resigned, that

Genader had previously served as a director and President of Ambac,

and that Genader served as Chairman of the Board from July 24, 2006

through January 16, 2008 when he resigned; admit that Genader served

as Chairman, President and CEO of Ambac Assurance for a period of

time; admit that at times during the Class Period, Genader participated

on the Securitization Senior Credit Committee, which was responsible

for approving Ambac's guarantees of certain mortgage-backed

securities; respectfully refer the Court to Ambac's 2005, 2006, and 2007

proxy statements for a breakdown of the compensation Genader

received (valued as of the time the compensation was awarded) in 2004,

2005, and 2006, respectively; aver that a large portion of the

compensation Genader received in 2004, 2005, and 2006 was in the

form of equity (stock options and restricted stock units) that is now

worth significantly less than it was worth at the time it was awarded;

admit that Leonard signed Ambac's 2006 Form 10-K on behalf of

Genader pursuant to Genader's grant of power-of-attorney to Leonard,

and that Ambac's 2006 Form 10-K, without the exhibits, was reprinted

in Ambac's 2006 Annual Report; admit that Genader executed

certifications in connection with Ambac's 2006 10-K; admit that

Genader executed certifications in connection with certain Form 10-Qs

that Ambac filed during Genader's service as CEO; except as

specifically admitted, otherwise deny the allegations of paragraph 21.

22.    Defendant Sean T. Leonard ("Leonard") has served as Senior Vice President and Chief Financial Officer ("CFO") of Ambac and Ambac Assurance since June 2005.  Leonard is responsible for managing Ambac's Investor and Rating Agency Relations, Fixed Income Investment Management and Financial Services businesses.  In 2006, Leonard received $1,301,558 in total compensation; this figure jumped to $1,833,789 in 2007.  Leonard signed Ambac's Form 10-Ks, Form 10-Qs, and certain of its Form 8-Ks issued during the Class Period. Also, Leonard directly made false and misleading statements during conference calls on April 25, 2007, July 25, 2007, October 24, 2007, November 7, 2007 and January 22, 2008 and during the November 27, 2007 Bank of America conference.

**Answer:**    Admit that Leonard served as Senior Vice President and Chief Financial

Officer of Ambac and Ambac Assurance from June 2005 through the

end of the Class Period; admit that Leonard was responsible for

managing Ambac's Investor and Rating Agency Relations, Fixed

Income Investment Management and Ambac's Financial Services

businesses from March 2008 through the end of the class period, and

that he had executive responsibility for managing Investor and Rating

Agency Relations prior to March 2008; respectfully refer the Court to

Ambac's 2007 and 2008 proxy statements for a breakdown of the

compensation Leonard received (valued as of the time the compensation

was awarded) in 2006 and 2007, respectively; aver that a large portion

of the compensation Leonard received in 2006 and 2007 was in the

form of equity (stock options and restricted stock units) that is now

worth significantly less than it was worth at the time its was awarded;

admit the fourth sentence; except as specifically admitted, otherwise

deny the allegations of paragraph 22.

23.     Defendant John W. Uhlein, III ("Uhlein") has served as Executive Vice President of Ambac since December 2003.  He is responsible for Ambac's commercial and consumer asset-backed securities group, which included leasing and asset finance, conduits, structured energy, structured insurance, student loans, utilities and emerging markets.  Throughout the Class Period, Uhlein was a member of Ambac's Credit Risk Committee.  In 2006, Uhlein received a payment of approximately $2 million for his significant role in helping Ambac's Structured Finance Group achieve a record year.  Defendant Uhlein directly made false and misleading statements during a March 6, 2007 AIFA conference and a June 12, 2007 KBW Mortgage Finance conference.

**Answer:**     Admit that Uhlein served as Executive Vice President of Ambac from

December 2003 through the end of the Class Period; respectfully refer

the Court to Ambac's 2006, 2007, and 2008 proxy statements for a

description of Uhlein's responsibilities during the Class Period; admit

that at times during the Class Period, Uhlein participated on the

Securitization Senior Credit Committee, which was responsible for

approving Ambac's guarantees of certain mortgage-backed securities;

respectfully refer the Court to Ambac's 2007 proxy statement for a

breakdown of the compensation Uhlein received in 2006 (valued as of

the time the compensation was awarded); aver that a large portion of the

compensation Uhlein received in 2006 was in the form of equity (stock

options and restricted stock units) that is now worth significantly less

than it was worth at the time its was awarded; except as specifically

admitted, otherwise deny the allegations of paragraph 23.

24.     Defendant David W. Wallis ("Wallis") has served as Senior Managing Director and Head of Portfolio and Market Risk Management for Ambac and Ambac Assurance since July 2005.  Wallis has been responsible for the monitoring of individual credit exposures and portfolio trends as well as remediation efforts of stressed credits.  Throughout the Class Period, Wallis was a member of the Credit Risk Committee.  Defendant Wallis directly made false and misleading statements during October 24, 2007, November 7, 2007 and January 22, 2008 conference calls and a November 27, 2007 Bank of America conference.

**Answer:**     Admit that Wallis served as Senior Managing Director and Head of

Portfolio and Market Risk Management for Ambac and Ambac

Assurance from July 2005 through January 2008, and that he served as

Chief Risk Officer of Ambac and Ambac Assurance from February

2008 through the end of the Class Period; respectfully refer the Court to

Ambac's 2007, 2008, and 2009 proxy statements for a description of

Wallis's responsibilities during the Class Period; admit that at times

during the Class Period, Wallis participated on the Securitization Senior

Credit Committee, which was responsible for approving Ambac's

guarantees of certain mortgage-backed securities; except as specifically

admitted, otherwise deny the allegations of paragraph 24.

25.     Defendants Genader, Leonard, Uhlein and Wallis are referred to herein collectively as the "Officer Defendants," except that Genader is named from the beginning of the Class Period through his resignation effective as of January 16, 2008.  Ambac and the Officer Defendants are referred to as the "Exchange Act Defendants."

**Answer:**    Aver that no response is required to plaintiffs' definition of terms in

paragraph 25; to the extent a response is required, deny the allegations

of paragraph 25.

26.    As officers and directors of a publicly-held company whose shares are registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange, and governed by the federal securities laws, the Officer Defendants each had a duty to disseminate promptly accurate information with respect to Ambac's business, operations, financial statements and internal controls, and to correct any previously-issued statements that had become materially misstated or untrue, so that the market price of Ambac's publicly-traded securities would be based upon accurate information.

**Answer:**    Aver that paragraph 26 states plaintiffs' legal conclusions as to which

no response is required; to the extent a response is required, Defendants

deny and dispute plaintiffs' allegations.

27.    The false and misleading statements made in the Company's published documents (including but not limited to its press releases and SEC filings) constitute "group published information," which the Officer Defendants were responsible for creating.  During their respective terms of employment at Ambac, the Officer Defendants, through their positions of control and authority, had direct involvement in the daily business of the Company and participated in the preparation and dissemination of Ambac's "group published information." Each of the Officer Defendants had the ability to prevent the issuance of the written statements at issue in this action, or to cause them to be corrected.  Moreover, each of the Officer Defendants personally made public statements at analyst and investor conference calls and meetings on behalf of the Company.

**Answer:**    Aver that the first two sentences state plaintiffs' legal conclusions as to

which no response is required, and that they are also general in nature

and do not particularize factual allegations to which a response can

meaningfully be made; to the extent a response is required, Defendants

deny and dispute plaintiffs' allegations; aver that the allegations in the

third sentence are general in nature and do not particularize factual

allegations to which a response can meaningfully be made; to the extent

a response is required, deny such allegations; admit that each of the

Officer Defendants from time to time made public statements and aver

that no such statements were materially misleading or otherwise in

violation of law; except as specifically admitted, otherwise deny the

allegations of paragraph 27.

28.     Prior to the Class Period, on March 21, 2006, Defendant Genader summed up the Company's business model as follows:

> *In this business, the one thing you really have to be excellent at is minimizing claims and risk management.  We do that by only underwriting investment-grade transactions.  We have very conservative risk limits*....  Constantly looking at your portfolio, looking for the next risk area, is something that we meet on every month....
>
> Our objectives, excel at risk underwriting.  That's what is our passion.  We look [at] credit risk, operational risk, reputational risk, legal risk, model risk, pinhole risk.  That is what we do; that is what the passion of our company is all about, is *trying to find the minute detail* that can cause a transaction to go – not necessarily pay a claim, but to get downgraded.  (Emphasis added.)

**Answer:**     Admit that Genader spoke at the Piper Jaffray Financial Services

Conference on March 21, 2006, but deny plaintiffs' characterizations

and further deny that matters plaintiffs allege are presented in their

appropriate context, and respectfully refer the Court to the record

thereof for the complete contents and context; except as specifically

admitted, otherwise deny the allegations of paragraph 28.

29.     As alleged herein, the Exchange Act Defendants, abandoned this model in favor of short-term profits, thus jeopardizing Ambac's survival.

**Answer:**     Deny.

30.     Founded in 1971, Ambac was the first financial guarantor to insure the principal and interest of municipal bonds.  Ambac became known as a "monoline" insurer because it provided one type of insurance – a guarantee to protect against credit risk, *i.e.*, the risk of default. For over thirty years, Ambac built a reputation as one of the leading financial guarantee insurers in the world, known for its coveted "AAA" investment grade credit rating and solid record of

insuring the highest quality municipal bonds.  Ambac was recognized for assessing risk to a "remote-loss" underwriting standard, meaning that Ambac paid on such a small amount of defaults that it was able to assume that any exposure that passed its rigorous investigation and credit analysis was not going to default.  In fact, Ambac told investors in its 2006 Form 10-K that it only insured exposures that it determined, after its underwriting process was complete, "are of investment grade quality with a remote risk of loss."

> **Answer:**    Admit that Ambac Assurance, a subsidiary of Ambac, is the financial
>
> guarantee company that wrote the first bond insurance policy in 1971;
>
> admit that Ambac and/or its subsidiaries are sometimes referred to as
>
> "monoline" insurers; admit that Ambac had a reputation as one of the
>
> leading financial guarantors; admit that Ambac had a triple-A rating
>
> from S&P and Moody's throughout the Class Period and had a triple-A
>
> rating from Fitch from the start of the Class Period through January 15,
>
> 2008; admit that Ambac's 2006 Form 10-K contained the language
>
> quoted in the last sentence, but deny plaintiffs' characterizations and
>
> further deny that matters plaintiffs allege are presented in their
>
> appropriate context, aver that Ambac's 2006 Form 10-K also stated that
>
> "[h]owever, losses may occur," and respectfully refer the Court to the
>
> 2006 Form 10-K for its complete contents and context, including the
>
> cautionary statements and risk factors referred to therein; except as
>
> specifically admitted, otherwise deny the allegations of paragraph 30.

31.    Ambac's success in the financial guarantee market was based on Ambac's financial strength and its ability to cover all of its obligations should a default occur and payments be required.  Ambac increased investor confidence by emphasizing the rigorous credit analysis it conducted for every exposure receiving Ambac's coveted insurance.

> **Answer:**    Aver that Ambac Assurance's financial strength was an important part
>
> of Ambac Assurance's ability to provide financial guarantees and aver
>
> that Ambac cautioned its investors that any reduction in Ambac

Assurance's AAA ratings could have a material adverse affect on

Ambac Assurance's ability to compete in the financial guarantee

business; deny knowledge or information sufficient to form a belief as

to the truth of the second sentence; except as specifically admitted,

otherwise deny the allegations of paragraph 31.

32.    Ambac's principal business was selling the promise to cover the principal and interest owed if its insurance clients suffered defaults.  The symbol of the credibility the market placed on Ambac's promise was its top-notch rating from the main credit rating agencies.  In 1979, Ambac received its first AAA credit rating from Standard & Poor's ("S&P").  Moody's Corporation followed suit in 1987 (awarding its equivalent Aaa rating), and Fitch Ratings awarded Ambac its AAA rating in 1994.

**Answer:**    Admit that Ambac and/or its subsidiaries provided financial guarantee

insurance that protected the holder of a fixed income obligation against

non-payment of principal and interest when due; admit that Ambac

Assurance's AAA ratings were an important part of Ambac Assurance's

ability to provide financial guarantees and aver that Ambac cautioned

its investors that any reduction in those ratings could have a material

adverse affect on Ambac Assurance's ability to compete in the financial

guarantee business; admit the third and fourth sentences; except as

specifically admitted, otherwise deny the allegations of paragraph 32.

33.    Through a financial guarantee insurance contract – known as a "wrap" in industry parlance – Ambac would enhance a bond's or asset-backed security's credit rating by "lending" its own top rating to the security.  "Wrapped" bonds and asset backed securities are effectively converted to a AAA-rated investment, allowing an issuer of a bond or asset-backed security to save money by lowering the interest rate it has to pay to investors.  In exchange, the issuer pays the guarantor a premium that is calculated as a portion of the "spread" between the amount of interest it would pay absent insurance and the lower amount it pays by virtue of the financial guarantee.

**Answer:**    Acknowledge that paragraph 33 provides a general description of

certain financial guarantees that Ambac Assurance issued and of certain

industry terminology; aver that the allegations of paragraph 33 are

general in nature and do not particularize factual allegations to which a

response can meaningfully be made; to the extent a response is required,

deny such allegations.

34.     Because Ambac effectively sold its AAA credit rating to enhance the credit rating of bonds and asset-backed securities, the Company's business model depended entirely on maintaining its AAA rating.  For example, a June 2005 Euromoney article entitled "The worm of doubt:  credit-worthiness of monoline insurers," stated:  "[t]here is no AA+ for these guys, it's AAA or nothing."  Ambac agreed, disclosing in the "Introduction" section of its 2006 Form 10-K, that Ambac's "triple-A financial strength ratings . . . are an essential part of Ambac Assurance's ability to provide credit enhancement and any reduction in these ratings could have a material adverse affect on Ambac Assurance's ability to compete in the financial guarantee business."

**Answer:**     Deny the first sentence; deny knowledge or information sufficient to

form a belief as to the truth of the allegations of the second sentence;

admit that Ambac's 2006 Form 10-K contains statements substantially

similar to the language quoted in the third sentence, but deny plaintiffs'

characterizations and further deny that matters plaintiffs allege are

presented in their appropriate context, and respectfully refer the Court

to Ambac's 2006 Form 10-K for its complete contents and context,

including the cautionary statements and risk factors referred to therein;

except as specifically admitted, otherwise deny the allegations of

paragraph 34.

35.     Rating agencies assign ratings to bond insurers based on proprietary models that measure, among other characteristics, the capital adequacy of financial guarantors under stress scenarios.  In order to preserve its credit rating, Ambac was required to maintain capital levels at, or in excess of, each agency's required amount, *i.e.*, a capital cushion.  This process is meant to ensure that each monoline has an adequate level of capital to cover all potential liabilities. According to Moody's September 2006 guide, "Moody's Rating Methodology for the Financial Guaranty Insurance Industry:"

At the heart of Moody's assessment of an insurer's creditworthiness is an opinion about the company's economic capital and its capital adequacy (e.g., solvency) or operational leverage. Economic capital is the cushion available to the insurer to absorb unfavorable deviations in losses and operating results. Capital adequacy measures a company's operating leverage in terms of business volume generated and [its] risk[s] relative to the company's capital. ***Capital adequacy is critically important for [an insurer] because insurance regulators require minimum capital levels or ratios in order for the company to continue to operate. Capital constraints can also negatively impact a company's ability to grow its business and impact strategy.*** (Emphasis added.)

> **Answer:**    Admit that rating agencies, in assessing capital adequacy, consider potential losses under rating agency stress scenarios; admit that to preserve a particular credit rating Ambac Assurance was required to satisfy the rating agencies' capital adequacy criteria for such rating; deny knowledge or information sufficient to form a belief as to the truth of the allegations of the third and fourth sentences; except as specifically admitted, otherwise deny the allegations of paragraph 35.

36.    Ambac's public disclosures about its loss reserves and its insured exposures were particularly important to the rating agencies and the investing community in assessing capital adequacy, since the Company's capital cushion depended on losses on insurance obligations remaining consistent with rating agency and investor expectations.

> **Answer:**    Deny.

37.    Investors placed tremendous importance on the ability of Ambac to maintain its history of "remote loss" insurance. Ambac's total capital was only a fraction of its total amount of insured obligations, so any marked increase in losses would place the adequacy of Ambac's capital cushion, and ultimately its AAA rating, at risk. For example, according to Ambac's first quarter 2007 Operating Supplement, while Ambac's net financial guarantees in force were a total of $819 billion as of March 31, 2007, its qualified statutory capital was only $6.6 billion, and its total claims paying resources was only $13.24 billion. This resulted in a capital ratio (based on qualified statutory capital) of 125:1, and a financial resources ratio (based on total claims paying resources) of 62:1. Since the failure of as little as 5% of Ambac's insured portfolio would be enough to wipe out Ambac's excess capital, the quality of the Company's underwriting and monitoring of its risk exposures was highly material to investors.

**Answer:**     Deny knowledge or information sufficient to form a belief as to the truth of the first sentence; aver that the allegations in the second sentence are general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations; respectfully refer the Court to Ambac's publicly available first quarter 2007 Operating Supplement for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; aver that the allegations in the last sentence are ambiguous, general in nature, or argumentative and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations; otherwise deny the allegations of paragraph 37.

38.     If Ambac began to suffer greater than expected losses, its capital cushion would promptly become impaired and its investment grade ratings lost.  As Ambac disclosed in its Form 10-K for 2006, its "ability to compete with other Triple-A rated financial guarantors, and its results of operations and financial condition, would be materially adversely affected by any reduction in its ratings."  Recognizing the importance of preserving Ambac's credit rating in order to maintain its business, even the rating agencies assumed that financial guarantors would avoid actions that placed their "AAA" financial strength ratings in jeopardy.  For example, in July 2006, Moody's reported that "because ratings are so important to the [monoline] industry's value proposition, a highly-rated financial guarantor will likely take whatever actions are feasible to preserve its rating during times of stress."

**Answer:**     Aver that the allegations in the first sentence are general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations; admit that Ambac's 2006 Form 10-K contains statements substantially similar to the language quoted in the second sentence, but deny plaintiffs' characterizations and further deny that matters plaintiffs

allege are presented in their appropriate context, and respectfully refer

the Court to that public filing for the complete contents and context,

including the cautionary statements and risk factors referred to therein;

deny knowledge or information sufficient to form a belief as to the truth

of the third and fourth sentences; except as specifically admitted,

otherwise deny the allegations of paragraph 38.

39.     The importance to Ambac of preserving its credit rating and avoiding excessive risk at all costs came into tension with its efforts to increase its income.  This tension became greater in recent years, as Ambac's safe and stable municipal bond insurance business became a diminishing source of growth.  According to Moody's, "they've taken the muni market about as far as it can go.  When you have penetration like that, it's hard to do more business and maintain reasonable premium notes."

**Answer:**     Deny knowledge or information sufficient to form a belief as to the

truth of the last sentence; otherwise deny the allegations of paragraph

39.

40.     In addition, Ambac learned, in 2006, that its municipal bond insurance business faced a fundamental risk.  The Moody's rating agency privately informed Ambac that it would cease its undisclosed practice of assigning lower ratings to municipalities and government entities in order to force them to purchase bond insurance they did not need.  On July 30, 2008, the State of Connecticut filed a lawsuit against the rating agencies, alleging that they had awarded lower ratings to municipal issuers than they gave to higher risk corporate issuers, in order to create fee revenues for the rating agencies and the bond insurers (including Ambac), who were privy to and beneficiaries of this scheme.  The Connecticut complaint and accompanying press release quotes an Ambac executive who responded to Moody's early 2006 proposal by writing:  "[t]his looks pretty serious to me. . . .  This is cutting at the heart of our industry....  [W]hile we in the industry might agree with the default/loss conclusion (this is in part the basis of our success and ability to leverage as high as we are), to lay it out there like this could be very detrimental."

**Answer:**     Deny knowledge or information sufficient to form a belief as to the

truth of the allegations of the last two sentences of paragraph 40;

otherwise deny the allegations of paragraph 40.

41.     As further explained in Connecticut's July 30, 2008 complaint, Ambac senior executives were temporarily successful in avoiding this proposed rating agency correction.  But

it was a matter of time until Ambac's safest and surest revenues streams would slow down if not stop altogether.  Thus, the Exchange Act Defendants had a further undisclosed motive to assume increased risk in Ambac's structured finance operations, and then hide the consequences of their risk-taking once their RMBS bets went bad.

**Answer:**    Deny.

42.    As a result of the events described herein, Ambac became the first major bond insurer to lose its AAA rating when Fitch downgraded Ambac to AA on January 18, 2008, two days after Ambac shocked investors by disclosing a $5.4 billion write-down on derivative exposure to CDOs backed in part by RMBS, including over $1 billion in impairment charges, and $143 million in loss reserves on direct RMBS exposures.  In the following months, both S&P (on June 5, 2008) and Moody's (on June 19, 2008) downgraded Ambac.  Ambac is no longer a AAA-rated company and, as a result, its ability to continue operating has been placed in jeopardy.  Ambac's financial guarantee underwritings have declined to the point where Ambac is seeking to resurrect a dormant subsidiary to underwrite new financial guarantee business, in the hopes that its subsidiary's rating will be unaffected by Ambac Assurance's financial stress.

**Answer:**    Admit that Fitch downgraded Ambac Assurance's credit rating from AAA to AA on or about January 18, 2008; admit that S&P downgraded Ambac Assurance's credit rating from AAA to AA on June 5, 2008; admit that Moody's downgraded Ambac Assurance's credit rating from Aaa to Aa3 on June 19, 2008; respectfully refer the Court to Ambac's January 16, 2008 press release for the information concerning mark-to-market losses, impairments, and loss reserves allegedly announced therein; admit that Ambac Assurance is no longer an AAA-rated company and that this has adversely impacted Ambac's ability to continue operating; admit that during part of 2008 and 2009, Ambac considered providing additional capital to a subsidiary so that it could write financial guarantee insurance in the public finance market as a separate, stand-alone legal entity; except as specifically admitted, otherwise deny the allegations of paragraph 42.

43.    At their core, the RMBS and CDO securities that lie at the heart of this case are pools of assets whose cumulative cash flows are distributed in a structured manner to investors. Both RMBS and CDOs backed in significant part by RMBS are ultimately dependant on the cash flows expected from their underlying pools of mortgage assets.  An RMBS receives its cash inflows directly from thousands of residential mortgages.  A CDO is at least one step further removed, since its cash inflows come from asset backed securities (including RMBS), or it may be multiple steps removed when its cash comes from other CDOs that are themselves funded by asset backed securities.

      **Answer:**    Aver that the allegations of paragraph 43 are general in nature and do

not particularize factual allegations to which a response can

meaningfully be made; to the extent a response is required, deny such

allegations.

44.    The basic purpose of an RMBS or CDO is to pass the risk of default of the underlying collateral (i.e., mortgages) to another party who bears that risk in exchange for leveraged investments that involve varying degrees of risk.  In this market, banks and other financial institutions compiled mortgages into RMBS, either purchasing the mortgages from mortgage lenders or originating them directly.  RMBS were then often sold to institutions that oversaw the creation and issuance of hundreds of billions of dollars in CDOs.  Ambac became the ultimate holder of the risk for billions of dollars of mortgages underlying the instruments by issuing default protection through direct insurance for RMBS or derivative credit default swaps for CDOs.

      **Answer:**    Aver that the allegations of the first three sentences are general in nature

and do not particularize factual allegations to which a response can

meaningfully be made; to the extent a response is required, deny such

allegations; admit that certain of Ambac's subsidiaries provided

guarantees on certain structured financial instruments, including RMBS,

which are asset-backed securities where the underlying collateral is

mortgage loans, and CDOs, which are asset-backed securities where the

underlying collateral is, in whole or part, other asset-backed securities

(such as RMBS); admit that certain Ambac subsidiaries directly insured

tranches issued by RMBS; admit that certain Ambac subsidiaries

provided credit protection on tranches of CDOs through the issuance of

CDS, though aver that Ambac's CDS were modified from the standard

form of CDS; except as specifically admitted, otherwise deny the

allegations of paragraph 44.

45.    According to the SEC's July 2008 Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies (the "SEC Rating Agency Report"), an RMBS is an asset backed security ("ABS") that is collateralized by a pool of residential mortgages.  To create an RMBS, an arranger, generally an investment bank or mortgage originator, packages thousands of mortgage loans into a pool.  The arranger then sells the pool of mortgages to a trust, and the trust becomes entitled to the thousands of monthly interest and principal payments that homeowners make on the pool of mortgages.  In order to pay the arranger for these mortgages, the trust issues and sells securities collateralized by the pool of mortgages.  The trust uses that income from the pool of mortgages to make monthly interest and principal payments to the purchasers of the securities it has issued.  The chart below depicts the composition of a typical RMBS:  [chart in Complaint is not reprinted here]

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

truth of the allegations as to the contents of the SEC Rating Agency

Report; aver that the remaining allegations in paragraph 45 are general

in nature and do not particularize any factual allegations to which a

response can meaningfully be made; to the extent a response is required,

Defendants deny such allegations; otherwise deny the allegations of

paragraph 45.

46.    The securities that the trust issues to fund its initial purchase of assets can be subdivided into different classes, known as "tranches."  The arranger uses certain techniques to structures these tranches in ways that expose them to more – or less – risk.

**Answer:**    Aver that the allegations in paragraph 46 are general in nature and do

not particularize factual allegations to which a response can

meaningfully be made; to the extent a response is required, deny such

allegations.

47.    The primary technique is called "subordination."  Subordination creates an order of loss absorption among the different tranches, and requires the lower-rated tranche to first absorb any shortfall that the trust experiences because the underlying mortgages are failing to perform.  These tranches offer a sliding scale of interest payments depending on their position in the subordination hierarchy.  Lower subordination means greater risk and higher interest payments.  If the trust experiences a capital shortfall due to the failure of its assets, the lowest-rated tranche must absorb that loss until the tranche is rendered worthless.  Once the lowest-rated tranche becomes worthless, the next lowest-rated tranche must take any remaining loss, and so on up through the hierarchy of tranches.

**Answer:**    Aver that the allegations in paragraph 47 are general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations.

48.    According to the SEC Rating Agency Report, a CDO is a fixed-income investment vehicle that is structured in similar fashion to an RMBS, except that instead of pooling mortgages, the CDO pools a variety of complex derivative securities as its underlying collateral.  Typically, a sponsor, such as an investment bank, creates a trust to hold the CDO's assets and issue its securities.  To generate the income necessary for the trust to purchase assets, the trust issues and sells debt securities to investors.  These securities are structured, through subordination, into different tranches, each carrying a different rating and interest rate.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations as to the contents of the SEC Rating Agency Report; aver that the remaining allegations in paragraph 48 are general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations; otherwise deny the allegations of paragraph 48.

49.    Once the CDO has sold its securities, the CDO uses that money to purchase a variety of complex securities, including tranches of RMBS, other CDOs and other ABS.  Those assets generate revenue for the trust in the form of fixed interest and principal payments, which the trust then uses to make fixed interest and principal payments to the purchasers of the trust's own securities.  The chart below depicts the structure of such a CDO issuer in its most basic form: [chart in Complaint is not reprinted here]

**Answer:**    Aver that the allegations in paragraph 49 are general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations.

50.    As the above diagram illustrates, the CDO structuring process allowed lower rated tranches of RMBS to be compiled into pools whose cash flows would be restructured so that other CDO tranches were labeled as investment grade.  A core assumption in this restructuring is that the correlation between similarly rated RMBS tranches would be limited.  In other words, if all or most of the similarly rated RMBS tranches supporting a CDO suffered defaults at the same time, the protective benefits of subordination may prove illusory.

**Answer:**    Aver that the allegations in paragraph 50 are general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations.

51.    In its public disclosures during the Class Period, Ambac distinguished between "High Grade" and "Mezzanine" CDOs.  High-Grade CDOs were comprised of underlying collateral that was generally rated "A" or better by one or more rating agency at the CDO's inception.  "Mezzanine" CDOs were comprised of underlying collateral that was primarily rated "BBB" at inception.  Both types of CDOS included substantial percentages of subprime, mid-prime and second lien RMBS collateral.

**Answer:**    Admit that certain of Ambac's public disclosures during the Class Period referred to the "High-grade CDO of ABS" and the "Mezzanine CDO of ABS" asset classes for CDOs, and respectfully refer the Court to those disclosures for the complete contents and context, including the cautionary statements and risk factors referred to therein; acknowledge that the second and third sentences generally describe the "High-grade CDO of ABS" and the "Mezzanine CDO of ABS" asset classes; except as specifically admitted, otherwise deny the allegations of paragraph 51.

52.     In addition to CDOs as described above, Ambac also began offering credit default swap derivative protection for what is known as a CDO-squared.  A CDO-squared is a type of CDO where the underlying portfolio of assets consists primarily of tranches in other CDOs. However, most of Ambac's CDO exposures included some tranches of other CDOs.

> **Answer:**     Admit that Ambac and/or its subsidiaries have provided certain credit enhancement on certain CDO squareds through the issuance of credit default swaps, though aver that Ambac's credit defaults swaps were modified from the standard form of credit default swap; admit that CDO of CDO (or "CDO squared") transactions may be collateralized primarily with other CDO of ABS securities; admit that certain Ambac's CDO transactions involved CDOs that were collateralized in part by other CDOs; except as specifically admitted, otherwise deny the allegations of paragraph 52.

53.     As the CDO market evolved, and the fee revenues to investment banks grew dramatically, the banks sought to structure larger deals.  However, because there was only a limited amount of RMBS or similar ABS to serve as the CDO's underlying assets, investment banks created a synthetic vehicle.  CDOs structured solely with asset-backed securities are called "cash CDOs".  Virtually all of the CDOs insured by Ambac during the Class Period, however, included as assets of the CDO, in addition to RMBS or CDOs, derivative or "synthetic securities."  These synthetic securities were in the form of credit default swaps which were, in effect, insurance contracts between the financing bank and the CDO that is linked to the performance of the ABS collateral already included in the CDO.

> **Answer:**     Aver that the allegations in the first and second sentences are general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations; admit that certain CDOs for which Ambac and/or its subsidiaries wrote credit protection in the form of CDS during the Class Period included as collateral RMBS, CDOs, synthetic ABS, or other

forms of ABS; otherwise aver that the allegations in paragraph 53 are

general in nature and do not particularize factual allegations to which a

response can meaningfully be made; to the extent a response is required,

deny such allegations; except as specifically admitted, otherwise deny

the allegations of paragraph 53.

54.    Insuring a synthetic CDO magnifies the risk of underperformance of underlying RMBS.  This is because payment to the CDO depends on cash flow from the actual RMBS or other ABS, as well as cash flows from complex derivatives whose value depends on the performance of the same underlying collateral.  Thus, investments in synthetic CDO instruments actually lowered Ambac's diversification by, in effect, "doubling down" (or worse) on the same underlying securities.  Most of the CDOs Ambac was exposed to during the Class Period were synthetic CDOs, thus severely amplifying its risk of taking material mark-to-market adjustments and loss impairment charges if the collateral underperformed.

     **Answer:**     Deny.

55.    The current crisis in the U.S. residential mortgage market is rooted in the massive volume of mortgage loans given to extremely high credit risk consumers in recent years.  The magnitude of this crisis is due in large part to the bundling of those loans by Wall Street investment banks into the RMBS and CDO securities described above.

     **Answer:**     Aver that the allegations in paragraph 55 are general in nature and do

               not particularize factual allegations to which a response can

               meaningfully be made; to the extent a response is required, deny such

               allegations.

56.    During the early and mid-2000s, the housing market bubble inflated.  As interest rates for mortgages declined, more individuals were afforded access to residential mortgages, spurring a rapid increase in the residential mortgage industry.  The resulting demand for homes amid these lower interest rates fueled a rise in home prices, which then fueled a building boom in new homes.

     **Answer:**     Aver that the allegations of paragraph 56 are general in nature and do

               not particularize factual allegations to which a response can

               meaningfully be made; to the extent a response is required, deny such

allegations; except as specifically admitted, otherwise deny the

allegations of paragraph 56.

57.     As the RMBS market grew by leaps and bounds—and indeed *because* the market grew so fast—mortgage lending standards plummeted.  Lenders engaged in aggressive lending practices in order to reach the maximum number of potential homebuyers.  Many mortgage lenders cast aside responsible underwriting criteria and originated massive volumes of loans that were much more likely to default.  Lenders were willing to make these riskier loans because mortgage purchasers in the secondary markets – primarily investment banks – were clamoring to buy mortgages for securitization into RMBS, relieving the lender of the balance sheet risk associated with holding a weak or poorly underwritten loan.

> **Answer:**     Aver that the allegations of paragraph 57 are general in nature and do
>
> not particularize factual allegations to which a response can
>
> meaningfully be made; specifically deny that Defendants at any time
>
> misrepresented their knowledge or beliefs as to such matters and
>
> specifically deny that Defendants made any untrue statement or material
>
> fact or omitted to state a material fact necessary to make any statements
>
> made not misleading.

58.     The below graph reflects the severe deterioration in lending standards between 2001 and 2006, as evidenced by a steep and rapid increase in loans carrying high risk profiles:[3] [graph in Complaint is not reprinted here]

> **Answer:**     Aver that the allegations of paragraph 58 are general in nature and do
>
> not particularize factual allegations to which a response can
>
> meaningfully be made; to the extent a response is required, deny
>
> knowledge or information sufficient to form a belief as to the truth of
>
> the allegations in paragraph 58.

58 n.3.     "Combined Loan to Value" is the percentage that the first and second mortgages make up of the property value.  For instance, if a home costs $200,000 and two mortgages are taken out, one for $150,000 and another for $30,000, the combined loan to value is 90%.  "100% Financing" denotes that the two loans in the prior example equal $200,000, and that the homebuyer has spent none of his own capital.  A "limited documentation" loan," or "Liar's Loan," denotes that the applicant has not fully documented his or her income and assets.

> **Answer:**    Aver that no response is required to plaintiffs' definition of terms in paragraph 58, footnote 3; also aver that paragraph 58, footnote 3 is general in nature and does not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58, footnote 3.

59.    These low-grade loans were basic assets in the RMBS and CDOs that Ambac insured.  By insuring instruments backed by underperforming loans, Ambac dramatically increased its risk of incurring crippling losses, a fact unknown to the investing community until the Company was forced to take billions of dollars in mark-to-market losses and loss reserves.

> **Answer:**    Deny.

60.    Ambac played a key role in the explosion of the RMBS and CDO of RMBS market, while generating substantial profits and propping up its earnings to maintain its AAA-rating and high stock price.  Ambac provided direct insurance for RMBS and protection for CDOs through CDS.  Both the insurance and CDS protections meant that Ambac would provide interest and principal in case of default of the underlying assets.

> **Answer:**    Aver that the allegations in the first sentence of paragraph 60 are argumentative as well as general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations; admit that in certain cases Ambac's subsidiaries directly insured certain RMBS and provided financial guarantees written as credit default swaps ("CDS") on certain CDOs of ABS; except as specifically admitted, otherwise deny the allegations of paragraph 60.

61.    In the case of an RMBS, Ambac provided protection against default of the underlying mortgages in the asset pool.  RMBS insurance contacts were entered into between Ambac and the issuing trust of the RMBS, not the investors in the RMBS.

**Answer:**     Admit that in the direct RMBS business Ambac generally insures the

most senior tranche of the RMBS, from a given loss attachment point to

the top of the capital structure; except as specifically admitted,

otherwise deny the allegations of paragraph 61.

62.     Ambac also insured growing amounts of second-lien RMBS.  A HELOC, or home equity line of credit, is a second mortgage loan drawn against the equity in a home (*i.e.*, drawn against the difference between the value of the remaining first mortgage and the present market value of the home).  Unlike a HELOC, in which the borrower can decide to borrow, pay down principal and then borrow again up to the maximum amount of the loan, a closed-end second ("CES") loan is also drawn against the value of the home in excess of any first-lien loan, but the borrower draws the entire amount upon loan issuance and cannot re-borrow after paying down principal.

**Answer:**     Aver that the allegations of paragraph 62 are general in nature and do

not particularize factual allegations to which a response can

meaningfully be made; to the extent a response is required, deny the

allegations; respectfully refer the Court to Ambac's public filings and

other public disclosures during the Class Period that identify the amount

of various types of securities for which Ambac's subsidiaries provided

credit protection from time to time; except as specifically admitted,

otherwise deny the allegations of paragraph 62.

63.     Payment on second-lien loans (HELOCs and CES) is directly related to the borrower's ability to pay the underlying first mortgage.  And because second-liens comprise the last to be repaid, as housing prices decrease, the losses incurred on second-liens are far more severe than on first-liens.  As a result, in a deteriorating market, the risk of defaults and delinquencies in HELOC and CES deals was significantly higher.  Ambac's portfolios of RMBS composed of HELOCs and CES mortgages faced the increasing likelihood of losses at a time of decreasing home sales and stagnant or declining home prices.

**Answer:**     Acknowledge that second-lien loans are generally subordinated to first

mortgages; aver that the allegations of paragraph 63 are general in

nature and do not particularize factual allegations to which a response

-34-

can meaningfully be made; to the extent a response is required, deny such allegations.

64.     With respect to CDOs, Ambac did not enter into traditional insurance contracts but, instead, entered into credit default swaps. Ambac generally issued its CDS to investors purchasing the debt of the CDO, usually an investment bank. Pursuant to the CDS, the investment banks would pay Ambac a premium for its guarantee that the principle and interest payments due to the investment bank as a senior debt holder of the CDO would be paid.

**Answer:**    Admit that certain CDOs included RMBS among their collateral; admit that Ambac's subsidiaries wrote credit protection on certain super senior tranches of CDOs through CDS; aver that the CDS that Ambac issued was modified from standard form of CDS; admit that Ambac subsidiaries received premiums in return for the credit protection they wrote; aver that the allegations of paragraph 64 are general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations; except as specifically admitted, otherwise deny the allegations of paragraph 64.

65.     Notably, when Ambac wrote traditional insurance, it had to allocate approximately 3% of the amount insured to support its capital cushion for regulatory and rating agency purposes. However, when Ambac wrote credit default swaps against CDOs, the amount of capital it had to allocate to the transaction was lower, even if the size of the deals and premiums paid to Ambac were the same. Writing credit default swaps, therefore, could be more profitable to Ambac than traditional insurance.

**Answer:**    Deny.

66.     Ambac's portfolio of CDOs of RMBS increased exponentially in recent years. Based on a CDO exposure chart that Ambac provided in the first quarter of 2008, the Company's net exposure to CDOs with greater than 25% RMBS as the underlying collateral increased from $900 million in 2004 to approximately $29 billion as of December 31, 2007. In percentage terms, CDOs with over 25% RMBS collateral represented just 5.8% of its total domestic CDO exposure in 2004, and rose to 57.5% of the portfolio by the first quarter of 2008.

**Answer:**    Respectfully refer the Court to the record of Ambac's contemporaneous

website postings for their complete contents and context, including the

cautionary statements and risk factors referred to therein; aver that

Ambac made public disclosures of the increasing amounts of credit

protection its subsidiaries had written on CDOs on Ambac's website

and in Ambac's SEC filings, and respectfully refer the Court to the

record of the same for the complete contents and context thereof,

including the cautionary statements and risk factors referred to therein;

except as specifically admitted, otherwise deny the allegations of

paragraph 66.

67.    Under the leadership of Defendant Genader, Ambac's focus turned to the generation of greater profits in lieu of risk management and loss avoidance.  In 2005, Genader made this focus known.  According to Confidential Witness ("CW") 1, a former underwriter and quantitative analyst at Ambac between 1997 and 2005, at a company-wide meeting in 2005, Genader announced that Ambac's goal would be to achieve $1 billion a year in net income in the near future.  Genader aggressively pushed all units of the Company to focus on increasing gross premium income, but resisted the increased staffing and other expense needed to ensure adequate underwriting and risk monitoring capabilities for complex insurance products.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents of alleged statements by, alleged

Confidential Witness ("CW") 1; otherwise deny the allegations of

paragraph 67.

68.    Defendant Genader profited handsomely from his insistence that Ambac assume greater risk.  His compensation was linked closely to Ambac's reported returns on equity. Including salary, bonus and stock and option awards, Genader earned $5,873,674 in 2005 and $11,235,531 in 2006.

**Answer:**    Deny the first sentence; respectfully refer the Court to Ambac's 2006

and 2007 proxy statements for a breakdown of the compensation

Genader received (valued as of the time the compensation was awarded)

in 2005 and 2006, respectively; aver that a large portion of the

compensation Genader received in 2005 and 2006 was in the form of

equity (stock options and restricted stock units) that is now worth

significantly less than it was worth at the time it was awarded; except as

specifically admitted, otherwise deny the allegations of paragraph 68.

69.     As alleged herein, Ambac's abandonment of its conservative underwriting and surveillance practices was directly tied to Genader's emphasis on profits and revenues.  During this time, Ambac became more reliant on revenues from structured finance, *i.e.*, the direct and derivative guarantees of RMBS and CDOs tied to RMBS.

**Answer:**     Deny the first sentence; admit that Ambac's total exposure to RMBS

and CDOs collateralized by RMBS grew between 2000 and 2006 and

aver that Ambac made public disclosures of this increase in Ambac's

SEC filings and on Ambac's website, among other places; except as

specifically admitted, otherwise deny the allegations of paragraph 69.

70.     The significance of structured finance to Ambac's growth and profitability was acknowledged by Ambac's own officers.  During the March 6, 2007 conference, Defendant Uhlein noted that:

Just take a look here at the diversification of our portfolio, and how it has changed over the last ten years.  In less than ten years, our public finance exposures [sic] has gone from 85% of the book to 35%.  This is not due to a lack of interest in public finance, but due to the strong growth in structured finance and international.  In a period of less than ten years, our insured portfolio has tripled to $519 billion.

**Answer:**     Admit Uhlein spoke at an AIFA conference on March 6, 2007, but deny

plaintiffs' characterizations and further deny that matters plaintiffs

allege are presented in their appropriate context, and respectfully refer

the Court to the record of the same for the complete contents and

context; except as specifically admitted, otherwise deny the allegations

of paragraph 70.

71.     It was this drive for revenue and expansion into deriving more profits from RMBS and CDOs backed by RMBS that was eventually the cause of material increases in mark-to-market write-downs and loss reserves that erased over 5 years of Ambac's profits.

**Answer:**     Deny.

72.     The Exchange Act Defendants were aware of the steep decline in the housing market by the beginning of the Class Period.  As explained below, they abandoned Ambac's historical underwriting standards in order to insure riskier and riskier RMBS-related instruments. Nevertheless, the Exchange Act Defendants consistently represented that Ambac's superior underwriting allowed it to select higher quality mortgage-linked collateral and that its monitoring of the performance of that collateral ensured that surprise losses would not happen.

**Answer:**     Deny.

73.     These assurances were particularly important because Ambac's RMBS and CDOs were opaque instruments, and investors had little insight into the actual performance of the underlying collateral.  For CDOs in particular, investors did not even know the identities of the CDOs that Ambac guaranteed, or the actual collateral supporting those CDOs, until near the end of the Class Period.  Instead, investors and market analysts were left to rely on the positive representations by the Exchange Act Defendants.

**Answer:**     Deny.

74.     As noted above, before the Class Period, Defendant Genader set earnings goals that resulted in Ambac taking on greater risk, including the riskier RMBS and CDO exposures described below.  According to CW 1, during a company-wide meeting in 2005, Defendant Genader announced the goal of achieving net income of $1 billion a year.  The Company had reported $724 million in earnings for 2004.

**Answer:**     Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents of alleged statements by, alleged CW 1;

admit that Ambac had reported approximately $724.6 million in net

income for 2004, and respectfully refer the Court to Ambac's public

filings with respect to Ambac's 2004 financial performance for their

complete contents and context, including the cautionary statements and

risk factors referred to therein; except as specifically admitted,

otherwise deny the allegations of paragraph 74.

75.     While Genader pushed all units of the Company to drive gross premium income, the Company "didn't want to increase the company's infrastructure to achieve it," according to CW 1, "[t]he goal forced Ambac to take on high-premium, high-risk transactions.  To meet that kind of target, you have to shoot for white elephants."  Those "white elephants" came in the form of riskier RMBS and CDOs.  Ambac's unwillingness to invest in greater infrastructure to accompany its growth was confirmed by CW 2, a former Assistant Vice President from March 2002 through August 2006, who worked in Ambac's financial control group.  CW 2 explained that the surveillance department was not responsive and "a lot of times short-staffed" and that "[t]here was a lot of shuffling of people in the department.  A lot of people left. . . .  They were always hiring and re-hiring."  In sum, explained CW 2, Ambac's surveillance department "was in disarray" in 2006.

> **Answer:**     Deny knowledge or information sufficient to form a belief as to the
>
> existence of, or the contents of alleged statements by, alleged CWs 1
>
> and 2; otherwise deny the allegations of paragraph 75.

76.     As Ambac's focus shifted from risk management to revenue and income maximization, the home mortgage market was showing troubling signs.  The Exchange Act Defendants witnessed firsthand the weakness of the underwriting standards being employed by the mortgage originators, and the resulting poor quality of the loans being issued and included as collateral in RMBS and, ultimately, CDOs.  According to Ambac's own disclosures, Ambac's underwriting often "*entails on-site due diligence covering the parties to the transaction, such as the issuer, originator, servicer or manager.*"  (*See*, *e.g.*, Ambac 2006 Form 10-K.)

> **Answer:**     Admit that Ambac's 2006 Form 10-K contains language substantially
>
> similar to that quoted in the last sentence, and respectfully refer the
>
> Court to that filing for the complete contents and context thereof,
>
> including the cautionary statements and risk factors referred to therein;
>
> except as specifically admitted, otherwise deny the allegations of
>
> paragraph 76.

77.     According to CW 3, a former underwriter in Ambac's RMBS group from October 2001 to February 2007, during Ambac's routine due diligence visits to mortgage originators, Ambac learned in 2005 and early 2006 that the underwriting standards of the mortgage originators were being systematically lowered in order to maintain profits in the face of a slumping market.  Ambac continued to witness the deterioration of the underwriting standards at

the mortgage originators throughout the Class Period.  Instead of requiring heightened protections and demanding solid underlying collateral for RMBS-related deals it insured, Ambac lowered its own underwriting standards, while at the same time assuring the investing community that its RMBS-related portfolio was better than the market due to its stringent underwriting and surveillance policies.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the existence of, or the contents of alleged statements by, alleged CW 3; aver that the allegations of the second sentence of paragraph 77 are general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations; otherwise deny the allegations of paragraph 77.

78.    Ambac's historical underwriting standards prevented the RMBS sales team from guaranteeing many of the RMBS deals being offered to Ambac in 2006.  Ambac's prior commitment to investor and capital protection, however, conflicted with the push to generate short term revenues sufficient to reach Defendant Genader's goal of reporting $1 billion of net income.

> **Answer:**    Deny.

79.    Accordingly, the Exchange Act Defendants chose to accept and embrace the deterioration of the originator's lending standards, changing Ambac's own underwriting standards so that the Company could insure more and more of these poorly vetted loans.  This material change in underwriting standards was also undisclosed.

> **Answer:**    Deny.

80.    The first shift towards accepting greater risk came through lowered demands for overcollateralization when HELOC deals were wrapped.  For example, according to CW 3, prior to 2006, Ambac would wrap HELOC RMBS deals only if, within a 12 month time frame, the model predicted that the RMBS would be overcollateralized by 3.5%, meaning that it had a 3.5% cash cushion above anticipated cash outflows, including defaults.  This overcollaterization would be obtained through pre-payment of the HELOC loans in the first 12 months.  This 3.5% of overcollaterization served as a credit enhancement, or protection from loss, for Ambac, since there would be an additional 3.5% of collateral to offset any losses in the HELOC RMBS.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the existence of, or the contents of alleged statements by, alleged CW 3; admit that overcollaterization was one type of credit enhancement,

among many, that Ambac's subsidiaries considered when deciding

whether to underwrite a mortgage-related securities deal; admit that

overcollateralization generally represented a credit enhancement; aver

that other forms of credit enhancement may also be used in particular

transactions; except as specifically admitted, otherwise deny the

allegations of paragraph 80.

81.    However, according to CW 3, by the beginning of 2006, Ambac did not require that a HELOC product include as much overcollaterization. By this time, as long as the model predicted that the RMBS would include overcollaterization of only 0.5%, Ambac would approve the deal. This reduction was highly material and substantially lowered the credit enhancement protection Ambac required in its HELOC deals, thereby significantly increasing the Company's risk exposure to these deals. Ambac did so in order to wrap more and more of these deals so it could generate increasing revenue and achieve Genader's $1 billion goal.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents of alleged statements by, alleged CW 3;

otherwise deny the allegations of paragraph 81.

82.    During this same time period, Ambac began to insure RMBS backed by loans that were structurally riskier than it had in the past, particularly closed-end second lien products (as described in ¶322). Prior to 2006, the RMBS that Ambac insured were backed by mortgages from borrowers who had owned their homes for years, so they had a history of payment on their first liens and owned equity in their homes. After 2006, however, Ambac agreed to insure increasing amounts of RMBS backed by CES mortgages issued to home purchasers who applied for a second lien ***to cover the initial downpayment on their homes***, otherwise known as piggy-back loans. In other words, these home purchasers either did not have enough capital or were not willing to pay their own capital to meet the down-payment requirements of the first lien loans. Moreover, Ambac was aware that these CES loans were being originated under substandard underwriting standards. (See ¶¶55-59; 76-79) According to CW 3, the change in the underlying CES loans increased the risk level of Ambac's CES products.

**Answer:**    Admit that, from time to time, Ambac's subsidiaries provided financial

guarantees on mortgage-backed securities for which CES was the

underlying collateral, as Ambac publicly disclosed (including

disclosures on its website); deny knowledge or information sufficient to

form a belief as to the existence of, or the contents of alleged statements

by, alleged CW 3; aver that the remaining allegations of paragraph 82

are general in nature and do not particularize factual allegations to

which a response can meaningfully be made; to the extent a response is

required, deny such allegations; except as specifically admitted,

otherwise deny the allegations of paragraph 82.

83.    Moreover, in June 2006, Ambac affirmatively and secretly changed the risk profile of its RMBS portfolio by altering its underwriting model so it could approve deals that would not be approved under the prior model.

**Answer:**    Deny.

84.    CW 3 explained that the direct RMBS underwriting group saw many lucrative HELOC deals go to financial guarantor competitors because Ambac rejected these deals as being too risky.  According to CW 3, in June 2006, Pat McCarthy, First Vice President in the Consumer Asset-Backed Securities Group, wrote a memo proposing a drastic change in the HELOC underwriting standards that was submitted to the Credit Risk Committee.  The new standards were reviewed and were explicitly approved by all members of the Credit Risk Committee, including Defendants Genader, Uhlein and Wallis.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents of alleged statements by, alleged CW 3;

admit that Ambac rejected a number of HELOC deals later insured by

Ambac's competitors; except as specifically admitted, otherwise deny

the allegations of paragraph 84.

85.    According to CW 3, the new model created by Ambac's underwriting department and approved by members of the Credit Risk Committee was designed so that riskier, lower-quality RMBS would be approved.  Ambac's historical underwriting model attempted to determine the future performance of a particular RMBS through a detailed review of the characteristics of each underlying HELOC loan contained within the mortgage pool providing cash flows to the RMBS.  Ambac would apply tested assumptions on a loan-by-loan basis to predict performance and assess risk.  The lower quality of mortgages being originated would be identified by this pool-specific approach.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents of alleged statements by, alleged CW 3;

aver that the allegations in sentences two, three, and four are general in

nature and do not particularize factual allegations to which a response

can meaningfully be made; to the extent a response is required, deny

such allegations; admit that Ambac's underwriting for its guarantees of

RMBS at times included consideration of data available to Ambac

regarding the mortgage loans that served as the collateral for the

RMBS; except as specifically admitted, otherwise deny the allegations

of paragraph 85.

86.    In contrast to the Company's historical model, Ambac's post-June 2006 RMBS underwriting model, implemented by the start of the Class Period, did not look at *any* of the actual loans in the mortgage pool collateralizing the RMBS. Instead, the new model looked only at the historical cumulative default rates of the loan originators. For instance, if a pool of underlying loans was originated by Countrywide Financial Corp. ("Countrywide"), Ambac would run its model against Countrywide's historical cumulative default rate on the type of loans being securitized, but would not look at the actual underlying loans in the pool, to determine the future performance of the RMBS.

**Answer:**    Deny.

87.    This new model's reliance on historical rates of default by originator was highly problematic. The historical default rates of loan originators could not predict the future performance of loans issued in and after mid-2006. According to CW 3, by mid-2006, Ambac knew that the originators had materially lowered their underwriting standards across the board. CW 3 stated that the new underwriting model resulted in Ambac approving high risk RMBS transactions, which would have been rejected under the prior model. Ambac never disclosed to the public that it materially changed its underwriting methodology.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents of alleged statements by, alleged CW 3;

otherwise deny the allegations of paragraph 87.

88.    Further, according to CW 3, in October 2006, four months after Ambac adopted the weaker RMBS underwriting model, Defendant Uhlein received a memorandum from Iain

Bruce, head of the Consumer Asset-Backed Securities group, who was greatly concerned about Ambac's decision to abandon their strict underwriting guidelines and insure CDOs containing even riskier RMBS as the underlying collateral.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> existence of, or the contents of alleged statements by, alleged CW 3;
>
> admit that Iain Bruce acted as the head of the Consumer Asset-Backed
>
> Securities group; except as specifically admitted, otherwise deny the
>
> allegations of paragraph 88.

89.    According to CW 3, who saw this memorandum on a computer screen around the time it was sent, Bruce wrote "***Why are we willing to insure stuff in the secondary market*** [i.e., the CDO market] ***that we would not touch with a ten foot pole in the primary market*** [i.e., the RMBS market]?" In other words, the RMBS collateral supporting the CDOs that Ambac guaranteed by writing credit default swaps was of such poor quality that the same RMBS could not be approved to be directly insured by Ambac.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> existence of, or the contents of alleged statements by, alleged CW 3;
>
> otherwise deny the allegations of paragraph 89.

90.    Other internal managers expressed concern over the quality of the RMBS contained within the insured CDOs. Jeff Nabi was a Managing Director in Ambac's Consumer Asset-Backed Securities Group. According to CW 4, a former First Vice President who worked in Ambac's Consumer Asset-Backed Securities Group from July 2002 to April 2007, Nabi expressed concerns about Ambac's CDO exposure, complaining within Ambac that the Company's Credit Risk Committee "didn't look at and evaluate CDO exposure with the same scrutiny" as was applied to other exposures, and that the CDO deals did not face the "same degree" of stress-testing as other transactions.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> existence of, or the contents of alleged statements by, alleged CW 4;
>
> admit the second sentence; except as specifically admitted, otherwise
>
> deny the allegations of paragraph 90.

91.    One reason for Ambac's acceptance of mortgage collateral in CDOs that would not even pass Ambac's lowered RMBS underwriting standards was that in late 2006 and early 2007, Ambac's CDO team was "churning out deals" for which the underwriters did not "really

dig down all that deeply," according to CW 5, a former Vice President of Ambac between January 2005 and July 2007.  Instead of conducting deep and detailed underwriting, the process evolved to "relying on counterparties," meaning the investment bankers who originated CDOs. When asked if Ambac's CDO underwriters were conducting an in-depth analysis of the collateral supporting CDOs, CW 5 answered, "Were they doing that on every deal? I would say no."

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> existence of, or the contents of alleged statements by, alleged CW 5;
>
> otherwise deny the allegations of paragraph 91.

92.    Notwithstanding what Ambac's senior management was seeing and saying in private, in public they assured investors that the Company remained "very cautious" about the securities it was insuring.  For example, during Ambac's October 25, 2006 conference call, CFO Sean Leonard preached Ambac's disciplined approach, stating:

> ... I would say, as a general matter, ***we're very selective in that sector***, one, for the obvious risk that's out in the marketplace, and two, the ability to get properly compensated for that.  I would also say, as a matter, that our CDO portfolio, when we look at structured credit with MBS, ***we're also very cautious about mezzanine-type securities that come out of mortgage-backed securitizations.  So, we are taking a cautious position for underwriting reasons***, but also the availability of profitable transactions is not as great as it has been in the past.  (Emphasis added.)

> **Answer:**    Admit that Ambac held a conference call on October 25, 2006, but deny
>
> plaintiffs' characterizations and further deny that matters plaintiffs
>
> allege are presented in their appropriate context, and respectfully refer
>
> the Court to the record of the same for the complete contents and
>
> context thereof, including the cautionary statements and risk factors
>
> referred to therein; except as specifically admitted, otherwise deny the
>
> allegations of paragraph 92.

93.    Leonard's assurances were important to investors and analysts, who relied on Ambac's underwriting discipline as the key to avoiding losses.  In discussing Ambac's need to balance the drive for revenues against avoiding unreasonable risk, Morgan Stanley's Ken Zerbe wrote in December 14, 2006 that "***we highly doubt management would lower its underwriting***

***standards just to post top line growth***, particularly given the years it has taken them to build their profitable franchise."

> **Answer:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 93.

94.    The Exchange Act Defendants' false and misleading statements about how Ambac maintained its superior underwriting continued through the Class Period. In Ambac's 2006 Annual Report, Defendant Genader wrote a letter telling investors they should "[r]est assured that we will continue to be disciplined and rigorous in our scrutiny of" mortgage-linked exposures. At a June 12, 2007 KBW Mortgage Finance Conference, Defendant Uhlein answered questions about how RMBS weakness could affect Ambac. He discussed the newest CDO-related credit default swaps that Ambac issued in early 2007 and told investors "we've been pretty conservative and so we are very comfortable with our current book of business, even in this environment."

> **Answer:** Admit that Genader's letter to stockholders in Ambac's 2006 Annual Report contains language substantially similar to that quoted in the second sentence, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to such 2006 Annual Report for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; admit that Uhlein spoke at the KBW Mortgage Finance Conference on June 12, 2007, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the record of the same for the complete contents and context thereof; except as specifically admitted, otherwise deny the allegations of paragraph 94.

95.    Investors became more sensitive to RMBS and CDO risks over the summer, including after the July 23, 2007 disclosures by Countrywide, once the country's biggest mortgage originator, of significant losses in its mortgage portfolio. Countrywide was a major servicer and originator of Ambac's RMBS exposures. In Ambac's July 25, 2007 earnings

release, Defendant Genader highlighted the Company's "rigorous and proven approach" to selecting and monitoring its exposures. During that day's analyst conference call, Defendant Leonard insisted that Ambac had been "conservative" in its underwriting, stating that Ambac has "been cautious and selective" in guaranteeing the repayment of CDOs backed by RMBS and that "Ambac remains diligent in [the] structuring of transactions."

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence; admit that, as was publicly disclosed, Countrywide acted as the servicer and/or originator of certain mortgage-backed securities, tranches of which Ambac insured; admit that Genader's comments quoted in Ambac's July 25, 2007 earnings release included the phrase "rigorous and proven approach," but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the earnings release for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; admit that Ambac held a conference call on July 25, 2007, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the record of the same for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 95.

96.    As explained above, these statements were false and misleading because, in fact, Ambac knew that the quality of the mortgages supporting its RMBS and CDO exposures had deteriorated because of lowered underwriting standards of mortgage originators, and that Ambac's own underwriting standards had weakened so it could approve revenue-generating deals that would once have been considered too risky.

> **Answer:**    Deny.

97.     Ambac also misrepresented its surveillance process during the Class Period. Throughout the Class Period, the Exchange Act Defendants repeatedly assured investors that Ambac was carefully monitoring the performance of its portfolio. Such monitoring was critical to investors because sudden losses or collateral deterioration would undermine Ambac's capital cushion, as well as its credibility.

**Answer:**     Aver that the allegations of the second sentence are general in nature and do not particularize factual allegations to which a response can meaningfully be made; to the extent a response is required, deny such allegations; except as specifically admitted, otherwise deny the allegations of paragraph 97.

98.     The following was Ambac's description, in its 2006 Form 10-K, of its structured finance surveillance practices, including the central role that senior management played in overseeing and executing the surveillance process:

*Surveillance and Remediation:*

The Surveillance Group is responsible for monitoring outstanding financial guarantee exposures, including credit derivatives. The group's monitoring activities are designed to detect deterioration in credit quality or changes in the economic, regulatory or political environment which could adversely impact the portfolio. Active surveillance enables Ambac Assurance's Surveillance Group to track single credit migration and industry credit trends....

... The focus of the surveillance review is to assess performance, identify credit trends and recommend appropriate classifications, ratings and review periods.... Those credits that are either in default or have developed problems that eventually may lead to a claim or loss are tracked closely by the appropriate surveillance team and reported to management and Ambac's Board of Directors by preparation of an adversely classified credit listing. Relevant information, along with the plan for corrective actions and a reassessment of the credit's rating and credit classification, is reviewed with senior management in regular adversely classified credit meetings....

**Answer:**     Admit that the 2006 Form 10-K contains statements substantially similar to the language quoted above, and respectfully refer the Court to the same for the complete contents and context, including the

-48-

cautionary statements and risk factors referred to therein; except as

specifically admitted, otherwise deny the allegations of paragraph 98.

99.    The Credit Risk Committee responsible for approving RMBS-related deals included the Company's senior management.  According to CW 4, the Credit Risk Committee members included Genader, the Company's CEO, Wallis, the Chief Credit Officer, along with the Chief Risk Officer and the heads of relevant business groups.  Defendant John Uhlein, Ambac's Executive Vice President and head of its U.S. Structured Finance Department, was the representative Credit Risk Committee member for the structured finance group.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents of alleged statements by, alleged CW 4;

admit that, during the Class Period, from time to time, Uhlein, Wallis,

and/or Genader participated on the Securitization Senior Credit

Committee, which was responsible for approving Ambac's guarantees

of certain mortgage-backed securities; except as specifically admitted,

otherwise deny the allegations of paragraph 99.

100.    The Exchange Act Defendants' false assurances about their ongoing and in-depth monitoring of Ambac's RMBS-related exposures continued through the Class Period.  During a March 6, 2007 conference, Defendant Uhlein insisted that Ambac (1) has "maintained the same conservative standards over the years," and (2) carefully analyzes "monthly, quarterly reports on all the transactions that we guarantee."  Defendant Uhlein also highlighted that while Ambac's business mix may have changed, its corporate focus had not:  "Our core corporate objective has been very consistent year-to-year, we will continue to strive to excel in all aspects of risk underwriting, structuring, and surveillance."

**Answer:**    Admit Uhlein spoke at an AIFA conference on March 6, 2007, but deny

plaintiffs' characterizations and further deny that matters plaintiffs

allege are presented in their appropriate context, and respectfully refer

the Court to the record of the same for the complete contents and

context; except as specifically admitted, otherwise deny the allegations

of paragraph 100.

101.    During Ambac's conference call on July 25, 2007, Tom Gandolfo, Senior Managing Director of Ambac and Ambac Assurance and head of Ambac's Global Structured Credit, Derivative Products, Fixed Income Investment Management and Risk Transfer groups, in explaining how Ambac evaluated and reviewed its CDO products, stated that "[w]e believe our credit-risk analysis goes far beyond that which a typical CDO investor would perform." He also assured investors: "*We do a detailed review and re-rating of all the underlying RMBS collateral in the deal.* (Emphasis added.)

> **Answer:**    Admit that Ambac held a conference call on July 25, 2007, but deny
>
> that matters plaintiffs allege are presented in their appropriate context,
>
> and respectfully refer the Court to the record of the same for the
>
> complete contents and context thereof, including the cautionary
>
> statements and risk factors referred to therein; except as specifically
>
> admitted, otherwise deny the allegations of paragraph 101.

102.    In reality, if Ambac conducted the "active surveillance" it described to assess loan performance and detect collateral deterioration, then the Exchange Act Defendants affirmatively knew the delinquency rates and default rates of the underlying loans in the residential mortgage instruments Ambac insured were increasing throughout the Class Period, as set forth in ¶¶111-133. A review of the "monthly, quarterly reports on all the transactions that [Ambac] guarantee[s]" would readily have alerted the Exchange Act Defendants of this fact. However, the Exchange Act Defendants never disclosed to the investing public that Ambac's residential mortgage portfolio was experiencing increased defaults and delinquencies in line with the mortgage market at large.

> **Answer:**    Deny.

103.    If the Exchange Act Defendants did not know about the poor performance and collateral deterioration set forth at ¶¶111-133, that was because, in fact, they did not conduct the surveillance of Ambac's RMBS exposures that they claimed. In fact, CW 5 stated that the CDO surveillance group relied heavily on the published ratings by the credit rating agencies in determining whether to actually review the RMBS collateral supporting Ambac's CDO exposures.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> existence of, or the contents of alleged statements by, alleged CW 5;
>
> otherwise deny the allegations of paragraph 103.

104.    This heavy reliance on the ratings agencies was in direct contradiction to Ambac's assurances that it was actively monitoring the performance of its CDOs. During the October 24,

2007 conference call, Defendant Leonard highlighted that "*As always, we will continue to actively monitor these transactions, closely analyzing collateral performance and then consider structural protections available to us.*"  (Emphasis added.)  Indeed, as late as December 27, 2007, Ambac maintained that it did not rely on ratings of rating agencies.  In a SEC filing that day, Ambac asserted:

> Ambac does not rely on the agencies in either approving transactions or assigning internal ratings to the deals it approves.  *We conduct our own independent analysis of each transaction and the transaction is reviewed by one of our respective Senior Credit Committees pursuant to our credit process and policies.*  The Committee also evaluates the recommended rating for the transaction at that time.  Closed transactions are analyzed by our Portfolio Risk Management Group; and our original internal ratings are confirmed or revised, as appropriate.  (Emphasis added.)

**Answer:**    Admit that Ambac held a conference call on October 24, 2007, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the record of the same for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; admit that Ambac filed a Form 8-K on December 27, 2007 containing language substantially similar to the language quoted above, and respectfully refer the Court to the same for the complete contents and context, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 104.

105.    Had Ambac's prior representations been true, Ambac, in independently analyzing the performance of the underlying assets, would have known that (a) by the beginning of the Class Period, there was a negative trend indicating rising delinquencies and default rates in the underlying collateral in the RMBS-related instruments that Ambac insured that should have been disclosed to investors, together with its 2006 lowering of its underwriting standards; (b) the cost of the credit default swaps that Ambac issued for CDOs backed by RMBS were increasing in value, and Ambac's liabilities through these swaps should have been marked-to-market in

significant amounts as early as February 2007; and (c) the RMBS-related instruments that Ambac insured were materially impaired much earlier than January 2008.

>    **Answer:**      Deny.

106.     By late 2006, the signs of a housing downturn were prevalent – housing sales were on the decline, interest rates increased, and default and delinquency rates were starting to spike.  As illustrated in the following chart, U.S. housing prices began a precipitous collapse in early 2006 (which continues today): [chart in Complaint is not reprinted here]

>    **Answer:**      Aver that the allegations of the first sentence of paragraph 106 are
>
>    general in nature and do not particularize factual allegations to which a
>
>    response can meaningfully be made; to the extent a response is required,
>
>    deny such allegations; otherwise deny the allegations of paragraph 106.

107.     Near the end of 2006, as home price appreciation was materially declining, the quality of mortgage loans that were securitized was also steadily declining.  Starting in 2005 and extending into 2007, the quality of mortgage loans that were pooled together into RMBS-related deals deteriorated with each successive quarter.  As described above, Ambac was aware of this deterioration in mortgage originators' underwriting standards based on its quarterly review and due diligence of mortgage originators.

>    **Answer:**      Aver that the allegations of the first two sentences of paragraph 107 are
>
>    general in nature and do not particularize factual allegations to which a
>
>    response can meaningfully be made; to the extent a response is required,
>
>    deny such allegations; otherwise deny the allegations of paragraph 107.

108.     In an S&P report for the third quarter of 2006, S&P noted that issuers claimed to be tightening their underwriting standards in response to rising delinquencies and early payment defaults.  Similarly, Moody's Investors Service ("Moody's") observed that there had not merely been a one-time shift in the quality of loans, but that there appeared to be a trend of weakening loan quality.  In the first quarter of 2007, Moody's noted that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."  In June 2007, Moody's noted that "within the 2006 vintage... the performance of late-2006 pools is generally worse than that of early-2006 pools," and that "following the pattern of serious delinquencies... cumulative losses for late 2006 pools have trended higher than those for early 2006 pools at the same points of seasoning."

>    **Answer:**      Deny knowledge and information sufficient to form a belief as to the
>
>    truth of the allegations of paragraph 108.

109.     These conditions created a substantial risk of increased losses in Ambac 's RMBS-related exposures.  The erosion of the supposedly secure revenue streams that supported the highly rated tranches of RMBS and CDOs that Ambac guaranteed meant that the risk was increasing that Ambac would actually have to (a) pay out on these instruments and (b) disclose and account for these losses, impairing its capital cushion.  The Exchange Act Defendants understood that reporting a sudden increase in losses and capital impairments would create significant pressure on Ambac's AAA credit ratings.  Accordingly, once the declines in the housing and credit markets increased the risk of those losses materializing, the Exchange Act Defendants had a strong motive to conceal Ambac's problems.

**Answer:**     Deny.

110.     Rather than disclose to investors that Ambac faced substantial losses as a consequence of this increased risk, the Exchange Act Defendants continued to represent to investors that Ambac's guaranteed products were of superior quality and were not exposed to the declines in value affecting the housing market.  As set forth below, the Exchange Act Defendants' insistence that Ambac's exposures performed better than the market in general because of its superior underwriting and surveillance practices was accepted by investors as true, yet was demonstrably false.

**Answer:**     Deny.

111.     By early 2007, both the media and research analysts were reporting on the weakening housing market, and began to link the decline in housing prices, rise in interest rates and increase in defaults to a weakening of the securitized RMBS and CDO markets.  Investors became concerned that significant declines in two market-based indices known as the ABX[4] and TABX[5] indicated deterioration in the values of RMBS and CDOs backed by RMBS collateral.

**Answer:**     Aver that the allegations of paragraph 111 are general in nature and do

not particularize factual allegations to which a response can

meaningfully be made; to the extent a response is required, deny

knowledge or information sufficient to form a belief as to the truth of

the allegations of paragraph 111.

111 n.4.     The ABX (or ABX.HE) consists of market indices that track the value of credit default swaps written as insurance against dozens of representative RMBS, much like the S&P 500 index is a proxy for the performance of large publicly-traded corporations.  Each "ABX.HE" index tracks the price of CDS based on set of RMBS separated by year of origination, vintage and rating:  AAA, AA, A and BBB.  As the price of buying credit protection for the relevant vintage and rated RMBS on which the ABX is based increases, the ABX index declines.

**Answer:**    Aver that Markit has publicly stated that the ABX index was "not

designed to be uncritically extrapolated to the broader ABS market, and

it was certainly not designed as a valuation tool for individual

securities," Ben Logan, "The ABX Index: A Pricing Conundrum,"

*Credit* (May 1, 2008); otherwise deny knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph

111, footnote 4.

111 n.5.    The TABX, launched in February 2007, tracks the price of CDS based on the BBB and BBB-tranches of the ABX indices, except that it tracks valuation based on year of origination and level of subordination. The TABX cut the BBB and BBB-tranches into a capital structure of six tranches that ranged from the first dollar of loss (those assets with ratings of BBB or lower) to the AAA tranches of typical CDOs. The TABX is based on the price of credit default swaps for underlying RMBS collateral that were similar in nature to those entered into by Ambac, in that they were "Pay-As-You-Go" and did not require physical settlement. As set forth below, Lead Plaintiffs' consultants focused on the ABX and TABX indices most like Ambac's credit default swap exposures in assessing the mark-to-market losses that Ambac should have been reporting.

**Answer:**    Aver that commentators have stated that "there is no way to use TABX

pricing as the benchmark for CDO pricing," Laurie S. Goodman *et al.*,

*Subprime Mortgage Credit Derivatives* 160 (2008); otherwise deny

knowledge or information sufficient to form a belief as to the truth of

the allegations of the first, second, and fourth sentences of paragraph

111, footnote 5, and deny the allegations of the third sentence of

paragraph 111, footnote 5.

112.    Rather than report collateral deterioration and mark-to-market write-downs in line with the deteriorating market, which would disclose to investors that Ambac's RMBS-related exposures were under stress and that losses were a reasonable expectation, the Exchange Act Defendants bolstered Ambac's stock price by insisting that market deterioration was not an indication of deterioration of Ambac's exposures. As set forth in Section VI, investors and analysts relied upon the Exchange Act Defendants' assurances about the higher quality of Ambac's RMBS-related exposures and the difference between those exposures and the market in general. These statements, however, were materially false and misleading. In reality, Ambac

was witnessing in its portfolios the same deteriorating mortgage performance as the rest of the market.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence; otherwise deny the allegations of paragraph 112.

113.    In connection with their investigation, Lead Plaintiffs retained mortgage industry experts to evaluate the Exchange Act Defendants' assertions that the mortgage collateral included within Ambac's RMBS and CDOs compared favorably to the market in general.  As Lead Plaintiffs demonstrate below, rather than performing better than the market, Ambac's insured RMBS and the RMBS contained in their insured CDOs actually performed exactly the same or worse than the market in general.  The analysis described below is a simulation of the "surveillance" that the Exchange Act Defendants claimed was being performed at Ambac prior to and during the Class Period.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the existence of, or the contents or nature of the alleged analysis performed by, the Lead Plaintiffs' alleged (and anonymous) consultants; otherwise deny the allegations of paragraph 113.

114.    In order to assess the validity of Ambac's representations, Lead Plaintiffs retained an independent expert consulting firm whose members include economists, financial academics, experienced finance and mortgage industry specialists, Chartered Financial Analysts and Ph.Ds. A team of consultants, including statisticians and consultants on the performance and valuation of derivative securities, conducted the analysis set forth below.  In addition, Lead Plaintiffs retained another independent consultant, who formerly structured and traded RMBS and CDOs like those that Ambac insured.  The methodology and results of Lead Plaintiffs' consultants' analysis is summarized below.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 114.

115.    Notably, Ambac did not identify the underlying collateral of its insured CDOs. Thus, the CDO analysis below could not have been performed by the investing community before January 30, 2008.  Even as to the RMBS, investors could not, absent costly and arduous efforts and review of disparate sources of information, determine whether Ambac's statements about its mortgage collateral were true.

> **Answer:**     Aver that Ambac had well prior to January 30, 2008 publicly provided
>
> information, including on Ambac's website, on Ambac's RMBS and
>
> CDO exposures, including identifying all of Ambac's RMBS exposures
>
> and the nature of their underlying collateral, as well as the type of
>
> collateral underlying its CDO exposures; aver that such publicly
>
> provided information was updated from time to time by Ambac;
>
> otherwise deny the allegations of paragraph 115.

116.    This changed on January 30, 2008, when a third party posted on its website an "Open Source Model," which listed all of Ambac's RMBS and CDO exposures, including the securities comprising the collateral for Ambac's CDOs.  Lead Plaintiffs used the information included in the Open Source Model to analyze the performance of the collateral underlying Ambac's exposures, as the Exchange Act Defendants claimed they performed all along.

> **Answer:**     Admit that William A. Ackman and/or representatives of Pershing
>
> Square Capital Management, L.P. posted a purported "Open Source
>
> Model" on the world wide web on or about January 30, 2008; deny
>
> knowledge or information sufficient to form a belief as to the truth of
>
> the allegations in the first clause of the second sentence concerning
>
> Lead Plaintiffs' asserted actions; except as specifically admitted,
>
> otherwise deny the allegations of paragraph 116.

117.    By mid-2007, Ambac had approximately $29 billion of exposure to a total of 28 CDOs.  The analysis discussed herein focuses on the CDOs of RMBS issued in 2006 and 2007.  Of those 28 CDOs in Ambac's portfolio, 19 were created in 2006 or 2007 and had a total exposure to Ambac of approximately $22 billion.  Of those 19 CDOs, three were CDO-squared instruments, meaning that 100% of the collateral was in the form on another CDO, specifically BBB-rated mezzanine CDOs.  The remaining 16 CDOs had an average of 77% of their collateral in RMBS, half of which was subprime RMBS.  Lead Plaintiffs' consultants selected a representative sampling analyzing 5 CDOs with over 25% RMBS, which represented approximately 30%, or $6.7 billion, of Ambac's total exposure from its 2006 and 2007 CDOs.

> **Answer:**     Respectfully refer the Court to Ambac's contemporaneous public
>
> website postings for information regarding Ambac's CDO exposures as

of June 30, 2007; deny knowledge or information sufficient to form a

belief as to the truth of the allegations of the second and sixth sentences;

deny knowledge or information sufficient to form a belief as to the

existence of, or the contents or nature of the alleged analysis performed

by, Lead Plaintiffs' alleged (and anonymous) consultants; except as

specifically admitted, otherwise deny the allegations of paragraph 117.

118.    The 5 CDOs analyzed were Belle Haven ABS CDO 2006-1 Ltd. ("Belle Haven"), Duke Funding High Grade IV, Ltd ("Duke"), McKinley Funding III, Ltd ("McKinley"), Longshore CDO Funding 2006-1, Ltd. ("Longshore"), and Ridgeway Court Funding II, Ltd ("Ridgeway") (collectively, the "Ambac representative CDOs").  As of March 31, 2008 these CDOs were rated internally by Ambac as follows:  Belle Haven (BBB-), Duke (A+), McKinley (below investment grade ("BIG"), Longshore (AA), and Ridgeway (BBB-).  Thus, the Ambac representative CDOs selected for analysis included 4 from 2006 and 1 from 2007 and covered a wide range of ratings that is representative of Ambac's overall exposure to CDO backed by RMBS.

> **Answer:**    Respectfully refer the Court to Ambac's contemporaneous public
>
> website postings for information regarding Ambac's CDO exposures as
>
> of March 31, 2008; deny knowledge or information sufficient to form a
>
> belief as to the existence of, or the contents or nature of the alleged
>
> analysis performed by, Lead Plaintiffs' alleged (and anonymous)
>
> consultants; except as specifically admitted, otherwise deny the
>
> allegations of paragraph 118.

119.    Once the Ambac representative CDOs were selected, Lead Plaintiffs' consultant constructed datasets of the RMBS collateral within each CDO from the information made public through the Open Source Model.  Next, certain key performance metrics were collected for each RMBS collateralizing Ambac representative CDOs from monthly service reports obtained by Lead Plaintiffs' consultant and, to a lesser extent, from the Bloomberg database.  These metrics included delinquency rates of 30+, 60+ and 90+ days.  This data helps to track the trends and deterioration of the relevant mortgage pools.  For each of these metrics, an average value was computed for each CDO based on a dollar weighted average of the underlying collateral.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents or nature of the alleged analysis performed

by, Lead Plaintiffs' alleged (and anonymous) consultants; otherwise

deny the allegations of paragraph 119.

120.    After the above data was collected for the RMBS collateral in the Ambac representative CDOs, similar data was gathered for the RMBS collateral underlying 6 different ABX indices.  The 6 indices selected for comparison to the Ambac representative CDOs were: ABX.HE 2006-1 A, which is the ABX index for RMBS issued in the first half of 2006 with a rating of A.  The remaining index names can be interpreted similarly:  ABX.HE 2006-1 AA, ABX.HE 2006-2 A, ABX.HE 2006-2 AA, ABX.HE 2007-1 A, ABX.HE 2007-2 AA.  These indices are considered "high-grade" since each is rated A or above.

**Answer:**    Aver that Markit has publicly stated that the ABX index was "not

designed to be uncritically extrapolated to the broader ABS market, and

it was certainly not designed as a valuation tool for individual

securities," Ben Logan, "The ABX Index:  A Pricing Conundrum,"

*Credit* (May 1, 2008); deny knowledge or information sufficient to form

a belief as to the existence of, or the contents or nature of the alleged

analysis performed by, Lead Plaintiffs' alleged (and anonymous)

consultants; otherwise deny the allegations of paragraph 120.

121.    These indices are similar in both year of issue and rating to the Ambac's representative CDOs that Lead Plaintiffs' consultants analyzed.  Upon analysis, Lead Plaintiffs learned that, at least two-thirds of the RMBS that actually comprise the ABX high-grade indices are contained in one or more of the Ambac's representative CDOs.  This overlap alone suggests that the Exchange Act Defendants' insistence that Ambac does not underwrite the market were false.  Lead Plaintiffs' analysis went deeper.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents or nature of the alleged analysis performed

by, Lead Plaintiffs' alleged (and anonymous) consultants; otherwise

deny the allegations of paragraph 121.

122.    Once all of the data for each of the metrics was collected, the performance data of the RMBS underlying the Ambac representative CDOs was compared to the performance data of the RMBS underlying the selected ABX indices.  All three performance metrics that Lead Plaintiffs' consultants examined – the 30+, 60+ and 90+ day delinquencies –demonstrated a high degree of correlation, as shown below.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> existence of, or the contents or nature of the alleged analysis performed
>
> by, Lead Plaintiffs' alleged (and anonymous) consultants; otherwise
>
> deny the allegations of paragraph 122.

123.    Besides touting the underlying quality of its collateral, Ambac also highlighted that it enjoyed significant "subordination" before incurring its own losses on RMBS and CDO exposures.  Lead Plaintiffs' comparison to the ABX indices tested the Exchange Act Defendants' assertions about Ambac's high-grade collateral quality.  In order to test their assertions about the benefit of subordination, Lead Plaintiffs' also compared the RMBS in the Ambac representative CDOs to the TABX, an index based on the price of credit default swaps for various tranches of RMBS collateral.  The TABX index, unlike the ABX index, focuses on levels of subordination, thus providing a point of comparison to the subordination levels of the CDO tranches insured by Ambac.

> **Answer:**    Admit that subordination is one of a number of credit enhancements
>
> that is present in certain RMBS and CDO transactions that Ambac
>
> guaranteed; deny knowledge or information sufficient to form a belief
>
> as to the existence of, or the contents or nature of the alleged analysis
>
> performed by, Lead Plaintiffs' alleged (and anonymous) consultants;
>
> except as specifically admitted, otherwise deny the allegations of
>
> paragraph 123.

124.    The TABX.HE 07-1 06-2 40-100 (the "40-100 TABX") is the most senior TABX index tranche because it is tied to the underlying RMBS collateral assuming a subordination of 40%.  Lead Plaintiffs' consultants compared Ambac's representative CDO collateral to the collateral underlying the 40-100 TABX for purposes of showing the correlation between Ambac's underlying collateral and that in the most senior TABX trance.  This is a very conservative comparison because the 40-100 TABX subordination level is much larger that the Ambac representative CDOs.  Indeed, over half of the Ambac representative CDOs attached below the 20% level of subordination and the average subordination level of the 2006 and 2007 CDOs was 24%.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the existence of, or the contents or nature of the alleged analysis performed by, Lead Plaintiffs' alleged (and anonymous) consultants; respectfully refer the Court to Ambac's public website postings for information regarding attachment points for Ambac-insured CDOs of ABS with exposure to MBS; except as specifically admitted, otherwise deny the allegations of paragraph 124.

125.    The following chart shows the correlation between the RMBS in Ambac representative CDO exposures and the pertinent ABX and TABX indices using the 90+ day delinquency metric, which is a commonly used mortgage industry standard for identifying non-performing loans.  This chart demonstrates that the performance of the RMBS insured by Ambac through its CDOs did not perform better than the market, as the Exchange Act Defendants represented, but instead performed similarly, and often times worse, than the "market." [chart in Complaint is not reprinted here]

**Answer:**    Deny knowledge or information sufficient to form a belief as to the existence of, or the contents or nature of the alleged analysis performed by, Lead Plaintiffs' alleged (and anonymous) consultants; otherwise deny the allegations of paragraph 125.

126.    The above chart illustrates that, notwithstanding the Exchange Act Defendants' statements to the contrary, the collateral supporting the Ambac representative CDO exposures performed directly in line with (*i.e.*, just as poorly as) the collateral comprising the ABX and TABX indices.  In fact, between June 2006 and January 2008 – when Ambac finally disclosed meaningful write-downs and impairments on its CDO exposures – the 90+ day delinquency rates skyrocketed over 600%.  Notably, the Ambac representative CDOs also included tranches of other inner CDOs, which gave Ambac indirect exposure to lower grade RMBS.  In this respect, Lead Plaintiffs' analysis gives Ambac the benefit of the doubt by focusing on actual RMBS in its CDOs only.  In fact, the 2006 and 2007 CDOs, on average, had approximately 20% of their assets in the form of other CDOs, 15% of which were mezzanine, *i.e.*, BBB-rated or lower, CDOs.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the existence of, or the contents or nature of the alleged analysis performed

by, Lead Plaintiffs' alleged (and anonymous) consultants; otherwise

deny the allegations of paragraph 126.

127.    To confirm the close relationship illustrated above, Lead Plaintiffs' consultants also performed a regression analysis comparing the Ambac representative CDOs and the ABX and TABX indices.  This analysis showed that the average regression coefficient is statistically equivalent to 1, meaning that the collateral behind the Ambac representative CDOs moved on average in tandem with the underlying collateral of both the ABX and TABX indices.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents or nature of the alleged analysis performed

by, Lead Plaintiffs' alleged (and anonymous) consultants; otherwise

deny the allegations of paragraph 127.

128.    Lead Plaintiffs' consultants also analyzed the performance of Ambac's second-lien RMBS portfolio.  As set forth above, Ambac insisted that it conducted "active surveillance" of its RMBS portfolio, including regularly reviewing the performance of its underlying collateral.  Lead Plaintiffs and their consultants attempted to replicate the "surveillance" that Ambac supposedly did.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents or nature of the alleged analysis performed

by, Lead Plaintiffs' alleged (and anonymous) consultants; except as

specifically admitted, otherwise deny the allegations of paragraph 128.

129.    To analyze Ambac's direct second-lien RMBS exposure, Lead Plaintiffs' consultant collected and analyzed performance data of the mortgage loans underlying Ambac's HELOC and CES portfolios for insurance written from 2005 to 2007.  Lead Plaintiffs focused on the 90+ day delinquency rates, which approximates the data point that major mortgage lenders, like Countrywide, applied in defining a loan as a "non-performing asset."

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents or nature of the alleged analysis performed

by, Lead Plaintiffs' alleged (and anonymous) consultants; otherwise

deny the allegations of paragraph 129.

130.    As depicted in the chart on the following page, by no later than the first quarter of 2007, there was a clear deterioration in the underlying assets of Ambac's HELOC and CES portfolios, evidenced by significantly increasing average 90+ day delinquency rates.  In order to provide a point of reference in assessing the increase in 90+ day delinquencies on Ambac's RMBS exposures, Lead Plaintiffs compared the actual delinquency figures with the 90+ day delinquency figures of the ABX and TABX.  [chart in Complaint is not reprinted here]

**Answer:**    Deny knowledge or information sufficient to form a belief as to the existence of, or the contents or nature of the alleged analysis performed by, Lead Plaintiffs' alleged (and anonymous) consultants; otherwise deny the allegations of paragraph 130.

131.    Notably, Ambac's HELOC and CES exposures performed almost identically (*i.e.*, just as poorly) as the ABX and TABX indices.  Investors should have been, but were not, informed that Ambac's HELOC and CES exposures were showing markedly deteriorating performance – just like the deterioration making headlines in the marketplace.

**Answer:**    Deny.

132.    Ambac has recently made a disclosure about trends in its HELOC and CES portfolios that confirms Lead Plaintiffs' conclusions set forth above.  In its second quarter 2008 earnings release and the related slide presentation, Ambac disclosed the below graphic, which shows the collateral performance of "select" samples of Ambac's CES and HELOC portfolios.  The graphic demonstrates the 30-59 day delinquencies of select samples of Ambac's HELOS and CES portfolios:  [graphic in Complaint is not reprinted here]

**Answer:**    Deny the first sentence; admit that Ambac disclosed slides in connection with its second quarter 2008 earnings release and related conference call, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the record of the same for the complete contents and context, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 132.

133.    In Ambac's "select" sampling, the black line shows the increase of the average delinquency rate.  Like Lead Plaintiffs' expert analysis set forth at ¶¶128-131 above, this chart

illustrates that through mid-2006, the average percentage of underlying mortgages that were in delinquency by 30-59 days was under 1%, but that this figure had doubled by the end of 2006, it had tripled by the late summer of 2007, and quadrupled by the end of the year. Ambac should have disclosed this negative trend to investors.

> **<u>Answer:</u>**    Admit that Ambac disclosed slides in connection with its second quarter
>
> 2008 earnings release and related conference call, but deny plaintiffs'
>
> characterizations and further deny that matters plaintiffs allege are
>
> presented in their appropriate context, and respectfully refer the Court
>
> to the record of the same for the complete contents and context,
>
> including the cautionary statements and risk factors referred to therein;
>
> otherwise deny the allegations of paragraph 133.

134.    Ambac was required to account for the value of its credit default swap exposures to CDOs in accordance with Statement of Financial Accounting Standards 133, entitled "Accounting for Derivative Instruments and Certain Hedging Activities" ("SFAS 133"). Specifically, SFAS 133 "requires that an entity recognize all derivatives as either assets or liabilities in the statement of financial position and measure those instruments ***at fair value***." Fair value for accounting purposes is:

> The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.... The transaction to sell the asset or transfer the liability is a hypothetical transaction at the measurement date, considered from the perspective of a market participant that holds the asset or owes the liability. Therefore, the objective of a fair value measurement is to determine the price that would be received to sell the asset or paid to transfer the liability at the measurement date (an exit price).
>
> [F]air value is a market-based measurement, not an entity-specific measurement. Therefore, a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability.

> **<u>Answer:</u>**    Admit that Ambac accounted for its credit default swaps at fair value
>
> pursuant to the guidance of SFAS 133; admit that SFAS 133 is entitled
>
> "Accounting for Derivative Instruments and Certain Hedging

Activities"; admit that the Financial Accounting Standards Board's

executive summary of SFAS 133 contains statements substantially

similar to the language quoted in the second sentence, and respectfully

refer the Court to the same for the complete contents and context; aver

that the passage quoted in the last sentence is not taken from SFAS 133,

but rather is substantially similar to statements contained in SFAS 157

and its accompanying summary; except as specifically admitted,

otherwise deny the allegations of paragraph 134.

135.    Throughout the Class Period, Ambac failed to comply with SFAS 133 by ignoring the governing relationship between fair value and pertinent market data.  Until January 16, 2008, Ambac's mark-to-market reporting bore little relationship to the actual change in value of Ambac's credit default swaps relating to its CDOs.  Having shown above that the RMBS collateral in Ambac's CDO exposures performed in line with the market indices, Lead Plaintiffs' outside consultants proceeded to estimate the mark-to-market write-downs that Ambac should have reported for each quarter of 2007.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents or nature of the alleged analysis performed

by, Lead Plaintiffs' alleged (and anonymous) consultants; otherwise

deny the allegations of paragraph 135.

136.    As noted above, once the declines in the ABX and TABX market indices became very severe in 2007, investors questioned why Ambac's reported mark-to-market losses bore little to no resemblance to the general market declines.  Besides claiming that its superior underwriting allowed it to select safer exposures – an assertion refuted above – Ambac also differentiated itself from the "market" by highlighting that it typically insured so-called "high-grade" tranches of CDOs and therefore enjoyed considerable subordination (*i.e.*, it would not incur losses until subordinate tranches lost all their value) before it incurred any losses.  The above analysis and diagram illustrate why these statements were also false.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

truth of the allegations in the first sentence; admit that subordination is

one of a number of credit enhancements that is present in certain RMBS

and CDO transactions that Ambac guaranteed; aver that the allegations

of the second sentence are general in nature and do not particularize

factual allegations to which a response can meaningfully be made; to

the extent a response is required, deny such allegations; except as

specifically admitted, otherwise deny the allegations of paragraph 136.

137.   Lead Plaintiffs' consultants used the declines in the relevant TABX indices as a proxy for estimating Ambac's required mark-to-market write-downs.

**Answer:**     Deny knowledge or information sufficient to form a belief as to the

existence of, or the contents or nature of the alleged analysis performed

by, Lead Plaintiffs' alleged (and anonymous) consultants; otherwise

deny the allegations of paragraph 135.

138.   Immediately upon launch in early 2007, the various TABX tranches materially declined.  As depicted in the chart on the following page, which depicts historical prices for the TABX indices from Markit Group, the 40-100 TABX declined from nearly 100 on February 16, 2007, to around 84 by the end of March 2007, to about 70 at the end of June, and about 35 at the end of September 2007.  [chart in Complaint is not reprinted here]

**Answer:**     Deny knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 138.

139.   Taking into account (a) the significant declines in the TABX index (shown above), (b) the fact that TABX was an index of CDS similar to those issued by Ambac, and (c) that the performance of the underlying RMBS referenced by the TABX was highly correlated to the performance of the underlying RMBS collateral of Ambac's CDOs, Ambac should have taken material mark-to-market write-downs beginning in the first quarter of 2007.

**Answer:**     Deny.

140.   To calculate the estimated mark-to-market write-downs Ambac should have taken in a given quarter, one must take into consideration:  (1) Ambac's total amount of CDOs backed by RMBS exposure at that particular point in time; (2) the corresponding price of the 40-100 TABX; and (3) the correlation coefficient factor between underlying RMBS collateral of Ambac's CDOs and the underlying RMBS collateral referenced by the CDS that comprise the 40-100 TABX.

**Answer:**     Deny.

141.    As of March 30, 2007, Ambac had exposure to approximately $20 billion of CDS on CDOs of ABS.  As discussed above, as of this period the 40-100 TABX had declined to approximately 84% of par.  Thus, by March 30, 2007, applying the above methodology, Ambac was required by GAAP and SFAS 133 to write-down at least ***$2.068 billion*** relating to its CDS on CDOs of ABS from 2006-2007.  For that same quarter, Ambac, in violation of GAAP and SFAS 133, wrote down a total of only $ 5.124 million in total.  Had Ambac's financial statements for the quarter accurately reported this mark-to-market write-down, Ambac's reported net earnings would have declined from a reported profit of $213 million to a loss of $1,311 million, and its earnings per diluted share would have declined from a reported profit of $2.04 per share to a loss of $12.53 per share.

> **Answer:**    Respectfully refer the Court to Ambac's public website postings for the
>
> first quarter of 2007 for information regarding Ambac's exposure to
>
> CDOs of ABS; deny knowledge or information sufficient to form a
>
> belief as to the truth of the allegations in the second sentence;
>
> specifically deny that GAAP and SFAS 133 required a write-down of
>
> the magnitude alleged in the third sentence of paragraph 141; admit that
>
> Ambac took an unrealized mark-to-market loss on the value of credit
>
> derivative contracts of approximately $5.124 million in its 1Q 2007
>
> filing; admit that Ambac reported a profit of $213 million and $2.04 per
>
> share for the 1Q of 2007; except as specifically admitted, otherwise
>
> deny the allegations of paragraph 141.

142.    As of June 30, 2007, Ambac had exposure to approximately $24.3 billion of CDS on CDOs of ABS.  As discussed above, as of this period the 40-100 TABX had declined to approximately 69% of par.  Thus, by June 30, 2007, applying the above methodology, Ambac was required by GAAP and SFAS 133 to write-down at least an additional ***$2.716 billion*** relating to its CDS on CDO of ABS from 2006-2007.  For that same quarter, Ambac, in violation of GAAP and SFAS 133, wrote down a total of $56.87 million.  Had Ambac's financial statements for the quarter accurately reported this mark-to-market write-down, Ambac's reported net earnings would have declined from a reported profit of $173 million to a loss of $1,810 million, and its earnings per diluted share would have declined from a reported profit of $1.69 per share to a loss of $17.65 per share.

> **Answer:**    Respectfully refer the Court to Ambac's public website postings for the
>
> second quarter of 2007 for information regarding Ambac's exposure to

CDOs of ABS; deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence; specifically deny that GAAP and SFAS 133 required a write-down of the magnitude alleged in the third sentence of paragraph 142; admit that Ambac took a mark-to-market loss on the value of credit derivative contracts of approximately $56.87 million in its 2Q 2007 filing; admit that Ambac reported a profit of $173 million and $1.69 per share for the 2Q of 2007; except as specifically admitted, otherwise deny the allegations of paragraph 142.

143.    As of the end of the third quarter 2007, ending September 30, 2007, Ambac had exposure to $26.2 billion of CDS on CDO of ABS.  As discussed above, as of this period the 40-100 TABX had declined to approximately 33% of par.  Thus, by September 30, 2007, applying the above methodology, Ambac was required by GAAP and SFAS 133 to write-down at least an additional *$8.923 billion* relating to its CDS on CDO of ABS from 2006-2007.  As of this point, Ambac only took a minor write-down of $743 million in violation of GAAP and SFAS 133.  Had Ambac's financial statements for the quarter accurately reported this mark-to-market write-down, Ambac's reported net earnings would have declined from a reported loss of $361 million to a loss of $6,314 million, and its earnings per diluted share would have declined from a reported loss of $3.53 per share to a loss of $61.73 per share.

**Answer:**    Respectfully refer the Court to Ambac's public website postings for the third quarter of 2007 for information regarding Ambac's exposure to CDOs of ABS; deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence; specifically deny that GAAP and SFAS 133 required a write-down of the magnitude alleged in the third sentence of paragraph 143; admit that Ambac took a mark-to-market loss on the value of the credit derivative contracts of approximately $743 million in its 3Q 2007 filing; admit that Ambac reported a loss of $361 million and $3.53 per share for the

3Q of 2007; except as specifically admitted, otherwise deny the

allegations of paragraph 143.

144.    As of December 31, 2007, Ambac had exposure to $28.9 billion of CDS on CDO of ABS.  By this time, the 40-100 TABX had declined to approximately 18% of par.  Thus, by December 31, 2007, applying the above methodology, Ambac was required by GAAP and SFAS 133 to write-down at least an additional ***$3.672 billion*** relating to its CDS on CDO of ABS from 2006-2007.  On January 16, 2008, Ambac disclosed its first material market-to-market write-down, disclosing $5.4 billion of the required amount.

> **Answer:**    Respectfully refer the Court to Ambac's public website postings for the
>
> fourth quarter of 2007 for information regarding Ambac's exposure to
>
> CDOs of ABS; deny knowledge or information sufficient to form a
>
> belief as to the truth of the allegations in the second sentence;
>
> specifically deny that GAAP and SFAS 133 required a write-down of
>
> the magnitude alleged in the third sentence of paragraph 144; admit that
>
> Ambac announced an estimated mark-to-market loss of approximately
>
> $5.4 billion for the 4Q of 2007 in its January 16, 2008 press release, but
>
> deny plaintiffs' characterizations and further deny that matters plaintiffs
>
> allege are presented in their appropriate context, and respectfully refer
>
> the Court to the January 16, 2008 press release for its complete contents
>
> and context, including the cautionary statements and risk factors
>
> referred to therein; except as specifically admitted, otherwise deny the
>
> allegations of paragraph 144.

145.    Thus, for the entire year of 2007, Ambac only took a reported write-down of approximately $6.1 billion write-down on its CDO of RMBS.  Ambac was required by GAAP and SFAS 133 to write-down at least $17 billion for the year end December 31, 2007 relating to its CDS on CDO of ABS from 2006-2007.  Moreover, had Ambac's financial statements for the year ended December 31, 2007, properly accounted for the mark-to-market write-down, Ambac's reported net earnings for the year would have declined from a reported loss of $3.24 billion to a loss of $10.45 billion, and its earnings per diluted share would have declined from a reported loss of $31.56 per share to a loss of $101.57 per share.

**Answer:**    Specifically deny that GAAP and SFAS 133 required a write-down of

the magnitude alleged in the second sentence of paragraph 145; admit

that the cumulative amount of mark-to-market losses Ambac announced

on credit derivative contracts, including CDS its subsidiaries had

written on CDO of ABS, in 2007 was approximately $6 billion, and

respectfully refer the Court to Ambac's Form 10-K for the year 2007 for

a description of Ambac's mark-to-market losses; admit that Ambac

reported a net loss for 2007 of approximately $3.24 billion and loss per

share of approximately $31.56 and respectfully refer the Court to

Ambac's Form 10-K for the year 2007 for a complete description of

Ambac's 2007 financial results; except as specifically admitted,

otherwise deny the allegations of paragraph 145.

146.    As explained above, during the Class Period, the Exchange Act Defendants knew or were reckless in not knowing that:  (1) mortgage originators had lowered their standards for underwriting residential mortgages that were being included in a wide range of RMBS; (2) Ambac itself had changed its underwriting policies in a way that allowed it to assume riskier RMBS exposures than would have been allowed under the pre-existing policies; (3) housing and credit market conditions deteriorated severely; (4) the RMBS collateral that Ambac insured directly and that supported Ambac's derivative CDO exposures was deteriorating in near lockstep with the performance of the RMBS comprising the collateral in the pertinent ABX and TABX indices; (5) Ambac violated GAAP by not properly taking mark-to-market writedowns on its CDO portfolio and by not taking adequate loss reserves on its RMBS portfolio; and (6) as a result of the above, Ambac's public reports were materially false and misleading.

**Answer:**    Deny.

147.    On October 25, 2006, Ambac issued a press release announcing its third quarter 2006 financial results.  In the press release, Defendant Genader asserted:  "We are currently witnessing a solid level of deal inquiries and opportunities. . . .  We remain steadfast in judiciously allocating our capital to transactions that enable us to continue to deliver superior returns."

**Answer:**    Admit that Ambac issued a press release on October 25, 2006 that

includes statements substantially similar to the language quoted, and

respectfully refer the Court to the same for the complete contents and

context, including the cautionary statements and risk factors referred to

therein; except as specifically admitted, otherwise deny the allegations

of paragraph 147.

148.    During the conference call that day, Defendant Leonard highlighted Ambac's conservatism in assuming mortgage-related exposures, stating that Ambac was "very selective in that sector" and that "our CDO portfolio, when we look at structured credit with MBS, we're also very cautious about mezzanine-type securities that come out of mortgage-backed securitizations. So, we are taking a cautious position for underwriting reasons, but also the availability of profitable transactions is not as great as it has been in the past."

**Answer:**    Admit that Ambac held a conference call on October 25, 2006, but deny

plaintiffs' characterizations and further deny that matters plaintiffs

allege are presented in their appropriate context, and respectfully refer

the Court to the record of the same for the complete contents and

context thereof, including the cautionary statements and risk factors

referred to therein; except as specifically admitted, otherwise deny the

allegations of paragraph 148.

149.    These statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

a.    In 2006, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* ¶¶55-59; 76-79).

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* ¶¶76-91).

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics. (*See* ¶¶111-133).

**Answer:**    Deny the allegations of paragraph 149, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

150.    On November 8, 2006, Ambac issued its Form 10-Q for the quarter ended September 30, 2006 (the "3Q06 Form 10-Q"). The 3Q06 Form 10-Q was signed by Defendant Leonard and included as exhibits Sarbanes-Oxley Certifications (the "Sarbanes-Oxley Certifications") signed by Defendants Genader and Leonard certifying, *inter alia*, that they had reviewed the 3Q06 Form 10-Q and, to their knowledge the (i) report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; and (ii) the financial statements and other financial information included in the report fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in the report.

**Answer:**    Admit.

151.    The 3Q06 Form 10-Q described Ambac's "active surveillance" of its insured portfolio to identify "adversely classified" credits as follows:

> Active surveillance of the insured portfolio enables Ambac's
> Surveillance Group to track credit migration of insured obligations
> from period to period and prepare an adversely classified credit
> listing. The active credit reserve is established only for adversely
> classified credits. The criteria for an exposure to be included on
> the adversely classified credit listing includes **...**
> **underperformance of the underlying collateral (for collateral
> dependent transactions such as mortgage-backed
> securitizations)**, problems with the servicer of the underlying
> collateral **and other adverse economic events or trends**....
> (Emphasis added.)

**Answer:**    Admit that Ambac's 3Q06 Form 10-Q includes statements substantially

similar to the language quoted, and respectfully refer the Court to the

same for the complete contents and context, including the cautionary

statements and risk factors referred to therein; except as specifically

admitted, otherwise deny the allegations of paragraph 151.

152.    The 3Q06 Form 10-Q disclosed that Ambac took active credit reserves based on, among other things, Ambac's information regarding "historical default information" and "internally developed loss severities."

**Answer:**    Admit that Ambac's 3Q06 Form 10-Q includes statements substantially similar to the language quoted, and respectfully refer the Court to the same for the complete contents and context, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 152.

153.    The 3Q06 Form 10-Q stated that "we note that the mortgage-backed and home equity ultimate [loss] severities have been better than or equal to our current severity assumption." With respect to CDO obligations, the 3Q06 Form 10-Q stated that "Ambac considers the unique attributes of the underlying collateral and transaction."

**Answer:**    Admit that Ambac's 3Q06 Form 10-Q includes statements substantially similar to the language quoted, and respectfully refer the Court to the same for the complete contents and context; aver that these statements were accompanied by cautionary statements, such as "[i]ncreases in mortgage rates, unemployment and/or personal bankruptcies could adversely impact residential real estate values and the severity of loss for our transactions" and "[i]t is reasonably possible that loss estimates for CDOs may increase as a result of increased severity of loss of the underlying collateral."

154.    The above statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

    a.    In 2006, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* ¶¶55-59; 76-79).

    b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* ¶¶76-91).

      c.      As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics.  (*See* ¶¶111-133).

      d.      Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process.  (*See* ¶¶97-105).

**Answer:**      Deny the allegations of paragraph 154, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

155.    On January 31, 2007, Ambac issued a press release announcing its fourth quarter 2006 financial results.  The press release disclosed that Ambac's total revenues were $454.3 million, and net income for the quarter was $202.7 million, or $1.88 per diluted share.  Ambac's loss and loss expense reserve was $220.1 million, a decrease from $304.1 million at the end of the prior year.  During Ambac's conference call that day, Defendant Leonard responded to questions about worsening trends reported in the mortgage sector by assuring investors that "from a surveillance perspective, we consider that and look for those types of trends, obviously trying to identify those early ... but those are things that we specifically look for in the surveillance function."

**Answer:**      Admit that Ambac issued a press release on January 31, 2007 that

reported certain unaudited financial results, including fourth quarter

2006 total revenues of approximately $454.3 million, fourth quarter

2006 net income of approximately $202.7 million or $1.88 per diluted

share, and loss and loss expense reserves of approximately $220.1

million as of December 31, 2006, and respectfully refer the Court to the

January 31, 2007 press release for its complete contents and context,

including the cautionary statements and risk factors referred to therein;

admit that Ambac held a conference call on January 31, 2007, but deny

plaintiffs' characterizations and further deny that matters plaintiffs

allege are presented in their appropriate context, and respectfully refer

the Court to the record of the January 31, 2007 call for the complete

contents and context thereof, including the cautionary statements and

risk factors referred to therein; except as specifically admitted,

otherwise deny the allegations of paragraph 155.

156.    The January 31, 2007 press release also reported a net mark-to-market loss on financial guarantee credit derivative contracts in the fourth quarter of $838,000 and a net mark-to-market gain of $9.1 million for the year 2006.

**Answer:**    Admit that Ambac's January 31, 2007 press release reported certain

unaudited financial results, including net mark-to-market losses on

credit derivative contracts of approximately $838 thousand for the

fourth quarter of 2006 and net mark-to-market gains on credit derivative

contracts of approximately $9.1 million in the year ended December 31,

2006, and respectfully refer the Court to the January 31, 2007 press

release for its complete content and context, including the cautionary

statements and risk factors referred to therein.

157.    Investors and market analysts relied upon and responded favorably to Ambac's statements.  A January 31, 2007, Morgan Stanley report "continue[d] to recommend investors build a position in the ABK shares" and noted that Ambac had "lower credit losses."  A February 8, 2007 Citigroup report commented favorably on the fourth quarter results and a meeting with Ambac senior management, in which defendant Genader "emphasized that the portfolio cannot be measured in average terms because the financial guarantee model is predicated on zero-loss underwriting."  Based on comments from Managing Director Tom Gandolfo, Citibank also wrote that Ambac's "[d]ue diligence has been key to low losses... Not only does Ambac review the deal closely, but also is careful only to work with established CDO managers," and that keys to Ambac's success were its favorable "structure, access to collateral and good financial controls and financial resources."

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 157.

158.    The above statements by the Exchange Act Defendants were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

a.    In 2006, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards.  (*See* ¶¶55-59; 76-79).

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.  (*See* ¶¶76-91).

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics.  (*See* ¶¶111-133).

d.    Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process.  (*See* ¶¶97-105).

**Answer:**    Deny the allegations of paragraph 158, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

159.    On March 1, 2007, Ambac filed with the SEC its Form 10-K for the year ended December 31, 2006 (the "2006 Form 10-K"), which was signed by Defendants Leonard and Genader.  The 2006 Form 10-K included Sarbanes-Oxley Certifications making the same representations as set forth in ¶150 above.  The 2006 Form 10-K represented that Ambac's "Consolidated Financial Statements have been prepared in conformity with U.S. generally accepted accounting principles using management's best estimates and judgment."

**Answer:**    Admit.

160.    Ambac's 2006 Form 10-K reported the same loss and loss expense reserves, net earnings and net earnings per share, as reported in the January 31, 2007 press release, as set forth in ¶155, *supra*.  The 2006 Form 10-K reported net mark-to-market losses of $838,000 on financial guarantee credit derivative contracts for the fourth quarter and a gain of $9.1 million for the year.  Regarding its mark-to-market process, the 2006 Form 10-K disclosed:

Ambac's exposure to derivative instruments ... are accounted for at fair value under SFAS 133[].  Fair value is determined based upon market quotes from independent sources, when available.  When independent quotes are not available, fair value is determined using

valuation models....  For derivatives that trade in less liquid markets, such as credit derivatives on synthetic collateralized debt obligations ... a proprietary model is used because such instruments tend to be more complex and pricing information is not readily available in the market.

**Answer:**    Admit that Ambac's 2006 Form 10-K reported certain financial results, including a fourth quarter 2006 net income of approximately $202.7 million or $1.88 per diluted share, loss and loss expense reserves of approximately $220.1 million as of December 31, 2006, and net mark-to-market gains on credit derivative contracts of approximately $9.1 million in the year ended December 31, 2006; admit that Ambac's 2006 Form 10-K contains statements substantially similar to the language quoted above, and respectfully refer the Court to the same for the complete contents and context, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 160.

161.    With respect to the underwriting of structured finance products, the 2006 Form 10-K represented that "the amount and quality of asset coverage required is ***determined by the historical performance of the underlying asset type*** or the transaction's specific underlying assets."  (Emphasis added.)  The 2006 Form 10-K also stated that, as part of the underwriting process, Ambac performed due diligence on its loan originators, a process that "***often entails on-site due diligence covering the parties to the transaction, such as the issuer, originator, services or manager***.  (Emphasis added.)

**Answer:**    Admit that the 2006 Form 10-K contains statements substantially similar to the language quoted above, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the same for the complete contents and context, including the cautionary statements and risk factors referred to therein.

162.    In describing Ambac's "active surveillance" of its exposures, the 2006 Form 10-K stated as follows:

> The Surveillance Group is responsible for monitoring outstanding financial guarantee exposures, including credit derivatives. The group's monitoring activities are designed to detect deterioration in credit quality or changes in the economic, regulatory or political environment which could adversely impact the portfolio. Active surveillance enables Ambac Assurance's Surveillance Group to track single credit migration and industry credit trends...
>
> ... The focus of the surveillance review is to assess performance, identify credit trends and recommend appropriate classifications, ratings and review periods.... Those credits that are either in default or have developed problems that eventually may lead to a claim or loss are tracked closely by the appropriate surveillance team and reported to management and Ambac's Board of Directors by preparation of an adversely classified credit listing. Relevant information, along with the plan for corrective actions and a reassessment of the credit's rating and credit classification, is reviewed with senior management in regular adversely classified credit meetings....
>
> Surveillance for collateral dependent transactions focuses on review of the asset and servicer performance as well as transaction cash flows.

**Answer:**    Admit that the 2006 Form 10-K contains statements substantially similar to the language quoted above, and respectfully refer the Court to the same for the complete contents and context, including the cautionary statements and risk factors referred to therein.

163.    The 2006 Form 10-K stated, inter alia, that "[t]he criteria for an exposure to be included on the adversely classified credit listing includes ... underperformance of the underlying collateral (for collateral dependent transactions such as mortgage-backed securitizations), problems with the servicer of the underlying collateral and other adverse economic events or trends...." The 2006 Form 10-K also stated that "mortgage-backed and home equity ultimate [loss] severities have been less than or equal to our current severity assumption." With respect to CDO obligations, the 2006 Form 10-K stated that "Ambac considers the unique attributes of the underlying collateral and transaction" and that "Ambac's exposure to CDOs in its classified portfolio is currently limited."

**Answer:**    Admit that the 2006 Form 10-K contains statements substantially

similar to the language quoted above, and respectfully refer the Court to

the same for the complete contents and context, including the

cautionary statements and risk factors referred to therein; except as

specifically admitted, otherwise deny the allegations of paragraph 163.

164.    The above statements were materially false and misleading because the Exchange
Act Defendants misrepresented and/or failed to disclose that:

a.    In 2006, the quality of mortgages comprising Ambac's direct and
derivative RMBS exposures declined because mortgage originators
lowered their underwriting standards.  (*See* ¶¶55-59; 76-79).

b.    Ambac had lowered its own underwriting standards to allow it to accept
greater risk characteristics in RMBS exposures and in CDOs backed by
RMBS.  (*See* ¶¶76-91).

c.    As a result of Ambac's lower underwriting standards, the collateral
supporting Ambac's RMBS-exposures and in CDOs backed by RMBS
showed negative trends in delinquencies and other key metrics.  (*See*
¶¶111-133).

d.    Either Ambac conducted the surveillance it claimed, and the Exchange
Act Defendants knew of but did not disclose these negative trends, or
Ambac misrepresented its surveillance process.  (*See* ¶¶97-105).

e.    After the date of the close of the 2006 financial period but prior to the
issuance of the 2006 Form 10-K, Ambac's CDO portfolio experienced an
undisclosed mark-to-market decline, disclosure of which was a subsequent
event necessary to prevent these financial statements from being
misleading.  (*See* ¶¶134-145).

**Answer:**    Deny the allegations of paragraph 164, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

165.    The 2006 Form 10-K also contained a "Risk Factors" section, which was
materially false and misleading because certain of the risks identified in the 2006 Form 10-K had

already materialized, a fact not disclosed to investors.  In addition, certain material risks known to the Exchange Act Defendants were omitted from the 2006 Form 10-K.

> **Answer:**     Deny the allegations of paragraph 165, and specifically deny that
>
> Defendants made any untrue statement of material fact or omitted to
>
> state a material fact necessary to make the statements made not
>
> misleading.

166.    Under the heading "We are subject to credit risk throughout our businesses," including large single risks and correlated risks," the 2006 Form 10-K stated that:

> We are exposed to the risk that issuers of debt which we have
> insured (or with respect to which we have written credit
> derivatives) ... may default on their financial obligations, whether
> as the result of insolvency, lack of liquidity, operational failure or
> other reasons....  Such credit risks may be in the form of ... losses
> in respect of different, but correlated, credit exposures.

> **Answer:**     Admit that the 2006 Form 10-K contains statements substantially
>
> similar to the language quoted above, and respectfully refer the Court to
>
> the same for the complete contents and context, including the
>
> cautionary statements and risk factors referred to therein.

167.    The 2006 Form 10-K also included a risk factor entitled "General economic conditions can adversely affect our business results and prospects."  This risk factor spoke generically about how general market conditions could lead to losses for the Company.  Another risk factor, under the heading "Changes in prevailing interest rate levels could adversely impact our business results and prospects," a risk factor stated that:

> Additionally, increasing interest rates could lead to increased credit
> stress on consumer asset-backed transactions in our insured
> portfolio (as the securitized assets supporting a portion of these
> exposures are floating rate consumer obligations); slower
> prepayment speeds and resulting "extension risk" relative to such
> consumer asset-backed transactions in our insured portfolio....

> **Answer:**     Admit that the 2006 Form 10-K contains statements substantially
>
> similar to the language quoted above, but deny plaintiffs'
>
> characterizations and further deny that matters plaintiffs allege are

presented in their appropriate context, and respectfully refer the Court

to the same for the complete contents and context, including the

cautionary statements and risk factors referred to therein; except as

specifically admitted, otherwise deny the allegations of paragraph 167.

168.    The above three "risk factors" were materially false and misleading because, as the Exchange Act Defendants knew or recklessly disregarded: (a) Ambac's lowering of underwriting standards in its RMBS portfolios had already resulted in negative trends in delinquencies and other key performance metrics and had increased the expectation that "issuers of debt" that Ambac insured "may default" due to the failure of their underlying collateral; (b) Ambac's changed underwriting policies increased the likelihood of highly correlated defaults in Ambac's RMBS exposures; and (c) interest rates had already increased while housing prices had declined, thereby increasing the expectation of defaults in Ambac's RMBS exposures.

**Answer:**    Deny the allegations of paragraph 168, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

169.    The 2006 Form 10-K included a risk factor stating that "[o]ur risk management policies and practices may not anticipate unforeseen risks and/or the magnitude of potential for loss as the result of foreseen risks."  This risk factor stated that Ambac's "underwriting policies and practices . . . are based in part on models reflecting historical factors, e.g. default rates and severity of loss experience.  These policies and practices may not may not insulate us from risks that are unforeseen and which have unanticipated loss severity."

**Answer:**    Admit that the 2006 Form 10-K contains statements substantially

similar to the language quoted above, and respectfully refer the Court to

the same for the complete contents and context, including the

cautionary statements and risk factors referred to therein.

170.    This risk disclosure was materially false and misleading because the Exchange Act Defendants knew or recklessly disregarded that reliance on "historical" default rates and severity assumptions for underwriting purposes would likely result in increased exposure to inherently riskier products.  Specifically, as the Exchange Act Defendants knew or recklessly disregarded, mortgage underwriters had loosened their historical lending standards and Ambac had relaxed its historical RMBS underwriting standards.

**Answer:**     Deny the allegations of paragraph 170, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

171.    The 2006 Form 10-K omitted any credit risk factor directly addressing Ambac's RMBS and CDO backed by RMBS exposures.  This omission was material, as Ambac effectively admitted on January 25, 2008, when it issued a Form 8-K in which Ambac "revised certain risk factors it previously disclosed in its Form 10-K for the year ended December 31, 2006."  Among those "revised" risk factors was the following *new* risk disclosure, entitled, "We are subject to credit risk related to residential mortgage backed securities and CDOs of ABS":

> We have insured, and written credit default swaps ("CDS") with respect to, RMBS and CDOs of ABS and are thus exposed to credit risk associated with those asset classes.  Performance of these transactions can be adversely affected by general economic conditions, including recession, rising unemployment rates, declining house prices and unavailability of consumer credit; mortgage product attributes, such as interest rate adjustments and balloon payment obligations; financial difficulty experienced by mortgage servicers; and, particularly in the case of CDOs of ABS, transaction-specific factors such as the lack of control of the underlying collateral security which can result in a senior creditor determining to liquidate underlying assets to the disadvantage of mezzanine and subordinated creditors and disputes between creditors with respect to the interpretation of legal documents governing the particular transaction.

> Transactions within Ambac Assurance's insured RMBS and CDO portfolios also may be downgraded, placed on watch or subject to other actions by the three rating agencies that have granted Ambac Assurance its triple-A claims-paying ratings.  Such ratings or other actions could require Ambac Assurance to maintain a material amount of additional capital to support the exposures it has insured.  This could cause us to:

> - have to raise additional capital, if available, on terms and conditions that may be unfavorable;

> - curtail the production of new business; or

> - pay to reinsure or otherwise transfer certain of its risk exposure.

**Answer:**     Deny the first sentence; admit that Ambac filed a Form 8-K on January 25, 2008 that contains statements substantially similar to the language quoted above, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, aver that the Form 8-K represented Ambac's updating of its risk disclosures in light of developments, and respectfully refer the Court to the January 25, 2008 Form 8-K for its complete contents and context; except as specifically admitted, otherwise deny the allegations of paragraph 171 and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

172.     The failure to disclose the above risk in Ambac's 2006 Form 10-K was material. Further, the above risk disclosure was entirely based on information known and available to the Exchange Act Defendants when the 2006 Form 10-K was issued.

**Answer:**     Deny the allegations of paragraph 172, and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

173.     On March 6, 2007, Defendant Uhlein gave a presentation at an Association of Independent Financial Advisors ("AIFA") conference.  Uhlein stated that "[t]he deals we ensure must meet Ambac's strict underwriting standards.  They must be investment grade and structured to allow us to actively surveil the transaction, we get monthly, quarterly reports on all the transactions that we guarantee."  Defendant Uhlein also highlighted that while Ambac's business mix may have changed, its corporate focus had not:  "[o]ur core corporate objective this has been very consistent year-to-year, we will continue to strive to excel in all aspects of risk underwriting, structuring, and surveillance."  Uhlein reiterated that "we have maintained the same conservative standards over the years" and that:

our participation in subprime market has dropped significantly over the last three years.  The deals we have done ... are performing satisfactorily.  We get monthly downloads on all of our

deals and actively surveil, and monitor the performance of all our mortgage originators.

**Answer:**    Admit Uhlein spoke at the AIFA conference on March 6, 2007, but

deny that matters plaintiffs allege are presented in their appropriate

context, and respectfully refer the Court to the record of the same for

the complete contents and context; except as specifically admitted,

otherwise deny the allegations of paragraph 173.

174.    Uhlein's remarks were materially false and misleading because Uhlein misrepresented and/or failed to disclose that:

a.    In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* ¶¶76-77).

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* ¶¶76-91).

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics. (*See* ¶¶111-133).

d.    Either Ambac conducted the surveillance Uhlein claimed, and the Exchange Act Defendants knew of but did not disclose these negative trends, or Uhlein misrepresented Ambac's surveillance process. (*See* ¶¶97-105).

**Answer:**    Deny.

175.    On or about March 30, 2007, Ambac issued its 2006 Annual Report, which included Ambac's 2006 Form 10-K. Defendant Genader stated in a letter to shareholders contained in the Annual Report that Ambac has "a dedication to disciplined pricing, risk management and strategic growth" and "strategically pursue[s] our business, seeking market and sector opportunities where our expertise is highly valued and appropriately priced."

**Answer:**    Admit the first sentence; admit that Genader's letter to stockholders in

Ambac's 2006 Annual Report contains language substantially similar to

that quoted in the second sentence, and respectfully refer the Court to

the same for the complete contents and context thereof, including the

cautionary statements and risk factors referred to therein; except as

specifically admitted, otherwise deny the allegations of paragraph 175.

176.    With respect to Ambac's structured finance business, Defendant Genader stated that "[i]t is important to remember that we participate in this market by providing our guarantee at the triple-A portion of the capital structure, ensuring strong credit quality while generating excellent risk-adjusted returns."  Genader added that "[t]here is little doubt that the U.S. mortgage market is under stress, and we cautiously view this business.  Since 2004, we have significantly pulled back on our level of MBS writings, especially in the sub-prime sector.  However, opportunities still exist, and we have used our breadth of market knowledge to pinpoint attractive opportunities."  Genader also stated that investors should "*[r]est assured that we will continue to be disciplined and rigorous in our scrutiny of this asset class*."  (Emphasis added.)

**Answer:**        Admit that Genader's letter to stockholders in Ambac's 2006 Annual

Report contains language substantially similar to the language quoted

above, and respectfully refer the Court to the same for the complete

contents and context thereof, including the cautionary statements and

risk factors referred to therein; except as specifically admitted,

otherwise deny the allegations of paragraph 176.

177.    The above statements, including the incorporated Form 10-K, were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

   a.    In 2006, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards.  (*See* ¶¶55-59; 76-79).

   b.    Ambac lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.  (*See* ¶¶76-91).

   c.    After the date of the close of the 2006 financial period but prior to the issuance of the 2006 Form 10-K, Ambac's CDO portfolio experienced an undisclosed mark-to-market decline, disclosure of which was a subsequent event necessary to prevent these financial statements from being misleading.  (*See* ¶¶134-145).

    d.    While Genader stated that Ambac was reducing its subprime RMBS exposures, Ambac concealed from the market the comparable risks associated with the Company's exposure to high risk CDOs backed by RMBS, which as of this time was $20 billion.  (*See* ¶141)

**Answer:**    Deny.

178.    On April 25, 2007, Ambac issued a press release announcing its first quarter 2007 financial results.  The press release disclosed that Ambac's total revenues were $461.8 million, and net income for the quarter was $213.3 million, or $2.02 per diluted share.  Financial Guarantee net mark-to-market losses on credit derivatives contracts were $5.124 million.  Ambac's loss and loss expense reserve was $231.3 million, a modest increase from $220.1 million at the end of the prior year.  Defendant Genader stated that "recent evidence of credit spread widening in the mortgage related asset classes should lead to increased demand for our core financial guarantee product, provided of course, that wider spreads continue to prevail."  The press release also stated that "[d]uring the quarter, Ambac benefited from increased writings in utilities, structured insurance and pooled debt obligations (CDOs)" and that "Ambac remains focused on achieving the best risk-rated returns and will remain disciplined until pricing in this product is commensurate with the level of risk."

**Answer:**    Admit that Ambac issued a press release on April 25, 2007 that reported certain unaudited financial results, including first quarter 2007 total revenues of approximately $461.8 million, first quarter 2007 net income of approximately $213.3 million or $2.02 per diluted share, first quarter 2007 net mark-to-market losses on credit derivative contracts of approximately $5.124 million, and loss and loss expense reserves of approximately $231.3 million as of March 31, 2007; admit that the April 25, 2007 press release contained statements substantially similar to the language quoted above, and respectfully refer the Court to the same for its complete contents and context, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 178.

179.    During the Ambac conference call that day, Defendant Leonard discussed "the subprime and mid prime sectors of MBS, as well as CDOs containing large components of this asset type" and claimed that "[w]e will continue to be selective in the nature of the business we

write, and are obviously hopeful that this pricing trend will continue." Leonard added that "We will continue to maintain discipline and seek to underwrite those transactions where our superior financial strength, experience and reputation in the market is most valued."

> **Answer:**    Admit that Ambac held a conference call on April 25, 2007, but deny
>
> that matters plaintiffs allege are presented in their appropriate context,
>
> and respectfully refer the Court to the record of the same for the
>
> complete contents and context thereof, including the cautionary
>
> statements and risk factors referred to therein; otherwise deny the
>
> allegations of paragraph 179.

180.    During the question and answer session of the call, Leonard stated that Ambac had "very current information – information, pool information up through the end of March, so very current," and that Ambac was "able to analyze that on a very current basis and look for trends of the underlying performance." Based on this supposed "current" monitoring, Leonard asserted that "[w]e just haven't seen -- certainly not significant deterioration, as you can tell from the comments I made on below investment-grade.... We're just not seeing deterioration up through March that wasn't expected."

> **Answer:**    Admit that Ambac held a conference call on April 25, 2007, but deny
>
> plaintiffs' characterizations and further deny that matters plaintiffs
>
> allege are presented in their appropriate context, and respectfully refer
>
> the Court to the record of the same for the complete contents and
>
> context thereof, including the cautionary statements and risk factors
>
> referred to therein; otherwise deny the allegations of paragraph 180.

181.    Investors and analysts relied upon these material statements. Bank of America on April 26 maintained its "Buy" rating on the stock, stating that Ambac "is entering a ***sweet spot*** as signs of further gradual credit spread widening are emerging and exposure to areas of concern – namely subprime and Alt-A – are limited." (Emphasis in original.) Citigroup commended Ambac for its "[s]elective MBS writings," noting that Ambac "continue[s] to minimize subprime writings" and that Ambac's RMBS exposure was "very well contained and selected."

> **Answer:**    Deny information or knowledge sufficient to form a belief in the
>
> allegations of paragraph 181, and specifically deny that Defendants

made any untrue statement of material fact or omitted to state a material

fact necessary to make the statements made not misleading.

182.   The above statements by the Exchange Act Defendants were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

a.   In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards.  (*See* ¶¶76-77).

b.   Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.  (*See* ¶¶76-91).

c.   As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics.  (*See* ¶¶111-133).

d.   Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process.  (*See* ¶¶97-105).

e.   Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS.  Had Ambac's financial statements for the quarterly period ended March 31, 2007 properly accounted for the mark-to-market write-down of $2.068 billion, Ambac's reported net earnings would have declined from a reported profit of $213 million to a loss of $1.311 billion, and its earnings per diluted share would have declined from a reported profit of $2.04 per share to a loss of $12.53 per share.  (*See* ¶¶134-145, 141).

**Answer:**   Deny the allegations of paragraph 182, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

183.   On May 10 2007, Ambac filed with the SEC its Form 10-Q for the quarter ended March 31, 2007 (the "1Q07 Form 10-Q").  The 1Q07 Form 10-Q was signed by Defendant Leonard and included as exhibits Sarbanes-Oxley Certifications signed by Defendants Genader and Leonard that made the representations set forth at ¶150, *supra*.

**Answer:**      Admit.

184.     The 1Q07 Form 10-Q represented that Ambac's consolidated unaudited interim financial statements were prepared on the basis of GAAP.  The 1Q07 Form 10-Q also reported the same loss and loss expense reserves, mark-to-market adjustments, net earnings and net earnings per share, as reported in the April 25, 2007 press release, as set forth in ¶178, *supra*. The 1Q07 Form 10-Q disclosed that net mark-to-market losses on credit derivative contracts for the three months ended March 31, 2007 were ($5.1) million, compared to net mark-to-market gains of $2.0 million in the three months ended March 31, 2006.

> **Answer:**      Admit the first sentence; admit that Ambac's Form 10-Q for the first
>
> quarter of 2007 reported certain unaudited financial results, including
>
> loss and loss expense reserves of approximately $231.3 million as of
>
> March 31, 2007, first quarter 2007 net mark-to-market losses on credit
>
> derivative contracts of approximately $5.124 million, first quarter 2007
>
> total revenues of approximately $461.8 million, and first quarter 2007
>
> net income of approximately $213.3 million or $2.02 per diluted share,
>
> and respectfully refer the Court to the first quarter 2007 10-Q for its
>
> complete contents and context, including the cautionary statements and
>
> risk factors referred to therein.

185.     The 1Q07 Form 10-Q repeated the statements quoted at ¶¶151-153, *supra*, regarding (a) Ambac's "active surveillance" of its insured portfolio to identify "adversely classified" credits, including determining whether there was "underperformance of the underlying collateral"; (b) the process by which an active credit reserve is established; and (c) RMBS and CDO "loss severity assumptions."

> **Answer:**      Admit that Ambac's Form 10-Q for the first quarter of 2007 contained
>
> statements substantially similar to the language quoted in paragraphs
>
> 151-153 above, respectfully refer the Court to Ambac's first quarter
>
> 2007 Form 10-Q for its complete contents and context, including the
>
> cautionary statements and risk factors referred to therein, and repeat and

reallege the answers to paragraphs 151-153; except as specifically

admitted, otherwise deny the allegations of paragraph 185.

186.     The 1Q07 Form 10-Q also repeated the statement made in the 2006 Form 10-K, quoted at ¶160, *supra*, about Ambac's use of proprietary valuation models.

> **Answer:**     Admit that Ambac's Form 10-Q for the first quarter of 2007 contained
>
> statements substantially similar to the language quoted in paragraph
>
> 160, respectfully refer the Court to Ambac's first quarter 2007 Form 10-
>
> Q for its complete contents and context, including the cautionary
>
> statements and risk factors referred to therein, and repeat and reallege
>
> the answer to paragraph 160.

187.     The above statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

> a.     In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards.  (*See* ¶¶55-59; 76-79).
>
> b.     Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.  (*See* ¶¶76-91).
>
> c.     As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics.  (*See* ¶¶111-133).
>
> d.     Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process.  (*See* ¶¶97-105).
>
> e.     Ambac's "proprietary model" to mark its CDO exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices.  (*See* ¶¶111-127).
>
> f.     Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, based on the failure to properly mark-to-market the true value of its CDO-related exposures.  Had Ambac's financial statements for the quarterly period ended March 31, 2007 properly accounted for the mark-to-market write-down of $2.068

billion, Ambac's reported net earnings would have declined from a reported profit of $213 million to a loss of $1.311 billion, and its earnings per diluted share would have declined from a reported profit of $2.04 per share to a loss of $12.53 per share.  (*See* ¶¶134-145, 141).

**Answer:**    Deny the allegations of paragraph 187, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

188.    On June 12, 2007, Defendant Uhlein gave a presentation at a KBW Mortgage Finance Conference, Defendant Uhlein answered questions about how RMBS weakness could affect Ambac.  He discussed the newest CDS that Ambac wrote in early 2007 and concluded his remarks by stating:

> [F]rom Ambac's perspective, it's really there's two things.  It's the new business size and obviously our book of business and speaking really from the MBS side and as I said, I think w*e've been pretty conservative and so we are very comfortable with our current book of business, even in this environment*.  So I think the focus from our perspective is to the extent there is a little turmoil in the market, to be honest, that's actually a good thing for financial guarantors, so we are hoping to participate more in the market going forward.  (Emphasis added.)

**Answer:**    Admit that Uhlein spoke at the KBW Mortgage Finance Conference on

June 12, 2007, but deny plaintiffs' characterizations and further deny

that matters plaintiffs allege are presented in their appropriate context,

and respectfully refer the Court to the record of the same for the

complete contents and context thereof; except as specifically admitted,

otherwise deny the allegations of paragraph 188.

189.    The above statement was materially false and misleading because Defendant Uhlein misrepresented and/or failed to disclose that:

> a.    In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards.  (*See* ¶¶55-59; 76-79).

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.  (*See* ¶¶76-91).

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics.  (*See* ¶¶111-133).

d.    Based on these negative trends it was misleading for Uhlein to state that Ambac was "comfortable" with its current "book of business."  Either Ambac conducted the surveillance it claimed, and Uhlein knew of these negative trends, or Ambac misrepresented its surveillance process.  (*See* ¶¶97-105).

**Answer:**    Deny.

190.    On July 25, 2007, Ambac issued a press release announcing its second quarter 2007 financial results.  Ambac reported second quarter net income of $173.0 million, or $1.67 per diluted share.  Financial guarantee net mark-to-market losses on credit derivative contracts were $56.9 million, and Ambac's loss and loss expense reserve was $255.8 million, a slight increase from $231.3 million at the end of the prior quarter.  The press release attributed the minor mark-to-market write-down to unfavorable market pricing of CDOs containing subprime RMBS collateral.

**Answer:**    Admit that the press release Ambac issued on July 25, 2007 reported

certain unaudited financial results, including second quarter 2007 net

income of approximately $173.0 million or $1.67 per diluted share,

second quarter 2007 net mark-to-market losses on credit derivative

contracts of approximately $56.9 million, and loss and loss expense

reserves of approximately $255.8 million as of June 30, 2007; admit

that the July 25, 2007 press release stated that Ambac's "second quarter

2007 unrealized mark-to-market losses on credit derivatives exposures

is the result of unfavorable market pricing of collateralized debt

obligations with significant amounts of sub-prime residential mortgage

collateral," and respectfully refer the Court to the July 25, 2007 press

release for its complete contents and context, including the cautionary

statements and risk factors referred to therein; except as specifically

admitted, otherwise deny the allegations of paragraph 190.

191.    The press release disclosed that Ambac's Active Credit Reserve "increased by $14.9 million during the quarter, from $188.8 million at March 31, 2007, to $203.7 million at June 30, 2007," which was "driven primarily by increases in reserves on certain credits primarily within the transportation sector of the U.S. public finance portfolio and to a lesser extent within the non-subprime RMBS sector of the structured finance portfolio...."

> **Answer:**    Admit that Ambac's July 25, 2007 press release contained statements
>
> substantially similar to the language quoted above, and respectfully
>
> refer the Court to the same for its complete contents and context,
>
> including the cautionary statements and risk factors referred to therein;
>
> except as specifically admitted, otherwise deny the allegations of
>
> paragraph 191.

192.    In the press release, Defendant Genader highlighted that "[o]ur *rigorous and proven approach* enabled us to deliver positive results despite the turmoil in the sub-prime mortgage market" and that "*in the unlikely event of default* we pay scheduled principal and interest, thereby minimizing liquidity risk." (Emphasis added.) Genader also stated that Ambac's "disciplined execution" of its approach would allow it "to benefit from the improving business conditions we see, with wider spreads, enhanced credit terms and increased demand for our valuable financial guarantee products."

> **Answer:**    Admit that Ambac's July 25, 2007 press release contained statements
>
> substantially similar to the language quoted above, but deny plaintiffs'
>
> characterizations and further deny that matters plaintiffs allege are
>
> presented in their appropriate context, and respectfully refer the Court
>
> to the same for its complete contents and context, including the
>
> cautionary statements and risk factors referred to therein.

193.    On July 25, 2007, Ambac held a conference call chaired by Defendant Leonard, who reiterated the "unlikely event of default" on any CDO exposures. Leonard attributed the $56.9 million mark-to-market decline to the "lack of liquidity in CDOs of ABS" in the market,

and highlighted that "*[o]n these transactions, as with all of our CDO exposure, Ambac expects that mark-to-market adjustments in either direction will reverse through the income statement over time as the transactions move towards maturity*."  (Emphasis added.)  Defendant Leonard also stated that Ambac had been "conservative" in its underwriting, that "our strongest writings were in CDOs of ABS where we have been cautious and selective..." and that "Ambac remains diligent in structuring of transactions, particularly in those asset classes where demand for our product is improving."

> **Answer:**    Admit that Ambac held a conference call on July 25, 2007, but deny
>
> plaintiffs' characterizations and further deny that matters plaintiffs
>
> allege are presented in their appropriate context, and respectfully refer
>
> the Court to the record of the same for the complete contents and
>
> context thereof, including the cautionary statements and risk factors
>
> referred to therein; except as specifically admitted, otherwise deny the
>
> allegations of paragraph 193.

194.    Similarly, Senior Managing Director Gandolfo emphasized that Ambac "does not underwrite based solely on the deal's public rating" and that "[w]e believe our credit-risk analysis goes far beyond that which a typical CDO investor would perform."  Gandolfo stated that Ambac puts each deal through a "rigorous review process," including "a rigorous review of the CDO manager" a "detailed assessment of the triggers and control rights embedded in the CDO" and a "detailed review and re-rating of the underlying RMBS collateral in the deal," including a base case and stress case model.

> **Answer:**    Admit that Thomas Gandolfo was a Senior Managing Director of
>
> Ambac Financial Group in July 2007; admit that Ambac held a
>
> conference call on July 25, 2007, but deny that matters plaintiffs allege
>
> are presented in their appropriate context, and respectfully refer the
>
> Court to the record of the same for the complete contents and context
>
> thereof, including the cautionary statements and risk factors referred to
>
> therein; except as specifically admitted, otherwise deny the allegations
>
> of paragraph 194.

195.    Gandolfo further stated that reference to the ABX and TABX indices in marking Ambac's CDO exposures to market was misplaced:

> I look at the same indexes that you look at.  It is really hard, right now, to know how much of that spread widening is fundamental and how much is technical....
>
> **What we do is, when we look at our deals, we don't feel we underwrite the market.**  (Emphasis added.)

**Answer:**    Admit that Ambac held a conference call on July 25, 2007, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the record of the same for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 195.

196.    With respect to Ambac's RMBS book, Defendant Leonard disclosed internal rating downgrades of pre-2004 transactions, highlighting that investors should take comfort by Ambac's ability to track the performance of underlying collateral on a monthly basis and stated that "over the entire portfolio, we are not seeing" increased stress.  "I think that's largely due to selectivity" and the supposedly safer nature of the collateral Ambac insured, Leonard explained.

**Answer:**    Admit that Ambac held a conference call on July 25, 2007, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the record of the same for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 196.

197.    The Exchange Act Defendants' statements were highly material and relied upon by investors and market analysts.  For example, a July 25, 2007 Morgan Stanley report highlighted that "[t]he company's in-depth discussion on the conference call about how it

protects itself against CDO losses and the favorable outlook for new business seemed to go a long way toward alleviating investor concerns..." The next day, a Deutsche Bank report emphasized that Ambac has a "**Rigorous CDO underwriting process**" and that "**Ambac is not the market.**" (Emphasis in original). With regard to the latter point, the report added:

> If we assume that its underwriting was done properly, its credit performance should not reflect the average or fall even close to the average. Historically, that has been true as Ambac's paid claims has totaled only 2.6 basis points of the par that it has insured. We do not believe this time is different with CDOs and the RMBS market.... Given Ambac's strict underwriting standards, risk assessment skills, and small exposure relative to the overall market, we believe Ambac will not suffer from credit losses.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 197, and specifically deny any allegation that any Defendant made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

198.    The above statements by the Exchange Act Defendants were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

a.    In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards. (*See* ¶¶55-59; 76-79).

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS. (*See* ¶¶76-91).

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics. (*See* ¶¶111-133).

d.    Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process. (*See* ¶¶97-105).

e.    Contrary to Gandolfo's statement that Ambac does not "underwrite the market," in fact, the collateral underlying Ambac's exposures deteriorated in line with the collateral comprising the pertinent market indices. (*See* ¶¶111-133).

e.     Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS.  Had Ambac's financial statements for the quarterly period ended June 30, 2007 properly accounted for the mark-to-market write-down of $2.716 billion, Ambac's reported net earnings would have declined from a reported profit of $173 million to a loss of $1.810 billion, and its earnings per diluted share would have declined from a reported profit of $1.69 per share to a loss of $17.65 per share.  (*See* ¶¶134-145, 142).

**Answer:**     Deny the allegations of paragraph 198, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

199.    On August 9, 2007, Ambac filed with the SEC its Form 10-Q for the quarter ended June 30, 2007 (the "2Q07 Form 10-Q").  The 2Q07 Form 10-Q was signed by Defendant Leonard and included as exhibits Sarbanes-Oxley Certifications signed by Defendants Genader and Leonard that made the representations set forth at ¶150.

**Answer:**     Admit.

200.    The 2Q07 Form 10-Q represented that Ambac's consolidated unaudited interim financial statements were prepared on the basis of GAAP.  The 2Q07 Form 10-Q reported the same loss and loss expense reserves, mark-to-market adjustments, net earnings and net earnings per share, as reported in the July 25, 2007 press release, as set forth in ¶190.

**Answer:**     Admit the first sentence; admit that Ambac's Form 10-Q for the second

quarter of 2007 reported certain unaudited financial results, including

loss and loss expense reserves of approximately $255.8 million as of

June 30, 2007, second quarter 2007 net mark-to-market losses on credit

derivative contracts of approximately $56.9 million, and second quarter

2007 net income of approximately $173.0 million or $1.67 per diluted

share, respectfully refer the Court to Ambac's second quarter 2007

Form 10-Q for its complete contents and context, including the

cautionary statements and risk factors referred to therein, and repeat and

reallege the answer to paragraph 190; except as specifically admitted,

otherwise deny the allegations of paragraph 200.

201.    The 2Q07 Form 10-Q repeated the statements quoted at ¶¶151-153, *supra*,
regarding (a) Ambac's "active surveillance" of its insured portfolio to identify "adversely
classified" credits, including determining whether there was "underperformance of the
underlying collateral; (b) the process by which an active credit reserve is established; and (c)
RMBS and CDO "loss severity assumptions."

**Answer:**    Admit that Ambac's Form 10-Q for the second quarter of 2007

contained statements substantially similar to the language quoted in

paragraphs 151-153 above, respectfully refer the Court to Ambac's

second quarter 2007 Form 10-Q for its complete contents and context,

including the cautionary statements and risk factors referred to therein,

and repeat and reallege the answers to paragraphs 151-153; except as

specifically admitted, otherwise deny the allegations of paragraph 201.

202.    The 2Q07 Form 10-Q repeated the statements made in the 2006 Form 10-K
quoted at ¶160, *supra* about the use of proprietary valuation models.  The 2Q07 Form 10-Q
stated that the previously disclosed net mark-to-market loss on credit derivative contracts for the
quarter of $56.9 million was "related to collateralized debt obligations of asset-backed
securitizations ("CDO of ABS") containing sub-prime mortgage-backed securities as collateral."

**Answer:**    Admit that Ambac's Form 10-Q for the second quarter of 2007

contained statements substantially similar to the language quoted in

paragraph 160, as well as statements substantially similar to the

language quoted in paragraph 202, and respectfully refer the Court to

the second quarter 2007 Form 10-Q for its complete contents and

context, including the cautionary statements and risk factors referred to

therein; repeat and reallege the answer to paragraph 160; except as

specifically admitted, otherwise deny the allegations of paragraph 202.

203.    Notably, the 2Q07 Form 10-Q disclosed that Ambac's $26.3 billion of exposures to CDO of high-grade RMBS "have underlying collateral that consist of 39% subprime RMBS, 36% RMBS and 13% mezzanine CDO exposures" and surprised the market by stating that "we have noted a continued widening of credit spreads across the derivative portfolio, particularly CDO of ABS and collateralized loan obligations, resulting in additional mark-to-market losses." The market reaction was immediate, with Ambac's shares declining $2.00 within minutes of the filing of the Form 10-Q.  Ambac's stock price closed at $69.50, a decline of $2.90 per share from the August 8 closing price of $72.40 per share.  Ambac stock continued to decline in the following days, closing at $66.14 on August 10 and $56.00 by August 15.

**Answer:**    Admit that Ambac's Form 10-Q for the second quarter of 2007 reported that "Ambac's exposures to CDO of ABS were $29.2 billion, of which $26.3 billion related to CDO of high-grade ABS"; admit that the 2Q07 Form 10-Q included the language "Ambac's CDO of high-grade ABS exposures have underlying collateral that consists of 39% sub-prime RMBS, 36% other RMBS and 13% mezzanine CDO exposures," and "At the end of July 2007, we have noted a continued widening of credit spreads across the credit derivative portfolio, particularly CDO of ABS and collateralized loan obligations, resulting in additional mark-to-market unrealized losses," but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the 2Q07 Form 10-Q for its complete contents and context, including the cautionary statements and risk factors referred to therein; admit that Ambac's stock price closed at $72.40 on August 8, 2007, $69.50 on August 9, 2007, $66.14 on August 10, 2007, and $56.00 on August 15, 2007; except as specifically admitted, otherwise deny the allegations of paragraph 203.

204.    Analysts continued to accept and react positively to Ambac's statements.  An August 15, 2007 Citigroup analyst report discussed a meeting that day with management and noted that the "conservative" management team "appears very comfortable that losses will be

minimal."  An August 23, 2007 Piper Jaffrey analyst report, which commented on a recent Ambac web disclosure on its CDO underwriting, listed "key takeaways" from the disclosure, including that Ambac engaged in "a highly regimented process for underwriting CDO of ABS transactions," which involved a "dedicated team of underwriters," with "all transaction risk and return modeling" performed by a separate and "dedicated group of professionals in Risk Analysis and Reporting."  Piper Jaffrey also highlighted Ambac's "*review of the underlying collateral*, analytic modeling of case and stress case scenarios, Sr. Credit Committee processes and legal review."  (Emphasis added.)  The Piper Jaffrey report noted, however, that in the end, only Ambac had access to the information needed to accurately assess the quality of its exposures and investors were left to trust Ambac's internal models and representations about its processes:  "*Despite any analyst or investor's best attempt, the information flow on a deal by deal basis simply can not be granular enough to come to any real conclusion about these very protections, let alone knowing whether or not they exist in any specific deal*."  (Emphasis added).

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 204, and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

205.    The above statements by the Exchange Act Defendants were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

   a.   In 2006 and thereafter, the quality of mortgages comprising Ambac's direct and derivative RMBS exposures declined because mortgage originators lowered their underwriting standards.  (*See* ¶¶55-59; 76-79).

   b.   Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.  (*See* ¶¶76-91).

   c.   As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics.  (*See* ¶¶111-133).

   e.   Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of these negative trends, or Ambac misrepresented its surveillance process.  (*See* ¶¶97-105).

   f.   Ambac's "proprietary model" to mark its CDS exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices.  (*See* ¶¶111-127).

g.   Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS.  Had Ambac's financial statements for the quarterly period ended June 30, 2007 properly accounted for the mark-to-market write-down of $2.716 billion, Ambac's reported net earnings would have declined from a reported profit of $173 million to a loss of $1.810 billion, and its earnings per diluted share would have declined from a reported profit of $1.69 per share to a loss of $17.65 per share.  (*See* ¶¶134-145, 142).

**Answer:**   Deny the allegations of paragraph 205, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

206.   After the close of the market on October 10, 2007, Ambac issued a press release announcing its "Estimate of Unrealized Market-to-Market Loss on Its Credit Derivative Portfolio" for the third quarter.  The press release sought to assure the market that any mark-to-market write-downs were contained and did not represent ultimate losses, but merely were caused by liquidity issues that would not affect Ambac, and that Ambac remained confident about its structured finance exposure.  The press release disclosed that Ambac expected to take a $743 million loss on its credit derivative portfolio and that Ambac "[e]xpected to report" a "loss provision of approximately $20 million" for the quarter.  Ambac expected to report a loss of $3.43 per diluted share.

**Answer:**   Admit that Ambac issued a press release on October 10, 2007 that

disclosed that Ambac estimated that its fair value adjustment to its

credit derivative portfolio for the third quarter of 2007 would result in

an unrealized, pre-tax loss of $743 million on that portfolio, admit that

the press release announced that Ambac expected to report a net loss per

diluted share of up to $3.50, but deny plaintiffs' characterizations and

further deny that matters plaintiffs allege are presented in their

appropriate context, and respectfully refer the Court to the press release

for its complete contents and context, including the cautionary

statements and risk factors referred to therein; except as specifically

admitted, otherwise deny the allegations of paragraph 206.

207.    The press release quoted Defendant Genader as stating that despite "the turmoil in the structured finance markets," which resulted in the mark-to-market loss, "I remain confident in our underwriting abilities, credit standards and the transactions we have insured."  The press release also quoted Defendant Leonard, stating that "Ambac does not view the current adjustments as predictive of future claims. . . .  Indeed, the average internal credit rating of our derivative portfolio is AA+ at September 30, 2007 and based on our recent analysis of the portfolio, management believes that the potential for material paid claims is very low."  Investors and analysts credited these statements.  On October 11, 2007, Ambac's stock price rose $2.84, from $67.73 to $70.57.

**Answer:**    Admit Ambac issued a press release on or about October 10, 2007, but

deny that matters plaintiffs allege are presented in their appropriate

context, and respectfully refer the Court to the press release for its

complete contents and context; aver that the press release stated that

"[t]his release, in particular the remarks of Messrs. Genader and

Leonard, contains statements about our future results that may

constitute 'forward-looking statements' . . . [and] [w]e caution you that

these statements are not guarantees of future performance" and listed

numerous factors that could affect Ambac's operations; deny

knowledge or information sufficient to form a belief as to the truth of

the second-to-last sentence; admit that Ambac's stock price closed at

$67.73 on October 10, 2007 and $70.57 on October 11, 2007; except as

specifically admitted, otherwise deny the allegations of paragraph 207.

208.    The financial commentary on Ambac's October 10 disclosures was favorable.  An October 11, 2007 Dow Jones article attributed the increase in Ambac's stock price to the press release "calm[ing] concerns about the impact of the mortgage crisis on the company," and an October 11, 2007 Morgan Stanley report concluded that, "'[w]hile the size of the mark [to market] may cause a negative short-term market reaction, it does not change our fundamental view of the company."  An October 11, 2007 Bank of America analyst report stated:  "[w]e view Ambac's pre-announcement as a net positive," adding that "***It all comes down to underwriting***

*standards and the bond insurers have a long and strong track record of high-quality underwriting with minimal losses as a percentage of par outstanding*." (Emphasis added)

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> truth of the allegations of paragraph 208.

209.   The above statements by the Exchange Act Defendants were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

> a.    Defendant Genader omitted that Ambac had lowered its own underwriting standards in order to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS, and that the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics. (*See* ¶¶76-91, 111-133).
>
> b.    Contrary to Defendant Leonard's statements, the reported mark-to-market write-down in fact was drastically lower than an appropriate write-down based upon the actual performance of Ambac's CDS portfolio at that time, which would have reflected underlying collateral deterioration. (*See* ¶¶134-145).
>
> c.    The widening of credit spreads and better pricing in mortgage-backed structured finance reflected growing risk and expected losses on RMBS-related instruments. The widening spreads in fact indicated that the value of Ambac's pre-existing RMBS-related exposure was significantly declining, which would result in a mark-to-market loss and increased impairments and loss reserves in Ambac's financial statements. (*See* ¶¶134-145, 259-307).
>
> d.    Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS. Had Ambac's financial statements for the quarterly period ended September 30, 2007 properly accounted for the mark-to-market write-down of $8.923 billion, Ambac's reported net earnings would have declined from a reported loss of $361 million to a loss of $6.314 billion, and its earnings per diluted share would have declined from a reported loss of $3.53 per share to a loss of $61.73 per share. (*See* ¶¶134-145, 143.)

> **Answer:**    Deny the allegations of paragraph 209, and specifically deny that
>
> Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

210.    On October 24, 2007, Ambac issued a press release announcing its third quarter 2007 financial results.  Ambac reported a third quarter net loss of $360.6 million, or $3.51 per diluted share, which it attributed to the previously announced $743 million loss on credit derivative exposures.  Ambac's loss and loss expense reserve was $278.7 million, an increase from $255.8 million at the end of the prior quarter.  The press release made several new disclosures, including that Ambac's case basis credit reserves increased from $59.8 million from $47.3 million at June 30, 2007 to $107.1 million at September 30, 2007, and that the increase "relates primarily to two RMBS transactions that are underperforming original expectations."

**Answer:**        Admit that the October 24, 2007 press release announced certain

unaudited financial results, including a third quarter 2007 net loss of

approximately $360.6 million or $3.51 per diluted share, a mark-to-

market unrealized loss on credit derivative exposures of approximately

$743.4 million for the third quarter 2007, loss and loss expense reserves

of approximately $278.7 million as of September 30, 2007, and an

increase of approximately $59.8 million in case basis loss reserves

during the third quarter of 2007 (from $47.3 million at June 30, 2007 to

$107.1 million at September 30, 2007), which it stated "relate primarily

to two RMBS transactions that are underperforming original

expectations," and respectfully refer the Court to the press release for its

complete contents and context, including the cautionary statements and

risk factors referred to therein; except as specifically admitted,

otherwise deny the allegations of paragraph 210.

211.    During Ambac's conference call that day, Leonard again assured the investment community that Ambac's mark-to-market losses were transitory and did not represent a likelihood of future claims.  Leonard added, "[s]ince all of our credit derivative transactions are performing and are rated internally above investment grade, no adjustment to operating earnings is considered necessary."  Defendant Leonard reiterated that the mark-to-market write-down

"*does not translate into expectations for claim payments*" and that "*we do not expect to pay any claims*." (Emphasis added.)

> **Answer:** Admit that Ambac held a conference call on October 24, 2007, but deny
>
> plaintiffs' characterizations and further deny that matters plaintiffs
>
> allege are presented in their appropriate context, and respectfully refer
>
> the Court to the record of the call for the complete contents and context
>
> thereof, including the cautionary statements and risk factors referred to
>
> therein; except as specifically admitted, otherwise deny the allegations
>
> of paragraph 211.

212.    Defendant Leonard then explained that the $59.8 million increase in case base reserves was "primarily due to two recent HELOC transactions that are clearly underperforming our original expectations, and as a result, have been internally rated below investment grade." To allay investor concerns regarding Ambac's direct RMBS portfolio, Defendant Wallis assured investors that the two HELOCs were "idiosyncratic" in terms of their structure and "very poor performance," which "led to the very early loss."

> **Answer:** Admit that Ambac held a conference call on October 24, 2007, but deny
>
> plaintiffs' characterizations and further deny that matters plaintiffs
>
> allege are presented in their appropriate context, and respectfully refer
>
> the Court to the record of the call for the complete contents and context
>
> thereof, including the cautionary statements and risk factors referred to
>
> therein; except as specifically admitted, otherwise deny the allegations
>
> of paragraph 212.

213.    Defendant Leonard reinforced Ambac's carefully crafted image of being safer than the market, holding higher quality exposures, and being able to weather the storm already hitting big banks which held some of the same RMBS securities Ambac was insuring and which served as Ambac's CDS counterparties.  Leonard highlighted that Ambac's "below investment grade exposures remained flat during the quarter at $4.7 billion; were less than 1% of our total portfolio" and that "even under these stressful conditions, most of our transactions are performing; remain rated within the investment grade category....  As always, we will continue to actively monitor these transactions, closely analyzing collateral performance and then consider structural protections available to us."

> **Answer:**    Admit that Ambac held a conference call on October 24, 2007, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the record of the call for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 213.

214.    Defendant Wallis also stated that, while Ambac did not expect "the tail event that we're seeing today" "the good news is, and it is good news is that the portfolio can withstand that." Even as to the CDO mezzanine deals for which Ambac issued CDS, Wallis assured that those deals retained an investment grade rating and that "[w]e are not in the habit of putting investment grade ratings on worthless securities."

> **Answer:**    Admit that Ambac held a conference call on October 24, 2007, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the record of the call for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 214.

215.    Analysts accepted Ambac's statements about the performance of its CDO and RMBS exposures. For example, Bank of America on October 24, 2007 issued a report entitled, "In Our View, It'll Be Worth the Ride." The report accepted Ambac's assurance that its portfolio should not be compared to the weak securities in the marketplace, reiterating the Company's mantra: "*Underwriting discipline is the key to the divergence we expect to see between the performance of Ambac's insured portfolio and the continued deterioration in the general marketplace*." (Emphasis added.) A Fox-Pitt report dated October 24, 2007 highlighted that "[t]he company indicated" that the two HELOC deals driving the increased loss reserves "were uncharacteristic of other deals." and "[t]he Company stated that there are no other deals like these." A William Blair analyst report concluded that the reserves for the two HELOC transactions were not "indicative of any specific problems within the HELOC segment."

**Answer:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 215, and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

216.    The above statements by the Exchange Act Defendants were designed to assure the market that Ambac's RMBS-related direct and derivative exposures remained safe. Many investors and analysts credited these statements which were false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

a.    Ambac had lowered its underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS, and that the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics which were so severe as to require substantially higher loss reserves and mark-to-market write-downs. (*See* ¶¶76-91, 111-145, 259-307). Accordingly, Wallis's statement that the two downgraded deals were "idiosyncratic" is false because those deals actually reflected a broad sample of the portfolio.

b.    Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of these negative trends but did not disclose them, or Ambac misrepresented its surveillance process. (*See* ¶¶97-105).

c.    Ambac's "proprietary model" to mark its CDS exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices. (*See* ¶¶111-127).

d.    Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS. Had Ambac's financial statements for the quarterly period ended September 30, 2007 properly accounted for the mark-to-market write-down of $8.923 billion, Ambac's reported net earnings would have declined from a reported loss of $361 million to a loss of $6,314 billion, and its earnings per diluted share would have declined from a reported loss of $3.53 per share to a loss of $61.73 per share. (*See* ¶¶134-145, 143)

**Answer:**    Deny the allegations of paragraph 216, and specifically deny that Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

217.    On November 1, 2007, Defendant Genader gave an interview on the floor of the New York Stock Exchange that was broadcast on CNBC.  Genader stated that

> First of all, we use our own ratings, and so we rate the transactions.
> All of them are Triple A.  And how we actually dig into them is
> that we drill down.  In the case of some of our transactions we will
> look at 15,000 individual [Cusips], we will then project current
> rates of loss, and future rates.  We are very comfortable with that
> portfolio and our detailed analysis that we update every single
> month.

**Answer:**    Admit that Genader was interviewed on CNBC in or about early

November 2007, but deny that matters plaintiffs allege are presented in

their appropriate context, and respectfully refer the Court to the record

of the interview for the complete contents and context thereof; except as

specifically admitted, otherwise deny the allegations of paragraph 217.

218.    Defendant Genader also reassured the market that "there clearly is a disconnect between the value of our portfolio, which is in very good shape, versus what has happened in the stock price in the last couple of months;" that "[o]ur company is very solid and very safe;" and that Ambac's "stock price is definitely too low."  Genader also stated that Ambac engages in "good selection and the initial underwriting" and "[g]ood modeling to ensure that you are dealing with the best possible issuers."  Defendant Genader insisted that "[o]ur performance, as Ambac, is very different than the rest of the market."

**Answer:**    Admit that Genader was interviewed on CNBC in or about early

November 2007, but deny plaintiffs' characterizations and further deny

that matters plaintiffs allege are presented in their appropriate context,

and respectfully refer the Court to the record of the interview for the

complete contents and context thereof; except as specifically admitted,

otherwise deny the allegations of paragraph 218.

219.    The above statements were false and misleading because Genader misrepresented and/or failed to disclose that:

      a.      After Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics which were so severe as to require substantially higher reserves.  (*See* ¶¶76-91, 111-145, 259-307).

      b.      Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of these negative trends but did not disclose them, or Ambac misrepresented its surveillance process.  (*See* ¶¶97-105).

      c.      Ambac's proprietary model used to mark its CDO exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices.  (*See* ¶¶111-127).

    **Answer:**    Deny the allegations of paragraph 219, and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

220.    On November 2, 2007, Morgan Stanley issued a report that lowered the firm's ratings on the financial guarantee industry to "in-line" from "attractive" and raised concerns that additional losses at Ambac could force the Company to raise capital to protect its triple-A rating. The report openly questioned whether Ambac should be placing greater reliance on the ABX and TABX indices when marking its own CDS exposures.

    **Answer:**    Admit that Morgan Stanley issued a report on November 2, 2007 that lowered Morgan Stanley's ratings on the financial guarantee industry to "in-line" from "attractive" and that sets out a "bear case scenario" in which financial guarantors lose their AAA rating if they cannot raise capital, and respectfully refer the Court to the report for its complete contents and context; except as specifically admitted, otherwise deny the allegations of paragraph 220.

221.    Ambac attempted to refute the report in an extraordinary press release on November 6, 2007.  The press release disputed the analyst's contention that Ambac's reported mark-to-market losses were too low compared to Merrill Lynch's recently disclosed write-downs on seemingly similar CDO exposures, stating, *inter alia*, that "[s]everal differences may exist

between exposures contained in Ambac's portfolio and an investment bank's portfolio and therefore may influence the estimated mark of the different portfolios." These differences could include exposure to different vintages of mortgages, "the amount of first loss subordination and credit migration triggers present in a structure," and that "Ambac CDS contracts do not include collateral posting provisions, and are generally limited to payment shortfalls of interest and principal," which "have significant value, particularly in difficult markets." As to its mark-to-market valuation, Ambac also stated:

> Ambac believes that only through rigorous analytics of the actual transaction and its attributes and protections, as well as performance to date and expected future performance of underlying collateral, will one obtain meaningful information on the potential for actual losses.

**Answer:**    Admit that Ambac issued a press release on November 6, 2007, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the press release for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 221.

222.    The above statements were materially false and misleading because, irrespective of Ambac's claims of potential differences between its and a typical investment banks' CDO exposures, in fact, the performance of the collateral in Ambac's CDO exposures was closely following the performance of the general market. Ambac's CDO exposures were not performing better, as Ambac suggested, but in fact were deteriorating just as rapidly. Accordingly, Ambac's mark-to-market losses were much higher than the losses it had reported at this time. (*See* ¶¶134-145). Ambac's statements were also false and misleading because, while Ambac suggested that "an unrealized loss may not result in an increased expectation of loss," in fact, Ambac's CDO exposures were deteriorating at a rate at which realized losses were virtually certain.

**Answer:**    Deny the allegations of paragraph 222, and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

223.    The November 6, 2007 press release disputed the analyst's assertion that "[w]e are increasing our CDO loss expectations for both Ambac and MBIA to reflect an updated tally of various market opinions about cumulative sub prime losses."  The press release responded that:

> It appears that the "various market opinions" referred to in the analyst's report relate to the 2006 and early 2007 vintage sub prime.  ***It also appears that he is assuming that the Ambac ABS CDO book will reflect the performance of the ABX index of 2006 and 2007 vintage sub prime collateral and ignores the actual vintage diversification and asset quality triggers inherent in Ambac's book.***  (Emphasis added.)

**Answer:**    Admit that the November 2, 2007 Morgan Stanley report contained statements substantially similar to the language quoted in the first sentence above, and respectfully refer the Court to the same for its complete contents and context; admit that Ambac issued a press release on November 6, 2007, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to such release for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 223.

224.    This statement was materially false and misleading because, as set forth at ¶¶111-127, irrespective of Ambac's claims of potential differences between the collateral underlying its CDO exposures and that underlying the ABX indices, in fact, the collateral in Ambac's CDO exposures was closely following the performance of the pertinent ABX indices' RMBS collateral.  Accordingly, Ambac was required to take larger mark-to-market write-downs than it had to date.  (*See* ¶¶134-145).

**Answer:**    Deny the allegations of paragraph 224, and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

225.    Ambac concluded its release by stating that "we have a rigorous and current review and rating process in place and we will react quickly as projected collateral performance changes."

**Answer:**    Admit that Ambac's November 6, 2007 press release contains statements substantially similar to the language quoted above, and respectfully refer the Court to the November 6, 2007 press release for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 225.

226.    This statement was materially false and misleading because Ambac had already seen significant collateral deterioration in its RMBS and CDO exposure but had not reacted accordingly or disclosed that deterioration.

**Answer:**    Deny the allegations of paragraph 226, and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

227.    On November 7, 2007, Ambac held a public senior management conference call. The purpose of the call was to correct what Defendant Genader described as "a significant and painful [stock price] drop in the last few weeks that has been caused by a number of misperceptions about the industry in general and misperceptions about Ambac specifically.... I hope to be able to calm the stories and restore the faith in the credit underwriting skills and surveillance and remediation capabilities that this Company has displayed for more than 35 years." These "misperceptions" were, *inter alia*, that (1) "mark-to-market equals real losses," (2) "Ambac's insured portfolio mirrors the ABX," (3) "rating agencies are about to downgrade" Ambac, and that (4) Ambac's "$14 billion capital is inadequate." Genader also stated that "Ambac underwrites to withstand stretched market conditions," and that he was "pleased with the results of our most recent drill-down analysis of our CDO squared portfolio" and "[o]ur track record of risk taking has been proven."

**Answer:**    Admit that Ambac held a conference call on November 7, 2007, but deny plaintiffs' characterizations and further deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer

the Court to the record of the call for the complete contents and context

thereof, including the cautionary statements and risk factors referred to

therein; except as specifically admitted, otherwise deny the allegations

of paragraph 227.

228.    Defendant Leonard added that an "unrealized mark-to-market on an investment grade credit is not expected to result in a loss."  Defendant Wallis stated that Ambac was "giving our HELOC and closed-end second portfolios particular scrutiny," and that the reserves Ambac took in the third quarter "encompass what we believe to be reasonable whole-life estimates of potential future claims, principally with regard to investment bank shelf HELOC transactions."  Wallis also assured investors that there were only "limited cases where we are experiencing issues such as those referenced above," and that "[w]e will continue to take timely and appropriate internal rating and reserving actions as future performance and analysis dictates."

**Answer:**    Admit that David Wallis was a senior managing director and the head of

Portfolio and Market Risk Management at Ambac as of November 7,

2007; admit that Ambac held a conference call on November 7, 2007,

but deny that matters plaintiffs allege are presented in their appropriate

context, and respectfully refer the Court to the record of the call for the

complete contents and context thereof, including the cautionary

statements and risk factors referred to therein; except as specifically

admitted, otherwise deny the allegations of paragraph 228.

229.    The above statements by the Exchange Act Defendants were false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

a.    After mortgage originators lowered their underwriting standards, Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS, and the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics.  This deterioration was so severe as to require substantially higher loss reserves and mark-to-market write-downs.  (*See* ¶¶76-91, 111-145, 259-307).

b.    Leonard's insistence that reported mark-to-market losses did not indicate realized losses omitted that the collateral underlying Ambac's exposures

performed in line with the collateral comprising the pertinent market indices. (*See* ¶¶111-127).

    c.    Wallis's assurances about Ambac's HELOC and CES exposures falsely omitted that the weaker characteristics and poor performance extended far beyond the two deals giving rise to the disclosed reserve increases. (*See* ¶¶128-133, 293-307).

    d.    Ambac's CDO exposures were deteriorating rapidly, and Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time. (*See* ¶¶134-145).

    e.    Due to the real and dramatic deterioration in the underlying assets of Ambac's RMBS-related portfolio, Ambac's $14 billion capital was inadequate and, accordingly, Ambac was in danger of losing and ultimately did lose its AAA rating from all three rating agencies. (*See* ¶¶111-145, 259-307.)

    **Answer:**    Deny the allegations of paragraph 229, and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

230.    On November 9, 2007, Ambac filed with the SEC its Form 10-Q for the quarter ended September 30 2007 (the "3Q07 Form 10-Q"). The 3Q07 Form 10-Q was signed by Defendant Leonard and included as exhibits Sarbanes-Oxley Certifications signed by Defendants Genader and Leonard that made the representations set forth at ¶150.

    **Answer:**    Admit.

231.    The 3Q07 Form 10-Q represented that Ambac's consolidated unaudited interim financial statements were prepared on the basis of GAAP. The 3Q07 Form 10-Q reported the same reserves, mark-to-market adjustments, net earnings and net earnings per share, as reported in the October 24, 2007 press release, as set forth in ¶210.

    **Answer:**    Admit the first sentence; admit that Ambac's Form 10-Q for the third quarter of 2007 reported loss and loss expense reserves of approximately $284.1 million as of September 30, 2007, net mark-to-market losses on credit derivative contracts of approximately $743 million for the third quarter of 2007, and a net income loss of

approximately $360.6 million or $3.53 per diluted share for the third

quarter of 2007, and respectfully refer the Court to Ambac's third

quarter 2007 Form 10-Q for its complete contents and context,

including the cautionary statements and risk factors referred to therein;

repeat and reallege the answer to paragraph 210; except as specifically

admitted, otherwise deny the allegations of paragraph 231.

232.     The 3Q07 Form 10-Q disclosed active credit reserves of $166.7 million and case base reserves of $822.1 million at September 30, 2007, with the increase in case base reserves attributed to the default of several mortgage-backed transactions.  Like Ambac's prior Form 10-Q's, the 3Q07 Form 10-Q touted Ambac's establishment of active credit reserves using "historical default information" and "internally developed loss severity assumptions", and Ambac's "active surveillance" to identify "adversely classified" credits quoted.  The 3Q07 Form 10-Q also repeated the statements in the 2Q07 Form 10-Q that (1) 'Loss severity estimates are based upon available evidence" and (2) "Ambac's exposure to CDOs in its classified credit portfolio is currently limited."

> **Answer:**     Admit that Ambac's Form 10-Q for the third quarter of 2007 reported
>
> active credit reserves of approximately $166.7 million and case basis
>
> credit reserves of approximately $117.4 million as of September 30,
>
> 2007, admit that the 3Q07 Form 10-Q contains statements substantially
>
> similar to the language quoted above, but deny plaintiffs'
>
> characterizations and further deny that matters plaintiffs allege are
>
> presented in their appropriate context, and respectfully refer the Court
>
> to the third quarter Form 10-Q for its complete contents and context,
>
> including the cautionary statements and risk factors referred to therein;
>
> except as specifically admitted, otherwise deny the allegations of
>
> paragraph 232.

233.     The above statements were materially false and misleading for the reasons set forth in ¶216, above.

**Answer:**     Deny the allegations of paragraph 233, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

234.    On November 13, 2007, Ambac filed with the SEC a Form 8-K that contained "Frequently Asked Questions" ("FAQs") that were originally posted on Ambac's website on November 9, 2007.  The FAQs represented that:

> Ambac does not rely on the agencies in either approving
> transactions or assigning internal ratings to the deals it approves.
> ***We conduct our own independent analysis of each transaction
> and the transaction is reviewed by one of our respective Senior
> Credit Committees pursuant to our credit process and policies.***
> The Committee also evaluates the recommended rating for the
> transaction at that time.  Closed transactions are analyzed by our
> Portfolio Risk Management Group; and our original internal
> ratings are confirmed or revised, as appropriate.  (Emphasis
> added.)

**Answer:**     Admit that Ambac filed a Form 8-K with the SEC on or about

November 13, 2007 that contained, as an exhibit, FAQs originally

posted on Ambac's website on or about November 9, 2007; admit that

the November 13, 2007 Form 8-K contained statements substantially

similar to the language quoted above, aver that the Form 8-K stated that

certain statements in the Form 8-K and the exhibits were "'forward

looking statements' . . . based on management's current expectations

and are subject to uncertainty and changes in circumstances . . . due to a

variety of factors" set out in Ambac's SEC filings, and respectfully refer

the Court to the Form 8-K for its complete contents and context.

235.    The FAQs also stated that and that, "absent any real credit losses, any MTM adjustments will reverse over time" and that "[i]n fact, Ambac is not a proxy for the mortgage market:  we are not a mortgage guarantor, ***we did not wrap any of the deals on the ABX index*** and we have wrapped only a fraction of the hundreds of deals that have been downgraded by

S&P, Moody's and Fitch." With respect to Ambac's RMBS underwriting, the FAQs represented that Ambac's subprime RMBS exposure "has steadily decreased . . . [as] a result of Ambac having been very selective in underwriting new direct RMBS exposure in the last two years." (Emphasis added.)

> **Answer:** Admit that Ambac filed a Form 8-K with the SEC on or about November 13, 2007 that contained, as an exhibit, FAQs originally posted on Ambac's website on or about November 9, 2007; admit that the November 13, 2007 Form 8-K contained statements substantially similar to the language quoted above, aver that the Form 8-K stated that certain statements in the Form 8-K and the exhibits were "'forward looking statements' . . . based on management's current expectations and are subject to uncertainty and changes in circumstances . . . due to a variety of factors" set out in Ambac's SEC filings, and respectfully refer the Court to the Form 8-K for the complete contents and context thereof; except as specifically admitted, otherwise deny the allegations of paragraph 235.

236.    The FAQs also represented that "[o]f the $18.2Bn of HELOC and Closed End Seconds, over 91% ha[ve] performed within our expectations and [are] currently rated by AMBAC at or above the assigned ratings given at the time the transactions closed" and that "Ambac believes that the risk of loss [for its mezzanine CDO exposures] remains at an investment grade level."

> **Answer:** Admit that Ambac included FAQs as an exhibit to its November 13, 2007 Form 8-K, but deny that matters plaintiffs allege are presented in their appropriate context, and respectfully refer the Court to the same for the complete contents and context thereof, including the cautionary statements and risk factors referred to therein; except as specifically admitted, otherwise deny the allegations of paragraph 236.

237.    The above statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

    a.    After mortgage originators lowered their underwriting standards, Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS, and the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics.  This deterioration was so severe as to require substantially higher loss reserves and mark-to-market write-downs.  (*See* ¶¶71-91, 111-145, 259-307.)

    b.    Notwithstanding Ambac's claim that it "did not wrap any of the deals on the ABX index," in fact, about two-thirds of those deals were included in Ambac's CDO exposures.  (*See* ¶121.)

    c.    Ambac's insistence that reported mark-to-market losses did not indicate realized losses omitted that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices.  Ambac's CDO exposures were deteriorating rapidly, and Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time.  (*See* ¶¶111-127, 134-145.)

    d.    Ambac's HELOC and closed-end second portfolios in fact were experiencing substantial deterioration, and the problems in those portfolios were not limited as Ambac suggested.  Nor had Ambac engaged in the "very selective underwriting" of its RMBS direct exposures that it claimed.  (*See* ¶¶76-91, 128-133.)

    e.    Either Ambac conducted the surveillance it claimed, and the Exchange Act Defendants knew of these negative trends, or Ambac misrepresented its surveillance process.  (*See* ¶¶97-105.)

    **Answer:**    Deny the allegations of paragraph 237, and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

238.    On November 27, 2007, Defendants Leonard and Wallis spoke at a Banc of America Bond Insurance Mini-Conference.  Leonard stated that Ambac's "business model is investment grade underwriting."

    **Answer:**    Admit that Leonard and Wallis spoke at a Banc of America Bond Insurance Mini-Conference on November 27, 2007, but deny plaintiffs'

characterizations and further deny that matters plaintiffs allege are

presented in their appropriate context, and respectfully refer the Court

to the record of the same for the complete contents and context thereof;

except as specifically admitted, otherwise deny the allegations of

paragraph 238.

239.    Defendant Wallis was also asked "What's going on in the high-yield collateralized CDOs? ...  And are you going to disclose anything about what you're seeing there?" In response, Wallis reassured investors that "***they're performing just fine.  We're not anticipating losses in that portfolio.***"  (Emphasis added.)  He also reassured investors that, with respect to CDOs, "in relation to the physical payment of cash.... we don't anticipate that."

> **Answer:**    Admit that Wallis spoke at a Banc of America Bond Insurance Mini-
>
> Conference on November 27, 2007, but deny plaintiffs'
>
> characterizations and further deny that matters plaintiffs allege are
>
> presented in their appropriate context, and respectfully refer the Court
>
> to the record of the same for the complete contents and context thereof;
>
> except as specifically admitted, otherwise deny the allegations of
>
> paragraph 239.

240.    The above statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

a.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in various second-lien RMBS exposures and in CDOs backed by RMBS.  (*See* ¶¶76-91.)

b.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and CDOs backed by RMBS showed negative trends in delinquencies and other key metrics.  (*See* ¶¶111-133.)

c.    While Wallis stated that Ambac would make no payments on its high grade CDO exposures, in fact, the underlying RMBS collateral in Ambac's CDO exposures was deteriorating at a rate at which actual losses were likely.  (*See* ¶¶111-127, 134-145.)

**Answer:**    Deny the allegations of paragraph 240, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

241.    On November 28, 2007, Defendant Genader gave a presentation at a Friedman
Billings Capital Markets Investor Conference.  Defendant Genader stated that "mark-to-market"
is an issue that does not impact Ambac's business operations.  He also stated that "[o]ur
transactions do not replicate the ABX Index," and that "this [the ABX] is not Ambac.'" With
respect to the performance of Ambac's HELOC portfolios, Genader stated that "[w]'eve learned
that the bank-originated shelves perform better than the investment-bank originated shelves," and
that "[o]ur two deals that we took reserves on were investment-bank shelves in the HELOC
sector."

**Answer:**    Admit that Genader spoke at a Friedman Billings Capital Markets

Investor Conference on November 28, 2007, but deny plaintiffs'

characterizations and further deny that matters plaintiffs allege are

presented in their appropriate context, and respectfully refer the Court

to the record of the same for the complete contents and context thereof;

except as specifically admitted, otherwise deny the allegations of

paragraph 241.

242.    The above statements were materially false and misleading because Genader
misrepresented and/or failed to disclose that:

a.    The performance of the collateral in Ambac's CDO exposures was closely
following the performance of the general market indices; Ambac's CDO
exposures were not performing better, as Ambac was suggesting, but in
fact, were deteriorating just as rapidly; and Ambac's mark-to-market and
likely credit losses were much higher than the losses it had reported at this
time.  (*See* ¶¶111-127, 134-145.)

b.    Ambac's RMBS-related portfolio experienced significant deterioration
requiring massive mark-to-market losses and increased reserves, and the
weak underwriting characteristics and deterioration evident in Ambac's
RMBS portfolio went far beyond the two HELOC investment bank
transactions identified to date.  (*See* ¶¶111-145, 259-307.)

**Answer:**     Deny the allegations of paragraph 242, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

243.     On December 27, 2007, Ambac filed with the SEC a Form 8-K that contained "Frequently Asked Questions" that were originally posted on Ambac's website on December 20 and 26, 2007.  The FAQs included the same statements that were made in Ambac's November 13, 2007 FAQs quoted in ¶¶234-235 regarding, in part, Ambac's underwriting and surveillance activities; Ambac's mark-to-market adjustments; Ambac not being "a "proxy for the mortgage market;" and Ambac's "selective" RMBS underwriting.  Ambac also asserted that it

> does not rely on the agencies in either approving transactions or assigning internal ratings to the deals it approves.  We conduct our own independent analysis of each transaction and the transaction is reviewed by one of our respective Senior Credit Committees pursuant to our credit process and policies.  The Committee also evaluates the recommended rating for the transaction at that time. Closed transactions are analyzed by our Portfolio Risk Management Group; and our original internal ratings are confirmed or revised, as appropriate.

**Answer:**     Admit that Ambac filed a Form 8-K with the SEC on or about

December 27, 2007 that contained as an exhibit FAQs posted on

Ambac's website as of December 26, 2007; admit that the December

27, 2007 Form 8-K contained statements substantially similar to the

language quoted in paragraphs 234-235 above, respectfully refer the

Court to the December 27, 2007 Form 8-K for its complete contents and

context, including the cautionary statements and risk factors referred to

therein, and repeat and reallege the answers to paragraphs 234-235;

admit that the December 27, 2007 Form 8-K contained statements

substantially similar to the language quoted above in paragraph 243,

and respectfully refer the Court to the same for its complete contents

and context, including the cautionary statements and risk factors

referred to therein; except as specifically admitted, otherwise deny the

allegations of paragraph 243.

244.    The above statements were materially false and misleading for the same reasons set forth in ¶237.

**Answer:**    Deny the allegations of paragraph 244, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

245.    On January 16, 2008, Ambac issued a press release in which it announced, *inter alia*, that it was cutting its dividend, had replaced Defendant Genader with Callen as interim CEO, and estimated a $5.4 billion mark-to-market loss on its credit derivative portfolio for the quarter, including a $1.1 billion credit impairment.  The press release also stated that Ambac expected to report a net loss "of up to $32.83" for the quarter.

**Answer:**    Admit that Ambac issued a press release on January 16, 2008; admit

that in the press release Ambac announced that it was reducing its

quarterly dividend from $.21 to $.07, that Genader was retiring from

Ambac, and that Michael Callen was named Chairman and Interim

Chief Executive Officer as of January 16, 2008; admit that the press

release estimated that the fair value adjustment for Ambac's credit

derivative portfolio for fourth quarter 2007 would amount to an

estimated loss of $5.4 billion pre-tax, of which approximately $1.1

billion represented an estimated credit impairment; admit the second

sentence; respectfully refer the Court to the press release for its

complete contents and context, including the cautionary statements and

risk factors referred to therein; except as specifically admitted,

otherwise deny the allegations of paragraph 245.

246.    The press release disclosed that the loss was due to Ambac's "fourth quarter fair value review of its outstanding credit derivative contracts," and that, outside of the $1.1 billion credit impairment charge taken by Ambac, "***Ambac continues to believe that the balance of the mark-to-market losses taken to date are not predictive of future claims*** and that, in the absence of further credit impairment, the cumulative marks would be expected to reverse over the remaining life of the insured transactions."  (Emphasis added.)  The press release also disclosed that Ambac expected to report a $143 million pre-tax loss provision "relates primarily to underperforming home equity line of credit and closed-end second lien RMBS securitizations."

> **<u>Answer:</u>**    Respectfully refer the Court to the January 16, 2008 press release for its
>
> complete contents and context, including the cautionary statements and
>
> risk factors referred to therein; otherwise deny the allegations of
>
> paragraph 246.

247.    The press release was materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

> a.    The performance of the collateral in Ambac's CDO exposures was closely following the performance of the general market indices; Ambac's CDO exposures were not performing better, as Ambac was suggesting, but in fact were deteriorating just as rapidly, and Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time.  (*See* ¶¶111-127, 134-145.)
>
> b.    The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures. Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS-backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly.  (*See* ¶¶134-145, 259-307.)
>
> c.    Ambac's reported write-down as of December 31, 2007, of only $5.4 billion, was materially lower than an appropriate write-down based upon the actual performance of Ambac's CDS portfolio at that time, which would have reflected underlying collateral deterioration.  Thus, for the entire year of 2007, Ambac only took a total of approximately $6.1 billion write-down on its CDO of RMBS.  Ambac was required by GAAP and SFAS 133 to write-down at least $17 billion for the year end December 31, 2007 relating to its CDS on CDO of ABS from 2006-2007.  Had

Ambac's financial statements for the year ended December 31, 2007 properly accounted for the mark-to-market write-down, Ambac's reported net earnings for the year would have declined from a reported loss of $3.24 billion to a loss of $10.45 billion, and its earnings per diluted share would have declined from a reported loss of up to $32.83 per share to a loss of $101.57 per share. (*See* ¶¶134-145, 145.)

d.      Due to the undisclosed dramatic deterioration in the underlying assets of Ambac's direct RMBS exposure, Ambac's reserves for the quarter were materially understated, and Ambac's net assets and liabilities, income and income per share were materially overstated. (*See* ¶¶128-133, 293-307.)

**Answer:**     Deny the allegations of paragraph 247, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

248.    On January 22, 2008, Ambac issued a press release announcing its fourth quarter 2007 financial results. For the quarter, Ambac reported a net loss of $3.25 billion, or $31.85 per share. Financial guarantee net mark-to-market losses on credit derivatives contracts were $5.2 billion, including an estimated credit impairment of $1.1 billion. Ambac's loss and loss expense reserve was $484.3 million, an increase from $255.8 million at the end of the prior quarter.

**Answer:**     Admit the first sentence; respectfully refer the Court to the January 22,

2008 press release for its complete contents and context, including the

cautionary statements and risk factors referred to therein; except as

specifically admitted, otherwise deny the allegations of paragraph 248.

249.    The press release quoted Michael Callen, Ambac's CEO after Genader's resignation, stating that "[w]e view the current perceptions of Ambac's business by both the market and ratings agencies as underestimating Ambac's strengths and future potential" and that "we believe that Ambac can realize new business opportunities in our core markets and through reinsurance while we strengthen our capital position further to maintain our triple-A ratings under S&P and Moody's and seek to regain it under Fitch." The press release also stated that "management remains confident that Ambac's capital position and claims paying ability remain strong. Management is equally confident in Ambac's insured portfolio and the Company's ability to support policyholder liabilities."

**Answer:**     Respectfully refer the Court to the January 22, 2008 press release for

the complete contents and context thereof and aver that the release

specifically stated that "[t]his release, in particular the remarks of Mr.

Callen, contains statements about . . . future results that may constitute

'forward looking statements' . . . [and] [w]e caution you that these

statements are not guarantees of future performance"; otherwise deny

the allegations of paragraph 249.

250.    The press release disclosed that Ambac's Active Credit Reserves "increased by $196.7 million during the quarter, from $166.7 million at September 30, 2007 to $363.4 million at December 31, 2007," and that "[t]he increase was driven by unfavorable credit activity within the home equity line of credit and closed-end second lien RMBS portfolio, partially offset by favorable credit activity within the public finance portfolio."

**Answer:**    Respectfully refer the Court to the January 22, 2008 press release for

the complete contents and context thereof, including the cautionary

statements and risk factors referred to therein; otherwise deny the

allegations of paragraph 250.

251.    During Ambac's conference call that day, Callen stated that "[t]he loss estimates incorporated into Ambac's stock price today and loss assumptions supporting various models cited in the market are very disparate and drastic; and personally, I cannot find the logic underlying these assumptions."  Also, Defendant Leonard continued to assure the market that: "Ambac continues to believe that the balance of the mark-to-market losses taken to date are not predictive of future claims, and that in the absence of further credit impairment, that the cumulative marks would be expected to reverse over the remaining life of the insured transactions."  In response to an analyst question, Defendant Leonard also stated that Ambac had "obviously analyzed the portfolio very thoroughly" and that "while we do have some impairment and that has been a confidence type issue, we are confident in what we have done."

**Answer:**    Admit that Ambac held a conference call on or about January 22, 2008,

but deny plaintiffs' characterizations and further deny that matters

plaintiffs allege are presented in their appropriate context, specifically

deny the attribution of the quote in the second sentence to Leonard, and

respectfully refer the Court to the record of the call for the complete

contents and context thereof, including the cautionary statements and

risk factors referred to therein; except as specifically admitted,

otherwise deny the allegations of paragraph 251.

252.    The above statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

a.    Contrary to Callen's statements that the current market perceptions were "underestimating Ambac's strengths and future potential" and that Ambac could "strengthen our capital position further to maintain our triple-A ratings," in fact, Ambac was in a precarious financial position.  The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures. Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS-backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly.  (*See* ¶¶111-145, 259-307).

b.    Callen's critique of the "loss assumptions" supporting various models cited in the market hid the breadth of the actual deterioration of the collateral supporting Ambac's RMBS-exposures and CDOs backed by RMBS.  (*See* ¶¶111-145, 259-307).

c.    The reported write-down in fact was drastically lower than an appropriate write-down based upon the actual performance of Ambac's CDO exposure at that time, which would have reflected underlying collateral deterioration.  (*See* ¶¶134-145).  Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time. (*See* ¶¶111-145, 259-307).

**Answer:**    Deny the allegations of paragraph 252, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

253.    On February 29, 2008, Ambac filed with the SEC its Form 10-K for the year ended December 31, 2007 (the "2007 Form 10-K").  The 2007 Form 10-K was signed by Defendant Leonard and included as exhibits Sarbanes-Oxley Certifications signed by Defendant Leonard.  These Certifications made the identical representations set forth at ¶150, *supra*.  The 2007 Form 10-K also contained the same representation that the Consolidated Financial Statement were prepared in accordance with GAAP as in the 2006 Form 10-K.

**Answer:**    Admit.

254.    The 2007 Form 10-K reported the same reserves, mark-to-market adjustments, credit impairment, net earnings and net earnings per share, as reported in the January 22, 2008 press release, as set forth in ¶248, *supra*.

> **Answer:**    Respectfully refer the Court to Ambac's 2007 Form 10-K for its
>
> complete contents and context, including the cautionary statements and
>
> risk factors referred to therein, and repeat and reallege the answer to
>
> paragraph 248; otherwise deny the allegations of paragraph 254.

255.    The above statements because the Exchange Act Defendants misrepresented and/or failed to disclose that:

a.    The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures. Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS-backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly.  (*See* ¶¶111-145, 259-307).

b.    After mortgage originators lowered their underwriting standards, Ambac lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.  (*See* ¶¶76-91).

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and CDOs backed by RMBS showed severely negative trends in delinquencies and other key metrics. (*See* ¶¶111-133).

d.    The reported write-down in fact was drastically lower than an appropriate write-down based upon the actual performance of Ambac's CDO portfolio at that time, which would have reflected underlying collateral deterioration (*see* ¶¶ 134-145, *supra*).  Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time.  (*See* ¶¶134-145, 259-307).

e.    Ambac's financial statements for the year ended December 31, 2007 violated GAAP by materially misstating Ambac's assets and liabilities, net income and income per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on its direct RMBS exposures.  Instead of reporting a loss of $3.24 billion, Ambac should have reported a loss of $10.45 billion for the year 2007.  (*See* ¶¶134-145, 145).

**Answer:**    Deny the allegations of paragraph 255, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

256.    On March 14, 2008, Ambac issued a letter by Michael Callen to Ambac's "policyholders, clients, shareholders and friends."  The letter represented that:

> Ambac has over $15 billion of claims-paying resources, sufficient to meet Moody's and S&P's criteria to retain a triple-A rating. Additionally, our capital base will build further as other judicious capital strengthening actions are implemented.

**Answer:**    Admit that Ambac released a letter by Michael Callen directed to

Ambac's policyholders, clients, shareholder and friends on March 14,

2008, and respectfully refer the Court to the letter for its complete

contents and context, including the cautionary statements and risk

factors referred to therein.

257.    The letter also asserted that:

> --    *Loss projections that you read and hear about are simply that - projections.  They are based on limited data and the numbers that get the headlines are stress case losses, not expected losses.*  We remain confident that Ambac will weather the storm.  With over $15 billion in claims-paying resources behind all we do, no investor in an Ambac-insured security should worry that they will miss a principal or interest payment.
>
> --    *Ambac never considered a "bailout."  Bailouts are for firms that are facing insolvency....*
>
> --    *Lost amidst all the noise and market volatility is the simple fact that most of Ambac's insurance portfolio is performing strongly.  The issues in Ambac's portfolio arise largely from four transactions, the "CDO-squareds," that account for the vast majority of our potential losses.*  (Emphasis added.)

**Answer:**    Respectfully refer the Court to the March 14, 2008 letter for its

complete contents and context, including the cautionary statements and

risk factors referred to therein.

258.    These statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that:

a.    Contrary to Callen's statements that Ambac had sufficient claims-paying resources "sufficient to retain a triple-A rating" and that Ambac was not facing "insolvency," Ambac in fact was in a precarious financial position. The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures. Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS-backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly.  (See ¶¶134-145, 259-307).

b.    Ambac's insurance portfolio was not "performing strongly" and the "issues" were not confined to four CDOs.  As Ambac later conceded on its April 23, 2008 conference call and thereafter, the "issues" spilled over to numerous closed-end seconds and HELOC transactions – on which Ambac began incurring substantial reserves – as well as Ambac's "high-grade" CDOs backed by RMBS.  (*See* ¶¶111-145, 259-307).

**Answer:**    Deny the allegations of paragraph 258, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

259.    The Exchange Act Defendants made numerous untrue statements of material fact and omitted to state material facts necessary to make Ambac's reported financial results not misleading.  The Exchange Act Defendants caused the Company to falsely report its position and results of operations for the year ended December 31, 2006 and December 31, 2007, and interim financial statements for the quarterly periods ended March 30, 2007, June 30, 2007, and September 30, 2007 by, among other things, overstating assets and net earnings, understating liabilities, failing to disclose negative trends, failing to fairly mark-to-market the value of its CDS on CDOs, and failing to take required loss reserves on its direct RMBS exposures.

**Answer:**    Deny the allegations of paragraph 259, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

260.    Generally Accepted Accounting Principles ("GAAP") are those principles
recognized by the accounting profession as the conventions, rules and procedures necessary to
define accepted accounting practices at a particular time.  The SEC has the statutory authority for
the promulgation of GAAP for public companies and has delegated that authority to the
Financial Accounting Standards Board ("FASB").  SEC Regulation S-X (17 C.F.R.
§ 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not presented
in accordance with GAAP will be presumed to be misleading, despite footnotes or other
disclosures.  SEC Regulation S-X (17 C.F.R. § 210.10-01(a)(5)) also requires that interim
financial statements comply with GAAP and "shall include disclosures either on the face of the
financial statements or in accompanying footnotes sufficient so as to make the interim
information presented not misleading."

> **Answer:**    Aver that paragraph 260 consists of legal conclusions and statements of
>
> accounting principles as to which no response is required and
>
> respectfully refer the Court to the cited SEC regulations and any
>
> accounting statements referenced therein for the complete contents and
>
> context thereof; otherwise deny the allegations of paragraph 260.

261.    GAAP consists of a hierarchy of authoritative literature.  The highest priority is
comprised of FASB Statements of Financial Accounting Standards ("SFAS").  Other sources to
be used for financial reporting include FASB Interpretations ("FIN"), Accounting Principles
Board Opinions ("APB"), and AICPA Auditing Standards ("AU") and Statements of Position
("SOP").  GAAP provides other authoritative pronouncements including, among others, the
FASB Concept Statements ("FASCON"), which provide a framework for the standard process
for reporting transactions that are not specifically addressed by an existing accounting standard.

> **Answer:**    Aver that paragraph 261 consists of general statements relating to
>
> accounting principles as to which no response is required and
>
> respectfully refer the Court to such accounting principles or statements
>
> related thereto for the content thereof; otherwise deny the allegations of
>
> paragraph 261.

262.    The responsibility for preparing the financial statements in conformity with
GAAP rests with the company's management, as, for example, set forth in AU 110:03:

The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, authorize, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . ***Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***. (Footnote omitted, emphasis added.)

**Answer:**       Aver that paragraph 262 consists of general statements relating to

accounting principles as to which no response is required and

respectfully refer the Court to AU 110:03 or statements related thereto

for the content thereof; otherwise deny the allegations of paragraph 262.

263.    As set forth herein, Ambac's relevant financial statements presented the Company's financial position and results of operations in a manner which, among other things, also violated the following accounting concepts, requiring that a Company's financial reporting provide information:

   a.    that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON 1 ¶34);

   b.    about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASCON 1 ¶40);

   c.    that represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASCON 2 ¶¶58-59);

   d.    that is complete, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2 ¶79);

   e.    is verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASCON 2 ¶81); and

    f.    the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risk inherent in business situations are adequately considered.  (FASCON 2 ¶¶95, 97).

**Answer:**    Deny.

264.    Financial guarantees on the various RMBS and CDOs directly insured by Ambac are accounted for differently under GAAP than credit default swap derivatives.  CDS transactions are considered to be credit derivatives, and are accounted for at fair value and require changes in fair value to be recognized currently in earnings under SFAS 133, *Accounting for Derivative Instruments and Hedging Activities*, and SFAS 107, *Disclosures About Fair Value of Financial Instruments*, with additional guidance from FIN 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others*.  Direct financial guarantees on RMBS and CDOs are recognized as insurance contracts under SFAS 60, *Accounting and Reporting by Insurance Enterprises*, and are largely accounted for as loss contingencies under SFAS 5, *Accounting for Contingencies*.  FASB Statement of Position ("SOP") 94-6, *Disclosure of Certain Significant Risks and Uncertainties*, FASB Staff Position ("FSB") SOP 94-6-1, as discussed above in ¶¶301-307, augment both SFAS 60 and SFAS 5 accounting requirements.

**Answer:**    Deny that Ambac or its subsidiaries directly insured CDOs; aver that, as Ambac stated in its Form 10-K for 2006, Ambac established liabilities (such as reserves) for its credit losses on insured RMBS based in part on the accounting guidance in SFAS No. 60, supplemented by SFAS No. 5, while Ambac accounted for derivative contracts, including CDS issued on CDOs, based in part on the accounting guidance in SFAS No. 133, and respectfully refer the Court to the 2006 Form 10-K for its complete contents and context, including the cautionary statements and risk factors referred to therein; aver that the second, third, and fourth sentences of paragraph 264 consist of general statements relating to accounting principles as to which no response is required and respectfully refer the Court to accounting statements cited above for the content thereof; otherwise deny the allegations of paragraph 264.

265.    As explained herein, Ambac failed to properly account for the Company's derivative exposure to CDS by failing to properly mark their fair value to the market, in clear violation of SFAS 133.  Additionally, Ambac failed to make adequate loss reserve disclosures for its billions of dollars of direct RMBS and CDO exposure.

**Answer:**    Deny.

266.    Item 303 of Regulation S-K, *Management's Discussion and Analysis (MD&A) of Financial Condition and Results of Operations*, specifically requires MD&A disclosures regarding Ambac's liquidity, capital resources, results of operations and contractual obligations, among other things.  Regulation S-K, Item 303(a) requires the identification of "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way;" "any known material trends, favorable or unfavorable, in the registrant's capital resources;" and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operation."

**Answer:**    Aver that paragraph 266 consists of legal conclusions as to which no

response is required, and respectfully refer the Court to Item 303 of

Regulation S-K or statements related thereto for the content thereof; to

the extent a response is required, deny the allegations of paragraph 266.

267.    Ambac was required by Item 303, from the fourth quarter of 2006 forward, to, *at the very least*, disclose how and why the known trends in the housing market and interest rate environment created serious risk to Ambac's financial condition.  As set forth herein, the Exchange Act Defendants (a) knew but did not disclose that the underwriting standards of the mortgage originators whose loans comprised the collateral for Ambac's RMBS had weakened precipitously by mid-2006 (¶¶76-77); (b) secretly changed Ambac's own direct RMBS underwriting guidelines to abandon a loan-by-loan analysis of mortgage pools included in its RMBS, thus allowing the Company to guarantee the riskier mortgage loans passing through the originators' weakened standards (¶¶78-91); and (c) failed to properly acknowledge or account for the impact of the declining housing market, rising interest rates, and observed reference collateral deterioration on Ambac's direct RMBS and CDOs, and on Ambac's credit default swaps against CDOs of RMBS (¶¶111-145, 259-307).

**Answer:**    Deny.

268.    These trends were reasonably likely to have a pronounced effect on the value of Ambac's direct RMBS and CDOs backed in part by RMBS.  Accordingly, Item 303 required, at the very least, disclosure by Ambac of the "known trends" affecting its exposure to the housing market, its capital cushion, and its financial position generally.

**Answer:**     Aver that the allegations in the first sentence of paragraph 268 are

general in nature and do not particularize factual allegations to which a

response can meaningfully be made; to the extent a response is required,

deny such allegations; aver that the allegations in the second sentence of

paragraph 268 reflect plaintiffs' legal conclusions to which no response

is required; to the extent a response is required, Defendants deny such

allegations; otherwise deny the allegations of paragraph 268.

269.    As described herein, Ambac violated SFAS 133 by failing to mark its CDS of CDO exposure in a manner reflecting the actual performance and declining market value of those securities.  Ambac's "proprietary model" produced values divorced from the prevailing market indices – in this case, the ABX and TABX indices.  By ignoring both actual market prices and the relevant market indices in favor of an undisclosed proprietary model that bore no resemblance to either the prevailing market prices or market indices, Ambac's mark-to-market valuations were false, misleading, and in violation of GAAP, SFAS 133, SFAS 107 and FIN 45.

**Answer:**     Deny.

270.    In order to meet the peculiar financial reporting and capital management needs of Wall Street investment banks, when Ambac insured CDOs backed largely by residential mortgage securities, it did so primarily by writing complex derivative contracts rather than employing its historical practice of writing true insurance contracts.  According to its 2007 10-K:

> Ambac's exposure to derivative instruments is created through
> interest rate, currency, total return and credit default swaps.  These
> contracts are accounted for at fair value under SFAS 133
> "Accounting for Derivative Instruments and Certain Hedging
> Activities," as amended ("SFAS 133").

**Answer:**     Admit that Ambac's subsidiaries provided credit protection with respect

to CDOs collateralized by mortgage-backed securities by means of

credit-default swaps; admit that Ambac's Form 10-K for the year 2007

described Ambac's accounting policies for such exposures and

respectfully refer the Court to the same for the complete contents and

context thereof, including the cautionary statements and risk factors

referred to therein; except as specifically admitted, otherwise deny the

allegations of paragraph 270.

271.    The cornerstone of SFAS 133 is that it "requires that an entity recognize all derivatives as either assets or liabilities in the statement of financial position and measure those instruments *at fair value*." *See* SFAS 133, Summary (emphasis added). SFAS 133 was intended to give investors and analysts much greater clarity about the use of derivatives and the effectiveness (and ineffectiveness) of a company's hedging activities, which are governed by SFAS 60 and 5, as discussed below.

> **Answer:**    Aver that paragraph 271 consists of statements of accounting principles
>
> as to which no response is required; to the extent a response is required,
>
> deny the allegations of paragraph 271.

272.    CDS are classified as "Derivative Liabilities" on Ambac's balance sheet. CDS are typically considered derivative contracts because they "derive" their value from underlying assets, including, of particular import in this case, RMBS. The price of a swap is set by the expected likelihood of a default and the probable amount of the loss, or the "loss severity." The "value" of the swap is the difference between the premiums the issuer/seller will receive and the likely default payments it will make. As the amount of the anticipated default payments increases, the value of the swap decreases. Basically, as asset-backed security prices (including CDOs) rise or fall, CDS prices will conversely fall or rise in the opposite direction.

> **Answer:**    Admit the first sentence; admit that the value of CDS may, in part, be
>
> derived from the value of the assets underlying the CDS, though aver
>
> that many other factors impact the value of a CDS, including, but not
>
> limited to, the modified form of CDS that Ambac issued and the
>
> structure of the security on which the CDS is issued; admit that the
>
> value of mortgage-related securities may, in part, be derived from the
>
> expected likelihood of defaults and the probable amount of loss, though
>
> aver that many other factors impact the value of mortgage-related
>
> securities; aver that the allegations in the second, third, fourth, fifth, and
>
> sixth sentences are general in nature and do not particularize factual
>
> allegations to which a response can meaningfully be made; to the extent

a response is required, deny such allegations; except as specifically

admitted, otherwise deny the allegations of paragraph 272.

273.    Therefore, if Ambac issued a CDS at a time when market spreads on the underlying reference collateral – the CDO at issue – were high, but subsequent events made the market take a more optimistic view of the CDO's performance, narrowing the credit spreads, Ambac was able to book income statement gains from this spread movement.  In effect, the insurance it was offering would be "wasted" if the underlying CDO proved healthier than expected when the counterparty purchased the insurance.  Insurers profit when insurance goes wasted.  On the other hand, if the expected performance of the CDO deteriorated after Ambac wrote its CDS against it, then Ambac was required by SFAS 133 to take write-downs based on the increased chance it would have to perform on its obligation.

**Answer:**    Aver that paragraph 273 consists of legal conclusions and statements of

accounting principles as to which no response is required and

respectfully refer the Court to Ambac's SEC filings for descriptions of

Ambac's accounting policies and to the accounting principles cited for

their complete contents and context; to the extent a response is required,

deny the allegations of paragraph 273.

274.    Mark-to-market gains and losses are recognized on Ambac's financial statements in an account called "Net Mark-to-Market (Losses) Gains on Credit Derivative Contracts," which represents the portion of mark-to-market gains/losses directly related to credit derivatives.

**Answer:**    Admit.

275.    SFAS 107, as amended by SFAS 133, requires a company to "disclose, either in the body of the financial statements or in the accompanying notes, the fair value of financial instruments for which it is practicable to estimate that value."

**Answer:**    Aver that paragraph 275 consists of statements of accounting policy as

to which no response is required and respectfully refer the Court to the

accounting statements cited for their complete contents and context; to

the extent a response is required, deny the allegations of paragraph 275.

276.    Both SFAS 107 and SFAS 133 contained similar market-driven definitions of fair value before being subsumed by SFAS 157, *Fair Value Measurements*, a Statement issued in

September 2006 (although not mandatorily adopted until November 2007), that defined fair value and provided a standardized framework for determining fair value as follows:

> *[F]air value is a market-based measurement, not an entity-specific measurement.*  Therefore, a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability.  (Emphasis added.)

**Answer:**    Aver that paragraph 276 consists of statements of accounting policy as to which no response is required; aver that SFAS 157 is effective only as to financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years (for Ambac, starting with its report of its results for the first quarter of 2008, filed with its Form 10-Q for that quarter); to the extent a response is required for the allegations of paragraph 276, deny the allegations.

277.    In addition to the requirements of SFAS 107 and 133, Ambac was required to make disclosures in accordance with FIN 45 with regard to its SFAS 133 derivative portfolio. FIN 45 elaborates on the disclosures to be made by a guarantor in its interim and annual financial statements about its obligations under certain guarantees that it has issued.  It also clarifies that a guarantor is required to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee.  Even "if the likelihood of the guarantor's having to make any payments under the guarantee is remote," FIN 45, ¶13 specifically required Ambac to disclose, among other things, "The nature of the guarantee, including the approximate terms of the guarantee, how the guarantee arose, and the events and circumstances that would require the guarantor to perform under the guarantee."  FIN 45 also required disclosure of:

a.    The current carrying amount of the liability, if any, for the guarantor's obligation obligations under the guarantee (including the amount, if any, recognized under paragraph 8 of Statement 5), regardless of whether the guarantee is freestanding or embedded in another contract.

b.    The nature of (1) any recourse provisions that would enable the guarantor to recover from third parties any of the amounts paid under the guarantee and (2) any assets held either as collateral by third parties that, upon the occurrence of any triggering event or condition under the guarantee, the guarantor can obtain and liquidate to recover all or a portion of the amounts paid under the guarantee.  The guarantor shall indicate, if estimable, the approximate extent to which the proceeds from liquidation

of those assets would be expected to cover the maximum potential amount
of future payments under the guarantee.

**Answer:**    Aver that paragraph 277 consists of legal conclusions and statements of

accounting principles as to which no response is required and

respectfully refer the Court to the accounting statements cited therein

for the complete contents and context thereof; to the extent a response is

required, deny the allegations of paragraph 277.

278.    These rules for establishing fair value are clear.  First, use market prices when
available.  If no market prices are available, use the best available proxy for the way market
participants would price the asset or liability, as the case may be.  As set forth below, Ambac
failed to comply with GAAP in determining fair value.

**Answer:**    Deny the allegations of paragraph 278, and aver that, at all times during

the Class Period, Ambac's financial statements complied with GAAP.

279.    Throughout the Class Period, Ambac failed to comply with SFAS 133, SFAS 107,
and FIN 45, because it disregarded the governing relationship between fair value and direct or
strongly indicative existing market valuations by refusing to mark its billions of dollars of CDS
exposure in relationship with the pertinent market indicator – the TABX – or even to provide an
estimate of its CDS fair value losses, as secondarily required by SFAS 133.

**Answer:**    Deny the allegations of paragraph 279, and aver that, at all times during

the Class Period, Ambac's financial statements complied with GAAP.

280.    According to its 2007 Form 10-K, Ambac's fair value amounts represent "the net
present value of the difference between the fees Ambac originally charged for the credit
protection and our estimate of the fees that a comparable financial guarantor may charge for the
same protection at the balance sheet date."  In order to determine the current pricing of a CDS on
the same underlying security, Ambac used a proprietary model.  Investors were forced to accept
the validity of Ambac's "mark-to-model" reporting because of the lack of transparency into these
models.  The Exchange Act Defendants justified use of Ambac's proprietary model through their
insistence that Ambac's CDO instruments were of higher quality than the market, and as having
little relation to perceived market fluctuations.

**Answer:**    Respectfully refer the Court to Ambac's 2007 Form 10-K for the

discussion of Ambac's accounting policies and practices set forth

therein; otherwise deny the allegations of paragraph 280.

281.    Ambac insiders who used the valuation model confirmed that senior management controlled the process.  CW 5 explained that Defendant Leonard had final oversight and approval of Ambac's mark-to-model reporting.  CW 5 also said that Ambac's culture of aggressively driving premium revenues contributed to a general hesitance to write-down losses on exposures. By devising a model that did not correlate to the relevant market indicators, Ambac avoided the write-down of billions of dollars of exposure throughout 2007.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> existence of, or the contents of alleged statements by, alleged CW 5;
>
> otherwise deny the allegations of paragraph 281.

282.    As set forth in ¶¶111-127 above, Lead Plaintiffs have shown that the collateral performance of the relevant ABX and TABX indices were so similar to Ambac's underlying CDO collateral that they were more than adequate market proxies.  In fact, the underlying collateral of Ambac's representative CDOs moved in tandem with the ABX and TABX underlying collateral.  Yet Ambac repeatedly and falsely stated that its CDOs performed better than the ABX and TABX indices, and therefore avoided reporting reliable mark-to-market losses in relation to the declines in the TABX for similarly senior CDS instruments.

> **Answer:**    Deny.

283.    In fact, using the collateral comprising the most senior attachment point in the TABX as a reference point, Ambac should have written down $2.068 billion of its exposure in the first quarter of 2007, $2.716 billion in the second quarter, $8.923 billion by the third quarter, and $3.6 billion for the fourth quarter.  Ambac's reported mark-to-market write-downs were $5.1 million in Q1, $56.8 million in Q2, $743 million in Q3, and $5.4 billion in Q4 or a total of approximately $6.204 billion for the entire year.  Yet, as Lead Plaintiffs' analysis demonstrates that Ambac should have taken mark-to-market write-downs of $17.3 billion for the year-ended December 31, 2007.

> **Answer:**    Deny the first and third sentences; respectfully refer the Court to
>
> Ambac's Form 10-Qs for the first through third quarters of 2007 and
>
> Ambac's Form 10-K for the fourth quarter of 2007 for the amount of
>
> mark-to-market losses reported therein; except as specifically admitted,
>
> otherwise deny the allegations of paragraph 283.

284.    Ironically, the problem with Ambac's reporting was only discovered because Wall Street investment banks holding similar exposures began to report their own massive write-downs in the fall of 2007.

**Answer:**    Admit on information and belief that other financial institutions,

including Wall Street investment banks, also (like Ambac) announced

mark-to-market losses on exposures to mortgage-related securities in

fall of 2007 and thereafter; except as specifically admitted, otherwise

deny the allegations of paragraph 284.

285.    As of the end of the third quarter of 2007, Ambac's exposure to CDO of ABS, including CDO-squareds, was $29.2 billion.  Thus, the $743 million mark-to-market adjustment announced on October 10, 2007 represented just 2.5% of Ambac's exposure to CDO of ABS. Isolating the $529 million of this write-down that Ambac attributed to its portfolio of CDOs based on ABS, the total charge represented just 1.8% of the total exposure.  This percentage write-down is *vastly smaller* than what other holders of similar securities were taking at the same time period.  Morgan Stanley analyst Ken Zerbe's opening question during an October 24, 2007 conference call raised this very issue:

> First of all, in terms of your mark-to-market loss, I estimate that
> your mark-to-market is somewhere in the range of, say, 2.5% of
> your CDO of ABS exposure, roughly speaking....  My question is
> *why is there such a huge difference between Merrill, which is
> basically writing off – or writing down – half the value of its
> Super Senior AAA CDO exposures versus Ambac, which is only
> taking a couple of percentage point write-down?*

**Answer:**    Admit that Ambac's Form 10-Q for the third quarter of 2007 stated that,

as of September 30, 2007, Ambac had $29.2 billion of exposure to CDO

of ABS where the RMBS collateral represented greater than 25% of the

collateral of the CDO; admit that on October 10, 2007 Ambac

announced net mark-to-market unrealized losses of approximately $743

million on its credit derivative contracts for the third quarter of 2007,

and respectfully refer the Court to Ambac's October 10, 2007 press

release for the complete contents and context thereof, including the

cautionary statements and risk factors referred to therein; admit that

Ambac reported in its third quarter 2007 Form 10-Q that $529 million

of the net mark-to-market losses on its credit derivative contracts in the

third quarter of 2007 were related to CDO of ABS; admit that Ambac

held a conference call on October 24, 2007 and respectfully refer the

Court to the record of the same for the complete contents and context

thereof, including the cautionary statements and risk factors referred to

therein; except as specifically admitted, otherwise deny the allegations

of paragraph 285.

286.    In response to other analyst questions of Ambac's reporting process, Defendant Leonard effectively conceded that Ambac bases its marks on the pricing it chose to charge for assuming the obligation in the first place.  Leonard explained that:  "At transaction pricing, we may be charging a premium that is one-third of the originated cash bond spread."  Leonard further stated that Ambac maintained the "one-third" ratio in marking the exposure at a later measurement date:  "So if that particular spread would move from 30 [basis points] to 60 [basis points in the market], we would move up the price that we would charge – our theoretical price that we would charge underlying the contract, say, from 10 to 20.  And effectively, that additional 10 basis points that would be theoretically charged would be discounted over the weighted average life of the transaction to arrive at an unrealized loss amount."

**Answer:**    Admit that Ambac held a conference call on October 24, 2007, but deny

plaintiffs' characterizations and further deny that matters plaintiffs

allege are presented in their appropriate context, and respectfully refer

the Court to the record of the same for the complete contents and

context thereof, including the cautionary statements and risk factors

referred to therein; except as specifically admitted, otherwise deny the

allegations of paragraph 286.

287.    A slide from a presentation given by Ambac to Bank of America in November 2007 further illustrates the faulty premise supporting Ambac's accounting:  [slide in Complaint is not reprinted here]

**Answer:**    Admit that Ambac used slides in a presentation to Banc of America in

November 2007, but deny plaintiffs' characterizations, and respectfully

refer the Court to the record of the slides for the complete contents and

context; except as specifically admitted, otherwise deny the allegations

of paragraph 287.

288.    As the chart above illustrates, when seeking quotes for the price at which it could transfer its CDS obligations to a third party, Ambac assumed that the asset value as of September 30, 2007, remained the same as the original notional amount from January 1, 2007.  However, if the $100 million is now only worth $75 million, the mark-to-market loss from inception should reflect not only the higher spreads that would be charged to insure the remaining value at risk, but should also incorporate an up-front cash payment to make the issuer of the new CDS whole for insuring $100 million for an asset that the market believes is only worth $75 million at the time of the transaction.  Ambac's mark-to-market methodology wrongly assumed no decrease in value of the underlying asset.

**Answer:**    Admit that Ambac used slides in a presentation to Banc of America in

November 2007, but deny plaintiffs' characterizations and further deny

that matters plaintiffs allege are presented in their appropriate context,

and respectfully refer the Court to the record of the same for the

complete contents and context; aver that throughout the class period,

Ambac's valuation of its CDS obligations complied with GAAP; except

as specifically admitted, otherwise deny the allegations of paragraph

288.

289.    An example of this occurred recently when Ambac announced on August 1, 2008, that it was transferring the liability of a CDS with a notional value of $1.4 billion back to Citigroup, the counterparty.  Citigroup required that, in addition to cancelling any future premiums and payments to Ambac, Ambac had to pay Citigroup an additional $850 million. This payment was likely based, in part, on the current deterioration of the value of the referenced assets in the CDS and the risk that Ambac did not have sufficient capital to make good on the CDS.

**Answer:**    Admit that Ambac announced in an August 1, 2008 press release that it

had settled a $1.4 billion CDS contract that it had written in exchange

for a cash payment of $850 million; aver that the press release further

reported that, as of March 31, 2008, Ambac had recorded approximately

$1.0 billion of mark-to-market losses against the CDS contract and thus

as a result of the settlement Ambac recorded a positive adjustment of

approximately $150 million to its aggregate mark-to-market losses;

except as specifically admitted, otherwise deny the allegations of

paragraph 289.

290.    Moreover, on July 28, 2008, Merrill Lynch announced that it would sell Super Senior CDO of RMBS with a par value of $30.6 billion for only $6.7 billion.  Merrill Lynch had previously written-down the value of the Super Senior CDO of RMBS to approximately $11.1 billion based on the deterioration of the CDO.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 290.

291.    Ambac's mark-to-market methodology would ignore that the CDS with Citigroup or the CDO sold by Merrill Lynch had declined in value.  In fact, Ambac's mark-to-market methodology assumes that the current value of the CDO remains at par.  This is simply not a proper mark-to market and violates GAAP.

**Answer:**    Deny the allegations of paragraph 291, and aver that, at all times during

the Class Period, Ambac's financial statements complied with GAAP.

292.    Ambac's method of valuing its CDS obligations to market also creates a perverse incentive:  the less the Company charges relative to then-current market spreads in the first place, the less downside risk it bears if the reference collateral deteriorates.  GAAP requires a more reasonable relationship between marks and observed market pricing.  ***In the third quarter of 2007, Ambac wrote no CDS against CDOs***.  It could not show that it or any market participant was willing to write credit default swaps against its CDO exposures for pricing consistent with Ambac's valuation methods.  Ambac's assumption that a market participant would purchase its pre-existing CDS obligations by reference to the price Ambac charged at issuance was in violation of SFAS 133 and 107.

**Answer:**    Admit that Ambac's subsidiaries wrote no CDS on CDOs in the third

quarter of 2007; except as specifically admitted, otherwise deny the

allegations of paragraph 292.

293.    In contrast to Ambac's CDS valuations, Ambac's direct RMBS and RMBS-backed non-derivative CDO portfolios are written as conventional insurance contracts and, therefore, have to be reported in conformity with GAAP's financial guarantee accounting

methodology, primarily SFAS 60 and 5.  Ambac employs two separate loss reserves in its
financial statements:  "case basis" reserves and "active credit reserves" ("ACR").

> **Answer:**    Admit that, as set forth in Ambac's 10-K for the year 2006, Ambac
>
> established liabilities (such as reserves) for its credit losses on insured
>
> RMBS based in part on the accounting guidance in SFAS No. 60,
>
> supplemented by SFAS No. 5; admit the second sentence; except as
>
> specifically admitted, otherwise deny the allegations of paragraph 293.

294.    Case basis reserves are taken when a particular credit has already incurred some
event of default.  SFAS 60, "*Accounting and Reporting by Insurance Enterprises*," provides
guidance for the premium and claims cost recognition for insurance companies, including
Ambac's case loss reserves.  Under SFAS 60, ¶17, Ambac was required to increase its "case
basis" loss reserves when insured events occur, such as a triggering event or event of default.

> **Answer:**    Admit that Ambac disclosed in its 10-K for the year 2006 that Ambac
>
> establishes case basis credit reserves for losses on insured obligations
>
> that have defaulted, guided in part by SFAS 60; aver that the second and
>
> third sentences consist of statements of accounting policy and plaintiffs'
>
> legal conclusions as to which no response is required; to the extent a
>
> response to such allegations is required, deny such allegations; except
>
> as specifically admitted, deny the allegations of paragraph 294.

295.    ACR's, on the other hand, are reserves taken when the credit quality of certain
insured assets deteriorates.  SFAS 5, "*Accounting for Contingencies*," governs the accounting
and reporting for loss contingencies before the actual event of default or other triggering event
occurs.  Under SFAS 5, a contingency is "an existing condition, situation, or set of circumstances
involving uncertainty as to [a] possible . . . loss (hereinafter, a "loss contingency") to an
enterprise that will ultimately be resolved when one or more future events occur or fail to occur."
SFAS 5, ¶1.

> **Answer:**    Admit that Ambac's Form 10-K for the year 2006 stated that Ambac
>
> establishes active credit reserves for probable and estimable losses on
>
> non-derivative insured credits that have not yet defaulted, and

respectfully refer the Court to the same for the complete contents and

context thereof, including the cautionary statements and risk factors

referred to therein; aver that the second and third sentences of paragraph

295 consist of statements of accounting policy and legal conclusions as

to which no response is required; to the extent a response is required,

deny such allegations; except as specifically admitted, otherwise deny

the allegations of paragraph 295.

296.    Ambac's reserves policy is based on guidance provided by SFAS 5.  As explained in Ambac's 2007 Form 10-K:

> Ambac establishes an active credit reserve to reflect the probable
> and estimable losses due to credit deterioration on insured credits
> that have not yet defaulted or been reported as of the reporting
> date.  The active credit reserve is established through a process that
> estimates probable losses inherent in the ***adversely classified credit***
> portfolio.  [Emphasis added]

**Answer:**    Admit that Ambac's Form 10-K for the year 2006 states that Ambac's

reserving policy is based, in part, on guidance provided by SFAS 5, and

respectfully refer the Court to the Form 10-K for its complete contents

and context, including the cautionary statements and risk factors

referred to therein; except as specifically admitted, otherwise deny the

allegations of paragraph 296.

297.    Pursuant to Paragraph 8 of SFAS 5, Ambac is required to accrue for a loss contingency, with an equal and corresponding charge to income, when it is both ***probable that an asset has been impaired*** or a liability incurred at the date of the financial statements and that the ***amount of loss can be reasonably estimated***.

**Answer:**    Aver that paragraph 297 consists of plaintiffs' legal conclusions and

statements of accounting policy as to which no response is required; to

the extent that a response is required, deny such allegations; aver that,

as Ambac stated in its Form 10-K for the year 2006, Ambac accrues a

loss reserve when the loss on an insured credit that is not a credit

derivative becomes probable and estimable pursuant to, in part, the

guidance of SFAS 5; otherwise deny the allegations of paragraph 297

and aver that during the Class Period Ambac's financial statements

complied with GAAP.

298.    Critically, even when a contingency does not meet both the "probable" and "reasonably estimable" prongs, the FASB requires the disclosure of contingencies and losses under circumstances directly applicable to Ambac in SFAS 5, ¶10.  In addition to the fundamental principles of financial reporting established by the principles and FASCONs stated above, GAAP requires certain disclosures (even without any accompanying quantitative estimates).

> If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is ***at least a reasonable possibility that a loss or an additional loss may have been incurred.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made***…  (Emphasis added.)

The above language makes clear that the disclosure of a contingency shall be made whenever it is "reasonably possible" (as opposed to probable) that a loss may have been incurred, even if the loss cannot be reasonably estimated under SFAS 5, ¶ 8.  SFAS 5 defines "reasonably possible" as "[t]he chance that the future event or events will occur is ***more than remote but less than likely***."  SFAS 5, ¶ 3(b) (emphasis added).  Regardless of whether a loss is "less than probable" or if the loss cannot be estimated, disclosure of a loss contingency is still required by GAAP.

**Answer:**    Aver that paragraph 298 consists of plaintiffs' legal conclusions and

statements of accounting policy as to which no response is required; to

the extent a response is required, deny such allegations and aver that

Ambac's financial statements complied with GAAP during the class

period.

299.    The following chart represents the loss contingency decision-making process: [chart in Complaint is not reprinted here]

> **Answer:**    Aver that paragraph 299 consists of plaintiffs' legal conclusions and statements of accounting policy as to which no response is required; to the extent a response is required, deny such allegations and aver that Ambac's financial statements complied with GAAP during the class period.

300.    From the fourth quarter of 2006 through the third quarter 2007, Ambac's loss reserves covered only 0.5% of its total RMBS exposure, excluding coverage of Ambac's CDO, CDS, municipal, public and other exposures, which would bring reserve coverage to only 0.04% of its net exposure.  Given the weak and deteriorating characteristics of Ambac's 2006 and 2007 RMBS exposure – as first publicly admitted by Ambac on April 23, 2008 – Ambac's failure to (a) provide an estimate of the Company's probable losses, or, at the very least (b) disclose that a contingent loss is reasonably possible along with a range of losses or an explanation why such range could not be estimated, violated SFAS 5.

> **Answer:**    Respectfully refer the Court to Ambac's 2006 Form 10-K, First Quarter 2007 Form 10-Q, Second Quarter 2007 Form 10-Q, and Third Quarter 2007 Form 10-Q for complete information regarding Ambac's loss reserves for such periods; otherwise deny the allegations of paragraph 300.

301.    In December 2005, the governing body of accountants issued a reminder to companies like Ambac to account for and disclose mortgage-related exposure, entitled FASB's Statement of Position ("SOP") 94-6-1, "Terms of Loan Products That May Give Rise To A Concentration of Credit Risk."

> **Answer:**    Admit that FASB SOP 94-6-1 was issued in December 2005; except as specifically admitted, otherwise deny the allegations of paragraph 301.

302.    SOP 94-6, the Statement upon which the reminder was based, requires the disclosure of certain significant risks and uncertainties, including information about (a) the nature of a company's operations, (b) the company's use of significant estimates in the preparation of financial statements, and (c) current vulnerability to certain concentrations.  (SOP 94-6, ¶8.)  These requirements are in addition to the disclosure requirements of SFAS 5 (described above at ¶¶293-305), as noted in SOP 94-6, ¶12:

In addition to the disclosures required by FASB Statement No. 5 and other accounting pronouncements, this SOP requires disclosures regarding estimates used in the determination of the carrying amounts of assets and liabilities or in disclosures of gain or loss contingencies...

**Answer:**    Aver that paragraph 302 consists of plaintiffs' legal conclusions and statements of accounting policy as to which no response is required; to the extent a response is required, deny the allegations of paragraph 302.

303.    Under SOP 94-6, ¶12, Ambac was required to disclose the nature of an estimate and indicate that (a) it is at least reasonably possible that the estimate will change in the near term, and (b) the effect of the change would be material to the financial statements.  SOP 94-6, ¶17 informs accountants:  "this SOP does not depend on the amount that has been reported on the financial statements, but rather the materiality of the effect that using a different estimate would have had on the financial statements."  This pronouncement therefore placed a responsibility on Ambac to disclose any factors that might change in the near term which would have materially impacted amounts reported in the financial statements.

**Answer:**    Aver that paragraph 303 consists of plaintiffs' legal conclusions and statements of accounting policy as to which no response is required; to the extent a response is required, deny the allegations of paragraph 303 and aver that Ambac's financial statements complied with GAAP during the Class Period.

304.    As the credit markets worsened through 2006 and into the beginning of 2007, it became more apparent that it was at least "reasonably possible" (*i.e.*, more than remote, but less than likely) that Ambac might be vulnerable to the liabilities regarding many of its direct RMBS and derivative CDS exposures.  On or about December 19, 2005, the FASB and its staff issued its FASB SOP 94-6-1, an unusual reminder specifically warning Ambac and other companies heavily involved in subprime that several of the loan products the Company guaranteed could result in increased defaults and losses.

**Answer:**    Deny.

305.    In April 2008, FASB Chairman Robert Herz called the subprime-type financial vehicles "ticking time bombs."  At the time, the FASB staff noted that it had drafted and released FASB SOP 94-6-1 "to emphasize the need for financial statement preparers to consider whether they had disclosed enough information about the risks involved in such loans, and whether changes in market conditions required additional disclosure."  Additionally, the FASB emphasized the need to reconsider disclosures in the face of changing market conditions to

determine if additional disclosure was required. According to a May 1, 2008 article entitled "FASB on Subprime: 'We Warned You,'" "[FSP SOP 94-6-1] strongly suggested that additional disclosure was required – by a variety of accounting standards – for many of the subprime scenarios it described."

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> truth of the allegations of paragraph 305.

306.    On February 29, 2008, in its 2007 Form 10-K, Ambac disclosed, under the heading "Residential Mortgage-Backed Securities Exposure":

> The risk of loss inherent in the 2005, 2006 and 2007 vintage sub-prime, mid-prime and second lien mortgage loans has been elevated due to a number of factors. These factors increase current and potential future losses and include but are not limited to the following:
>
> There has been a notable increase in mortgage loan delinquencies and foreclosures and this situation resulted in significant losses for mortgage lenders and investors in mortgage related products.
>
> *****
>
> The very unfavorable residential mortgage market in the United States has been marked by nationally declining home prices. As home prices fall, the value of collateral available to pay loan balances is diminished, which will cause significantly higher loss severities in the event a borrower defaults.
>
> Ambac insures tranches issued in RMBS, including transactions that contain risks to the above types of mortgages and risk classifications.

> **Answer:**    Admit that Ambac's 2007 Form 10-K contained statements
>
> substantially similar to the language quoted above, and respectfully
>
> refer the Court to the same for its complete contents and context,
>
> including the cautionary statements and risk factors referred to therein.

307.    But Ambac's February 29, 2008 disclosure of the risks in its insured exposures came too late; participants in the structured finance markets, such as the Exchange Act Defendants, had ample warning that these problems were on the horizon no later than the end of 2006, long before the Company issued its Form 10-K for the year ended December 31, 2007. Not only did the FASB, (among others), sound these warnings loudly and clearly via FASB SOP

94-6-1, in which it specifically warned of the two major causes of the current subprime debacle, "affordability products" and a decline in the housing markets, but the Exchange Act Defendants were aware, or were reckless in not being aware of the negative trends in the market through Ambac's purported surveillance of its RMBS-related portfolio.  (*See* ¶¶97-105, 111-133).

> **Answer:**    Deny.

308.    The Exchange Act Defendants' unlawful conduct alleged herein directly caused the losses incurred by Lead Plaintiffs and the Class.  Throughout the Class Period, the prices of Ambac common stock and other securities were artificially inflated as a direct result of the Exchange Act Defendants' false and misleading statements and omissions.  The false and misleading statements set forth above were widely disseminated to the securities markets, investment analysts and the investing public.  The Company's true condition became known by investors and the market through a series of partial corrective disclosures.  By making contemporaneous misstatements, the Company and its management mitigated the impact of those corrective discloses and prevented the full truth about Ambac from being revealed at once.

> **Answer:**    Deny.

309.    When the true facts became known and/or the materialization of the risks that had been fraudulently concealed by the Exchange Act Defendants occurred, the price of Ambac common stock and other securities declined precipitously as the artificial inflation was removed from the market price of these securities, causing substantial damage to Lead Plaintiffs and the members of the Class.  Examples of specific dates of adverse disclosures and corresponding declines in the price of Ambac securities are set forth below.

> **Answer:**    Deny.

310.    On October 24, 2007, Ambac disclosed, for the first time, a $60 million increase in case loss reserves on two HELOC deals of recent vintage.  The rapid deterioration of these deals called into question the company's statements about the quality of its underwriting and surveillance.  During its conference call that day, Ambac also disclosed that it had internally downgraded four additional CDOs - three high-grade CDOs (to AA) and a mezzanine CDO (to BBB).  This was the first internal downgrade disclosed by Ambac on its high-grade CDO exposures.

> **Answer:**    Admit that Ambac issued a press release on October 24, 2007, which
>
> announced, *inter alia*, that case basis loss reserves had increased $59.8
>
> million during the third quarter of 2007 and that the increased case
>
> reserves related primarily to two RMBS transactions that were
>
> underperforming original expectations; admit that Ambac held a
>
> conference call on October 24, 2007, and respectfully refer the Court to

the record of the call for the complete contents and context thereof,

including the cautionary statements and risk factors referred to therein;

except as specifically admitted, otherwise deny the allegations of

paragraph 310.

311.    In response to the October 24, 2007 conference call and announcements, Ambac's stock price fell 9% and 14% on October 24 and 25, respectively.  The abnormal dollar declines on those days are approximately $4.90 and $7.05 respectively.

**Answer:**    Admit that Ambac's stock price closed at $55.90 on October 23, 2007,

$51.00 on October 24, 2007, and $43.95 on October 25, 2007; except as

specifically admitted, otherwise deny the allegations of paragraph 311.

312.    An October 24, 2007 report by analyst Ken Zerbe of Morgan Stanley entitled "Disconnect Between Mgmt Comments and Market Perception is Widening" highlighted the "new news" to come out of Ambac's disclosures as follows:

> Another significant data point, in our view, was the downgrade of four CDO of ABS transactions totaling nearly $4.0 billion of exposure....

> Our concern is that we do not know if this is the beginning of a downward trend in its CDO ratings or if Ambac has truly stress tested its portfolio such that further internal downgrades are unlikely.  But that seems to be the $64,000 question – is Ambac being conservative enough?

> *****

> Oddly enough, one of the more relevant data points came not from the Company but from Merrill Lynch, which reported very significant write-downs in its CDO portfolio.  Write-downs at Merrill Lynch, which totaled $7.9 billion, ranged from 19% on its high-grade CDO exposures to 57% on its CDO-squared exposures. This is relevant because Ambac's mark-to-market losses of $743 million totaled roughly 2.5% of CDO of ABS book, which consists of high-grade, mezzanine and mezzanine CDO-squared deals.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 312.

313.    As to the increased reserves for two recent HELOC deals, Zerbe wrote: "We were a little disappointed with the large increase in case loss reserves in the quarter.... The transactions (vintage 2006 and 2007) were originally rated BBB, but now carry a below investment grade rating." Regarding one of the downgraded HELOC transactions, Morgan Stanley was

> *surprised that Ambac would agree to insure such a transaction*.... One transaction was a 'no OC [i.e., overcollateralization] down deal' according to management.... [T]he initial losses more than overwhelmed what little structural protection there was in the deal, resulting in early losses to Ambac. While we should take encouragement that Ambac is exposed to very few, if any more of these deals, *we cannot help but wonder why the company would agree to insure such a transaction in the first place.* (Emphasis added.)

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> truth of the allegations of paragraph 313.

314.    Nonetheless, other analysts, including analysts from William Blair and Fox Pitt Kelton Cochran, were satisfied with Ambac's explanation that the two HELOC deals were "idiosyncratic" and did not reflect Ambac's overall RMBS portfolio.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> truth of the allegations of paragraph 314.

315.    On January 16, 2008, Ambac announced a staggering $5.4 billion in mark-to-market write-downs, including over $1 billion of credit impairments on its credit default swap CDO exposures, and $143 million in loss reserves in its direct insurance RMBS exposure. Ambac also announced that its CEO, Defendant Genader, was resigning, effective immediately and that it was cutting its dividend by 67% in order to preserve capital.

> **Answer:**    Admit that Ambac reported mark-to-market losses, impairments, an
>
> increase in loss reserves, and the resignation of Robert Genader in a
>
> January 16, 2008 press release, and respectfully refer the Court to
>
> Ambac's January 16, 2008 press release for the complete contents and
>
> context thereof, including the cautionary statements and risk factors
>
> referred to therein; except as specifically admitted, otherwise deny the
>
> allegations of paragraph 315.

316.    Ambac's stock price plummeted **38.65%** on the news, from a closing price of $21.14 on January 15, 2008, to a closing price of $12.97.  These announcements caught Wall Street by surprise, as noted by *The New York Times* on January 19, 2008:

> Ambac, which had won clean bills of health from rating agencies a month ago, surprised Wall Street on Wednesday by writing down its insurance portfolio by $5.4 billion and ousting its chief executive, Robert J. Genader, after he and the board disagreed over whether the company should raise more capital.
>
> While much of the write-down was the result of declining market value of its contracts, the company admitted that an estimated $1.1 billion represented credit losses on which, over time, it would have to pay claims, something that the credit ratings firms had not anticipated.

**Answer:**    Admit that Ambac's stock price closed at $21.14 on January 15, 2008

and $12.97 on January 16, 2008; admit that an article appeared in the

*New York Times* on January 19, 2008; except as specifically admitted,

otherwise deny the allegations of paragraph 316.

317.    Following Ambac's January 16 announcement, analysts expressed their surprise and concerns.  The next day, several analysts downgraded Ambac stock in light of the stunning losses, and S&P issued a revised report regarding losses expected at the various bond insurers.  Ambac's stock price declined ***another* 52%**, closing at $6.24 on extremely high trading volume of almost 63 million shares.

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

truth of the allegations in the first two sentences; admit that Ambac's

stock price closed at $6.24 on January 17, 2008; except as specifically

admitted, otherwise deny the allegations of paragraph 317.

318.    Moody's also put Ambac on review for a possible downgrade, "citing the much higher than expected losses and the abrupt retirement of the company's chairman and CEO." (Friedman Billings Analyst Report, "Moody's Offers Another Blow to SBK – Lowering Price Target," January 17, 2008.)

**Answer:**    Admit that on January 16, 2008, Moody's publicly reported that it had

put Ambac Assurance's triple-A rating on review for possible

downgrade; except as specifically admitted, otherwise deny knowledge

or information sufficient to form a belief as to the truth of the

allegations of paragraph 318.

319.    On January 18, following Ambac's abandonment of its capital-raising plan, Ambac became the first bond insurer to lose its AAA rating when Fitch downgraded the company.

**Answer:**    Admit that it was publicly reported that Fitch downgraded Ambac

Assurance's credit rating from AAA to AA on January 18, 2008; except

as specifically admitted, otherwise deny the allegations of paragraph

319.

320.    On April 23, 2008, as Ambac announced a net loss of $1.66 billion, driven primarily by an impairment of $1.045 billion of HELOC and CES deals, and by a further mark-to-market loss of $1.725 billion on Ambac's CDS exposures.  Defendant Leonard stated in a conference call that "on some exposures, a few deals . . . ***losses could reach as high possibly as 80%***."  (Emphasis added.)  The market recognized the true deterioration of the underlying second lien exposures, and finally was able to link lower quality underlying collateral to Ambac's massive losses.  As reported by *Dow Jones*, "Ambac's stock fell 43% to $3.46 Wednesday after it stunned investors with a $1.66 billion net loss, nearly eight times worse than Wall Street had expected.  The loss was driven by bigger write-downs related to complex securities backed by mortgages, with surprising weakness in securities backed by home equity lines of credit and second-lien loans."  CreditSights analyst Robert Haines remarked that Ambac's announcement "sparked concerns that the company's AAA credit rating wasn't as safe as investors thought.  Just when you thought things are getting back to normal, there are these horrible numbers."

**Answer:**    Admit that in a press release issued on April 23, 2008, Ambac reported

a net loss and mark-to-market losses on Ambac's CDS exposures, and

an increase in losses and loss reserves related to its financial guarantees

of certain HELOC and CES products, and respectfully refer the Court to

Ambac's April 23, 2008 press release for the complete contents and

context thereof, including the cautionary statements and risk factors

referred to therein; admit that Ambac held a conference call on April

23, 2008, but deny that matters plaintiffs allege are presented in their

appropriate context, and respectfully refer the Court to the record of the

same for the complete contents and context, including the cautionary

statements and risk factors referred to therein; deny knowledge or

information sufficient to form a belief as to the truth of the allegations

concerning the alleged reports by Dow Jones and Robert Haines; except

as specifically admitted, otherwise deny the allegations of paragraph

320.

321.    The *Wall Street Journal* noted that "[i]nvestors sold off shares of Ambac
Financial Group Inc., convinced that the bond insurer's worse-than-expected earnings report
could cripple the company's ability to issue new insurance policies."  *Fortune* noted that
Ambac's RMBS-related losses were "noteworthy because the company has previously contended
that mark-to-market losses reflect the overwrought market environment and may be reversed in
future periods.  Ambac makes no such claim about credit impairment."

**Answer:**    Deny knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 321.

322.    Subsequent disclosures confirmed the weak characteristics of the second lien
portfolio.  For example, Ambac later explained, in a May 22, 2008 Second Lien RMBS Update,
that the poorly performing closed-end seconds were "piggyback" transactions with "high
concentrations of purchase and stated doc loans."  In other words, the loans supporting Ambac's
RMBS exposures had been used by home buyers to cover their down payment and often covered
the first 10-20% of home equity to disappear in a market downturn.  With one exception (which
was a late 2005 transaction), all of the "Below Investment Grade" closed end second transactions
took place in the 2006-2007 period.  Additionally, Ambac Executive Vice President, Douglas
Reinfield-Miller further conceded at a June 4, 2008 KBW conference that these recent vintage
closed-end second transactions "essentially [were] where people were leveraging to make 100%
- *leveraging their down payment on a house*."  (Emphasis added.)  Ambac's Reinfield-Miller
also explained that the poorly performing HELOC transactions "do not have a lot of credit
protection."  (Emphasis added.)

**Answer:**    Admit that Ambac posted a Second Lien RMBS Update on its website

that contained language substantially similar to the language quoted

above in the second sentence, but deny plaintiffs' characterizations and

further deny that matters plaintiffs allege are presented in their

appropriate context, and respectfully refer the Court to the record of the

same for its complete contents and context, including the cautionary

statements and risk factors referred to therein; admit that Renfield-

Miller spoke at a KBW conference on June 4, 2008, but deny plaintiffs'

characterizations and further deny that matters plaintiffs allege are

presented in their appropriate context, and respectfully refer the Court

to the record of the same for the complete contents and context; except

as specifically admitted, otherwise deny the allegations of paragraph

322.

323.    After reaching a Class Period closing high of $96.08 on May 18, 2008, the corrective disclosures alleged herein and any others that may be learned through discovery, caused Ambac's stock to decline to $3.46 on April 23, 2008, the last day of the Class Period. The stock price fell below $1.05 and its trading was temporarily halted on July 2, 2008. The price declines directly and proximately resulting from the above discussed disclosures were not caused by industry news, randomness, or by Ambac-related information unrelated to the alleged fraud. Each of the above referenced disclosures partially corrected the false and misleading information previously available to the market by the Exchange Act Defendants' wrongful course of conduct.

**Answer:**    Admit that Ambac's stock price closed at $96.08 on May 18, 2007 and

$3.46 on April 23, 2008, that Ambac's stock price traded at a low of

$1.04 on July 2, 2008, and that on July 2, 2008 the NYSE imposed an

"operational trading halt" on Ambac stock that temporarily halted

trading of Ambac's shares on the trading floor but allowed trading to

continue on the NYSE's electronic platform; except as specifically

admitted, otherwise deny the allegations of paragraph 323, and

specifically deny that Defendants made any untrue statement of material

fact or omitted to state a material fact necessary to make the statements

made not misleading.

324.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.

**Answer:**    Deny.

325.    First, none of the statements complained of herein was a forward-looking statement.  Rather they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements of reported financial results and underwriting, surveillance and accounting practices.  Given the then-existing facts contradicting the Exchange Act Defendants' statements, the generalized risk disclosures made by Ambac, including those regarding the Company's underwriting, surveillance, mark-to-market accounting, loss reserves, and/or financial condition, were not sufficient to insulate the Exchange Act Defendants from liability for the statements they made because those statements were materially misstated when made.  Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

**Answer:**    Deny.

326.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted the Exchange Act Defendants' statements regarding the Company's underwriting, surveillance and accounting practices, and its purported compliance with GAAP.

**Answer:**    Deny, further aver that Defendants' public statements were

accompanied by meaningful cautionary language, and respectfully refer

the Court to those statements for the accompanying cautionary

language.

327.    To the extent that the statutory safe harbor may apply to any of these false statements alleged herein, the Exchange Act Defendants are liable for those false forward-looking statements because at the time each of those statements were made the speaker actually knew the statement was false or the statement was authorized and/or approved by an executive officer of Ambac who actually knew that those statements were false when made.

**Answer:**    Deny.

328.    At all relevant times, the market for Ambac's securities was an efficient market for the following reasons, among others:

a.    The Company's securities were actively traded on the New York Stock Exchange, a highly efficient market;

b.  As a regulated issuer, the Company filed periodic public reports with the SEC;

c.  Ambac was followed by numerous securities analysts, who issued a significant number of reports on Ambac during the Class Period; and

d.  Ambac communicated with public investors via established market communication mechanisms, including the regular issuance of press releases through the Business Wire news service, and conference calls with analysts and investors.

**Answer:**    Aver that paragraph 328 consists of plaintiffs' legal conclusions as to

which no response is required; to the extent a response is required,

respectfully deny the allegations of paragraph 328.

329.    As a result, the market for Ambac's securities promptly digested current information with respect to Ambac from all publicly available sources and reflected such information in the price of the Company's securities.  Under these circumstances, all purchasers of the Company's publicly traded securities during the Class Period suffered similar injury through their purchase of the publicly traded securities of Ambac at artificially inflated prices, and a presumption of reliance applies.

**Answer:**    Aver that paragraph 329 consists of plaintiffs' legal conclusions as to

which no response is required; to the extent a response is required,

respectfully deny the allegations of paragraph 329.

## II.    CLAIMS FOR RELIEF UNDER EXCHANGE ACT

### ANSWER TO COUNT I
### (Alleging Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) (Against Defendants Ambac, Genader, Leonard, Uhlein, and Wallis))

330.    Lead Plaintiffs repeats and realleges ¶¶1-329 set forth above as if fully set forth herein.

**Answer:**    Each Defendant repeats and realleges each and every answer contained

above as if fully set forth herein.

331.    During the Class Period, the Exchange Act Defendants named in this Count: (a) deceived the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (b) artificially inflated and maintained the market price of Ambac's securities; and

(c) caused Lead Plaintiffs and other members of the Class to purchase Ambac's securities at artificially inflated prices.

**Answer:**   Deny.

332.   As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, the Exchange Act Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance, so that the market prices of Ambac's publicly traded securities would be based on truthful, complete and accurate information.

**Answer:**   Deny.

333.   The Exchange Act Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and/or substantially participated in the creation of the alleged misrepresentations, which operated as a fraud and deceit upon the purchasers of Ambac's securities, in an effort to maintain artificially high market prices for the securities of Ambac, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

**Answer:**   Deny.

334.   The Exchange Act Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or the mails, made, or substantially participated in the creation of, untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made about the Company in light of the circumstances under which they were made, not misleading, as set forth herein.

**Answer:**   Deny.

335.   The Exchange Act Defendants named in this Count had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  The facts alleged herein set forth a strong inference that each of the Exchange Act Defendants named in this Count acted with scienter.

**Answer:**   Deny.

336.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Ambac's securities were artificially inflated throughout the Class Period.  In ignorance of the fact that the market prices of Ambac's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Exchange Act Defendants, or upon the integrity of the market in which such shares trade, and the truth of any representations made to appropriate

agencies and to the investing public, at the times at which such statements were made, and/or on the absence of material adverse information that was known or, with recklessness, disregarded by the Exchange Act Defendants but not disclosed in public statements by these Defendants, Lead Plaintiffs and the other members of the Class purchased Ambac's securities at artificially high prices, and were damaged when truthful information was disclosed and the inflation of Ambac's securities' values was corrected.

**Answer:**    Deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading; deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding plaintiffs' purported reliance and purchases; otherwise deny the allegations of paragraph 336.

337.    At the time of said misrepresentations and omissions, Lead Plaintiffs and the other members of the Class were unaware of their falsity, and believed the false statements to be true.  Had Lead Plaintiffs, the other members of the Class and the marketplace known of the true nature of the operations of Ambac and the noncompliance with federal law, which were not disclosed by the Exchange Act Defendants, Lead Plaintiffs and the other members of the Class would not have purchased such securities or, if they had purchased such securities, they would not have done so at the artificially inflated prices which they paid.

**Answer:**    Deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading; deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding plaintiffs' purported beliefs and motivations; otherwise deny the allegations of paragraph 337.

338.    The Exchange Act Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of Ambac were materially false and misleading, knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents in violation of the federal securities laws.

**Answer:**    Deny.

339.    As alleged herein, the Exchange Act Defendants participated in the fraudulent scheme, by virtue of their receipt of information reflecting the true facts regarding Ambac, their control over, and/or receipt and/or modification of Ambac's allegedly materially misleading misstatements and/or their associations with Ambac which made them privy to confidential proprietary information concerning Ambac, participated in the fraudulent scheme alleged herein.

**Answer:**    Deny.

340.    The Exchange Act Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme alleged herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge or recklessness and complicity of the personnel at the highest level of the Company.

**Answer:**    Deny.

341.    The Exchange Act Defendants had the opportunity to perpetrate the fraudulent scheme and course of business described herein because they were the most senior officers and directors of Ambac, and they issued statements and press releases on behalf of Ambac and had the opportunity to commit the fraud alleged herein.  As illustrated by the Exchange Act Defendants' respective positions with the Company, they had and used their influence and control to further the scheme alleged herein.  The Exchange Act Defendants had broad responsibilities that included communicating with the financial markets and providing the markets with financial results.

**Answer:**    Deny.

342.    By reason of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, and are liable to Lead Plaintiffs and the other members of the Class for damages which they suffered in connection with their purchases of Ambac securities during the Class Period.

**Answer:**    Deny the allegations of paragraph 342, and specifically deny that

plaintiffs have any claim or cause of action against any of the

Defendants.

### ANSWER TO COUNT II
### (Alleging Violation of Section 20(a) of the 1934 Act
### (Against Genader and Leonard))

343.    Lead Plaintiffs repeat and reallege ¶¶1-342 above as it fully set forth herein.

**Answer:**    Each Defendant repeats and realleges each and every answer contained

above as if fully set forth herein.

344.    Ambac committed a primary violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, by making the false and misleading statements of material facts, identified above, in connection with the purchase or sale of securities, which constituted a fraud on the market and were, therefore, presumed to have been relied upon by Lead Plaintiffs and the Class.  At the time that it made these false and misleading statements, the Company either knew of, or recklessly disregarded, their falsity.

> **Answer**:    Deny.

345.    During their employment by Ambac, Defendants Genader and Leonard had direct control and/or supervisory involvement in Ambac's operations during the Class Period, and therefore had the power to control or influence the particular transactions giving rise to the violations of the Exchange Act by the Company as alleged herein, and exercised the same.

> **Answer**:    Deny.

346.    By reason of their status as officers of Ambac during the Class Period, Defendants Genader and Leonard are "controlling persons" of Ambac within the meaning of Section 20(a) of the Exchange Act because they had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, these Defendants were able to, and did, directly or indirectly, control the conduct of Ambac's business, the information contained in its filings with the SEC, and public statements about its business.

> **Answer**:    Deny.

347.    As senior executive officers and/or directors of Ambac, Defendants named in this count had a duty to disseminate accurate and truthful information regarding Ambac's financial statements and to correct any previously issued statements that had become untrue so that the market price of Ambac's securities would be based upon truthful and accurate information.

> **Answer**:    Aver that paragraph 347 states plaintiffs' legal conclusions as to which
>
> no response is required; to the extent a response is required, deny the
>
> allegations of paragraph 347.

348.    Each of the Defendants named in this Count participated in writing or reviewing the Company's corporate reports, press releases, and SEC filings alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and thus had the ability and opportunity to prevent their issuance or cause them to be corrected and thereby culpably participated in the fraud alleged herein.

> **Answer**:    Deny.

349.    Because of their positions and access to material non-public information available to them, each of the Defendants named in this Count knew or recklessly disregarded that the

adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  Thus, each of these Defendants is legally responsible for the falsification of Ambac's public reports, financial statements, press releases and other statements as alleged herein.

>    **Answer:**    Deny.

350.    As set forth above, each of the Defendants named in this Count controlled Ambac, which violated Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder by its acts and omissions as alleged in this complaint.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate cause of the wrongful conduct set forth in this Count, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

>    **Answer:**    Deny the allegations of paragraph 350, and specifically deny that
>
>    plaintiffs have any claim or cause of action against any of the
>
>    Defendants.

## III.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

351.    The following allegations are in effect a separate complaint.  For the following claims there is no allegation of fraud, scienter or recklessness.  These claims, brought under Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), are based solely on claims of strict liability and/or the absence of any affirmative defense based on the reasonableness of the pertinent defendants' investigation into the true facts.

>    **Answer:**    Admit that plaintiffs purport to bring claims under the referenced
>
>    statutes, but dispute and deny that any claim is properly asserted; aver
>
>    that the allegations of paragraph 351 include plaintiffs' legal
>
>    conclusions as to which no response is required; to the extent a response
>
>    is required, Defendants deny plaintiffs' allegations; except as
>
>    specifically admitted, otherwise deny the allegations of paragraph 351.

352.    Between October 2006 and April 2008, Ambac completed three securities offerings, which are identified below.  The registration statements and prospectuses Ambac filed with the U.S. Securities and Exchange Commission ("SEC") pursuant to these offerings contained untrue statements of material fact or omitted material facts, as explained in further detail below.

**Answer**:    Admit that Ambac completed three securities offerings between October 2006 and April 2008; except as specifically admitted, otherwise deny the allegations of paragraph 352.

353.    The Securities Act claims are brought on behalf of persons who purchased Ambac Financial Group, Inc. ("Ambac" or the "Company") securities issued under or traceable to the registration statements and prospectuses set forth hereafter.  Each of these registration statements and prospectuses contained misrepresentations or omissions of material fact, or incorporated by reference documents that contained misrepresentations or omissions of material fact.

**Answer**:    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence; otherwise deny the allegations of paragraph 353 and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

354.    The Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained in paragraphs 5-350, including the allegations of scienter and fraud.

**Answer**:    Aver that the allegations of paragraph 354 state plaintiffs' legal conclusions as to which no response is required; to the extent a response is required, Defendants deny plaintiffs' allegations.

355.    On February 6, 2007, Ambac filed with the SEC a post-effective amendment to an automatic shelf registration on Form S-3, dated February 16, 2006 ("Post-Effective Amendment No. 1"), in connection with the February 2007 Directly-Issued Subordinated Capital Securities ("DISCS") Offering ("February 2007 DISCS Offering").

**Answer**:    Admit.

356.    On February 7, 2007, Ambac filed with the SEC a prospectus supplement whereby Ambac offered $400 million of DISCS, which are unsecured subordinated debt instruments (together with Post-Effective Amendment No. 1, hereinafter referred to as the "DISCS Registration Statement/Prospectus").  The DISCS were priced at 99.335% of their par face value, for a total price to the public of $397.34 million.  After underwriting commissions, Ambac realized approximately $393 million.  At the close of trading on July 25, 2008, the DISCS were priced at $26.35.

**Answer:**    Admit that on February 8, 2007 Ambac filed with the SEC a prospectus

supplement dated February 7, 2007 in connection with the DISCS

offering; admit that Ambac offered $400 million of DISCS, which are

unsecured subordinated debt instruments; admit the second sentence;

respectfully refer the Court to the relevant documents for the complete

contents and context thereof, including the cautionary statements and

risk factors referred to therein; admit that Bloomberg LP reports the

closing price of DISCS to have been $26.35 on July 25, 2008; except as

specifically admitted, otherwise deny the allegations of paragraph 356.

357.    The DISCS Registration Statement/Propectus incorporated by reference certain documents which, as set forth hereafter, contained misrepresentations and/or omissions of material fact, including:  Ambac's Form 10-Q for the quarter ended September 30, 2006 and Ambac's Form 8-Ks filed on October 25, 2006 and January 31, 2007.

**Answer:**    Admit only that the DISCS Registration Statement/Prospectus

incorporated by reference certain documents that Ambac filed with the

SEC, including the Form 10-Q and Form 8-Ks referenced in paragraph

357; except as specifically admitted, otherwise deny the allegations of

paragraph 357, and specifically deny that Defendants made any untrue

statement of material fact or omitted to state a material fact necessary to

make the statements made not misleading in any such documents or

otherwise.

358-365.    [Paragraphs 358-365 omitted.]

**Answer:**    Aver that paragraphs 358-365 relate to plaintiffs' allegations regarding

the March 2008 offerings, and as the Court has dismissed plaintiffs'

claims relating to those offerings, no response is required.

366.    Lead Plaintiff Arkansas Teacher Retirement System ("Arkansas Teachers") purchased 212,361 shares of Ambac common stock in the March 2008 Common Stock Offering, as reflected in the supplemental certification of Arkansas Teachers attached hereto as Exhibit B.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 366.

367.    Lead Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi PERS") purchased 48,400 shares of Ambac common stock in the March 2008 Common Stock Offering, as reflected in the supplemental certification of Mississippi PERS attached hereto as Exhibit C.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 367.

368.    Plaintiff Painting Industry Insurance and Annuity Funds ("Painting Funds") purchased DISCS pursuant to the DISCS Registration Statement and was injured thereby, as reflected in the certification attached to the complaint in *Painting Industry Insurance and Annuity Funds v. Ambac Assurance Corporation, et al.*, Case No. 08cv6602 (S.D.N.Y.).

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegation that Painting Funds purchased DISCS as reflected in its certification; otherwise deny the allegations of paragraph 368.

369.    Plaintiffs Arkansas Teachers, Mississippi PERS and Painting Funds are hereinafter referred to as the "Securities Act Plaintiffs."

> **Answer:**    Aver that no response is required to plaintiffs' definition of terms in paragraph 369; to the extent a response is required, Defendants deny the allegations of paragraph 369.

370.    Defendant Ambac is a New York-based holding company whose subsidiaries provide financial guarantee products and financial services to both public and private sector clients.  Ambac Assurance Corporation is its primary operating subsidiary.  Ambac was the issuer of securities in the February 2007 DISCS Offering and the March 2008 Offerings.

> **Answer:**    Admit the first sentence; admit the second sentence insofar as it alleges that Ambac Assurance Corporation is an operating subsidiary of Ambac; admit the third sentence insofar as it alleges that Ambac issued

DISCS in February 2007; to the extent the paragraph includes

allegations about the March 2008 offerings, aver that the Court has

dismissed plaintiffs' claims relating to those offerings and therefore no

response is required; except as specifically admitted, otherwise deny the

allegations of paragraph 370.

371.    Defendant Robert J. Genader ("Genader") was at all relevant times a director, President and Chief Executive Officer ("CEO") of Ambac until January 16, 2008, when he resigned from the Company.  Genader became Chairman of Ambac's board of directors in July 2006.  Genader additionally served as Chairman, President and CEO of Ambac Assurance at all relevant times until January 16, 2008.  Pursuant to powers-of-attorney, Defendant Sean T. Leonard signed the DISCS Registration Statement/Prospectus on behalf of Defendant Genader in Genader's capacity as Chairman, President CEO and director of Ambac.

**Answer:**    Admit that Genader served as a director, President and CEO of Ambac

from the start of the Class Period through January 16, 2008 when he

resigned; admit the second sentence; admit that Genader served as

Chairman, President and CEO of Ambac Assurance from the start of the

Class Period through January 16, 2008; admit that Leonard signed Post-

Effective Amendment No. 1 on behalf of Genader pursuant to

Genader's grant of power-of-attorney to Leonard; except as specifically

admitted, otherwise deny the allegations of paragraph 371.

372.    Defendant Sean T. Leonard ("Leonard") is, and at all relevant times was, Senior Vice President and Chief Financial Officer ("CFO") of Ambac and Ambac Assurance.  Leonard signed or caused to be signed on his behalf the following documents:  (1) the DISCS Registration Statement/Prospectus; (2) Equity Units Registration Statement/Prospectus and (3) Common Stock Registration Statement/Prospectus.

**Answer:**    Admit that Leonard served as Senior Vice President and Chief Financial

Officer of Ambac and Ambac Assurance throughout the Class Period;

admit that Leonard signed Post-Effective Amendment No. 1; to the

extent the paragraph includes allegations about the March 2008

offerings, aver that the Court has dismissed plaintiffs' claims relating to

those offerings and therefore no response is required; except as

specifically admitted, otherwise deny the allegations of paragraph 372.

373.    Defendant Michael A. Callen ("Callen") is, and at all relevant times was, a director of Ambac.  On January 16, 2008, Callen succeeded Defendant Genader as Chairman and CEO of Ambac.  Pursuant to powers-of-attorney, Defendant Leonard signed the following documents on behalf of Defendant Callen:  (a) in Callen's capacity as director of Ambac, (1) the DISCS Registration Statement/Prospectus; and (b) in Callen's capacity as Chairman, President, CEO and director of Ambac, (2) the Equity Units Registration Statement/Prospectus and (3) Common Stock Registration Statement/Prospectus.

**Answer:**    Admit that Callen served as a director of Ambac throughout the Class

Period; admit that Callen was appointed as Chairman of the Board and

interim Chief Executive Officer of Ambac, effective upon retirement of

Genader on January 16, 2008; admit that, pursuant to Callen's grant of

power-of-attorney to Leonard, Leonard signed Post-Effective

Amendment No. 1 on behalf of Callen in Callen's capacity as director

of Ambac; to the extent the paragraph includes allegations about the

March 2008 offerings, aver that the Court has dismissed plaintiffs'

claims relating to those offerings and therefore no response is required;

except as specifically admitted, otherwise deny the allegations of

paragraph 373.

374.    Defendant Phillip B. Lassiter ("Lassiter") was a director of Ambac at all relevant times until May 8, 2007.  Pursuant to powers-of-attorney, Defendant Leonard signed the DISCS Registration Statement/Prospectus on behalf of Lassiter in Lassiter's capacity as director of Ambac.

**Answer:**    Admit that Lassiter served as a director of Ambac from the start of the

Class Period through his retirement from the Board on May 8, 2007;

admit that Leonard signed the Post-Effective Amendment No. 1 on

behalf of Lassiter pursuant to Lassiter's grant of power-of-attorney to

Leonard; except as specifically admitted, otherwise deny the allegations

of paragraph 374.

375.    Defendant Jill M. Considine ("Considine") is, and at all relevant times was, a director of Ambac.  Pursuant to powers-of-attorney, Defendant Leonard signed the following documents on behalf of Defendant Considine in Considine's capacity as director of Ambac: (1) the DISCS Registration Statement/Prospectus; (2) Equity Units Registration Statement/Prospectus and (3) Common Stock Registration Statement/Prospectus.

**Answer:**    Admit that Considine served as a director of Ambac throughout the

Class Period; admit that Leonard signed Post-Effective Amendment No.

1 on behalf of Considine pursuant to Considine's grant of power-of-

attorney to Leonard; to the extent the paragraph includes allegations

about the March 2008 offerings, aver that the Court has dismissed

plaintiffs' claims relating to those offerings and therefore no response is

required;  except as specifically admitted, otherwise deny the

allegations of paragraph 375.

376.    Defendant W. Grant Gregory ("Gregory") was a director of Ambac at all relevant times until his resignation on January 13, 2008.  Pursuant to powers-of-attorney, Defendant Leonard signed the DISCS Registration Statement/Prospectus on behalf of Gregory in Gregory's capacity as director of Ambac.

**Answer:**    Admit that Gregory served as a director of Ambac from the start of the

Class Period through his retirement from the Board on January 13,

2008; admit that Leonard signed Post-Effective Amendment No. 1 on

behalf of Gregory pursuant to Gregory's grant of power-of-attorney to

Leonard; except as specifically admitted, otherwise deny the allegations

of paragraph 376.

377.    Defendant Thomas C. Theobald ("Theobald") is, and at all relevant times was, a director of Ambac.  Pursuant to powers-of-attorney, Defendant Leonard signed the following

documents on behalf of Defendant Theobald in Theobald's capacity as director of Ambac: (1) the DISCS Registration Statement/Prospectus; (2) Equity Units Registration Statement/Prospectus; and (3) Common Stock Registration Statement/Prospectus.

**Answer:**    Admit that Theobald served as a director of Ambac throughout the

Class Period; admit that Leonard signed Post-Effective Amendment No.

1 on behalf of Theobald pursuant to Theobald's grant of power-of-

attorney to Leonard; to the extent the paragraph includes allegations

about the March 2008 offerings, aver that the Court has dismissed

plaintiffs' claims relating to those offerings and therefore no response is

required; except as specifically admitted, otherwise deny the allegations

of paragraph 377.

378.    Defendant Laura S. Unger ("Unger") is, and at all relevant times was, a director of Ambac.  Pursuant to powers-of-attorney, Defendant Leonard signed the following documents on behalf of Defendant Unger in Unger's capacity as director of Ambac:  (1) the DISCS Registration Statement/Prospectus; (2) Equity Units Registration Statement/Prospectus; and (3) Common Stock Registration Statement/Prospectus.

**Answer:**    Admit that Unger served as a director of Ambac throughout the Class

Period; admit that Leonard signed Post-Effective Amendment No. 1 on

behalf of Unger pursuant to Unger's grant of power-of-attorney to

Leonard; to the extent the paragraph includes allegations about the

March 2008 offerings, aver that the Court has dismissed plaintiffs'

claims relating to those offerings and therefore no response is required;

except as specifically admitted, otherwise deny the allegations of

paragraph 378.

379.    Defendant Henry Wallace ("Wallace") is, and at all relevant times was, a director of Ambac.  Pursuant to powers-of-attorney, Defendant Leonard signed the following documents on behalf of Defendant Wallace in Wallace's capacity as director of Ambac:  (1) the DISCS Registration Statement/Prospectus; (2) Equity Units Registration Statement/Prospectus; and (3) Common Stock Registration Statement/Prospectus.

**Answer:**     Admit that Wallace served as a director of Ambac throughout the Class

Period; admit that Leonard signed Post-Effective Amendment No. 1 on

behalf of Wallace pursuant to Wallace's grant of power-of-attorney to

Leonard; to the extent the paragraph includes allegations about the

March 2008 offerings, aver that the Court has dismissed plaintiffs'

claims relating to those offerings and therefore no response is required;

except as specifically admitted, otherwise deny the allegations of

paragraph 379.

380.    Defendant Philip N. Duff ("Duff") is, and at all relevant times since May 8, 2007, was a director of Ambac.  Pursuant to powers-of-attorney, Defendant Leonard signed the Equity Units Registration Statement/Prospectus and Common Stock Registration Statement/Prospectus on behalf of Duff in Duff's capacity as director of Ambac.

**Answer:**     Admit that Duff served as a director of Ambac from May 8, 2007

through the end of the Class Period; to the extent the paragraph includes

allegations about the March 2008 offerings, aver that the Court has

dismissed plaintiffs' claims relating to those offerings and therefore no

response is required; except as specifically admitted, otherwise deny the

allegations of paragraph 380.

381.    Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter for the following offerings:  (1) February 2007 DISCS Offering; (2) March 2008 Equity Units Offering; and (3) March 2008 Common Stock Offering.  Pursuant to the February 2007 DISCS Offering, Citigroup sold $140 million principal amount of DISCS.  Pursuant to the March 2008 Equity Units Offering, Citigroup sold 1,394,750 Equity Units.  Pursuant to the March 2008 Common Stock Offering, Citigroup sold 44,831,112 shares of the Company's common stock.

**Answer:**     Admit that Defendant Citigroup was an underwriter for the February

2007 DISCS Offering, and respectfully refer the Court to the offering

documents relating to the February 2007 DISCS offering for a

description of the underwriting arrangements related thereto; to the

extent the paragraph includes allegations about the March 2008

offerings, aver that the Court dismissed plaintiffs' claims relating to

those offerings and therefore no response is required; except as

specifically admitted, otherwise deny the allegations of paragraph 381.

382.    Defendant UBS Securities LLC ("UBS") was an underwriter for the following offerings:  (1) February 2007 DISCS Offering and (2) the March 2008 Offerings.  Pursuant to the February 2007 DISCS Offering, UBS sold $20 million principal amount of DISCS.  Pursuant to the March 2008 Equity Units Offering, sold 840,500 equity units.  Pursuant to the March 2008 Common Stock Offering, UBS sold 28,763,778 shares of the Company's common stock.

**Answer:**    Admit that Defendant UBS was an underwriter for the February 2007

DISCS Offering, and respectfully refer the Court to the offering

documents relating to the February 2007 DISCS offering for a

description of the underwriting arrangements related thereto; to the

extent the paragraph includes allegations about the March 2008

offerings, aver that the Court dismissed plaintiffs' claims relating to

those offerings and therefore no response is required; except as

specifically admitted, otherwise deny the allegations of paragraph 382.

383.    Defendant Goldman, Sachs & Co. ("Goldman") was an underwriter for the February 2007 DISCS Offering.  Pursuant to the February 2007 DISCS Offering, Goldman sold $80 million principal amount of DISCS.

**Answer:**    Admit that Defendant Goldman was an underwriter for the February

2007 DISCS Offering, and respectfully refer the Court to the offering

documents relating to the February 2007 DISCS Offering for a

description of the underwriting arrangements related thereto; except as

specifically admitted, otherwise deny the allegations of paragraph 383.

384.    Defendant J.P. Morgan Securities Inc. ("J.P. Morgan") was an underwriter for the February 2007 DISCS Offering.  Pursuant to the February 2007 DISCS Offering, J.P. Morgan sold $80 million principal amount of DISCS.

**Answer:**    Admit that Defendant J.P. Morgan was an underwriter for the February

2007 DISCS Offering, and respectfully refer the Court to the offering

documents relating to the February 2007 DISCS Offering for a

description of the underwriting arrangements related thereto; except as

specifically admitted, otherwise deny the allegations of paragraph 384.

385.    Defendant HSBC Securities (USA) Inc. ("HSBC") was an underwriter for the February 2007 DISCS Offering.  Pursuant to the February 2007 DISCS Offering, HSBC sold $20 million principal amount of DISCS.

**Answer:**    Admit that Defendant HSBC was an underwriter for the February 2007

DISCS Offering, and respectfully refer the Court to the offering

documents relating to the February 2007 DISCS Offering for a

description of the underwriting arrangements related thereto; except as

specifically admitted, otherwise deny the allegations of paragraph 385.

386.    Defendant Lehman Brothers Inc. ("Lehman") was an underwriter for the February 2007 DISCS Offering.  Pursuant to the February 2007 DISCS Offering, Lehman sold $20 million principal amount of DISCS.

**Answer:**    Admit that Defendant Lehman was an underwriter for the February

2007 DISCS Offering, and respectfully refer the Court to the offering

documents relating to the February 2007 DISCS Offering for a

description of the underwriting arrangements related thereto; except as

specifically admitted, otherwise deny the allegations of paragraph 386.

387.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") was an underwriter for the February 2007 DISCS Offering.  Pursuant to the February 2007 DISCS Offering, MLPFS sold $20 million principal amount of DISCS.

**Answer:**    Admit that Defendant MLPFS was an underwriter for the February

2007 DISCS Offering, and respectfully refer the Court to the offering

documents relating to the February 2007 DISCS offering for a

description of the underwriting arrangements related thereto; except as

specifically admitted, otherwise deny the allegations of paragraph 387.

388.    Defendant Wachovia Capital Markets, LLC ("Wachovia") was an underwriter for the February 2007 DISCS Offering.  Pursuant to the February 2007 DISCS Offering, Wachovia sold $20 million principal amount of DISCS.

> **Answer:**    Admit that Defendant Wachovia was an underwriter for the February
>
> 2007 DISCS Offering, and respectfully refer the Court to the offering
>
> documents relating to the February 2007 DISCS offering for a
>
> description of the underwriting arrangements related thereto; except as
>
> specifically admitted, otherwise deny the allegations of paragraph 388.

389.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter for the March 2008 Offerings.  Pursuant to the March 2008 Equity Units Offering, Credit Suisse sold 1,394,750 equity units.  Pursuant to the March 2008 Common Stock Offering, Credit Suisse sold 44,831,112 shares of the Company's common stock.

> **Answer:**    Aver that paragraph 389 relates to plaintiffs' allegations regarding the
>
> March 2008 offerings, and as the Court has dismissed plaintiffs' claims
>
> relating to those offerings, no response is required.

390.    Defendant Banc of America Securities LLC ("Banc of America") was an underwriter for the March 2008 Offerings.  Pursuant to the March 2008 Equity Units Offering, Banc of America sold 1,050,000 equity units.  Pursuant to the March 2008 Common Stock Offering, Banc of America sold 35,933,333 shares of the Company's common stock.

> **Answer:**    Aver that paragraph 390 relates to plaintiffs' allegations regarding the
>
> March 2008 offerings, and as the Court has dismissed plaintiffs' claims
>
> relating to those offerings, no response is required.

391.    Defendant Keefe, Bruyette & Wood, Inc. ("KB&W") was an underwriter for the March 2008 Offerings.  Pursuant to the March 2008 Equity Units Offering, KB&W sold 320,000 equity units.  Pursuant to the March 2008 Common Stock Offering, KB&W sold 10,951,111 shares of the Company's common stock.

> **Answer:**     Aver that paragraph 391 relates to plaintiffs' allegations regarding the
> March 2008 offerings, and as the Court has dismissed plaintiffs' claims
> relating to those offerings, no response is required.

392.     Defendant KPMG LLP ("KPMG") at all times relevant served as the Company's outside auditor.  KPMG consented to the incorporation by reference in the Equity Units Registration Statement/Prospectus; and Common Stock Registration Statement/Prospectus, of its unqualified opinions on the Company's financial statements and management's assessment of internal controls for the fiscal year ended December 31, 2007.  KPMG maintains an office in New York, New York.  KPMG issued unqualified opinions on the Company's financial statements and management's assessment of internal controls for the fiscal year ended December 31, 2007.

> **Answer:**     Aver that paragraph 392 relates to plaintiffs' allegations regarding the
> March 2008 offerings, and as the Court has dismissed plaintiffs' claims
> relating to those offerings, no response is required.

393.     The "Underwriter Defendants" refers to Citigroup, Goldman, J.P. Morgan, HSBC, Lehman, MLPFS, UBS, Wachovia, Credit Suisse, Banc of America and KB&W.

> **Answer:**     Aver that the allegations in the Complaint as to defendants Credit
> Suisse, Banc of America and KB&W relate only to certain March 2008
> offerings, as to which the Court has determined that plaintiffs have
> failed to state an actionable claim, and therefore no response is required
> to such allegations; aver that no response is required to plaintiffs'
> definition of terms in paragraph 393; to the extent a response is
> required, Defendants deny the allegations of paragraph 393.

394.     The claims asserted herein arise under Sections 11, 12 and 15 (15 U.S.C. §§ 77k, 77l and 77o) of the Securities Act of 1933 ("Securities Act").

> **Answer:**     Admit that plaintiffs purport to bring claims under the referenced
> statutes, but dispute and deny that any claim is properly asserted; except

as specifically admitted, otherwise deny the allegations of paragraph

394.

395.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act (15 U.S.C. § 77v).

> **Answer:**    Aver that the allegations of paragraph 395 reflect plaintiffs' legal
>
> conclusions to which no response is required; to the extent a response is
>
> required, deny such allegations.

396.    Venue is proper in this District pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District, and Ambac maintains its principal office in New York, New York.

> **Answer:**    Aver that the allegations of the first sentence reflect plaintiffs' legal
>
> conclusions to which no response is required; to the extent a response is
>
> required, deny such allegations; admit that Ambac maintains its
>
> principal office in New York, New York; aver that the portion of the
>
> second sentence not specifically admitted is general in nature and does
>
> not particularize factual allegations to which a response can
>
> meaningfully be made, and deny that any such acts constituted
>
> violations of law; except as specifically admitted, otherwise deny the
>
> allegations of paragraph 396.

397.    In connection with the acts alleged in these Claims for Relief under the Securities Act, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

> **Answer:**    Deny that Defendants used the means and instrumentalities of interstate
>
> commerce to in any way commit any violation of law.

398.    The DISCS Registration Statement/Prospectus incorporated certain documents by reference which contained materially false and misleading statements or omitted material facts.

Those documents were the following:  Ambac's Form 10-Q filed on September 30, 2006, and Ambac's Form 8-Ks filed on October 25, 2006 and January 31, 2007.  The October 25, 2006 and January 31, 2007 Form 8-Ks incorporated as exhibits Ambac's press releases of the same dates announcing Ambac's net income for the quarters ended September 30, 2006 and December 31, 2006, respectively.  In addition, a "Recent Developments" section in the DISCS Registration Statement summarized certain fourth quarter and full year 2006 financial results regarding its structured finance business, which were also reported in Ambac's January 31, 2007 press release, including Ambac's net income.

> **Answer:**    Deny the first sentence; admit that the DISCS Registration
>
> Statement/Prospectus incorporated by reference certain documents that
>
> Ambac filed with the SEC, including documents described in the
>
> second sentence above, and respectfully refer the Court to the same for
>
> the complete contents and context thereof, including the cautionary
>
> statements and risk factors referred to therein; admit the third sentence;
>
> admit that the DISCS prospectus supplement filed on February 8, 2007
>
> contained a section titled "Recent Developments," and respectfully refer
>
> the Court to the prospectus supplement for its complete contents and
>
> context, including the cautionary statements and risk factors referred to
>
> therein; deny that the DISCS Registration Statement/Prospectus or any
>
> of the documents incorporated by reference therein contained any false
>
> or misleading statements; except as specifically admitted, otherwise
>
> deny the allegations of paragraph 398.

399.    On October 25, 2006, Ambac filed with the SEC a Form 8-K, attaching a press release announcing its third quarter 2006 financial results.  In the press release, Defendant Genader asserted:  "We are currently witnessing a solid level of deal inquiries and opportunities....  We remain steadfast in judiciously allocating our capital to transactions that enable us to continue to deliver superior returns."

> **Answer:**    Admit that Ambac issued a press release on October 25, 2006 that
>
> includes statements substantially similar to the language quoted, and

respectfully refer the Court to the same for the complete contents and

context, including the cautionary statements and risk factors referred to

therein; except as specifically admitted, otherwise deny the allegations

of paragraph 399.

400.   The above statements were materially false and misleading because:

    a.   In 2006 mortgage originators lowered their underwriting standards for mortgages comprising Ambac's direct and derivative RMBS exposures.

    b.   Ambac had lowered its underwriting standards for RMBS and CDOs backed by RMBS.

    c.   The collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics.

**Answer:**   Deny.

401.   On November 8, 2006, Ambac issued its Form 10-Q for the quarter ended September 30, 2006 (the "3Q06 Form 10-Q"). The 3Q06 Form 10-Q was signed by Defendant Leonard and included as exhibits Sarbanes-Oxley Certifications (the "Sarbanes-Oxley Certifications") signed by Defendants Genader and Leonard certifying, *inter alia*, that they had reviewed the 3Q06 Form 10-Q and, to their knowledge the (i) report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; and (ii) the financial statements and other financial information included in the report fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in the report.

**Answer:**   Admit.

402.   The 3Q06 Form 10-Q described Ambac's "active surveillance" of its insured portfolio to identify "adversely classified" credits as follows:

> Active surveillance of the insured portfolio enables Ambac's Surveillance Group to track credit migration of insured obligations from period to period and prepare an adversely classified credit listing. The active credit reserve is established only for adversely classified credits. The criteria for an exposure to be included on the adversely classified credit listing includes **...** ***underperformance of the underlying collateral (for collateral dependent transactions such as mortgage-backed securitizations),*** problems with the servicer of the underlying

collateral ***and other adverse economic events or trends***....
(Emphasis added.)

> **Answer:** Admit that Ambac's 3Q06 Form 10-Q includes statements substantially
>
> similar to the language quoted, and respectfully refer the Court to the
>
> same for the complete contents and context, including the cautionary
>
> statements and risk factors referred to therein; except as specifically
>
> admitted, otherwise deny the allegations of paragraph 402.

403. The 3Q06 Form 10-Q disclosed that Ambac took active credit reserves based on, among other things, Ambac's information regarding "historical default information" and "internally developed loss severities."

> **Answer:** Admit that Ambac's 3Q06 Form 10-Q includes statements substantially
>
> similar to the language quoted, and respectfully refer the Court to the
>
> same for the complete contents and context, including the cautionary
>
> statements and risk factors referred to therein; except as specifically
>
> admitted, otherwise deny the allegations of paragraph 403.

404. The 3Q06 Form 10-Q stated that "we note that the mortgage-backed and home equity ultimate [loss] severities have been better than or equal to our current severity assumption." With respect to CDO obligations, the 3Q06 Form 10-Q stated that "Ambac considers the unique attributes of the underlying collateral and transaction."

> **Answer:** Admit that Ambac's 3Q06 Form 10-Q includes statements substantially
>
> similar to the language quoted, and respectfully refer the Court to the
>
> same for the complete contents and context; aver that these statements
>
> were accompanied by cautionary statements, such as "[i]ncreases in
>
> mortgage rates, unemployment and/or personal bankruptcies could
>
> adversely impact residential real estate values and the severity of loss
>
> for our transactions" and "[i]t is reasonably possible that loss estimates

for CDOs may increase as a result of increased severity of loss of the

underlying collateral."

405.    The above statements were materially false and misleading because:

a        In 2006 mortgage originators lowered their underwriting standards for
mortgages comprising Ambac's direct and derivative RMBS exposures.

b.       Ambac had lowered its underwriting standards for RMBS and CDOs
backed by RMBS.

c.       The collateral supporting Ambac's RMBS-exposures and in CDOs backed
by RMBS showed negative trends in delinquencies and other key metrics.

**Answer:**      Deny the allegations of paragraph 405, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

406.    On January 31, 2007, Ambac filed with the SEC a Form 8-K, attaching a press
release announcing its fourth quarter 2006 financial results.  The press release disclosed that
Ambac's total revenues were $454.3 million, and net income for the quarter was $202.7 million,
or $1.88 per diluted share.  Ambac's loss and loss expense reserve was $220.1 million, a
decrease from $304.1 million at the end of the prior year.

**Answer:**      Admit that on January 31, 2007 Ambac issued a press release (filed the

same day with the SEC in a Form 8-K) that reported certain unaudited

financial results, including fourth quarter 2006 total revenues of

approximately $454.3 million, fourth quarter 2006 net income of

approximately $202.7 million or $1.88 per diluted share, and loss and

loss expense reserves of approximately $220.1 million as of December

31, 2006, and respectfully refer the Court to the same for its complete

contents and context, including the cautionary statements and risk

factors referred to therein; except as specifically admitted, otherwise

deny the allegations of paragraph 406.

407.    The January 31, 2007 press release also reported a net mark-to-market loss on financial guarantee credit derivative contracts in the fourth quarter of $838,000 and a net mark-to-market gain of $9.1 million for the year 2006.

**Answer:**    Admit that Ambac's January 31, 2007 press release reported mark-to-

market numbers substantially similar to those set forth in paragraph

407, and respectfully refer the Court to the same for its complete

content and context, including the cautionary statements and risk factors

referred to therein.

408.    The above statements were materially false and misleading because:

a.    In 2006 mortgage originators lowered their underwriting standards for mortgages comprising Ambac's direct and derivative RMBS exposures.

b.    Ambac had lowered its own underwriting standards for RMBS and CDOs backed by RMBS.

c.    The collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics.

**Answer:**    Deny the allegations of paragraph 408, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

409-466.    [Paragraphs 409-466 omitted.]

**Answer:**    Aver that paragraphs 409-466 relate to plaintiffs' allegations regarding

the March 2008 offerings, and as the Court has dismissed plaintiffs'

claims relating to those offerings, no response is required.

**ANSWER TO COUNT III**
**(Alleging Violations of Section 11 of the Securities Act in Connection with the February**

**2007 DISCS Offering (Against Defendants Ambac, Genader, Leonard, Lassiter, Callen, Considine, Gregory, Theobald, Unger, Wallace, Citigroup, Goldman, J.P. Morgan, HSBC, Lehman, MLPFS, UBS and Wachovia))**

467.     Plaintiffs repeat and reallege the allegations above starting at paragraphs 351-466, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on strict liability and/or the absence of an affirmative defense based on the reasonableness of a partial defendant's investigation.

> **Answer:**     Each Defendant repeats and realleges each and every answer to
>
> paragraphs 351-466 as if fully set forth herein; aver that the allegations
>
> of paragraph 467 state plaintiffs' legal conclusions as to which no
>
> response is required; to the extent a response is required, Defendants
>
> deny plaintiffs' allegations;  except as specifically admitted, otherwise
>
> deny the allegations of paragraph 467.

468.     This claim is brought pursuant to Section 11 of the Securities Act, on behalf of all purchasers of Ambac securities in or traceable to the February 2007 DISCS Offering against Ambac, Genader, Leonard, Lassiter, Callen, Considine, Gregory, Theobald, Unger, Wallace, Citigroup, Goldman, J.P. Morgan, HSBC, Lehman, MLPFS, UBS and Wachovia (collectively, the "DISCS Defendants").

> **Answer:**     Admit that plaintiffs purport to bring a claim under the referenced
>
> statute, but dispute and deny that any claim is properly asserted; except
>
> as specifically admitted, otherwise deny the allegations of paragraph
>
> 468.

469.     The DISCS Registration Statement/Prospectus contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading, as set forth more fully above.

> **Answer:**     Deny the allegations of paragraph 469, and specifically deny that
>
> Defendants made any untrue statement of material fact or omitted to
>
> state a material fact necessary to make the statements made not
>
> misleading.

470.    Ambac is the issuer of the DISCS pursuant to the DISCS Registration Statement/Prospectus.  As issuer of the DISCS, Ambac is strictly liable to Plaintiffs and to the members of the Class who purchased DISCS pursuant to the DISCS Registration Statement/Prospectus for the materially untrue statements and omissions alleged herein.

**Answer:**    Admit the first sentence; except as specifically admitted, otherwise deny the allegations of paragraph 470, and specifically deny that Defendants made any untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading.

471.    Defendants Genader, Leonard, Lassiter, Callen, Considine, Gregory, Theobald, Unger, and Wallace (collectively, the "DISCS Officers and Directors"), signed the DISCS Registration Statement/Prospectus or authorized it to be signed on their behalf.

**Answer:**    Admit that Leonard signed Post-Effective Amendment No. 1 on behalf of himself and that Leonard signed Post-Effective Amendment No. 1 on behalf of Genader, Lassiter, Callen, Considine, Gregory, Theobald, Unger, and Wallace pursuant to grants of power-of-attorney to Leonard; except as specifically admitted, otherwise deny the allegations of paragraph 471.

472.    Citigroup, Goldman, J.P. Morgan, HSBC, Lehman, MLPFS, UBS and Wachovia (collectively, the "DISCS Underwriters") were underwriters of the February 2007 DISCS Offering.

**Answer:**    Admit that the defendants listed in paragraph 472 were underwriters with respect to the DISCS offering, and respectfully refer the Court to the underwriting-related documentation for a complete and accurate description of the underwriting arrangements; except as specifically admitted, otherwise deny the allegations of paragraph 472.

473.    Class members purchased DISCS issued under or traceable to DISCS Registration Statement/Prospectus.

> **Answer:**    Deny knowledge or information sufficient to form a belief as to the
>
> truth of the allegations of paragraph 473.

474.    Class members who purchased DISCS pursuant to the DISCS Registration Statement/Prospectus were damaged by these defendants as a direct and proximate result of the untrue statements and omissions in the DISCS Registration Statement/Prospectus.

> **Answer:**    Deny.

475.    This claim is brought within the applicable statute of limitations.

> **Answer:**    Deny.

476.    By reason of the foregoing, the defendants named in this count have violated Section 11 of the Securities Act.

> **Answer:**    Deny.

## ANSWER TO COUNT IV
### (Alleging Violations of Section 12(a)(2) of the Securities Act in Connection with the February 2007 DISCS Offering (Against Defendants Ambac, Citigroup, Goldman, J.P. Morgan, HSBC, Lehman, MLPFS, UBS and Wachovia))

477.    Plaintiffs repeat and reallege the allegations above starting at paragraphs 351-476, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on strict liability and/or the absence of an affirmative defense based on the reasonableness of a partial defendant's investigation.

> **Answer:**    Each Defendant repeats and realleges each and every answer to
>
> paragraphs 351-476 as if fully set forth herein; aver that the allegations
>
> of paragraph 477 state plaintiffs' legal conclusions as to which no
>
> response is required; to the extent a response is required, Defendants
>
> deny plaintiffs' allegations; except as specifically admitted, otherwise
>
> deny the allegations of paragraph 477.

478.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of all purchasers of Ambac securities in the February 2007 DISCS Offering against Ambac and the DISCS Underwriters in connection with the February 2007 DISCS Offering.

**Answer:**    Admit that plaintiffs purport to bring a claim under the referenced

statute, but dispute and deny that any claim is properly asserted; except

as specifically admitted, otherwise deny the allegations of paragraph

478.

479.    Ambac was a seller, offeror, and/or solicitor of sales of the securities offered pursuant to the DISCS Registration Statement/Prospectus, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

**Answer:**    Deny the allegations of paragraph 479, and specifically deny that

Defendants made any untrue statement of material fact or omitted to

state a material fact necessary to make the statements made not

misleading.

480.    The DISCS Underwriters were underwriters of the February 2007 DISCS Offering.  As underwriters of the February 2007 DISCS Offering, these defendants participated in the February 2007 DISCS Offering and sale of the debt securities to the investing public.

**Answer:**    Respectfully refer the Court to the relevant offering documents for a

description of the underwriting arrangements relating thereto; deny

knowledge or information sufficient to form a belief as to the truth of

the allegations in the second sentence; except as specifically admitted,

otherwise deny the allegations of paragraph 480.

481.    Members of the class who purchased DISCS pursuant to the February 2007 DISCS Offering have sustained damages as a result of the untrue statements of material facts and omissions in the DISCS Registration Statement/Prospectus, for which they hereby elect to rescind and tender their DISCS to the defendants sued in this count in return for the consideration paid for Ambac DISCS with interest.

**Answer:**    Deny.

482.    This claim is brought within the applicable statute of limitations.

**Answer:**    Deny.

483.    By virtue of the foregoing, the defendants named in this count violated Section 12(a)(2) of the Securities Act.

**Answer:**    Deny.

## ANSWER TO COUNT V
**(Alleging Violations of Section 11 of the Securities Act in Connection with the March 2008 Offerings (Against Defendants Ambac, Callen, Leonard, Duff, Considine, Theobald, Unger, Wallace, Credit Suisse, Citigroup, Banc of America, UBS, KB&W and KPMG))**

484-494.    [Paragraphs 484-494 omitted.]

**Answer:**    Aver that paragraphs 484-494 relate to plaintiffs' allegations regarding the March 2008 offerings, and as the Court has dismissed plaintiffs' claims relating to those offerings, no response is required.

## ANSWER TO COUNT VI

**(Alleging Violations of Section 12(a)(2) of the Securities Act in Connection with the March 2008 Offerings (Against Defendants Ambac, Credit Suisse, Citigroup, Banc of America, UBS and KB&W))**

495-502.    [Paragraphs 495-502 omitted.]

**Answer:**    Aver that paragraphs 495-502 relate to plaintiffs' allegations regarding the March 2008 offerings, and as the Court has dismissed plaintiffs' claims relating to those offerings, no response is required.

## ANSWER TO COUNT VII
**(Alleging Violations of Section 15 of the Securities Act in connection with the February 2007 DISCS Offering and the March 2008 Offerings (Against Defendants Genader, Leonard and Callen))**

503.    Plaintiffs repeat and reallege the allegations above starting at paragraphs 351-502, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

**Answer:**    Each Defendant repeats and realleges each and every answer to paragraphs 351-502 as if fully set forth herein; aver that the allegations of paragraph 503 state plaintiffs' legal conclusions as to which no

response is required; to the extent a response is required, Defendants

deny plaintiffs' allegations;  except as specifically admitted, otherwise

deny the allegations of paragraph 503.

504.    This Count is brought pursuant to Section 15 of the Securities Act on behalf of plaintiffs and the Class.

> **Answer:**    Admit that plaintiffs purport to bring a claim under the referenced
>
> statute, but dispute and deny that any claim is properly asserted; except
>
> as specifically admitted, otherwise deny the allegations of paragraph
>
> 504.

505.    This Count is asserted against (1) Defendants Genader and Leonard, for violations of Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Plaintiff Painting Funds and the other members of the Class who purchased or otherwise acquired DISCS issued in the February 2007 DISCS Offering and (2) Defendants Callen and Leonard, for violations of Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired securities issued in the March 2008 Offerings.

> **Answer:**    Admit that plaintiffs purport to bring a claim under the referenced
>
> statute, but dispute and deny that any claim is properly asserted; to the
>
> extent the paragraph includes allegations about the March 2008
>
> offerings, aver that the Court has dismissed plaintiffs' claims relating to
>
> those offerings and therefore no response is required; except as
>
> specifically admitted, otherwise deny the allegations of paragraph 505.

506.    These defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Specifically, Defendant Leonard served as Ambac's Senior Vice President and Chief Financial Officer prior to and at the time of the February 2007 DISCS Offering and the March 2008 Offerings; and Defendant Genader served as Ambac's Chairman, Chief Executive Officer, President and a director of Ambac prior to and at the time of the February 2007 DISCS Offering; and Defendant Callen served as a Chief Executive Officers, President and director of Ambac prior to and at the time of the March 2008 Offerings.

> **Answer:**    Aver that the first sentence of paragraph 506 states plaintiffs' legal
>
> conclusions as to which no response is required; to the extent a response

is required, deny such allegations; admit that Leonard served as

Ambac's Senior Vice President and Chief Financial Officer throughout

the Class Period, that Genader served as director, President, CEO and

Chairman of the Board of Ambac from the beginning of the Class

Period through January 16, 2008 when he resigned; to the extent the

paragraph includes allegations about the March 2008 offerings, aver

that the Court has dismissed plaintiffs' claims relating to those offerings

and therefore no response is required; except as specifically admitted,

otherwise deny the allegations of paragraph 506.

507.    Defendants Leonard and Genader prior to and at the time of the February 2007 DISCS Offering participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Ambac's business affairs.  Defendants Leonard and Genader participated in the preparation and dissemination of the DISCS Registration Statement/Prospectus, and otherwise participated in the process necessary to conduct the February 2007 DISCS Offering.  Because of their positions of control and authority as senior officers of Ambac, Genader and Leonard were able to, and did, control the contents of the DISCS Registration Statement/Prospectus, which contained materially untrue information.

**Answer:**    Aver that the first two sentences of paragraph 507 are general in nature

and do not particularize factual allegations to which a response can

meaningfully be made; to the extent a response is required, deny such

allegations; otherwise deny the allegations of paragraph 507 and

specifically deny that Defendants made any untrue statement of material

fact or omitted to state a material fact necessary to make the statements

made not misleading.

508.    Defendants Leonard and Callen prior to and at the time of the March 2008 Offerings participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Ambac's business affairs.  Defendants Leonard and Callen participated in the preparation and dissemination of the Equity Units Registration Statement/Prospectus and Common Stock Registration Statement/Prospectus, and otherwise participated in the process necessary to conduct the March 2008 Offerings.  Because

of their positions of control and authority as senior officers of Ambac, Callen and Leonard were able to, and did, control the contents of the Equity Units Registration Statement/Prospectus and Common Stock Registration Statement/Prospectus, which contained materially untrue information.

> **Answer:**    Aver that paragraph 508 relates to plaintiffs' allegations regarding the
>
> March 2008 offerings, and as the Court has dismissed plaintiffs' claims
>
> relating to those offerings, no response is required.

509.    By reason of the aforementioned conduct, Defendants Leonard and Genader are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as Ambac is liable under Sections 11 and 12(a)(2) of the Securities Act, to plaintiffs and members of the Class who purchased DISCS pursuant to the February 2007 DISCS Offering; and Defendants Leonard and Callen are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as Ambac is liable under Sections 11 and 12(a)(2) of the Securities Act, to plaintiffs and members of the Class who purchased securities pursuant to the March 2008 Offerings.

> **Answer:**    Aver that, to the extent the paragraph includes allegations about the
>
> March 2008 offerings, the Court has dismissed plaintiffs' claims
>
> relating to those offerings and therefore no response is required;
>
> otherwise deny the allegations of paragraph 509.

510.    As a direct and proximate result of Defendants Leonard and Genader in the February 2007 DISCS Offering, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of the DISCS.  As a direct and proximate result of Defendants Leonard and Callen in the March 2008 Offerings, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of the Ambac securities offered pursuant to the March 2008 Offerings.

> **Answer:**    Aver that, to the extent the paragraph includes allegations about the
>
> March 2008 offerings, the Court has dismissed plaintiffs' claims
>
> relating to those offerings and therefore no response is required;
>
> otherwise deny the allegations of paragraph 510.

### IV. CLASS ACTION ALLEGATIONS FOR EXCHANGE ACT AND SECURITIES ACT COUNTS

511.    Lead Plaintiffs (and, with respect to the February 2007 DISCS Offering, Plaintiff Painting Funds) bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons and entities who:  (i) purchased or otherwise acquired Ambac securities during the period from October 25, 2006, through and including April 23, 2008 and, who, upon disclosure of certain facts alleged herein, were injured thereby; (ii) purchased Ambac's 2007 Directly-Issued Subordinated Capital Securities ("DISCS") pursuant to a Post-Effective Amendment No. 1 to Form S-3 filed with the U.S. Securities and Exchange Commission ("SEC") on February 6, 2007, and a 424B5 prospectus supplement dated February 7, 2007, and who were injured thereby; (iii) purchased Ambac's equity units pursuant to the Post-Effective Amendment No. 2 to an automatic shelf registration statement on Form S-3 dated February 16, 2006, and a 424B5 prospectus supplement; and (iv) purchased Ambac common stock pursuant to the Post-Effective Amendment No. 2 and a 424B5 prospectus supplement.

**Answer:**    Acknowledge that plaintiffs purport to bring this action as a class action on behalf of the described persons, but deny and dispute plaintiffs' standing or entitlement to do so; deny and dispute that this case is appropriate for class action treatment; to the extent a response is required, Defendants deny the allegations of paragraph 511.

512.    The members of the Class are so numerous that joinder of all members is impracticable.  As of March 31, 2008, Ambac had 286,833,756 shares of common stock issued and outstanding.  Throughout the Class Period, Ambac common stock was actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that Class members number in the thousands.

**Answer:**    Aver that the first sentence of paragraph 512 states plaintiffs' legal conclusions as to which no response is required; to the extent a response is required, deny such allegations; deny the second sentence; admit that during the class period Ambac common stock was traded on the New York Stock Exchange; deny knowledge or information sufficient to form a belief as to the truth of the allegations of the fourth sentence; deny and dispute that this case is appropriate for class action treatment;

except as specifically admitted, otherwise deny the allegations of

paragraph 512.

513.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and the other members of the Class acquired Ambac securities in the offerings, pursuant to a registration statement, or purchased or sold Ambac securities in the market, and sustained damages as a result of Defendants' conduct complained of herein.

> **<u>Answer:</u>**    Aver that the first sentence of paragraph 513 states plaintiffs' legal
>
> conclusions as to which no response is required; to the extent a response
>
> is required, Defendants deny and dispute plaintiffs' allegations; deny
>
> and dispute that this case is appropriate for class action treatment;
>
> otherwise deny the allegations of paragraph 513.

514.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

> **<u>Answer:</u>**    Aver that paragraph 514, at least in part, states plaintiffs' legal
>
> conclusions as to which no response is required; deny and dispute that
>
> this case is appropriate for class action treatment; to the extent a
>
> response is required, Defendants deny the allegations of paragraph 514.

515.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

> **<u>Answer:</u>**    Deny.

516.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

> a.    whether the Federal securities laws were violated by Defendants' conduct as alleged herein;

b. whether the registration statements and prospectuses for the Company's Offerings contained material misstatements or omitted to state material information;

c. whether the SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

d. whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

e. whether and to what extent Defendant KPMG's audits of the Company's financial statements for the year ended 2007 failed to be conducted in accordance with the standards of the PCAOB;

f. whether and to what extent the market prices of Ambac common stock and other securities were artificially inflated during the Class Period due to the non-disclosures and/or misstatements complained of herein;

g. whether, with respect to Lead Plaintiffs' claims under the Securities Act, Defendants named in those claims can sustain their burden of establishing an affirmative defense pursuant to the applicable statute;

h. whether, with respect to Lead Plaintiffs' claims pursuant to (i) Section 15 of the Securities Act, Defendants Genader, Leonard, and Callen were controlling persons of Ambac, and (ii) Section 20(a) of the Exchange Act, Defendants Genader and Leonard were controlling persons of Ambac;

i. whether, with respect to Lead Plaintiffs' claims under the Exchange Act, Defendants named in those claims acted with scienter;

j. whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

k. whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

**Answer:**    Deny.

517. The names and addresses of those persons and entities who purchased or sold Ambac securities during the Class Period are available from the Company's transfer agent(s) and/or from the Underwriter Defendants. Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

**Answer:**     Deny knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 517.

## V.     PRAYER FOR RELIEF

Answering plaintiffs' prayer for relief, Defendants deny that plaintiffs are entitled

to relief against the Defendants.

## VI.     JURY DEMAND

Answering plaintiffs' demand for a jury trial, Defendants deny plaintiffs' demand

for a jury trial, except admit that plaintiffs purport to demand a jury trial.

\* \* \*

518.     To the extent any more specific response were to be required, each Defendant

states that all responses based in substance upon lack of knowledge or information, knowledge or

information insufficient to form a belief as to the truth of plaintiffs' allegations, or a document

speaking for itself should be construed to have the effect of a denial.

519.     Defendants deny each and every allegation of the Complaint not specifically

admitted; and any allegation which Defendants admit is admitted only as to the specific facts

admitted, and not as to any characterization, implication, speculation, or conclusion contained in

the allegation or in the Complaint as a whole.

## ADDITIONAL DEFENSES

520.     As additional defenses, each Defendant alleges, asserts and avers the following,

which apply to each and every cause of action asserted in the Complaint against each of the

Defendants to which such defense is or may be applicable.  By virtue of alleging these further

defenses, the Defendants do not assume any burden of proof, persuasion or production not

otherwise legally assigned to them.  Defendants also do not concede that facts contrary to one or more of the averments that follows would support liability as to any Defendant.  Defendants reserve all rights to assert other defenses as appropriate.

### FIRST DEFENSE

521.    Each Defendant must be judged separately based on any evidence with respect to that Defendant, and each Defendant denies and disputes the existence of any valid claim against him or her.

### SECOND DEFENSE

522.    The Complaint fails to state a claim upon which relief can be granted.

### THIRD DEFENSE

523.    Plaintiffs lack standing to assert the claims alleged in the Complaint.

### FOURTH DEFENSE

524.    The Complaint fails to comply with the requirements of Federal Rule of Civil Procedure 9(b).

### FIFTH DEFENSE

525.    The Complaint fails to comply with the requirements of the Private Securities Litigation Reform Act of 1995.  Among other things, the Complaint fails to plead fraud with particularity, and the Complaint allegations based on confidential witnesses or consultants are insufficient to support a claim.

## SIXTH DEFENSE

526.    None of the Defendants employed any device, scheme, or artifice to defraud, made any untrue statement of a material fact, omitted to state any material fact necessary in order to make statements made, in light of the circumstances in which they were made, not misleading, or otherwise engaged in any act, practice, or course of business that operated or would have operated as a fraud or deceit upon the members of the putative class.

## SEVENTH DEFENSE

527.    The Complaint fails to adequately allege any misrepresentations or omissions of material fact.

## EIGHTH DEFENSE

528.    At no time did any Defendant make any misrepresentations or omissions of material fact.

## NINTH DEFENSE

529.    The Complaint fails to adequately to allege scienter.

## TENTH DEFENSE

530.    None of the Defendants acted with scienter.  Among other things, none of the Defendants possessed the willfulness or scienter necessary to impose on them any liability arising from the alleged misstatements or omissions.

## ELEVENTH DEFENSE

531.    Each Defendant conducted a reasonable investigation and had reasonable grounds to believe, and did believe, that the statements they made were true and did not omit to state any material fact necessary to make the statements not misleading.

## TWELFTH DEFENSE

532.    None of the Defendants knew, and in the exercise of reasonable care could not have known, of any alleged untruth or omission.

## THIRTEENTH DEFENSE

533.    Defendants reasonably relied on the records of the corporation and upon information, opinions, reports and/or statements from, advice of, and expertise of others with knowledge and expertise of relevant matters who were selected with reasonable care.

## FOURTEENTH DEFENSE

534.    None of the Defendants misrepresented or failed to disclose, and none of the Defendants participated in, directed, controlled, assisted or induced any misrepresentation of or failure to disclose, material facts to plaintiffs and/or the members of the putative class.

## FIFTEENTH DEFENSE

535.    Each Defendant at all times acted in good faith and in the honest belief that their actions were in the best interests of the company and its shareholders.

## SIXTEENTH DEFENSE

536.    None of the Defendants had any duty to disclose any of the information that they allegedly failed to disclose.

## SEVENTEENTH DEFENSE

537.    None of the Defendants breached any duty owed to the plaintiffs and/or the members of the putative class.

## EIGHTEENTH DEFENSE

538.    Any alleged misrepresentations and omissions were not material.

## NINETEENTH DEFENSE

539.    In light of the total mix of information available to the marketplace, none of the alleged misstatements or omissions would have been material to a reasonable investor.

## TWENTIETH DEFENSE

540.    Any alleged misstatements or omissions were rendered non-actionable by cautionary statements publicly disseminated to the securities markets.

## TWENTY-FIRST DEFENSE

541.    Each Defendant's forward-looking statements are protected by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, including but not limited to those codified in the Securities Act of 1933, the Securities Exchange Act of 1934, and/or regulations promulgated thereunder.

## TWENTY-SECOND DEFENSE

542.    Each Defendant's statements are protected by the "bespeaks caution" doctrine.

## TWENTY-THIRD DEFENSE

543.    The alleged misstatements by each of the Defendants constitute inactionable puffery and/or inactionable statements of opinion.

## TWENTY-FOURTH DEFENSE

544.    If there were any misstatement, which Defendants specifically deny, then Plaintiffs' and the putative class members' claims are barred because they knew, or in the

exercise of reasonable care, should have known, of some or all the material facts and information relating to the claims, statements and omissions alleged in the Complaint at the time they purchased Ambac's securities, and their own negligence or other fault proximately contributed to the injuries allegedly suffered by the plaintiffs and the putative class, and bars any recovery.

## TWENTY-FIFTH DEFENSE

545.     Plaintiffs and the members of the putative class did not rely upon any alleged misrepresentations or omissions made by any of the Defendants, and any such reliance would in any event not have been reasonable in view of available public information and cautionary statements.

## TWENTY-SIXTH DEFENSE

546.     Plaintiffs and the members of the putative class would have purchased Ambac securities even with knowledge of the facts that they now allege were misrepresented or omitted.

## TWENTY-SEVENTH DEFENSE

547.     Plaintiffs and the members of the putative class purchased Ambac securities with actual or constructive knowledge of the risks involved in an investment in Ambac securities, and thus assumed the risk that the value of the securities would decline if such risks materialized.

## TWENTY-EIGHTH DEFENSE

548.     Any facts alleged by plaintiffs to have been concealed or misrepresented were publicly known and were incorporated into the trading price of Ambac securities at all relevant times during the putative class period.

## TWENTY-NINTH DEFENSE

549.    Defendants' alleged misrepresentations or omissions were neither the proximate cause nor the cause in fact of plaintiffs' alleged losses.

## THIRTIETH DEFENSE

550.    Plaintiffs and the members of the putative class have sustained no legally cognizable damage by virtue of any alleged misrepresentations or omissions because such alleged misrepresentations and omissions did not cause the drop in the price or value of the Ambac securities at issue in this case, and did not cause any alleged inflation of the price or value of the Ambac securities at issue in this case.

## THIRTY-FIRST DEFENSE

551.    Plaintiffs and members of the putative class have sustained no legally cognizable damage because the price or value of the Ambac securities at issue in this case during and after the putative Class Period was affected by numerous factors that were unrelated to the alleged misstatements and omissions and that had an independent and appreciable effect upon the price or value of the Ambac securities at issue in this case.

## THIRTY-SECOND DEFENSE

552.    Any damages or injuries allegedly suffered by plaintiffs or members of the putative class are the proximate result, either in whole or in part, of actions or omissions of persons or entities other than the Defendants.

## THIRTY-THIRD DEFENSE

553.    Plaintiffs have not established that the market for the Ambac securities at issue in this case was efficient.

## THIRTY-FOURTH DEFENSE

554.    Plaintiffs and members of the putative class are precluded from recovery, in whole or in part, because plaintiffs have failed to mitigate damages.

## THIRTY-FIFTH DEFENSE

555.    Claims asserted by members of the putative class herein are or may be precluded from recovery because such claims would create the potential for double recovery.

## THIRTY-SIXTH DEFENSE

556.    Any recovery for alleged damages, if any, is limited to the percentage of responsibility of each Defendant in proportion to the total fault of all persons, named as parties to this action or not, who caused or contributed to plaintiffs' alleged damages, pursuant to the proportionate liability provisions of the Private Securities Litigation Reform Act of 1995.

## THIRTY-SEVENTH DEFENSE

557.    With regard to claims arising under Section 15 of the Securities Act of 1933, Section 20(a) of the Securities Exchange Act of 1934, and regulations promulgated thereunder, the claims are barred because plaintiffs cannot establish the primary liability necessary to assert a claim for control person liability.

## THIRTY-EIGHTH DEFENSE

558.    With regard to claims arising under Section 15 of the Securities Act of 1933, Section 20(a) of the Securities Exchange Act of 1934, and regulations promulgated thereunder, Defendants are not "controlling persons" within the meaning of Section 15, Section 20(a), or regulations promulgated thereunder; among other things, they had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the

controlled person is alleged to exist, they were not culpable participants in any alleged primary violation, and they acted in good faith and did not directly or indirectly induce the act or acts constituting the cause of action.

## THIRTY-NINTH DEFENSE

559.    Plaintiffs' and the putative class members' claims are barred by the applicable statutes of limitations and/or by the doctrine of laches, including, but not limited to, statutes of limitations applicable to claims arising under Sections 11, 12, and 15 of the Securities Act of 1933 and Sections 10 and 20 of the Securities Exchange Act of 1934.

## FORTIETH DEFENSE

560.    Plaintiffs' and the putative class members' claims are barred in whole or in part by the doctrines of ratification, inequitable conduct, estoppel, waiver and/or unclean hands.

## FORTY-FIRST DEFENSE

561.    To the extent that Plaintiffs and the members of the putative class purchased DISCS in the secondary market that are not traceable to the registration statements for the DISCS, they are not entitled to any recovery from the Defendants.

## FORTY-SECOND DEFENSE

562.    This action may not be maintained as a class action.

## FORTY-THIRD DEFENSE

563.    The putative Class Period is overbroad and, therefore, many of the putative class members are not entitled to any recovery.

## FORTY-FOURTH DEFENSE

564.    Defendants reserve the right to assert that plaintiffs do not fairly and adequately represent the interests of the putative class they purport to represent and have no standing to maintain the claims alleged by the putative class.

## FORTY-FIFTH DEFENSE

565.    Defendants hereby adopt and incorporate by reference any other defenses asserted or to be asserted by any of the other defendants to the extent that Defendants may share in such a defense.

## ADDITIONAL DEFENSES RESERVED

566.    Defendants hereby give notice that they may rely on other defenses if and when such defenses become known during the course of the litigation, and hereby reserve the right to amend their answer and to assert any additional defenses, cross-claims, counterclaims, and third-party claims as they become known or available.

**WHEREFORE,** Ambac Financial Group, Inc., Robert J. Genader, Sean T. Leonard, John W. Uhlein, III, David W. Wallis, Michael A. Callen, Jill M. Considine, W. Grant Gregory, Philip B. Lassiter, Thomas C. Theobald, Laura S. Unger, and Henry Wallace pray for relief and judgment:

A.    Determining that this action is not a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Denying plaintiffs the relief sought in the Complaint;

C.    Dismissing the Complaint with prejudice;

D.    Ordering that plaintiffs take nothing and that judgment be entered for Ambac Financial Group, Inc., Robert J. Genader, Sean T. Leonard, John W. Uhlein, III, David W. Wallis, Michael A. Callen, Jill M. Considine, W. Grant Gregory, Philip B. Lassiter, Thomas C. Theobald, Laura S. Unger, and Henry Wallace, and against plaintiffs;

E.    Awarding Ambac Financial Group, Inc., Robert J. Genader, Sean T. Leonard, John W. Uhlein, III, David W. Wallis, Michael A. Callen, Jill M. Considine, W. Grant Gregory, Philip B. Lassiter, Thomas C. Theobald, Laura S. Unger, and Henry Wallace costs and expenses, including counsel and expert fees; and

F.    Granting such other and further relief as the Court may deem just and proper.

Dated:  May 7, 2010                    Respectfully Submitted,

                                       Defendants AMBAC FINANCIAL GROUP, INC.,
                                       ROBERT J. GENADER, SEAN T. LEONARD,
                                       JOHN W. UHLEIN, III, DAVID W. WALLIS,
                                       MICHAEL A. CALLEN, JILL M. CONSIDINE, W.
                                       GRANT GREGORY, PHILIP B. LASSITER,
                                       THOMAS C. THEOBALD, LAURA S. UNGER, and
                                       HENRY WALLACE


                                       By:  /s/  Peter C. Hein
                                             (one of their attorneys)

                                       Peter C. Hein (pchein@wlrk.com)
                                       Warren R. Stern (wrstern@wlrk.com)
                                       C. Lee Wilson (clwilson@wlrk.com)
                                       WACHTELL, LIPTON, ROSEN & KATZ
                                       51 West 52nd Street
                                       New York, NY  10019
                                       Tel:  (212) 403-1000
                                       Fax:  (212) 403-2000

                                       *Attorneys for Ambac Financial Group, Inc., Robert J.
                                       Genader, Sean T. Leonard, John W. Uhlein, III, David
                                       W. Wallis, Michael A. Callen, Jill M. Considine, W.
                                       Grant Gregory, Philip B. Lassiter, Thomas C.
                                       Theobald, Laura S. Unger, and Henry Wallace*