UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE AMBAC FINANCIAL GROUP, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 08 Civ. 411 (NRB)<br><br>ECF Case |

**NOTICE OF RECENT DECISION**

PLEASE TAKE NOTICE that on September 23, 2011, the United States Bankruptcy Court for the Southern District of New York issued a "Bench Decision Approving Settlement Stipulation and Insurer Agreement," which is attached hereto as Exhibit A, and designated the decision for publication.  As per footnote 1 of the attached decision, this decision was previously dictated on the record at the hearing held in the Bankruptcy Court on September 12, 2011.  The attached, for-publication version has been modified from the prior, dictated version "to include full citations and defined terms, and reflects minor additional non-substantive modifications."  *Id.*  A prior version of the attached decision was previously submitted to this Court as Exhibit 1 to the Declaration of Steven Singer, filed on September 21, 2011 (Docket No. 136).

Dated:  New York, New York
         September 23, 2011

WACHTELL, LIPTON, ROSEN & KATZ

By      /s/  Peter C. Hein
        Peter C. Hein (pchein@wlrk.com)
        Warren R. Stern (wrstern@wlrk.com)
        C. Lee Wilson (clwilson@wlrk.com)

51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for Ambac and Individual Defendants*

# Exhibit A

<u>**FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

In re:                                            Chapter 11

Ambac Financial Group, Inc.,                      Case No. 10-15973 (SCC)

                Debtor.

---------------------------------------------------------------x

**BENCH DECISION APPROVING SETTLEMENT STIPULATION
AND INSURER AGREEMENT[1]**

A P P E A R A N C E S:

DEWEY & LeBOEUF LLP
*Attorneys for the Debtor*
1301 Avenue of the Americas
New York, NY 10019
By: Peter A. Ivanick, Esq.
     Richard W. Reinthaler, Esq.

One Embarcadero Center, Suite 400
San Francisco, CA 94111
By: Bennett G. Young, Esq.

WACHTELL, LIPTON, ROSEN & KATZ
*Co-Counsel for the Debtor*
51 West 52nd Street
New York, NY 10019
By: Peter C. Hein, Esq.
     Christopher Lee Wilson, Esq.

---

[1] This decision was dictated on the record of the hearing held on September 12, 2011. It has been modified to include full citations and defined terms, and reflects minor additional non-substantive modifications. The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

1

MORRISON & FOERSTER LLP
*Attorneys for the Official Committee of Unsecured Creditors*
1290 Avenue of the Americas
New York, NY 10104
By: Anthony Princi, Esq.
    Jamie A. Levitt, Esq.
    Renee L. Freimuth, Esq.

KOHN SWIFT & GRAF, PC
*Attorneys for Police and Fire Retirement System of the City of Detroit*
One South Broad Street, Suite 2100
Philadelphia, PA 19107
By: Denis F. Sheils, Esq.
    Barbara L. Moyer, Esq.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
*Attorneys for Police and Fire Retirement System of the City of Detroit*
270 Madison Avenue
New York, NY 10016
By: Gregory M. Nespole, Esq.
    Demet Basar, Esq.
    Malcom T. Brown, Esq.

LOWENSTEIN SANDLER PC
*Attorneys for Lead Plaintiffs and the Class in the Securities Litigation*
1251 Avenue of the Americas, 18th Floor
New York, NY 10020
By: Michael S. Etkin, Esq.

Before the Court is the Amended Order, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 (A) Approving the Settlement Stipulation and the Insurer Agreement and (B) Approving Ambac's Entry into the Settlement Stipulation and the Insurer Agreement and Performance of all of its Obligations Thereunder. The Court assumes familiarity with the background and history of the Ambac chapter 11 proceedings, as well as that of the Securities Litigation and Derivative Actions which are the subject of the proposed settlement.

**Procedural Background**

On June 28, 2011, Ambac Financial Group, Inc. (the "Debtor" or "Ambac") filed a motion (the "9019 Motion") seeking approval of its entry into the Settlement Stipulation and

Insurer Agreement. No objections were filed to the 9019 Motion, nor were any objections raised at the hearing held on July 19, 2011. After the hearing, the Court entered an order approving Ambac's entry into the Settlement Stipulation and the Insurer Agreement.

The Debtor subsequently informed the Court that the plaintiffs in the Derivative Actions[2] had not been served with the 9019 Motion. On July 25, 2011, the Debtor filed a notice of presentment of the Amended Order approving Ambac's entry into the Settlement Stipulation and the Insurer Agreement, which notice set an objection deadline of July 28, 2011. After objections to the Amended Order were received, the Court set August 10, 2011 as a hearing date on the Amended Order.

At the August 10 hearing, counsel for certain of the plaintiffs in the Derivative Actions appeared, pressed their objections, and requested that they be afforded an opportunity to conduct discovery and present evidence as to why the Settlement Stipulation and Insurer Agreement should not be approved over their objection. It bears noting that, prior to their filing objections to the entry of the Amended Order on July 27, 2011, none of the plaintiffs in the Derivative Actions had appeared or filed anything in this chapter 11 case, which has been pending since November 8, 2010; indeed, as of the date of this decision, no plaintiff has sought leave to pursue the Derivative Actions on behalf of the Ambac estate.

In response to the Derivative Plaintiffs' request, the Court set September 8 as the date for a third and final hearing on the Settlement Stipulation and Insurer Agreement in order to allow the parties a month's time to conduct limited discovery and file additional submissions. An evidentiary hearing on the Amended Order was held on September 8 and 9, 2011.

---

[2] In re Ambac Financial Group, Inc. Shareholders Derivative Litigation, C.A. No. 3521-VCL (Del. Ch.) (the "Delaware Derivative Action"), In re Ambac Financial Group, Inc. Derivative Litigation, Case No. 08 Civ. 854 (SHS) (SDNY) (the "New York Derivative Action," and, together, the "Derivative Actions").

Of the filed objections, only the objections filed by (i) the Police and Fire Retirement System of the City of Detroit ("PFRS"), plaintiff in the Delaware Derivative Action, and (ii) Catherine Rubery, a plaintiff in the New York Derivative Action (together, the "Derivative Plaintiffs"), remain unresolved. These objectors request that the Court vacate its July 19 order and reject the Amended Order to the extent that it releases and bars shareholder derivative claims. PFRS also purports to seek this Court's authorization to pursue these derivative claims on behalf of the Debtor, but it has not filed a proper motion requesting standing. The Derivative Plaintiffs have raised both procedural and substantive objections to the entry of the Amended Order.

On August 9, the Debtor filed a reply to the objections, which reply was joined by both the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the lead plaintiffs in the Securities Litigation.[3] After the hearing on August 10, each of the parties filed supplemental pleadings. On September 6, the Debtor filed its Supplemental Brief in Support of the Amended Order, which was accompanied by the Declaration of Stephen M. Ksenak, Senior Managing Director and General Counsel of the Debtor. PFRS filed a Pre-Hearing Memorandum in Further Support of its objection, which was accompanied by the Expert Report of Lawrence A. Weiss. At the hearing held on September 8, 2011, Mr. Ksenak testified, and Dr. Weiss testified at the continuation of the hearing on September 9, 2011.

**The Procedural Objections**

I begin with the procedural objections, which relate primarily to the lack of notice of the Debtor's 9019 Motion given to the Derivative Plaintiffs. Notwithstanding the fact that it is unclear whether (i) the failure to provide notice to these parties was inadvertent or (ii) the Debtor

---

[3] In re Ambac Fin. Group, Inc. Sec. Litig., No. 08-cv-411-NRB (SDNY) (consolidated) (the "Securities Litigation").

4

was required to give such notice, the Court overrules the procedural objections. The Derivative Plaintiffs have conceded that, regardless of what happened prior to the July 19 hearing, they received actual notice of this Court's entry of the order granting the 9019 Motion on July 20, 2011. July 20 was 21 days prior to the August 10 hearing and some 50 days prior to the September 8 hearing. Whatever deficiencies may have existed with respect to notice have been cured, and the Derivative Plaintiffs have now agreed that they have been afforded an opportunity to object and be heard on the merits. Accordingly, it is unnecessary for the Court to determine whether notice was actually required to be given to the Derivative Plaintiffs pursuant to this Court's Amended Case Management Order or otherwise.

**The Substantive Objections**

With respect to the substantive objections asserted by the Derivative Plaintiffs, the Court finds that, upon commencement of the Debtor's chapter 11 case, the derivative claims which are the subject of the Derivative Actions became property of the Debtor's estate. See, e.g., iXL Enters., Inc. v. GE Capital Corp., 167 F. App'x 824, 826 (2d Cir. 2006) (citations omitted). The Debtor has the sole authority to prosecute such claims or to seek Court approval to settle them pursuant to Bankruptcy Rule 9019. As the Second Circuit noted in Smart World Technologies, LLC v. Juno Online Servs., Inc., 423 F.3d 166, 175 (2d Cir. 2005), while authority to pursue a Rule 9019 motion may, in certain rare circumstances, be vested in parties to the bankruptcy proceeding other than the debtor, Rule 9019 primarily vests authority to settle or compromise solely in the Debtor. Based on the facts before me, I find that the Debtor and its Board (with the support of the Creditors' Committee) have appropriately valued the merits of the securities action and the derivative claims encompassed in the settlement, and I am unable to find the

5

presence of rare circumstances which would make derivative standing appropriate here for the Derivative Plaintiffs.

For the reasons set forth below, moreover, the Derivative Plaintiffs' standing as parties in interest in the bankruptcy sense is tenuous at best given the absence of any evidence that the Derivative Plaintiffs have any economic stake in the outcome of this chapter 11 case, inasmuch as there exists at least $1.7 billion of general unsecured debt ahead of them in the capital structure which would have first claim on the proceeds of any settlement of claims belonging to the estate. Nonetheless, the Court has fully considered the objections on the merits and overrules them for the following reasons.

**Applicable Law**

I note, as I did at each of the hearings on the proposed Rule 9019 settlement, that the decision to accept or reject a compromise or settlement is within the sound discretion of the bankruptcy court under Bankruptcy Rule 9019,[4] and that here in the Southern District of New York we apply the Iridium factors in evaluating a proposed settlement. Those factors are as follows:

(1) the balance between the litigation's possibility of success and the settlement's future benefits;
(2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay;
(3) the paramount interests of creditors;
(4) whether other parties in interest support the settlement;
(5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing the settlement;
(6) the nature and breadth of releases to be obtained by officers and directors; and
(7) the extent to which the settlement is the product of arm's length bargaining.

See Motorola, Inc v. Official Comm. Of Unsecured Creditors and JP Morgan Chase Bank, N.A. (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007).

---

[4] Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides, in pertinent part, that "[o]n motion by the [debtor] and after notice and a hearing, the court may approve a compromise or settlement."

Perhaps the best formulation of how the Court should approach the task of evaluating a settlement can be found in the Supreme Court's seminal decision in <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>:

> [The Court must] apprise [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

390 U.S. 414, 424-25 (1968). In determining whether to approve a proposed settlement, courts have held that a bankruptcy court need not "conduct a 'mini-trial' to determine the merits of the underlying litigation" or the numerous issues of law and fact raised by the dispute and resolved by the settlement. <u>In re Ashford Hotels, Ltd.</u>, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998). "[T]he court's responsibilities are to 'familiarize itself with all facts necessary for an intelligent and objective opinion, canvass the issues, and see whether the settlement falls below the lowest point in the range of reasonableness.'" <u>Id.</u> (citations omitted); <u>see also</u> <u>Norman v. Stein</u>, 464 F.2d 689, 693 (2d Cir. 1972). Having conducted a two-day evidentiary hearing on the proposed settlement and reviewed three rounds of submissions by the parties in connection with the three hearings that have been held on the proposed settlement, the Court believes it has discharged its obligation to familiarize itself with the facts relevant and necessary to its decision.

**Decision**

The Court will now address the merits of the objections of the Derivative Plaintiffs. With respect to the first <u>Iridium</u> factor, and consistent with the requirements of <u>SmartWorld</u>, the Debtor has made a substantial showing regarding its consideration of the merits of the claims proposed to be settled and the likelihood of success on those claims. In connection with this

7

evaluation, the Debtor determined that there exist high barriers to recovery under Delaware law on the theoretical claims against Ambac's officers and directors which are to be released as part of the proposed settlement. See In re Citigroup Inc. Shareholder Derivative Litigation, 964 A.2d 106 (Del. Ch. 2009). Only a finding of bad faith by the Debtor's directors could result in a monetary recovery to the estate, and the Debtor has concluded, after considering the extraordinary difficulty of proving bad faith on the part of a board which was composed of a majority of independent directors, that the derivative claims are of little to no value under controlling Delaware law. Among other things, the Debtor (through the testimony of Mr. Ksenak and substantial documentary evidence) has pointed to the extensive systems, policies, and controls which it had in place during the relevant period and has argued convincingly that they are more than applicable law requires to rebut a claim of bad faith, gross negligence, or failure to exercise oversight, claims which are asserted in the derivative actions. Specifically, for example, the Debtor demonstrated that its Forms 10-K for the years 2005 through 2007 each reflect Ambac's external auditor's determination that the controls in place at Ambac were adequate.

The level of transparency regarding its RMBS, CDO, and so-called CDO-squared exposures that was exhibited by Ambac during the relevant period also contradicts a conclusion of intentional wrongdoing or reckless concealment of information by Ambac's officers and directors. Ambac, like dozens of other financial institutions, as well as the United States itself, fell prey to the myriad complex macroeconomic forces and market conditions that led to the subprime financial crisis. As the Delaware Chancery Court stated in Citigroup, in words that are compellingly applicable here:

> Citigroup has suffered staggering losses, in part, as a result of the recent problems in the United States economy, particularly those in the subprime mortgage

>market. It is understandable that investors, and others, want to find someone to hold responsible for these losses, and it is often difficult to distinguish between a desire to blame *someone* and a desire to force those responsible to account for their wrongdoing. Our law, fortunately, provides guidance for precisely these situations in the form of doctrines governing the duties owed by officers and directors of Delaware corporations. This law has been refined over hundreds of years, which no doubt included many crises, and we must not let our desire to blame someone for our losses make us lose sight of the purpose of our law. Ultimately, the discretion granted directors and managers allows them to maximize shareholder value in the long term by taking risks without the debilitating fear that they will be held personally liable if the company experiences losses. This doctrine also means, however, that when the company suffers losses, shareholders may not be able to hold the directors personally liable.

In re Citigroup Inc. Shareholder Derivative Litigation, 964 A.2d at 139.

Ambac has also preliminarily established that the Derivative Plaintiffs' allegations regarding the sales of stock by Ambac officers and directors during the relevant period and the claims related to those allegations appear unlikely to have merit. At the September 8 hearing, Mr. Ksenak provided a plausible explanation for the timing of the stock sales by the defendant officers and directors and also provided documentary evidence that <u>purchases</u> of stock by such individuals continued both during and after the relevant time period. Further, unlike some companies, Ambac has not been required to restate any of its audited financial statements from the relevant time period. No government enforcement proceedings have been commenced against any Ambac director or officer relating to the 2006-2009 time period, nor have any such individuals been charged with insider trading or other criminal wrongdoing.

In arguing that the likelihood of success on the derivative claims and the magnitude of potential damages renders the release of those claims unfair, the Derivative Plaintiffs mistakenly equate what they view as Ambac's losses from its exposure to the CDO and CDO-squared market with any demonstration that the defendant officers and directors caused those losses; no such nexus has been established. Indeed, beyond pointing to the well-pled allegations of its

complaint and the largely irrelevant fact that the complaint in the Securities Litigation survived a motion to dismiss in the District Court, PFRS has entirely failed to address the issue of likelihood of success on the merits of the derivative claims.  Moreover, even assuming certain of these claims had merit, the Court is convinced that pursuing such claims would not result in a net benefit to the estate.  The Derivative Plaintiffs posit that "[o]ne would think that the estate would be better off in any situation in which it was able to obtain more than the cost of pursing [sic] the claims."  One would indeed, but it is the Debtor's (and the Creditors' Committee's) view that this is not such a situation.  The Court agrees.  Nothing in Iridium or other applicable case law requires a debtor to gamble with the estate's interest at the behest of an out-of-the-money party who has nothing to lose by a roll of the litigation dice.

The Derivative Plaintiffs further argue that because their proffered expert, Lawrence Weiss, estimates "damages" from the Derivative Actions to be in the range of $15.6 to $17.1 billion, the Court should not approve the proposed settlement; they have not, however, presented any evidence showing a likelihood of success in the Derivative Actions which would yield this extraordinary level of recovery or any level of monetary recovery which would establish that the Debtor's evaluation of the proposed settlement does not pass muster under the first prong of Iridium.

On cross-examination, Dr. Weiss admitted that he has never valued a public company, a bond insurer, or a financial guarantee company.  Dr. Weiss also confirmed that, in preparing his expert report, he performed no evaluation of the merits of the Derivative Actions, and that his estimated damages amount was merely calculated by comparing the current value of Ambac with the "hypothetical" value of what Ambac "might" be worth had it not guaranteed CDOs and CDO-squareds.  His testimony also revealed that, in calculating this hypothetical value, Dr.

10

Weiss relied on assumptions that did not take into account, among other things, the general recession affecting the United States, the effect of the loss of Ambac's and other bond insurers' AAA credit ratings, or the fact that the market for guarantees for non-CDO mortgage backed securities has suffered substantial losses and has primarily dried up at this time. Simply put, the assumptions on which Dr. Weiss's opinion are based are highly flawed and at odds with reality.

At best, Dr. Weiss's expert report and testimony must be viewed as a mechanical and legally irrelevant mathematical analysis of Ambac's balance sheet and the effect of its CDO and CDO-squared exposure; it speaks not at all to whether the defendants in the Derivative Actions can, as a matter of Delaware law, be held liable. While the Court is sympathetic to the Derivative Plaintiffs' understandable desire to blame someone for the staggering losses Ambac sustained, neither the strength of that desire nor the magnitude of the losses suffered equates to a demonstration of causation or legal liability.

The second Iridium factor — the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay — also favors the proposed settlement. It is without serious dispute that, in the absence of the proposed settlement, litigation of the Securities Litigation and the Derivative Actions could continue for several years, during which time such costs and delays would continue. The Debtor has demonstrated that (contrary to the assertions of PFRS) its estate is receiving value for the release of the derivative claims through the settlement by (i) avoiding the significant legal costs in the actions (approximately $20 million, according to Mr. Ksenak's testimony) which would well exceed the $2.5M that the Debtor will pay in connection with the settlement and (ii) enabling the Debtor's management to continue to work toward the Debtor's reorganization instead of focusing their attention on litigation-related

activities which could delay such reorganization and cause the Debtor to, among other things, incur substantial administrative expenses.

In considering the third Iridium factor — the paramount interests of creditors — the Court concludes that the support of the Creditors' Committee here weighs heavily in favor of approval of the proposed settlement. The Debtor's over $1.7 billion in unsecured creditors have spoken: they support the settlement. These unsecured creditors stand ahead of the Derivative Plaintiffs in the Debtor's capital structure, and, under the absolute priority rule, they are the constituency which would stand to benefit from any recovery in the Derivative Actions brought on behalf of the Debtor, not the structurally subordinated Derivative Plaintiffs who are not currently slated to receive any distribution from the Debtor's estate. Stated differently, even if the Derivative Actions could be successfully litigated to judgment or a more lucrative settlement, an amount in excess of $1.7 billion would have to be recovered from the insurers and the individual defendants in order for the Derivative Plaintiffs to receive any potential recovery. Based on the information disclosed on a confidential basis to the Court regarding the insurance coverage available to the Ambac director and officer defendants, while some additional coverage does exist beyond the $24.6 million proposed to be paid in connection with the Settlement Stipulation and Insurer Agreement, the amount of available coverage does not nearly reach beyond the amount of the unsecured claims against the Debtor. The fact that there may be additional available insurance coverage (or, as the Derivative Plaintiffs have speculated, some other assets flowing to the Debtor's estate from non-debtors or other litigation recoveries) is not relevant to the Court's determination pursuant to Bankruptcy Rule 9019 as to the reasonableness of the proposed settlement.

In addition, it is abundantly clear that if there was any possibility of a more lucrative settlement of the Securities Litigation and/or the Derivative Actions, the Creditors' Committee, after performing its own independent analysis, would have objected to the settlement proposed by the Debtor.  Despite repeated requests by the Court to do so, the Derivative Plaintiffs have not put forth any theory as to why the Creditors' Committee would ignore the possibility of any reasonable settlement which would be more favorable to their constituency.  Notwithstanding the Derivative Plaintiffs' arguments and observations about the possible conflicting interests of the Debtor's Board members and their counsel, I find that the Creditors' Committee serves as a very reliable check on the business judgment of the Debtor, and I place far greater weight on the Committee's support for the settlement than the views of the Derivative Plaintiffs who have nothing at stake in terms of potential recovery in the bankruptcy case.  There is absolutely no evidence in the record that the Creditors' Committee's determination is in any way tainted; its support for the proposed settlement is dispositive of both the third and fourth Iridium factors.

Regarding the sixth Iridium factor — the nature and breadth of releases to be obtained by officers and directors — the Debtor has established that it has determined, in the exercise of its business judgment, that the injunctions and releases being given through the proposed settlement are appropriate in nature and scope and that the settlement would not be achievable without such provisions.  The Debtor submits that the settling parties have conditioned the effectiveness of the settlement upon the Court's approval of the release and injunction provisions and that the D&O insurers are unwilling to pay their portion of the settlement amount absent such approval.  The Creditors' Committee has also conducted its own independent analysis of these provisions and supports them as a component of the overall settlement.  I note that the releases and injunctions are one integral aspect of a multi-faceted settlement, and I find no reason to disagree with the

13

Debtor's business judgment in evaluating the appropriateness of such releases and injunctions in connection with the overall settlement.

The Court concludes that the seventh Iridium factor — the extent to which the settlement is the product of arm's length bargaining — has indisputably been met. There has been no evidence presented that the settlement, achieved through numerous mediation sessions taking place under the watchful eye of retired District Judge Nicholas Politan over the course of more than one year, was the result of anything other than arm's length negotiating. The involvement of the Creditors' Committee as an independent fiduciary and its support for the settlement also supports my finding in this regard. The fact that the Derivative Plaintiffs did not participate in the mediation sessions or settlement discussions does not alter this conclusion.

After considering the evidence presented, I am satisfied that the proposed settlement passes muster under the Iridium factors and falls well above the lowest point in the range of reasonableness. The Court finds that the Debtor has made a reasonable business judgment that, among other things, the claims asserted in the Derivative Actions lack merit, and that, even if those claims did have merit, the Debtor has exercised sound business judgment in determining that such claims are not worth pursuing and that the settlement is fair and equitable and in the best interest of the estate.

Finally, there is no merit to the Derivative Plaintiffs' argument that under the Supreme Court's recent decision in Stern v. Marshall, 131 S. Ct. 2594 (2011), I should "abstain" from deciding the claims at issue in the Derivative Actions. The Debtor is not asking this Court to hear and adjudicate these claims. As the Debtor accurately observed in its Supplemental Brief,

> This argument results from a misreading of Stern v. Marshall. That case has nothing to do with the Court's in rem jurisdiction to administer property of the estate. The 'narrow' issue in Stern was whether a bankruptcy court had subject matter jurisdiction to *hear and finally resolve* a debtor's counterclaim against a

14

>third party. See Stern v. Marshall, 131 S. Ct. 2594. Here, the Debtor does not seek to try the Derivative Actions in the bankruptcy court. Instead, the Debtor seeks this Court's approval of its disposition of the claims at issue in the Derivative Actions, assets which are property of the Debtor's estate.

See Debtor's Supplemental Brief [Docket No. 548] at ¶ 27; see also Safety Harbor Resort & Spa, 2011 Bankr. LEXIS 3238, *2-3 (M.D. Fla. 2011) (discussing narrow scope of Stern). This is the correct view of Stern v. Marshall and of the Court's jurisdiction and constitutional authority in this case. Unfortunately, Stern v. Marshall has become the mantra of every litigant who, for strategic or tactical reasons, would rather litigate somewhere other than the bankruptcy court. Whatever Stern v. Marshall may ultimately be held to mean, this Court is confident that, as a matter of law and practice, it most certainly does not stand for the proposition that the bankruptcy court cannot approve the compromise and settlement of a claim which is indisputably property of a debtor's estate.

For these reasons and based on the entirety of the record of the hearings held on (i) July 19, 2011, (ii) August 10, 2011, and (iii) September 8 and 9, 2011, the Court overrules the Derivative Plaintiffs' objections and will enter the Amended Order.[5]

Dated: September 23, 2011
New York, New York

*/s/ Shelley C. Chapman*
United States Bankruptcy Judge

---

[5] On September 13, 2011, the Court entered the Amended Order [Docket No. 558].

15